## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| John Velez, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| City of Chicago; Chicago Police Officers | ) | Case No. 18-cv-8144 |
| Michael R. Bocardo, Michael Dyra, John A. | ) | Honorable Marvin E. Aspen |
| Cruz, Sam Cirone, Patrick O'Donovan, | ) | |
| Kriston Kato, Bradul A. Ortiz, Michael J. | ) | JURY TRIAL DEMANDED |
| Walsh, Victor M. Perez, D. Wolverton | ) | |
| (#20014), J. Botwinski (#20392), A. | ) | |
| Jaglowski (#20196), Sgt. D. Walsh, John | ) | |
| Farrell, and Unknown Officers; Cook County | ) | |
| Sheriff's Department Detectives James Davis | ) | |
| and John Sullivan and Unknown Sheriff's | ) | |
| Department Officers; Sheriff of Cook County | ) | |
| Thomas J. Dart, Cook County Assistant | ) | |
| State's Attorney Megan Goldish; and Cook | ) | |
| County, | ) | |
| | | |
| Defendants. | | |

## SECOND AMENDED COMPLAINT

Plaintiff John Velez, by his attorneys, Loevy & Loevy and the Law Office of Jennifer

Blagg, complains of Defendants City of Chicago; Chicago Police Officers Michael R. Bocardo,

Michael Dyra, John A. Cruz, Sam Cirone, Patrick O'Donovan, Kriston Kato, Bradul A. Ortiz,

Michael J. Walsh, Victor M. Perez, D. Wolverton (#20014), J. Botwinski (#20392), A. Jaglowski

(#20196), Sgt. D. Walsh, John Farrell, , and Unknown Officers; Cook County Sheriff's

Department Detectives James Davis and John Sullivan and Unknown Sheriff's Department

Officers; Sheriff of Cook County Thomas J. Dart, Cook County Assistant State's Attorney

Megan Goldish; and Cook County, as follows:

### Introduction

1.     Plaintiff John Velez was wrongly convicted of the 2001 murder of Anthony Hueneca and spent sixteen years unjustly imprisoned, starting at age 17, before he was exonerated.

2.     Mr. Velez's wrongful conviction was caused by the Defendants, who concocted a false story that Mr. Velez had killed Hueneca in an "anniversary killing" of the death of his uncle.

3.     Defendants' wrongful case against Mr. Velez was built entirely on false and coerced witness statements.  No physical or forensic evidence of any kind connected Mr. Velez to the murder.

4.     To perfect their plan to frame Plaintiff, Defendants coerced Mr. Velez's pregnant girlfriend, Christina Izquierdo, into signing a statement that tracked Defendants' fabricated "anniversary killing" story. Their plot was successful. Due to Defendants' foul play, Mr. Velez was convicted of murder and sentenced to 80 years in prison.

5.     Never giving up on proving his innocence, Mr. Velez worked tirelessly to show that he had absolutely nothing to do with this crime.

6.     After newly-discovered evidence exposed the Defendants' "anniversary killing" theory as demonstrably false, the State took the extraordinary step of agreeing to vacate Plaintiff's conviction in December 2017.

7.     Plaintiff was finally cleared of the murder charge after over sixteen years wrongfully behind bars. This lawsuit seeks redress for his injuries.

**Jurisdiction and Venue**

8.     This action is brought pursuant to 42 U.S.C. § 1983 to redress Defendants' deprivation of Plaintiff's rights secured by the U.S. Constitution.

9.      This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367.

10.      Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district, the majority of the Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

**Parties**

11.      Plaintiff John Velez is a 36 year old father of a 17 year old daughter. During his wrongful incarceration of sixteen years, Mr. Velez earned a second GED and worked inmate jobs in the commissary, as a maintenance technician, and as a warehouse manager.

12.      Defendant City of Chicago is an Illinois municipal corporation and is and/or was the employer of each of the Defendant Officers.  The City of Chicago is liable for the acts of the Defendant Officers, which were undertaken within the scope of their employment for the City.

13.      At all times relevant hereto, Defendants Michael R. Bocardo, Michael Dyra, John A. Cruz, Sam Cirone, Patrick O'Donovan, Kriston Kato, Bradul A. Ortiz, Michael J. Walsh, Victor M. Perez, D. Wolverton (#20014), J. Botwinski (#20392), A. Jaglowski (#20196), Sgt. D. Walsh, John Farrell, and other unknown law enforcement officers (collectively, the "Defendant City Police Officers") were police officers in the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago. The supervisory defendants facilitated, condoned and approved the constitutional violations committed by their subordinates.Defendant Sheriff of Cook County Thomas J. Dart, in his official capacity, is the Chief Law Enforcement Officer in Cook

County. Under the provisions of the Illinois State Constitution and Illinois law, the Sheriff is responsible for overseeing and operating the Cook County Sheriff's Department  Defendant Sheriff of Cook County Thomas J. Dart is liable for the acts of the Defendants Davis and Sullivan, which were undertaken within the scope of their employment for the Cook County Sheriff.

