**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| John Velez,<br><br>Plaintiff,<br><br>v.<br><br>City of Chicago; Chicago Police Officers Michael R. Bocardo, Michael Dyra, John A. Cruz, Sam Cirone, Patrick O'Donovan, Kriston Kato, Bradul A. Ortiz, Michael J. Walsh, Victor M. Perez, D. Wolverton (#20014), J. Botwinski (#20392), A. Jaglowski (#20196), Sgt. D. Walsh, John Farrell, and Unknown Officers; Cook County Sheriff's Department Detectives James Davis and John Sullivan and Unknown Sheriff's Department Officers; Sheriff of Cook County Thomas J. Dart; Cook County Assistant State's Attorney Megan Goldish; and Cook County,<br><br>Defendants. | ) | Case No. 18-cv-8144<br>Honorable Edmond E. Chang<br>Honorable Jeffrey Cole<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF'S MOTION TO COMPEL DEFENDANT CITY TO PRODUCE COMPLAINT REGISTER AND HOMICIDE FILES REQUIRED TO SUPPORT HIS *MONELL* CLAIM**

## PROPOSED BRIEFING SCHEDULE

Defendant City of Chicago has indicated that it intends to propose a timeframe for its response brief after reviewing Plaintiff's filed motion, and Plaintiff respectfully seeks 10 days for his reply.

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

STATEMENT OF FACTS ........ 3

A. Plaintiff's Allegations ........ 3

B. Proof of the City's Policies and Customs in Analogous Cases ........ 5

C. *Monell* Litigation in This Case ........ 7

LEGAL STANDARD ........ 8

DISCUSSION ........ 8

A. *Monell* Discovery Is Necessarily Broad, Given the Burden of Proof ........ 8

B. The Homicide Files Are Essential to Plaintiff's *Monell* Theories ........ 10

C. The CR Files Are Essential to Plaintiff's *Monell* Theories ........ 14

D. The Homicide and CR Files are Proportional to the Needs of the Case ........ 15

CONCLUSION ........ 18

# TABLE OF AUTHORITIES

CASES

*Annie Oakley Enterprises Inc. v. Amazon.com, Inc.*,
No. 119CV01732JMSMJD, 2020 WL 4571742 (S.D. Ind. Aug. 7, 2020) ........................................8, 17

*Awalt v. Marketti*, 2012 WL 6568242 (N.D. Ill. Dec. 17, 2012) ..................................................9

*Banister v. Firestone*, No. 17 C 8940, 2018 WL 4224444 (N.D. Ill. Sept. 5, 2018) ...............................8, 17

*Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397 (1997) ...............................................8

*Chatman v. Kato, et al.*, No. 14-cv-2945 (N.D. Ill.)...........................................................1

*City of Canton v. Harris*, 489 U.S. 378 (1989) ..................................................................8

*Dixon v. County of Cook*, 819 F.3d 343 (7th Cir. 2016) ..........................................................8

*Elrod v. City of Chicago*, 2007 WL 3241352 (N.D. Ill. Nov. 1, 2007) ............................................9

*Fields v. Chicago*, 2017 WL 4553411 (N.D. Ill. Oct. 12, 2017) ...........................................*passim*

*Fields v. City of Chicago*, No. 17-3079, 2020 WL 6817489 (7th Cir. Nov. 20, 2020)..............................6, 9

*Gomez v. Guevara*, No. 18-cv-3335 (N.D. Ill.) ..................................................................16

*Hood v. Chicago*, No. 16-cv-1970 (N.D. Ill.)...............................................................6, 14

*In re Biomet M2A Magnum Hip Implant Prods. Liab. Litig.*,
2013 WL 1729682 (N.D. Ind. Apr. 18, 2013)........................................................................17

*Jones v. Elkhart*, 737 F.3d 1107 (7th Cir. 2013) ...............................................................8

*Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447 (N.D. Ill. 2006) ...................................8

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 237 F.R.D. 176 (N.D. Ill. 2006) .......................17

*Levy v. Marion Cty. Sheriff*, 940 F.3d 1002 (7th Cir. 2019).......................................................8

*Limone v. United States*, 497 F. Supp. 2d 143 (D. Mass. 2007).....................................................16

*Medina v. City of Chicago*, 100 F. Supp. 2d 893 (N.D. Ill. 2000)..................................................9

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978)............................................................8

*Padilla v. City of Chicago*, 2011 WL 3651273 (N.D. Ill. 2011) ...................................................9

*Palmer v. Marion County*, 327 F.3d 588 (7th Cir. 2003) .......... 9

*Parvati v. Oak Forest*, 2010 WL 2836739 (N.D. Ill. July 19, 2010) .......... 8

*Pittman ex rel. Hamilton v. County of Madison*, 746 F.3d 766 (7th Cir. 2014) .......... 9

*Prince v. Kato, et al.*, No. 1:18-cv-02952 (N.D. Ill.) .......... *passim*

*Rawat v. Navistar Int'l Corp.*, 2011 WL 3876957 (N.D. Ill. Sept. 1, 2011) .......... 17

*Resicom Custom Painting & Maint., Inc. v. Prof'l Retail Servs., Inc.*,
No. 14 CV 09190, 2017 WL 3951603 (N.D. Ill. Sept. 8, 2017) .......... 17

*Reyes & Solache v. Guevara*, Nos. 18 C 1028 & 18 C 2312 (N.D. Ill.) .......... *passim*