14.     At all times relevant hereto, Defendants James Davis and John Sullivan and other unknown law enforcement officers (collectively, the "Defendant County Police Officers") were police officers in the Cook County Sheriff's Department acting under color of law and within the scope of their employment for the Cook County Sheriff. The supervisory defendants facilitated, condoned and approved the constitutional violations committed by their subordinates. Defendant City Police Officers and Defendant County Police Officers are referred to, collectively, as the "Defendant Officers."

15.     At all relevant times, Megan Goldish was an Assistant Cook County State's Attorney acting under color of law and within the scope of her authority. Goldish conspired with the Defendant Officers, prior to the existence of probable cause to believe Plaintiff had committed a crime, and while acting in an investigatory capacity, to fabricate evidence, manipulate witness testimony, maliciously prosecute Plaintiff, and detain him without probable cause for Hueneca's murder.

16.     Defendant Cook County is a governmental entity within the State of Illinois and includes as components its Cook County State's Attorney's Office and Cook County Sheriff's Police Department. Defendant Cook County employed Defendants Goldish, Sullivan, and Davis at all relevant times. Defendant Cook County is a necessary party to this lawsuit.

**The Crime**

4

17.     In the early morning hours of March 19, 2001, 26-year-old Anthony Hueneca was tragically shot and killed while walking down the street in the Pilsen neighborhood of Chicago.

18.     Prior to the shooting, four friends—Micaela Gutierrez, Apolinar Mejia, Lorena Ricardo, and Gustavo Rivera—stopped nearby at a house located in Latin Kings territory.

19.     Rivera went inside the house while Gutierrez, Mejia, and Ricardo waited in the car.

20.     The street was poorly lit—the lamp on the street was not operational and the closest operational light was far away.

21.     As Gutierrez, Mejia and Ricardo waited in the car, a man wearing a dark-blue, hooded sweatshirt with his hood drawn over his head approached the car, pointed a semi-automatic gun at them and told them to "get ready to die."

22.     Rather than shoot, however, the man said, "King killer, Queen killer, SD love," and left. "SD love" referred to a rival street gang, the Satan Disciples.

23.     Gutierrez, Mejia and Ricardo then drove away. While they were driving away, they heard gunshots and saw men wearing dark-blue, hooded sweatshirts run down the street.

24.     Mejia then drove back to the area, because he worried that Rivera had been shot.

25.     Meanwhile, Rivera heard the gunshots while he was inside the house. He ran out of the house to see who had been shot, and found Hueneca lying on the ground.

26.     When Defendant City Police Officers responded to the scene, they spoke with witnesses including Ricardo, who told police that she had seen three to four Hispanic males in dark clothing running away from the scene, but she could not identify them. No one at the scene could provide any further description of the offenders.

**City Police Officer Defendants' Frame Up**

5

27.     After meeting with witnesses and conducting a canvas, the Defendant City Police Officers had no suspect and no witness who could describe the perpetrator, so they decided to pin the murder on someone.

28.     Defendant City Police Officers selected as their scapegoat Mr. Velez, who happened to be at the police station at the same time that Defendant City Police Officers brought Rivera, Ricardo, Gutierrez, and Mejia to Area 4 police station for questioning the night of the Hueneca murder.

29.     Mr. Velez was not present at the scene of the Hueneca shooting and knew absolutely nothing about it. He was at the police station to assist a friend.

30.     While waiting at the station, Mr. Velez was approached by Defendant Bocardo, who questioned him about another crime that Mr. Velez had witnessed. Defendant Bocardo wanted Mr. Velez to identify the perpetrator. Mr. Velez truthfully told Defendant Bocardo he did not know who committed the crime. Defendant Bocardo, wrongly believing that Mr. Velez was withholding information, sought revenge.

31.     Defendant City Police Officers, led by Defendant Detective Bocardo, a self-described "gang specialist," concocted a false story implicating Mr. Velez in the Hueneca shooting.