*Rivera v. Guevara*, 319 F.Supp.3d 1004 (N.D. Ill. May 11, 2018) .......... *passim*

*Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill. Aug. 3, 2018) .......... *passim*

*Rodriguez v. City of Chicago*, No. 18-CV-7951, 2019 WL 4278501 (N.D. Ill. Sept. 10, 2019) .......... 16

*Santos v. Culver City*, 228 Fed. App'x 655 (9th Cir. 2007) .......... 9

*Sierra v. Guevara*, No. 18 C 3029 (N.D. Ill.) .......... *passim*

*Simon v. Nw. Univ.*, No. 1:15-CV-1433, 2017 WL 467677 (N.D. Ill. Feb. 3, 2017) .......... 15, 16

*Smith v. City of Oakland*, 538 F. Supp. 2d 121 (N.D. Cal. 2008) .......... 16

*Thomas v. Cook County*, 604 F.3d 293 (7th Cir. 2010) .......... 15

OTHER AUTHORITIES

Federal Rule of Civil Procedure 26(b)(1) .......... 8, 15

Federal Rule of Evidence 401 .......... 8

## INTRODUCTION

In this Section 1983 lawsuit, Plaintiff John Velez alleges that notorious Area Four Chicago Police Officers Kriston Kato and Michael Bocardo, as well as other police and prosecutor defendants, caused his 16-year wrongful imprisonment for a murder he did not commit. Mr. Velez is one of many men with documented claims that Kato and Bocardo engineered their wrongful convictions by fabricating false witness statements and suppressing evidence. *See, e.g.*, *Williams v. Kato, et al.*, No. 1:21-cv-00819 (N.D. Ill.), at Dkt. 1, ¶¶ 67-72, 24-45 (chronicling Kato's history of coercing false statements, including his misconduct with two co-defendants in this case, Defendants Farrell and Cirone); *Prince v. Kato, et al.*, Case No. 1:18-cv-02952 (N.D. Ill.), Dkt. 1, at ¶¶ 82-85, 1-5 (chronicling Kato's history of misconduct); Dkt. 91, Second Am. Compl., at ¶¶ 83-89, 98-102 (chronicling Bocardo's history of misconduct). As but one example, Kato beat a false confession out of the homeless, mentally ill, and vulnerable Carl Chatman, causing him to be wrongfully imprisoned for 11 years before Chatman obtained a Certificate of Innocence. *Chatman v. Kato, et al.*, No. 14-cv-2945 (N.D. Ill.), Dkt. 316, at, e.g., ¶¶1-7, 52-63. The resulting civil suit was settled by the undersigned counsel's firm for $9,075,000 after a contemporaneous anonymous complaint by a police detective to the Chicago Police Department ("CPD") internal affairs office that detailed the beating and Kato's role in it came to light. *Id.* at Dkt. 314, Order of Nov. 9, 2015, at 1-3.

In Mr. Velez's case, as set forth in more detail below, discovery to date has already revealed egregious misconduct by Defendants Kato, Bocardo, and others to secure Mr. Velez's wrongful conviction. For example, a key piece of evidence against Mr. Velez at trial, a false inculpatory statement by Christina Izquierdo, was manufactured by Defendant Kato, who held this pregnant and injured witness overnight at the police station for over eight hours and threatened to take away her baby until she signed a false statement implicating Mr. Velez. *Infra* at 4. Discovery has revealed as false Defendant Bocardo's incredible claim that he miraculously cracked the case when key

eyewitness Apolinar Mejia just happened to serendipitously view a photograph of Mr. Velez on Bocardo's clipboard and identified him as the perpetrator; Mejia revealed during his deposition that the clipboard incident never occurred and that Bocardo told him who to identify (Mr. Velez) during a subsequent line-up. *Infra* at 4.

As in cases involving other notorious CPD officers such as Jon Burge or Reynaldo Guevara, Mr. Velez's wrongful conviction was the result not only of misconduct by individual officers such as Kato and Bocardo, but also the corrupt policies and customs of the CPD. For example, the City maintained a policy and practice of failing to discipline officers subject to high numbers of citizen complaints such as Kato and Bocardo, allowing them to operate with impunity. *E.g.*, Dkt. 91 at 98-102. In short, this is no run-of-the-mill civil rights case, and robust *Monell* discovery is warranted.

To prove his *Monell* claim, Plaintiff thus moves this Court to compel production of:

A. Complete files for all homicide investigations conducted by the CPD through Area Four for homicides taking place between 1995-2001; and,

B. Complaint Register ("CR") files for all officers assigned to Area Four in 1995-2001.

*See* Exh. 1, Responses to Requests for Production at Nos. 11-13; Exh. 2, Correspondence, at 1 (narrowing the requests). The requested homicide and CR files are relevant and discoverable, as has been repeatedly affirmed in analogous cases against notorious CPD wrongdoers such as Kato, in which courts in this district have routinely compelled production. Exh. 3, *Prince v. Kato*, No. 18 C 2952 (N.D. Ill.), Dkt. 205; Exh. 4, *Bouto*, No. 19 C 2441 (N.D. Ill.), Dkt. 153; Exh. 5, *Sierra v. Guevara*, No. 18 C 3029 (N.D. Ill.), Dkt. 154; Exh. 6, Reyes *& Solache v. Guevara*, Nos. 18 C 1028 & 18 C 2312 (N.D. Ill.), Dkt. 224. And two federal juries have recently found, based on precisely such evidence, that the City's policies caused constitutional violations resulting in wrongful homicide convictions. *Rivera v. Guevara*, No. 12 C 4428, Dkt. 678 (N.D. Ill. Aug. 3, 2018); *Fields v. Chicago*, 2017 WL 4553411, at *3-4 (N.D. Ill. Oct. 12, 2017).