32.     Defendant City Police Officers' theory was that Mr. Velez was a Satan Discipline who had killed Hueneca as part of an "anniversary killing" on March 19, 2001, to honor the anniversary of the murder of his uncle, Gent Velez, who was killed on March 23, 2000. According to Defendants, Gent Velez, too, was a Satan Disciple, and Hueneca's shooting arose from on-going gang war between the Latin Kings (Hueneca's gang), and the Satan Disciples.

33.     This story was entirely false. Furthermore, neither Mr. Velez nor his uncle was a Satan Disciple. In fact, the Defendant City Police Officers knew that Mr. Velez's uncle was a member of an entirely different street gang, the Almighty Ambrose gang.

### The Coerced Identifications

34.     Without any reason of any kind to believe that Mr. Velez had any involvement in the Hueneca murder, but with animosity towards Mr. Velez as a suspected gang member, Defendant Bocardo obtained a photograph of Mr. Velez and showed it to Mejia while questioning him about the Hueneca shooting.

35.     Defendant Bocardo then indicated to Mejia that Velez was the perpetrator of the Hueneca murder, showing him the photo of Velez, despite knowing that Mejia did not get a sufficient look at the man with the gun at the car to describe him in any way, let alone identify him.

36.     Defendant Bocardo's presentation of Velez's photograph in that manner was the equivalent of a single photograph show-up and was unduly suggestive. Due to Defendant Bocardo's suggestive tactic, Mejia falsely identified Mr. Velez as the man who threatened her and the others in the car before the Hueneca shooting.

37.     Next, one or more of the Defendant City Police Officers pressured Rivera, too, to falsely identify Mr. Velez as the shooter. Defendant City Police Officers promised Rivera that they would "help him out" with a recent conviction if he "cooperated" with them, or words to that effect, by falsely identifying Velez.

38.     After pressure and promises exerted on him by the Defendant City Police Officers, Rivera gave a false statement containing facts fed to him by Defendants. Rivera falsely claimed that he when he came out of the house, he saw Mr. Velez wearing a dark-blue, hooded

sweatshirt and following Hueneca. Rivera further falsely claimed that after he heard two shots fired, he again saw Velez, this time running away as Hueneca lay on the ground. In fact, Rivera had been inside the house during the shooting and had not seen the shooter at any time.

39.     One or more of the Defendant City Police Officers then went to Ricardo and Gutierrez's houses with a photo array that included the photograph of Mr. Velez taken by Defendant Bocardo. Defendants manipulated and coerced the witnesses into falsely identifying Velez as the man who threatened them before the shooting.

40.     Defendants suppressed or destroyed any evidence that they had coerced these witnesses into implicating Mr. Velez in the Hueneca shooting.

**Mr. Velez's Arrest**

41.     On March 25, 2001, Defendant City Police Officers arrested then seventeen year-old Mr. Velez and took him into custody solely on the basis of the coerced and fabricated witness identifications. Mr. Velez truthfully denied any involvement in the shooting.

42.     At the time of the shooting, Mr. Velez was at his cousin's house doing laundry, as he told Defendant City Police Officers when he was questioned. Defendants never bothered to investigate Mr. Velez's alibi witnesses.

43.     Mr. Velez's cousin, Alexis Robles, corroborates his account. She testified that Mr. Velez was dropped off at her house on the night of March 18, and she and Mr. Velez stayed up washing clothes and socializing, with Mr. Velez spending the night at her house.

**Defendants Coerce Christina Izquierdo**

44.     Defendant City Police Officers needed more to support their purported "anniversary killing" motive for the murder. They brought Defendant County Police Officers and Defendant ASA Meghan Goldish in on the conspiracy.

45. Together, Defendants coerced Mr. Velez's girlfriend, Christina Izquierdo, into falsely implicating Mr. Velez in the Hueneca shooting.

46. Defendant County Police Officers had encountered Izquierdo days earlier when they were investigating a shooting at a cemetery in which Izquierdo had been shot in the back. They interviewed Izquierdo at the hospital while she was being treated for a gunshot wound, and found out she was Velez's girlfriend and also five months pregnant with Velez's child.

47. Based on this encounter, on March 26, 2001 Defendant County Police Officers picked Izquierdo up from her home and brought her to Area 4 detective headquarters for questioning. Defendants fabricated evidence that Velez had purportedly confessed to Izquierdo while in front of the Defendant County Police Officers that he had committed the Hueneca homicide.

48. Defendants kept Izquierdo in a locked room by herself for approximately eight hours and denied her request for an attorney. Defendants had no justification for holding Izquierdo at the police station.

49. Defendants interrogated Izquierdo about the murder. She told them truthfully that she knew nothing about the murder, and certainly nothing about Mr. Velez's involvement in it.