This Court should decline the City's invitation to pare down the production. Plaintiff first requested homicide and CR files in September 2019. Exh. 1 at Nos. 11-13. Since that time, Plaintiff has already unilaterally narrowed the scope of his requests, both in geography (narrowing the requests to cover only Area Four) and timeframe (narrowing to 7 years). Exh. 2 at 1. Plaintiff repeatedly offered to compromise further on both the number of years of files and the type of files produced, if the City agreed not to turn around and try to exploit the narrower production by claiming at trial that Plaintiff's expert did not review enough files or the right type of files. *E.g.*, Exh. 2 at 1, 13, 17. Although the City has in the past agreed to so stipulate (e.g., Exh. 7, Stipulation, *Rivera*, No. 12 C 4428, Dkt. 313-88), it has refused to do so in this case (Exh. 2 at 15, 17 & 25). Thus, the City has reserved for itself the right to argue at trial that that the selection of files—whether their number, timeframe, or types of files produced—is not representative of the City's policies and practices. Put another way, the City wants to deny Plaintiff a full set of files in discovery, and then to argue at trial that Plaintiff did not obtain enough files for expert review.

This approach is unfair. It should not be allowed. Plaintiff is prepared to do the work to review the entire set of relevant files and present evidence to the jury in support of his *Monell* claims. He does not want to have an unnecessary, expensive, and distracting battle of statistical experts who present evidence about the reliability of sample sizes. The City cannot provide a justification for requiring such an expensive and unnecessary statistical expert battle through a discovery limitation. If the City declines in this case to enter a stipulation such as the one that the City previously agreed to in *Rivera* (Exh. 7, Dkt. 313-88), it should be compelled to produce the complete set of files.

## STATEMENT OF FACTS

### A. Plaintiff's Allegations

Plaintiff John Velez was wrongfully convicted of a heinous murder due to constitutional violations by Chicago Police Officer Defendants Michael Bocardo and Kriston Kato, and other

police and prosecutor defendants. Dkt. 91, at ¶¶ 1-7, 90-107. Incarcerated at the age of 17, Mr. Velez spent his entire young adulthood—sixteen years—behind bars, before finally winning back his freedom. *Id.* at ¶¶ 1-7.

Mr. Velez alleges that the Defendants secured his wrongful conviction by fabricating purported eyewitness evidence (*id.* at ¶¶ 34-40, 56-61); locking Mr. Velez's pregnant girlfriend in an interrogation room for eight hours and threatening to take away her baby unless she signed a false inculpatory statement (*id.* at ¶¶ 44-55); and suppressing exculpatory evidence that would have established that the prosecution's theory of the case—a gang "anniversary killing"—could not withstand scrutiny (*id.* at ¶¶ 31, 53).

Even prior to the conduct of most depositions in this case, discovery has already exposed staggering misconduct in Mr. Velez's case. For example, Defendant Bocardo claimed to have miraculously cracked the case when a key eyewitness, Apolinar Mejia, just happened to serendipitously view a photograph of John Velez that was supposedly on Bocardo's clipboard for an unrelated reason, identified him as the perpetrator, and then subsequently identified Mr. Velez in a line-up. *See* Exh. 8 (4/18/2001 Police Report, Excerpts). Yet Mr. Mejia revealed during his deposition that the clipboard incident never occurred and that Bocardo told him who to identify during the line-up. Exh. 9 (Mejia Dep. Excerpts) at pp. 52-56, 104-108. Another key piece of evidence against Mr. Velez at trial, a false inculpatory statement by Christina Izquierdo, was manufactured by Defendant Kato, who held this pregnant witness overnight at the police station for eight hours—just days after she was released from the hospital after a gunshot wound—and threatened to take away her baby until she signed a demonstrably false statement implicating Mr. Velez. *See* Exh. 10 (Izquierdo Testimony), at pp. 195-203, 230-233.

Mr. Velez's wrongful conviction would not have occurred but for the City's policies and practices. Dkt. 91 at ¶¶ 90-107. For example, Mr. Velez alleges that the City maintained a policy and

practice of failing to discipline police officers such as Defendants Bocardo and Kato who were subject to high levels of citizen complaints and lawsuits, allowing them to operate with a sense of impunity. *E.g.*, *id.* at ¶¶ 98-102, 83-89. Indeed, there are no fewer than 70 documented and proven cases since 1986 in which Chicago Police Detectives amassed "evidence" against innocent persons for serious crimes they did not commit—and "[t]here are undoubtedly many more such cases that have not yet been discovered." *Id.* ¶¶ 90.

Important in this case, the City had a practice of suppressing important investigatory materials in so-called "street files," which were kept within the police department but never sent to state prosecutors, criminal defendants, or their attorneys. *Id.* ¶¶ 92-94, 62. Juries in two recent trials have found the City liable for maintaining this practice from 1984 until after Mr. Velez's conviction. *Rivera*, No. 12 C 4428, Dkt. 678; *Fields v. Chicago*, 2017 WL 4553411, at *3-4 (N.D. Ill. Oct. 12, 2017).