50. Undeterred, Defendants coerced Izquierdo into falsely implicating Mr. Velez in the crime, including by threatening to take Izquierdo's daughter away from her and telling her she could only leave the police station if she signed a statement implicating Mr. Velez.

51. Defendant Goldish then prepared a fabricated statement that tracked the "anniversary killing" story made up by the City Police Defendants and bolstered by fabrications by the County Police Defendants. Defendant Goldish knew the "anniversary killing" story was

false, as well as the purported identifications by Mejia, Gutierrez, Ricardo, and Rivera used to buttress the false account.

52.     In the alternative, the scheme was perpetrated solely by the Defendant Officers, who concealed it from Defendant Goldish and the prosecution.

53.     According to the false statement, Izquierdo alleged that on March 21, 2001, she went to the cemetery to visit Mr. Velez's uncle, who had died a year earlier. Izquierdo supposedly was standing at the gravesite when she was shot. Izquierdo was taken to the hospital, where Velez purportedly confessed that he was to blame for the gravesite shooting because he had shot a Latin King the prior Sunday. Velez said that he shot the man because the Latin Kings had killed his uncle.

54.     This story was false. Izquierdo was at the cemetery when she had been shot, but she had been there to visit the grave of an acquaintance on his birthday. She was not there to visit Velez's uncle, whose grave was located on the opposite side of the cemetery and unmarked. Furthermore, Velez never confessed to her at the hospital, or any time, that he was involved in any way in the Hueneca shooting. Moreover, neither Mr. Velez nor his uncle was a Satan Disciple.

55.     Defendants suppressed or destroyed any evidence that they had coerced Izquierdo into implicating Mr. Velez.

**Defendants City Police Officers and ASA Goldish Coerce Rivera to Falsely Claim to Have Witnessed the Murder**

56.     While one or more of the Defendants was interrogating Izquierdo, one or more other City Police Defendants picked up Ricardo, Rivera, Gutierrez, and Mejia and brought them back to the station to view in-person lineups that included Mr. Velez.

57.     City Police Defendants continued to manipulate and coerce these witnesses into falsely identifying Mr. Velez. Due to City Police Defendants' misconduct, Ricardo, Gutierrez and Mejia falsely identified Velez as the man who threatened to kill them before Hueneca was shot.

58.     The misconduct continued with Rivera. As mentioned earlier, City Police Defendants had induced Rivera to falsely claim to have not only been an eyewitness to the murder, but have seen Velez supposedly approach Hueneca right before he was killed and leaving the site of his body right after the murder.

59.     Knowing they had elicited a bogus account unlikely to stand up over time, City Police Defendants proceeded to try to "lock in" Rivera to his story by having Defendant Goldish take a handwritten statement from him that contained his false story.

60.     City Police Defendants and Defendant Goldish suppressed or destroyed any evidence that they had coerced Rivera into writing a statement that implicated Mr. Velez, including their documentation of his initial report that he had not witnessed the murder.

61.     Due to the false identifications procured by Defendants, Defendants were able to charge Mr. Velez with first-degree murder of Hueneca.

**Defendant Officers Withhold Exculpatory Evidence**

62.     Through the actions above and others, Defendant Officers also produced a series of false and fraudulent police reports and related memoranda, fabricated evidence, unduly suggestive witness identification procedures, and manufactured witness statements, which they inserted into their case file. These documents, which were used to show Plaintiff's purported connection to the crime, contained statements and described events that were fabricated and that the Defendant Officers knew to be false. Defendant Officers prepared and signed off on these

reports, both as investigators and as supervisors, despite their knowledge that the information contained in those reports was entirely false. Simultaneously, the Defendant Officers withheld from the prosecution and Mr. Velez's defense documentation that would exculpate Mr. Velez, including documentation of their suggestive witness identification procedures, their coercive tactics, and exculpatory police reports and witness statements.

63.     Defendant Officers concealed the misconduct described above from Plaintiff and his criminal defense attorneys.

64.     The Defendant Officers' misconduct includes that of the supervisors, who knew full well of Defendants' misconduct and their fabrication of a case against Plaintiff. These supervisors nevertheless intentionally ignored and approved Defendants' misconduct, and decided to make Plaintiff responsible for a crime he did not commit, rather than directing the officers to go out and find the person who had shot Hueneca.

### Plaintiff's Conviction

65.     Mr. Velez's trial for first degree murder began on October 7, 2002.

66.     No physical evidence was presented linking Mr. Velez to the scene of the shooting, and there were no witness accounts—aside from the false procured ones—that placed him at the scene.