Consistent with these allegations and the discovery to date and to come, Plaintiff asserts *Monell* claims alleging that Defendants' constitutional violations and his wrongful conviction were caused by the City's policies and customs including those that: (1) allowed for eyewitness and identification procedure manipulation; (2) caused evidence fabrication; (3) caused routine evidence suppression, including burying documents in clandestine street files; and (4) left officers without adequate training, supervision, and discipline. Dkt. 91 at ¶¶ 91-107.

**B. Proof of the City's Policies and Customs in Analogous Cases**

Plaintiff's *Monell* theories have been tested in other analogous wrongful conviction cases in this District. In at least seven recent lawsuits, the City has been ordered to produce homicide files like those Plaintiff seeks here, after courts determined that they were centrally relevant to similar *Monell* theories.[1] In the two of those cases that have been tried, federal juries found—based on the

[1] Exh. 3, *Prince*, No. 18 C 2952 (N.D. Ill.); Exh. 4, *Bouto*, No. 19 C 2441 (N.D. Ill.); Exh. 6, *Reyes & Solache*, Nos. 18 C 1028, 2312 (N.D. Ill.); Exh. 5, *Sierra*, No. 18 C 3029 (N.D. Ill.); *Rivera*, No. 12 C 4428 (N.D. Ill.); *Fields*, No. 10 C 1168 (N.D. Ill.)

City's homicide files—that the City's policies and customs caused the violation of citizens' constitutional rights. *Rivera*, Dkts. 678 & 782; *Fields*, Dkts. 1175 & 1227; *Fields v. City of Chicago*, No. 17-3079, 2020 WL 6817489, at *16-18 (7th Cir. Nov. 20, 2020). Specifically, in *Rivera* and *Fields*, the homicide files were used to show that the City's policies and customs on investigative file keeping and the production of homicide files to the criminal justice system caused routine evidence suppression, violating the plaintiffs' constitutional rights. And in *Rivera*, the homicide files were used to show that the City's policies and customs regarding eyewitness identification procedures caused constitutional violations.[2] And in *Fields*, the Seventh Circuit recently affirmed that the homicide file discovery there was appropriate to establish "the extent to which the withholding of evidence was a systemic practice" and that the trial court's initial "prevention of that discovery foreclosed Fields's ability to prepare and present the case for *Monell* liability." 2020 WL 6817489, at *16.

Numerous courts in this District have likewise recognized that CR files—the City's only documentation of complaints against its officers and the City's response—are relevant to show notice to the City of police misconduct and to prove that the City did not properly train, supervise, and discipline. CR file production has been ordered in cases including *Hood v. Chicago*, No. 16 C 1970 (N.D. Ill.), Dkt. 191 (ordering production of 7 years of CR files); *Prince*, Exh. 3, at 11-12; *Bouto*, Exh. 4 at 8-9; *Sierra*, Exh. 5 at 3-4; and *Reyes* and *Solache*, Exh. 6 at 21-24. The City, too, has conceded the relevance of CR files to Plaintiff's *Monell* theories in other cases raising the same theories. *E.g.*, *Bouto*, Dkt. 142, at 18 ("[T]he City does not contest the relevance of Complaint Register (CR) files . . . . Plaintiff is alleging that the City failed to discipline its officers, and the CR files represent the City's investigation into complaints of officer misconduct.").

---

[2] The *Monell* theories in *Rivera* and *Fields*, and their supporting evidence, are summarized in post-trial motion responses (Exh. 11 (*Rivera*, Dkt. 735) at 78-118; Exh. 12 (*Fields*, Dkt. 1184) at 12-24), in expert analyses of homicide files (Exhs. 13-15; Exh. 16 at 30-68 (*Rivera*); Exh. 17; Exh. 18 at 6-39 (*Fields*)); in summary judgment briefs (Exh. 19 at 50-62); and in the Seventh Circuit's decision affirming the *Monell* verdict in *Fields*, 2020 WL 6817489, at *16-18. *See also Reyes*, Dkt. 195, at 5-7.

### C. *Monell* Litigation in This Case

Against this backdrop, and based on Plaintiff's counsel's experience in proving the *Monell* claims at issue, Plaintiff first requested homicide and CR files to prove his *Monell* claims in September 2019. Ex. A, at Nos. 11-13. Without obtaining any discovery stay, the City initially refused to respond on the basis of its bifurcation motion. *Id.* & Exh. 2 at 3 & 5. After this Court denied bifurcation (Dkt. 150), the City refused to substantively engage on the basis of the City's motion for reconsideration of the bifurcation denial order. Exh. 2 at 7-9, 12. After the City's motion for reconsideration, too, was denied (Dkt. 157), the City claimed that it was unable to provide a proposal for *Monell* discovery without a detailed explanation of how the homicide and CR files were relevant to Plaintiff's *Monell* theories (Exh. 2 at 14-15). Plaintiff responded with a 7-page single-spaced letter setting forth the relevance of the files in painstaking detail. Exh. 2 at 17-23. The City did not challenge Plaintiff's analysis of the relevance of the files other than stating that in a conclusory sentence that it did not concede relevance. Exh. 2 at 25.

With regard to the scope of the homicide and CR file production, in response to the City's concerns in its discovery responses, Plaintiff significantly narrowed the scope of his requests, both in geography (department-wide files to Area Four only) and timeframe (20-30 years to 7). *Compare* Exh. 1 at Request Nos. 11-13; *with* Ex. B, Correspondence, at 1. Plaintiff offered to compromise further on both the number of years of files and the types of files requested, if the City agreed not to turn around and try to exploit the narrower production by claiming at trial that Plaintiff's expert did not review enough files or the right ones. Exh. 2 at 1, 13, 17. The City refused to enter a stipulation (Exh. 2 at 15, 17 & 25), even though it has done so in other cases (Exh. 7, *Rivera*, Dkt. 313-88), and the parties are at impasse after multiple oral and written communications. *See* Exh. 2.