67.     Mejia, Ricardo, Gutierrez, Rivera and Izquierdo all testified at Mr. Velez's criminal trial and presented the only evidence suggesting Velez's guilt.

68.     Freed from the police station, Izquierdo recanted her inculpatory statement, explaining that the statement was a lie that had been coerced by the police. Despite her recantation, the statement was nevertheless read into evidence.

69.     After two hours of deliberations, the jury sent a note that they had reached an

impasse. After the court instructed the jury to keep deliberating, the jury asked to see Rivera's handwritten statement and trial testimony; his was the only eyewitness claiming that Mr. Velez had committed the crime.

70.     On October 15, 2002, based on Defendants' fabricated evidence, John Velez was wrongfully convicted of murder.

71.     Mr. Velez was sentenced to 80 years in prison for the crime.

72.     Absent Defendants' misconduct, Plaintiff would never have been prosecuted for or convicted of Hueneca's murder.

**Plaintiff's Exoneration**

73.     Plaintiff never stopped fighting to prove his innocence.

74.     In 2016, Plaintiff's perseverance paid off. Mr. Velez learned that Rivera had admitted that he did not witness the shooting, and had not seen Velez the night of the shooting. Rivera stated that the only reason he identified Velez was because police told him if he cooperated the State would "help him out" with his drug conviction.

75.     Armed with Rivera's recantation, Plaintiff brought his case to court. After conducting a thorough and independent investigation into Plaintiff's claims, the State took the extraordinary step of itself moving to vacate Mr. Velez's conviction.

76.     On December 11, 2017, after Mr. Velez had spent more than sixteen years in prison, the court granted the State's request and Plaintiff walked free for the first time in over sixteen years.

**Plaintiff's Devastating Injuries**

77.     Entering prison at 17 years old for a crime he did not commit, Plaintiff suffered immensely. He was wrongfully incarcerated for almost as long as he had lived outside of prison.

78.     During his sixteen years of wrongful imprisonment, Plaintiff was deprived of the ability to interact freely with his loved ones including his only daughter; to be present for holidays, births, deaths and other life events; to pursue his passions and interests; to engage in meaningful labor and develop a career; and to live freely, as an autonomous being.

79.     Instead, Plaintiff was detained in harsh, dangerous, and isolating prisons, branded a murderer.

80.      As a result of his wrongful conviction and incarceration, Plaintiff must now attempt to rebuild his life outside of prison, all without the benefit of the life experiences that ordinarily equip adults for such a task.

81.     In addition to causing the severe trauma of Plaintiff's wrongful imprisonment and loss of liberty, Defendants' misconduct caused and continues to cause Plaintiff extreme physical and psychological pain and suffering.

82.     The misconduct committed by Defendants was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence, and each Defendant is liable for punitive damages, as well as other relief described below.

### Defendant Bocardo's History of Misconduct

83.     Though Mr. Velez could not have known this at the time, he was not the first—nor the last person—that would be the victim of Defendants' coercion and fabrication. To the contrary, Defendant Bocardo has engaged in an emerging pattern of misconduct that sheds light on the methods used during his investigation of the Hueneca murder.

84.     His pattern of misconduct was first evidenced in the 2005 shooting of Eric Uribe and German Medina, two boys who had supposedly robbed a police officer's son. In that case,

Detectives Roberto Garcia and Michael Bocardo chased down Uribe and Medina, both of whom were juveniles, after it was alleged that they had robbed Garcia's son. Once Roberto and Bocardo stopped Uribe's vehicle, they fired shots into the car, killing Medina and injuring Uribe, without justification. Roberto and Bocardo claimed the boys were armed, but no gun was ever found. A lawsuit was filed against Bocardo and Roberto, and a jury returned a verdict in favor of both plaintiffs. On appeal from the trial court, the appellate court stated, "Bluntly put, it seems clear that but for the recklessly joined pursuit by the victim's off-duty detective father and his colleague Detective Bocardo, the injury and death here would not have occurred."

85.     The Garcia foray was not the last occasion that Bocardo engaged in misconduct. In 2006, Tristan Scaggs alleged that Bocardo shot him in the back while he lay on the ground unarmed. Two police officer eyewitnesses support Scagg's claim. *See People v. Scaggs*, No. 06 CR 26598.

86.     In 2011, Michael and Adrian Ayala sued Bocardo for excessive force. Bocardo and his fellow officers handcuffed and interrogated the Ayala brothers after stopping them on the street. When the Ayala brothers objected and told Bocardo that video cameras filmed the police officer's conduct, police at the scene began beating them. *See Ayala v. Bocardo et. al.*, No. 11 cv 6094.