## LEGAL STANDARD

The federal notice pleading system contemplates that parties will have broad discovery to investigate facts and help define and clarify issues. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978); *see also Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447, 450 (N.D. Ill. 2006). Accordingly, Fed. R. Civ. P. 26(b)(1) provides that "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Information is relevant if it "bears on" or "reasonably could lead to other matter that could bear on" any material facts or issue. *Oppenheimer*, 437 U.S. at 351; *see also* Fed. R. Evid. 401. "The burden rests upon the objecting party to show why a particular discovery request is improper." *Parvati v. Oak Forest*, 2010 WL 2836739, at *1 (N.D. Ill. July 19, 2010); *see also Annie Oakley Enterprises Inc. v. Amazon.com, Inc.*, No. 119CV01732JMSMJD, 2020 WL 4571742, at *1 (S.D. Ind. Aug. 7, 2020); *Resicom Custom Painting & Maint., Inc. v. Prof'l Retail Servs., Inc.*, No. 14 CV 09190, 2017 WL 3951603, at *1 (N.D. Ill. Sept. 8, 2017); *Banister v. Firestone*, No. 17 C 8940, 2018 WL 4224444, at *9 (N.D. Ill. Sept. 5, 2018). This Court has "extremely broad discretion in controlling discovery." *Jones v. Elkhart*, 737 F.3d 1107, 1115 (7th Cir. 2013).

## DISCUSSION

### A. *Monell* Discovery Is Necessarily Broad, Given the Burden of Proof

In determining the appropriate scope of discovery here, this Court must consider the evidentiary requirements for Plaintiff to succeed on his *Monell* claims. To prevail, a plaintiff must gather evidence that a municipality's "official policy, widespread custom, or action by an official with policy-making authority was the 'moving force' behind his constitutional injury." *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (quoting *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)); *see also Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997); *Levy v. Marion Cty. Sheriff*, 940 F.3d 1002, 1010-13 (7th Cir. 2019). This evidentiary burden is particularly challenging here, where

Plaintiff must prove a widespread custom, over a sufficiently long period of time, to establish liability. *See Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003) ("[P]roof of isolated acts of misconduct will not suffice; a series of violations must be presented . . . ."); *Pittman ex rel. Hamilton v. County of Madison*, 746 F.3d 766, 780 (7th Cir. 2014) (three past jail suicides was insufficient).

In light of this burden, *Monell* discovery is routinely more complex than discovery against individuals. *See*, *e.g.*, *Elrod v. City of Chicago*, 2007 WL 3241352, at *5 (N.D. Ill. Nov. 1, 2007); *Medina v. City of Chicago*, 100 F. Supp. 2d 893, 895 (N.D. Ill. 2000). Quite often, it requires production of many files and documents relevant to establishing widespread customs. For example, in *Awalt v. Marketti*, 2012 WL 6568242 (N.D. Ill. Dec. 17, 2012), the court compelled production of hundreds of inmate medical files for a five-year period, reasoning that the plaintiff's *Monell* theory required her to "prove more than just one, or two, or even three instances of inadequate medical care." *Id.* at *6. In *Padilla v. City of Chicago*, 2011 WL 3651273 (N.D. Ill. 2011), the court found it was clear error to refuse to order disclosure of five years' worth of misconduct reports across the whole police department. *Id.* at *4; *see also Santos v. Culver City*, 228 Fed. App'x 655, 660-61 (9th Cir. 2007) (reversing grant of summary judgment on *Monell* claim where the district judge denied five years of *Monell* discovery).

These precedents have convinced the courts in this district to routinely order production of many hundreds of investigative and CR files to litigate *Monell* claims. *E.g.*, *Prince,* Exh. 3 at 3 ("Plaintiff bears a heavy burden in proving *Monell* claims" and "*Monell* discovery is inherently time-consuming and voluminous," so the Court should "not excessively limit discovery such that it affects Plaintiff's ability to prove his claim at trial."); *Fields*, 2020 WL 6817489, at *16 (homicide file discovery in that case was appropriate to establish "the extent to which the withholding of evidence was a systemic practice by the City" and the district court's initial "prevention of that discovery foreclosed Fields's ability to prepare and present the case for *Monell* liability").

## B. The Homicide Files Are Essential to Plaintiff's *Monell* Theories

Area Four homicide files from 1995-2001 are unquestionably relevant to Plaintiff's *Monell* theories, contrary to the City's conclusory one-sentence contention otherwise (Exh. 2 at 25). Addressing similar *Monell* theories, Judge Harjani "ha[d] no trouble concluding that the Area Five homicide files in question are relevant to [p]laintiffs' stated *Monell* claims," and set forth the numerous bases for relevance, which track those asserted by Mr. Velez here. Exh. 6, *Solache/Reyes*, at 8. Likewise, in *Sierra*, Judge Weisman found that "plaintiff must have access to enough other homicide investigations to demonstrate that any violation of his constitutional rights was part of a larger practice," that Mr. Sierra "has explained a means by which the requested information . . . is sufficiently important for him to access and review," and the fact that he had "no other ready means of gathering this type of information and his *Monell* claim raises questions that are important not only to him but to the public-at-large also justifies the burden involved in the discovery requested." Exh. 5, *Sierra*, at 2; *see also Bouto*, Exh. 4 at 5 ("the Court . . . agrees with the other courts in this district that have found that [homicide] files are relevant."); *Prince*, Exh. 3 at 4 ("[T]he homicide files are relevant to Plaintiff's *Monell* theories."). This Court should reach the same result.