87.     Bocardo was sued again in 2011 by Mario Zamora. In that case, Bocardo and his fellow officers burst into Zamora's home and began searching it. Eventually, officers found a safe in Zamora's house and asked him to open it. When Zamora refused, an officer struck Zamora on the head causing him to fall into a chair. Officers then broke into the safe, destroying it. In an attempt to justify their unlawful search, police officers obtained a warrant to search after the fact. *See Zamora v. Wier*, No. 11 cv 07703.

15

88.     Lastly, in 2012, Gustavo Torres sued Bocardo for false imprisonment. In that case, Bocardo, dressed in civilian clothing, pulled a gun on Torres. Torres quickly entered a door of a nearby restaurant and was promptly arrested by Bocardo and his partner. Bocardo later found two guns near the bar and claimed that one of those guns belonged to Torres despite the fact that he never saw Torres with a gun. *See Torres v. Perez et. al.*, No. 12 cv 10402.

89.     Defendant Bocardo was never disciplined by the Chicago Police Department for any of the above-described misconduct.

### City of Chicago Policy and Practice of Prosecuting Innocent Persons in Violation of Due Process

90.     The Chicago Police Department is responsible for scores of miscarriages of justice. Since 1986, no fewer than 70 documented cases have come to light in which Chicago Police Detectives amassed "evidence" against an innocent person for a serious crime that he did not commit. There are undoubtedly many more such cases that have not yet been discovered.

91.     The false charges against innocent people include numerous cases in which Chicago Police Officers used the very same tactics that Defendants used against Plaintiff in this case, including: (1) procurement of false witness testimony; (2) concealment of exculpatory evidence; (3) manipulation of witnesses in order to obtain false identifications; (4) manipulation of witnesses in order to influence their testimony; and (5) employment of other tactics to secure the arrest, prosecution and conviction of persons without regard to their actual guilt or innocence.

92.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, and offering inducements to witnesses to provide false statements implicating innocent persons, knowing full well that those statements were false. As a matter of widespread custom and practice, members of the Chicago

Police Department, including the Defendants in this action, contrived false witness narratives that were fed to vulnerable witnesses who then adopted those false witness narratives as their own for the purpose of wrongly convicting an innocent person. Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness had been coerced, manipulated, threatened, pressured or offered inducements to make false statements.

93.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, procured false testimony from witnesses knowing full well that their testimony was false and would lead to the wrongful conviction of Plaintiff. The improper tactics used to gain cooperation from these witnesses were concealed from Plaintiff.

94.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as part of the official file.

95.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

96.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, routinely manipulated, tricked, lied to, and misled witnesses for the purpose of influencing their testimony to conform to a false narrative contrived by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false identifications of suspects.

97.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, manipulated, tricked, and improperly influenced the witnesses in this case to give false statements against Mr. Velez.

98.     The City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined for misconduct in any such case.

99.     Prior to and during 2001, the year in which Plaintiff was falsely charged with the Hueneca murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The City's Office of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

100.    As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In

accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

101.    As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

102.    Defendant Bocardo and others have a history of engaging in the kind of misconduct that occurred in this case, including the fabrication and concealment of evidence. Defendants engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

103.    The City of Chicago and its Police Department failed in 2001 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a.    The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified, to ensure that the evidence is made part of the criminal proceeding.

b.    The need to refrain from manipulative or potentially coercive conduct in relation to witnesses.

     c.     The risks associated with relying on testimony from incentivized witnesses.

     d.     The risks of wrongful conviction and the steps police officers should take to minimize risks.

     e.     The risks of engaging in "tunnel vision" during an investigation.

     f.     The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

104.     The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

105.     The City's failure to train, supervise, and discipline its officers, including repeat offenders such as Defendant Bocardo, effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

106.     The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

107.     The policies and practices described in the foregoing paragraphs were consciously approved by the City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

**Count I – 42 U.S.C. § 1983**

20

**Due Process: Fabrication of Evidence**
**Against Individual Defendants**

108.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

109.   As described more fully above, Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial by fabricating false evidence against Plaintiff.

110.   In the manner described more fully above, Defendants fabricated, coerced, manipulated and/or solicited false testimony from witnesses implicating Plaintiff in the crime that they knew he did not commit; falsified police reports; obtained Plaintiff's conviction using that false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

111.   Defendants' misconduct resulted directly in the unjust criminal conviction of Plaintiff, thereby depriving him of his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Plaintiff's prosecution could not, and would not, have been pursued.