**General Relevance of Homicide Files.** The City's homicide files represent perhaps the only documents the City possesses documenting Area Four homicide investigations during the relevant timeframe. The files reflect the police department's version of what occurred during the investigations. They are thus the linchpin of any theory about the City's widespread customs in homicide cases, and they are essential to assess any *Monell* theory regarding systematic defects in those investigations. If the City were permitted to decline to disclose these files, it would be difficult, if not impossible, for Plaintiff to prove *Monell* liability.

**Relevance to Eyewitness Identification Theories.** Area Four homicide files will reveal evidence that City policies and customs led to unduly suggestive identifications, and the suppression

of identifications, violating due process. The files will likely indicate: (1) whether improper identification procedures were used during an investigation;[3] (2) whether eyewitness identifications are unreliable, implausible, or impossible;[4] and (3) whether identification procedures went undocumented or were documented improperly.[5] For example, the files will likely contain evidence of the use of improperly suggestive identification procedures. They will demonstrate that the City failed to accurately document identification procedures, suppressing evidence that would have revealed unreliable eyewitnesses. And the homicide files will reveal facts showing that an eyewitness identification was the result of officer manipulation or suggestion. This may take the form—as it did in *Rivera* and *Fields*—of police reports and evidence revealing that a witness who later testified in the criminal proceedings could not have observed the crime or identified the perpetrator. It may also take the form of circumstantial indicia of unreliability—*e.g.*, a stranger identification, many months after, that is inconsistent with initial descriptions and based on suspect viewing opportunities—that reveal witness manipulation upon investigation.

All of these different theories are in play in Plaintiff's case. Even with many key eyewitness and defendant depositions still to come, evidence already exists indicating that Mr. Velez was subjected to improperly suggestive identification procedures, such as the single photo of Mr. Velez "accidentally" shown to key eyewitness Apolinar Mejia on a supposed clipboard. *Supra* at 4. Mr. Velez was also identified in suggestive line-ups, where eyewitnesses were told who to pick prior as they viewed the line-up. Exh. 9 at 52-56, 108. And Defendants failed to accurately document the identification procedures used, suppressing evidence of their suggestive nature and of key

---

3 Improper procedures include show-ups using a live suspect or photo of a suspect; live lineups or photo arrays in which the fillers look different than the suspect; as well as identification procedures that suggest who the suspect is (for example, where an eyewitness is told who the suspect is, or shown a single person or photo, prior to the procedure).

4 In *Rivera* and *Fields*, homicide files revealed that certain witnesses who provided identifications could not have actually seen the perpetrator. *See* Exh. 20, *Sierra*, Dkt. 138 at 10-11.

5 In *Rivera*, the homicide files showed that CPD never documented identification procedures where someone other than the suspect was picked. *See* Exh. 19 ( at 59-62; Exh. 14; Exh. 15.

circumstances in the identifications. *E.g.*, Exh. 9, Mejia Dep. at 48-49, 57-58 (revealing identification procedures that appear nowhere in any police reports). There is also evidence to date that eyewitnesses could not reliably see the shooter's face, and police reports documenting the identification procedures are contradicted by participants in those procedures.

In short, the homicide files will show, as they did in *Rivera*, that the manipulation of eyewitness identification procedures and the misreporting of those procedures was the result of City policy and custom, and not an isolated event. As indicated above, Judges Harjani, Weisman, and Cox have each deemed homicide files relevant to pursuing such a *Monell* theory. *Prince*, Exh. 3, at 4; *Sierra*, Exh. 5, at 1-2; *Bouto*, Exh. 4, at 4-5.

**Relevance to Fabrication Theories.** The homicide files are also probative of Plaintiff's *Monell* fabrication theories because they will likely contain documents that themselves are fabricated evidence. Homicide files standing alone can reveal fabricated police reports, such as when the "official" story told in typed police reports contradicts other documents in the file. For example, in *Rivera*, police reports suggested Mr. Rivera became a suspect only after the eyewitness picked his photo from a mugbook, but the homicide file contained a rap sheet revealing that defendants had considered him a suspect days earlier. Fabrication is also apparent when documentation of witness statements in police reports is contradicted by other reports or officer notes. "Homicide investigative files could also contain evidence supporting allegations of coercion," such as the length of time a witness or suspect was in custody prior to giving a statement, the participants in the interrogation, and the resulting statements. *Reyes*, Exh. 6, at 8.

As additional examples: the homicide files produced in *Monell* discovery in *Rivera* litigation concerning the investigation and arrest of Demetrius Johnson contained a fabricated police report stating that a key eyewitness had never previously identified anyone but Johnson, when in fact the eyewitness had first identified a different suspect. Exh. 21, Johnson post-conviction petition, at, e.g.,

pp. 1-5. Or consider the file in Rivera's case itself, where a report stated the crime victim had picked Rivera in a photo line-up conducted by Guevara, but other evidence revealed the victim was in a coma at the time. *Rivera v. Guevara*, 319 F.Supp.3d 1004, 1032 (N.D. Ill. 2018). These are merely examples of ways in which past homicide file reviews have revealed fabricated evidence.