112.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to Plaintiff's rights, and in total disregard of the truth and Plaintiff's clear innocence.

113.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great emotional pain and suffering, and other grievous and continuing injuries and damages.

114.    The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below, in Count VI.

**Count II – 42 U.S.C. § 1983**
**Due Process: *Brady* Violations**
**Against Defendant Officers**

115.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

116.    As described in detail above, the Defendant Officers, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial by withholding and suppressing exculpatory evidence. In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory evidence from Plaintiff and from the prosecution, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

117.    In addition, in the manner described more fully above, the Defendant Officers knowingly fabricated and solicited false evidence implicating Plaintiff in the crime; obtained Plaintiff's conviction using that false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

118.    The Defendant Officers' misconduct resulted directly in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

119.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

120.    As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great emotional pain and suffering, and other grievous and continuing injuries and damages.

121.    The misconduct described in this Count by was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

### Count III – 42 U.S.C. § 1983
### Deprivation of Liberty without Probable Cause
### Against Defendant Officers

122.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

123.    In the manner described more fully above, the individual Defendants, individually, jointly, and in conspiracy with one another, and others, as well as under color of law and within the scope of their employment, used false evidence that they had manufactured in order to accuse Plaintiff of criminal activity and cause the deprivation of Plaintiff's liberty, without probable cause in violation of his rights secured by the Fourth and Fourteenth Amendments.

124.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

125.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great emotional pain and suffering, and other grievous and continuing injuries and damages.

126.    The misconduct described in this Count by these Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

### Count IV – 42 U.S.C. § 1983

## Conspiracy to Deprive Constitutional Rights
## Against Individual Defendants

127.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

128.    Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and deprive him of his constitutional rights by maliciously causing Plaintiff's prosecution, by fabricating evidence that would be used to convict Plaintiff; and by withholding exculpatory information from Plaintiff's defense and the prosecution, as described above.

129.    In the alternative, the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and deprive him of his constitutional rights by maliciously causing Plaintiff's prosecution, by fabricating evidence that would be used to convict Plaintiff; and by withholding exculpatory information from Plaintiff's defense and the prosecution, as described above.

130.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

131.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

132.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

133. As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**Count V – 42 U.S.C. § 1983**
**Failure to Intervene**
**Against Individual Defendants**

134. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

135. During the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

136. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

137. As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered loss of liberty, great emotional pain and suffering, and other grievous and continuing injuries and damages.

138. The misconduct described in this Count by Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**Count VI – 42 U.S.C. § 1983**
**Municipal Liability**
**Against Defendant City of Chicago**

139. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

140. As described more fully herein, the City of Chicago is itself liable for the violation of Plaintiff's constitutional rights. Plaintiff's injuries were caused by the policies,

practices, and customs of the Chicago Police Department, in that employees and agents of the Chicago Police Department, including Defendants in particular, regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating criminal defendants in criminal conduct, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a similar manner to that alleged herein.

141. This institutional desire to close cases through abusive tactics regardless of actual guilt or innocence, to enhance police officers' personal standing in the Department, was known to the command personnel, who themselves participated in the practice.

142. The above-described widespread practices, which were so well-settled as to constitute the de facto policy of the Chicago Police Department, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. Furthermore, the above-described widespread practices were allowed to flourish because the Chicago Police Department declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

143. The constitutional violations described in this Complaint were also undertaken pursuant to the policy and practices of the Chicago Police Department in that the constitutional violations were committed with the knowledge or approval of persons with final policymaking authority for City of Chicago and the Chicago Police Department.

144. Chicago police officers who manufactured criminal cases against individuals such as Plaintiff had every reason to know that they not only enjoyed *de facto* immunity from criminal prosecution and/or Departmental discipline, but that they also stood to be rewarded for closing

cases no matter the costs. In this way, this system proximately caused abuses, such as the misconduct at issue in this case.

145.     The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

## Count VII – State Law Claim
## Intentional Infliction of Emotional Distress
## Against Individual Defendants

146.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

147.     In the manner described more fully above, Defendants engaged in extreme and outrageous conduct.

148.     The Defendants either intended that their conduct would cause severe emotional distress to Plaintiff or knew that there was a high probability that their conduct would cause severe emotional distress to Plaintiff.

149.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

150.     As a proximate result of this misconduct, undertaken within the scope of Defendants' employment, Plaintiff suffered injuries, including but not limited to severe emotional distress.