Even prior to many key depositions in this case, it is already apparent that similar evidence was fabricated in this case, including false inculpatory statements by Christina Izquierdo, who has already explained under oath how Defendants threatened her and fabricated her statement implicating Mr. Velez (*infra* at 4), and false accounts of the "clipboard" incident by Defendant Bocardo, which are contradicted by the sworn deposition testimony of eyewitness Apolinar Mejia (*infra* at 4).

The manipulated identification theories discussed *supra* at 11-12 also tie into fabrication of evidence. When a witness is told who to pick during a lineup, for example, police reports are typically created afterward that omit such information, instead falsely stating the witness viewed the lineup and made a confident, unprompted identification. Such reports, too, are fabricated evidence. The homicide files will reveal these fabrications in Mr. Velez's case were part of a pattern of fabrication endemic in Area Four.

**Relevance to Suppression Theories**. The homicide files are also relevant to Plaintiff's allegations that the City had an unconstitutional practice of suppressing evidence. This includes the suppression of investigative materials in clandestine files not provided to prosecutors and defense attorneys, and the widespread failure to preserve or document pertinent investigative information in the homicide files in the first place. Area Four homicide files are relevant to both theories. They can be examined by themselves to determine whether investigative information has been suppressed,[6] or

[6] For example, the *Rivera* homicide file contained General Progress Reports (GPRs) on which detectives write notes, but the Investigative File Inventory (which tracks the materials in the

compared with other files concerning the same investigation and prosecution to show what evidence was suppressed.[7] Such examination and comparison in *Rivera* and *Fields* revealed systemic evidence suppression. *See generally* Exhs. 13-19.

Plaintiff has alleged, and intends to prove, that exculpatory evidence was suppressed during his criminal case. Even prior to the conduct of many depositions in this case, Plaintiff's investigation, covers, for example, withheld evidence of improper tactics during the eyewitness identification procedures used in his case; of threats, and coercion used upon Christina Izquierdo; and missing police reports documenting important developments in the investigation such as General Progress Reports of interviews with critical witnesses such as Gus Rivera. Mr. Velez is entitled to the discovery to show that the suppression was a matter of City policy and custom.

**Relevance to Training and Supervision Theories.** Homicide files are relevant evidence of a failure to train and supervise police officers. In *Fields* and *Rivera*, the homicide files on their face contained ample evidence that police officers routinely did not follow written City policies governing the maintenance and production of homicide files. Exh. 12 at 16-24; Exh. 11 at 82-83.

### C. The CR Files Are Essential to Plaintiff's *Monell* Theories

CR files—the City's sole mechanism of documenting complaints against police officers and the City's response to those complaints—are plainly relevant to *Monell* theories that the City failed to train, supervise, and discipline its employees, and probative of a pattern of misconduct and notice to the City. Numerous courts have so held. *E.g.,* Exh. 3, *Prince*, at 4-6; *Hood v. Chicago*, No. 16 C 1970, Dkts. 172, 182, 189, 190, 191 (N.D. Ill.); Exh. 6, *Reyes*, at 21-24 (collecting cases). The City has so conceded in other wrongful conviction cases raising failure to train, supervise, and discipline theories

---

investigative file) showed that multiple GPRs created on key dates and logged into the file had gone missing. Exh. 11 at 30.

[7] For example, in *Rivera*, the Investigative File Inventory documenting the missing GPRs was not handed over to prosecutors or defense attorneys, leaving them in the dark that key investigative information had not been provided. Exh. 11 at 29-30.

of *Monell* liability, foreclosing any challenge to their relevance here. *See, e.g.*, *Bouto*, Dkt. 142 at 18. Plaintiff bears the burden of proving his *Monell* theories, and courts have repeatedly held that proving failure to train or supervise is a tall order. *Thomas v. Cook County*, 604 F.3d 293, 303 (7th Cir. 2010) (municipality must have had notice of the problem); *see also Rivera v. Guevara*, 319 F.Supp.3d 1004, 1070 (N.D. Ill. May 11, 2018) (records of misconduct relating to Guevara were insufficient to show a failure to train or discipline). Production of 1995-2001 CR files in Area Four is thus required for the fair resolution of this case.

**D. The Homicide and CR Files Sought are Proportional to the Needs of the Case**

Mr. Velez's request for documents is also modest in light of the magnitude and importance of this litigation, and thus the discovery sought is easily proportional to the needs of the case. In assessing proportionality, courts consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). As set forth above, numerous courts have found homicide and CR file production proportional in analogous wrongful conviction cases against notorious Chicago Police Officers, including in cases against Defendant Kato. *Supra* at 5-6 & n.1. There is no reason to reach a contrary conclusion here.

Regarding the first proportionality factor, the issues at stake in the action are unquestionably weighty. *See, e.g.*, *Simon v. Nw. Univ.*, No. 1:15-CV-1433, 2017 WL 467677, at *2 (N.D. Ill. Feb. 3, 2017). This case addresses a devastating and life-altering wrongful conviction that caused Mr. Velez to spend 16 years in prison as an innocent man, beginning at the young age of 17. Dkt. 91 at ¶¶ 1, 17. The case also implicates egregious misconduct by notorious Chicago Police Department officers Bocardo, Kato, and other Area Four co-conspirators (*supra* at 3-5) as well as tried-and-true *Monell* theories of liability that juries have already credited against the City (*supra* at 5-6). Cases such as this

one implicate "a profound interest" in moving "toward institutional reform" and achieving a "deterrent effect." *Rodriguez v. City of Chicago*, No. 18-CV-7951, 2019 WL 4278501, at *2 (N.D. Ill. Sept. 10, 2019), objections overruled, 429 F. Supp. 3d 537 (N.D. Ill. 2019) (quoting Order of Apr. 8, 2019, Dkt. 65, *Gomez v. Guevara*, 18-cv-3335 (N.D. Ill.)); *see also Simon*, 2017 WL 467677, at *2. The public interest in the litigation and "strong public policy in favor of disclosure of relevant materials" render the discovery proportional. *See Simon*, 2017 WL 467677, at *2.