## Count VIII – State Law Claim
## Malicious Prosecution
## Against Defendant Officers

151.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

152.     The individual Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted

and continued with malice and resulted in injury to Plaintiff. All such proceedings were ultimately terminated in Plaintiff's favor in a manner indicative of innocence.

153. The Defendants accused Plaintiff of murder, knowing that he was innocent of the crime. All of the individual Defendants fabricated evidence, coerced and manipulated witnesses, and withheld material exculpatory evidence. The law enforcement officer Defendants knowingly made false statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings against Plaintiff.

154. As described more completely above, Defendant Goldish would not have prosecuted Plaintiff but for the involvement and encouragement of the Defendant Officers. Indeed, Defendant Goldish would never have prosecuted the case without having at least one police officer available to document and testify to the version of events that led to the initiation of charges against Plaintiff.

155. Defendant Goldish needed the Defendant Officers to back up the fabricated charges against Plaintiff. Without the involvement, agreement, and falsifications of the Defendant Officers, Defendant Goldish would never have initiated or continued the false charges against Plaintiff.

156. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

157. As a direct and proximate result of this misconduct, undertaken within the scope of Defendants' employment, Plaintiff suffered injuries, including, but not limited to, emotional distress.

**Count IX – State Law Claim**
**Respondeat Superior**
**Against Defendants City of Chicago, Cook County, and Cook County Sheriff Thomas J. Dart**

158.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

159.     In committing the acts alleged in the preceding paragraphs, the Defendant City Police Officers were members and agents of the Chicago Police Department acting at all relevant times within the scope of their employment.

160.     Defendant City of Chicago is liable as principal for all torts committed by its agents.

161.     In committing the acts alleged in the preceding paragraphs, Defendant Goldish was a member of, and agent of, the Cook County State's Attorney's Office, acting at all relevant times within the scope of her employment and under color of law.

162.     In committing the acts alleged in the preceding paragraphs, Defendants Sullivan and Davis were members of, and agents of, the Cook County Sheriff's Police Department, acting at all relevant times within the scope of their employment and under color of law.

163.     Defendant Cook County Sheriff Thomas J. Dart is liable as a principal for all torts committed by his agents.

164.     Defendant Cook County is liable as principal for all torts committed by its agents.

<strong>Count X – State Law Claim<br>Civil Conspiracy<br>Against Individual Defendants</strong>

165.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

166.     As described more fully in the preceding paragraphs, each of the individual Defendants acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means.

167.     In the alternative, as described more fully in the preceding paragraphs, each of the Defendant Officers acting in concert with one another and other co-conspirators, known and

unknown, conspired to accomplish an unlawful purpose by unlawful means.

168.    In furtherance of the conspiracy, the Defendants each committed overt acts and were otherwise willing participants in joint activity.

169.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

170.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress.

**Count XI – State Law Claim**
**Indemnification**
**Against Defendants City of Chicago, Cook County, and Cook County Sheriff Thomas J. Dart**

171.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

172.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

173.    The City Police Defendant Officers are, or were, employees of the Chicago Police Department who acted within the scope of their employment in committing the misconduct described above.

174.    The City is liable to indemnify any compensatory judgment awarded against the Defendant Officers.

175.    Defendant Cook County was, at all times material to this complaint, the employer of Defendants Goldish, Sullivan, and Davis, and is therefore responsible for any judgment entered against Defendants Goldish, Sullivan, and Davis during said employment with the County, making the County a necessary party to this complaint.

176.    Defendant Cook County Sheriff Thomas J. Dart was, at all times material to this complaint, the employer of Defendants Sullivan and Davis, and is therefore responsible for any judgment entered against Defendants Sullivan and Davis during said employment with the Cook County Sheriff's Department, making the Cook County Sheriff Thomas J. Dart a necessary party to this complaint.

WHEREFORE, Plaintiff John Velez respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, punitive damages, costs, and attorneys' fees, and interest, as well as any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff John Velez hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: January 21, 2020

RESPECTFULLY SUBMITTED:

s/ Danielle Hamilton
Attorney for John Velez

Arthur Loevy
Jon Loevy
Russell Ainsworth
Ruth Brown
Danielle Hamilton
LOEVY & LOEVY
311 North Aberdeen St., 3rd floor
Chicago, IL 60607
Phone: (312) 243-5900
Fax: (312) 243-5902


Jennifer Blagg
LAW OFFICE OF JENNIFER BLAGG
1333 West Devon Ave., Suite 267
Chicago, IL 60660
Phone: (773) 859-0081
Fax: (773) 439-2863