Second, commensurate with the devastating loss of liberty at stake here, the amount in controversy is well in the eight figures, as "both juries and courts sitting without juries have found that wrongfully imprisoned plaintiffs were entitled to compensation of at least $1 million per year." *Limone v. United States*, 497 F. Supp. 2d 143, 243 (D. Mass. 2007); *see also Smith v. City of Oakland*, 538 F. Supp. 2d 1217, 1242-43 (N.D. Cal. 2008) (describing $1 million per year of wrongful incarceration as "a floor for wrongful imprisonment awards, not a ceiling"). Indeed, "if Plaintiff prevails it will be nearly impossible to put a price tag on the damages he sustained." *Simon*, 2017 WL 467677, at *3. The *Monell* discovery requested here will entail far less expense than that conducted in many other complex cases on this Court's docket with eight-figure recoveries at stake and should be allowed.

Regarding the next proportionality factor—the parties' relative access to the relevant information—the City has an informational advantage and is the sole party with access to the files sought. The City's refusal to enter a stipulation such as the one it agreed to in *Rivera* (Exh. 7, Dkt. 313-88) also bears on this factor, as the City is not only maintaining for itself unilateral access to the files necessary to prove Plaintiff's *Monell* claim, but also reserving for itself the opportunity to argue at trial that Plaintiff did not review the right number or kind of homicide and CR files. The information should be available to all parties equally. The parties' resources, too, counsel in favor of allowing the discovery because a large municipality such as the City is well-situated to, and routinely does, produce homicide and CR files. *See, e.g.*, *supra* at 5 & n.1.

Fifth, as set forth above, the requested files are essential to Plaintiff's *Monell* claims. *Supra* at 8-15. It is hard to fathom how Plaintiff could support his *Monell* claims without access to the requested files. *See id.* And the volume of documents requested represents a tiny fraction of the volume of documents routinely produced in complex civil cases in this District. *See, e.g.*, *In re Biomet M2A Magnum Hip Implant Prods. Liab. Litig.*, 2013 WL 1729682, at *1 (N.D. Ind. Apr. 18, 2013) (2.5 million documents); *Rawat v. Navistar Int'l Corp.*, 2011 WL 3876957, at *11-13 (N.D. Ill. Sept. 1, 2011) (1,170,932 pages); *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 237 F.R.D. 176, 183 (N.D. Ill. 2006) (4 million pages).

Nor can the City meet its burden to establish any overbreadth or undue burden in Plaintiff's requests. *See Parvati*, 2010 WL 2836739, at *1; *Annie Oakley Enterprises Inc.*, 2020 WL 4571742, at *1; *Resicom Custom Painting & Maint., Inc.*, 2017 WL 3951603, at *1; *Banister*, 2018 WL 4224444, at *9. First, any burden is not disproportionate, because Plaintiff is entitled to discover evidence required to meet his substantial burden of proof for *Monell* claims (*supra* at 8-9), as numerous other courts have determined in analogous cases (*supra* at 5 & n.1). Second, Plaintiff has offered to agree with the City on an appropriate sampling methodology of files required for *Monell* expert review, provided the City stipulates to the representativeness of the files produced (Exh. 2 at 1, 13, 17), as the City has reasonably agreed to in other cases (Exh. 7, *Rivera*, Dkt. 313-88). The City has declined to accept this proposal, reserving for itself the ability to contest, on statistical grounds, the reliability of such a sub-set. The City wants to deny discovery *ex ante* and then argue that there is insufficient evidence *ex post*, which is an unfair tactic. Third, the cost of the discovery needs to be weighed against the unnecessary and expensive statistical expert battle that will follow if the City is permitted to limit discovery and then claim that Plaintiff's expert did not review enough files or the right types of files.

Plaintiff is prepared to review the entire set of relevant files and present evidence to the jury in support of his *Monell* claims. He does not want to have an unnecessary, costly, and time-

consuming battle of statistical experts who present evidence about the reliability of a narrower sub-set of files. The City cannot provide a justification for requiring such a battle through a discovery limitation; this Court should thus grant Plaintiff's motion in full.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that Court order the City to produce Area Four homicide files for the years 1995 through 2001, and all CR files for Chicago Police Department officers who worked at Area Four between 1995 and 2001, inclusive.

RESPECTFULLY SUBMITTED,
By: /s/ Ruth Brown
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Russell Ainsworth
Ruth Brown
Sam Heppell
LOEVY & LOEVY
311 North Aberdeen
Chicago, Illinois 60607
(312) 243-5900

**CERTIFICATE OF SERVICE**

I, Ruth Brown, an attorney, hereby certify that on March 12, 2021, I caused the foregoing document to be filed using the Court's CM/ECF system, which effected service on all counsel of record.

By: /s/ Ruth Brown
*One of Plaintiff's Attorneys*