**CASE REVIEW AND ANALYSIS**

December 31, 2021

**TO:**      **Russell Ainsworth**
               **Loevy & Loevy**

**FROM:**   **Robert Bub**

**SUBJECT:**   **John Velez v. City of Chicago, et al.**
                    **CASE NO. 18-cv-8144**

## I.      PURPOSE

This review was conducted at the request of Russell Ainsworth of Loevy & Loevy regarding a lawsuit, John Velez v City of Chicago, et al, Case No. 18-c-8144. The review is to analyze the investigation leading to the arrest and trial of John Velez with an emphasis on the investigative process and procedures. Specifically, the quality and content of the investigation as it led to the arrest and conviction of John Velez.

## II.      METHODOLOGY

A review of all available, pertinent reports, deposition statements, sworn testimony, and documentation regarding this incident was completed. After completing a review of the below documentation, the information was analyzed and compared to sound and established investigative procedure and process. The material examined consisted of the following:

      Second Amended Complaint
      Deposition of Michael Bocardo
      Deposition of Sam Cirone
      Deposition of John Cruz
      Deposition of James Davis
      Deposition of Michael Dyra
      Deposition of Megan Goldish
      Deposition of Cristina Izquierdo
      Deposition of Allen Jaglowski
      Deposition of Kriston Kato

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

            Deposition of Apolinar Mejia
            Deposition of Victor Perez
            Deposition of Lorena Ricardo
            Deposition of John Sullivan
            Deposition of Denis Walsh
            Deposition of Michael Walsh
            Chicago Police Department Investigative File (Hueneca Homicide)
                Including Crime Scene and Vehicle Photographs
            Michael Bocardo Trial Testimony
            Gustavo Rivera Trial Testimony
            Micaela Gutierrez Trial Testimony
            Lorena Ricardo Trial Testimony
            Michael Bocardo MTQ Arrest Hearing Testimony
            Chicago Police Department Felony Screening Form
            Chicago Police Department, Bureau of Investigative Services,
                - Detective Division Training Program
                    - Lesson Plans
                    - Death and Homicide Investigations Instruction Manual
                    - Death Investigation References and Handouts
                    - Investigative Report Format
                    - Supplemental Case Reporting Book #2
            Chicago Police Department General Order 88-18 – Line Up Procedures
            Loevy & Loevy Review of Chicago Police Department Homicide Files, regarding Lineup
                Procedures.

The conclusions and opinions drawn within this report are based on my examination of all the information available at the time of the review. Those same conclusions and opinions rely upon my knowledge, experience, and expertise. I reserve the right to amend this report upon receipt of any additional relevant material related to this matter. Any additional reference documents considered in this report are identified in the ADDENDA section.


**III.  SYNOPSIS**


**CRIME AND INVESTIGATION OVERVIEW:**

This chronology of events is derived from the totality of witness and officer statements, notes, reports, and transcripts. Italics are used in this overview to note disputed versions of incidents.

        On Monday, March 19, 2001, Anthony Hueneca[1], the murder victim, arrived alone at the "La Terraza" Nightclub located at 2881 W. Cermak Road, Chicago, IL, between 12:45 AM and 1:00 AM, according to Edward Perez, an employee of the nightclub.[i] Hueneca met with friends, left the nightclub, and returned approximately five minutes later. Perez spoke with Hueneca and

---

[1] Anthony Hueneca was a member of the Latin Kings Street gang, known under the moniker "Bam Bam."

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

Witness Jacqulina Gonzalez. Perez overheard Gonzalez tell Hueneca she had just seen "J.J.," who was later identified as Juan Izaguirre, and that J.J. "needed a ride home."[ii] Hueneca said he was going to look for Izaguirre and Gonzalez offered to accompany him, but Hueneca said he would be "okay." Gonzalez was concerned about Hueneca's safety as the night club bordered areas "claimed" by rival gangs, such as the "Kings," the "Two-two Boys," and the "Deuces."[iii]

Later Edward Perez stated a group of women entered the club and told him there was shooting "going on outside."[iv] Perez exited the club and saw a male running southbound. Perez said the male turned "half-way" in Perez's direction and looked at him, then continued southbound on Marshall. Perez described the male as light-skinned, five feet eight to ten inches tall, and around or over 200 pounds.[v]

Gonzalez said she was upstairs when she heard two (2) shots, came downstairs, and exited the night club. She saw the back of a male "White/Hispanic" in black clothing as he was running south on Marshall Boulevard.

Lorena Ricardo was inside the nightclub with her friends, Apolinar Mejia and "Mima.[2]"[vi] She and her friends had left the nightclub about twenty (20) minutes prior to the shooting. As they were walking to Mejia's car, which was parked on Marshall Boulevard, she saw two male Hispanics in the area. Later, *"as they were driving westbound approaching on Marshall" she heard three (3) shots.*[vii] She looked and saw two male Hispanics run south on the sidewalk on the east side of Marshall Boulevard. They crossed Cermak Road and continued south toward 23rd Street. *Mejia drove north on Marshall from Cermak and stopped the car next to Hueneca.* Ricardo thought she recognized Hueneca from attending Farragut High School but didn't know him by name. Ricardo told her friends the two males she saw running were the same ones she had seen as they went to Mejia's car. She said she could identify one of them because he had looked directly at her.

Chicago Police Department (CPD) Uniformed Patrol Officer V. Perez was one of the first responders to the scene, and he completed the General Offense Case Report.[viii] The report referenced two witnesses, Lorena Ricardo, and Christine Murillo, and the "witnesses" account indicated three to four male Hispanics were seen "fleeing [the] scene southbound on Marshall, eastbound on 23rd St."

CPD Detectives John Cruz, Allen Jaglowski, E. Cunningham, G. Andras, G. Maurovich, J. Botwinski, and Donald Wolverton were informed about the shooting by Sgt. Keane, the 1st Watch Watch Commander, and responded to the call. Det. Cruz was assigned to handle the crime scene. Detectives Wolverton and Botwinski conducted interviews of witnesses Edward Perez, Jacqulina Gonzalez, and Lorena Ricardo.[ix] Ricardo was also interviewed by Detective Allen Jaglowski, whose typewritten notes are the main source for her statement within Cruz's report.[x] Detective Maurovich interviewed the responding paramedics, while Detectives Cunningham and Andras went to the hospital for information on the victim and notified Hueneca's family of his death.

---

[2] Throughout the initial reports, the moniker/nickname "Mema" is spelled numerous ways. This is more an indication of phonetic attempts to spell the name, rather than inaccurate or misleading investigative documentation.

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

Detective Cruz remained at the scene for approximately 30 minutes where he met and spoke with responding officers, made mental notes of the scene, and briefed the crime scene technicians, before he returned to Area 4. The responding detectives began various handwritten and typed reports on the incident. Sometime later that morning they left the information and paperwork with a supervisor to assign the investigation.

Gang Specialists/Detectives Michael Dyra and Michael Bocardo were assigned the case during their afternoon roll call on Monday, March 19, 2001.[xi] Dyra and Bocardo reviewed the available material within the investigative file and learned there were three (3) witnesses who needed to be identified, located, and interviewed.[xii] The witnesses were listed as Apolinar Mejia, and two others with the monikers/nicknames "Mina" and "J.J." Detectives Dyra and Bocardo went to the crime location with Detectives Kato and Cirone.[xiii]

Detectives spoke to Everett Jimenez who identified "Mema" as his sister Micaela Gutierrez. Jimenez provided detectives with an address for Gutierrez. Detectives also located and identified "J.J." as Juan Izaguirre, and spoke to a man named Gustavo Rivera, who they determined was also a witness. Both Izaguirre and Rivera agreed to be interviewed at Area 4. While en route to the station, detectives stopped at the residence address for Micaela Gutierrez and attempted to contact her. She was not there, and detectives left a business card with Gutierrez's uncle and requested she contact them.

At Area 4, detectives interviewed Gustavo Rivera.[3] Rivera said he had gone to La Terraza at around midnight on Sunday night. He was with Micaela Gutierrez - "Mema," Lorena Ricardo - "Lorena," and Apolinar Mejia - "Poli." During that time Rivera spoke to Anthony Hueneca, who he knew from the neighborhood as "Bam Bam." The four remained at the club until around 1:15 AM, and after leaving, they entered Mejia's car, a Ford Mustang, and drove around the neighborhood. Rivera asked to be brought to "a friend's house at the dead end" of 21st Place and Marshall Boulevard. Rivera wanted to get some rolling papers from his friend, "J.J." Mejia parked the car on 21st Street and Rivera went into the apartment building. Gutierrez, Ricardo, and Mejia remained in Mejia's car. Rivera said he was in the apartment for approximately five minutes talking to Izaguirre and "Phantom.[4][xiv] When he went back outside, Mejia, the women, and the car were gone.[xv]

While standing outside the apartment building, Rivera saw a man, who he later learned was Anthony Hueneca, walking northbound on the east sidewalk of Marshall Boulevard. Rivera saw another male, who he did not recognize, walking "quickly" behind Hueneca. As the second person approached Hueneca, Rivera noted the man's hand was in the pocket of his hoodie. When the second man was directly next to Hueneca, Hueneca quickly turned and walked southbound. At that point a red Grand Am pulled up alongside Rivera. Rivera knew the occupants of the vehicle "from the neighborhood." Rivera heard two gunshots and saw "two flashes of light" from the area of Hueneca and the second male. Rivera "ducked down" by the Grand Am and saw the people in the car duck down.[xvi] Rivera ran back into Izaguirre's apartment building, and as he

---

[3] There is no indication of which detectives interviewed Izaguirre and Rivera, nor of whether the interviews were conducted by both detectives, or if the detectives separated and each interviewed one witness.

[4] "Phantom" has never been identified in the reports provided.

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

did, he looked back and saw Huenca on the ground and the suspect running south on Marshall Blvd toward Cermak Road.  Once inside, Rivera told Izaguirre what happened, and both men looked out the apartment window and saw Huenca on the ground.  Rivera also saw the red Grand Am was still stopped in the street.[xvii]  Rivera left the apartment and walked toward Hueneca but didn't get near him.  Rivera got into the Grand Am with the two men and left the scene before the police arrived.[xviii]  Rivera told detectives he knew the nicknames of the men in the Grand Am, including the gang affiliation of one.[xix] And he stated he would be able to identify the suspect if he saw him again.

Detectives interviewed Juan Izaguirre.  Izaguirre said he was waiting in a first-floor apartment at 2876 W. 21st Place.[5]  The building was located at the west end of 21st Place where it dead-ended into the sidewalk on the east side of Marshall Boulevard.  Izaguirre was waiting for a ride home from Huenca. While waiting for Huenca, "Gus" arrived at the apartment and asked for "rolling papers."  Gus mentioned there were two girls waiting for him in a car outside the apartment building.  Izaguirre and Gus spoke for a short time and Izaguirre gave Gus the papers.  Izaguirre stated "right after" Gus left the apartment, he heard two gunshots, then Gus ran back into the apartment.  When Gus told Izaguirre there was a shooting outside, both men looked out of the window and saw the victim lying on the sidewalk.[xx]

Detectives next contacted Lorena Ricardo at her residence and requested her to go to Area 4 to be interviewed.  At Area 4, Ricardo stated she, Mejia, Gutierrez, and Rivera went to the La Terraza night club at around midnight and stayed until approximately 1:15 AM.  Ricardo left the club with Mejia.  Gutierrez and Rivera followed them out a few minutes later. As Ricardo and Mejia walked to Mejia's car, which was parked on Marshall Blvd., they passed two male Hispanics who "gave them a cold hard stare."[xxi]  Both male Hispanics were in their early 20s, wearing dark hooded sweatshirts and blue jeans.  One of the men was described as "chunky" and the other was "slim built."  Gutierrez and Rivera exited the club and the four entered Mejia's car, a Ford Mustang.  Mejia drove around "for a while" and they eventually "arrive[d] at the dead end."[xxii] Mejia parked the car in the middle of the street, next to a van, which was parked along the north curb. Rivera got out of the car, and went into the apartment building.  Ricardo thought Rivera was going inside to pick up some money.

Ricardo saw a man approach the apartment building as Rivera went inside.  The man stood in the entranceway of the building for a short time then walked next to the van.  Ricardo was in the right front passenger seat, Mejia was in the driver's seat, and Gutierrez was in the right rear passenger seat.

The man walked up to the Mustang and leaned into the open passenger window.  Ricardo recognized the suspect as one of the two men she had seen as she and Mejia exited the night club. He asked who they were and what gang affiliation they had.  The suspect removed a "chrome semi-auto gun"[xxiii] from a pocket in his hoodie and pointed it at Ricardo.  He continued to challenge the three people in the car and pointed the gun at each of them. Ricardo talked calmly to him and convinced him they were not from the neighborhood and none of them belonged to a

---

[5] The address is incorrectly listed as 2978 W. 21st Place twice in the Cleared Closed Supplemental Report, City 000035 & 000037.

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

gang, at which point, the suspect walked away.  Ricardo told Mejia to turn the car around and leave the area.  *Mejia drove eastbound on 21st Place, and as they turned south on to California Avenue, Ricardo heard two gunshots.*[6]  Mejia turned westbound on Cermak Road and drove back toward Marshall Boulevard.  As the Mustang approached Marshall Blvd., Ricardo saw two male Hispanics running south on the east side of Marshall Blvd., crossing Cermak Road.  Ricardo recognized one of the males as the one who had pointed a handgun at her while they were parked on 21st Place.  *As Mejia drove west, he crossed Marshall Blvd. and continued west.*  Ricardo looked north as they were crossing the intersection and saw the victim lying on the sidewalk.  *Ricardo convinced Mejia to return and see who had been shot.*  After the interview concluded, Ricardo showed Detectives Bocardo and Dyra the location Mejia resided.  Detectives decided to wait until the next day to attempt to contact Mejia.[xxiv]

The following day, March 20th, Micaela Gutierrez called the detectives and agreed to be interviewed at Area 4.  Detectives picked Gutierrez up and drove her to the police station.  Gutierrez was interviewed by Detective Bocardo.  Gutierrez stated that after leaving the "La Terraza" club, she, Ricardo, Rivera, and Mejia drove to the "dead end"[7] where Rivera exited the car and went into 2978 W. 21st Place.  Mejia was parked next to a van, which was, in turn, parked along the north side of 21st Place, in front of the building Rivera had entered.  As she, Mejia, and Ricardo were waiting for Rivera to return, a man walked up to the passenger side of Mejia's car and asked them what gang they belonged to.  The man pulled a gun out of the pocket of the hoodie he was wearing and pointed it at each of the passengers, first at Ricardo, then at Mejia and Gutierrez respectively.  Ricardo spoke to the man, who eventually put the gun away and left.  Gutierrez told Mejia to drive away.  Mejia turned the vehicle around and left driving eastbound on 21st Place.  When they arrived at California Avenue, and Mejia started to turn right, Gutierrez heard two (2) shots.[xxv]  Mejia drove to Cermak Road and again turned right (westbound) toward Marshall Boulevard.  When the car reached the intersection of Marshall Blvd. and Cermak Road, Gutierrez looked north and saw something on the sidewalk of Marshall Boulevard.[xxvi]  Mejia drove away from the intersection, but later returned, and stopped on Marshall Blvd.  Ricardo exited the car and walked toward the victim, and at that time the police were arriving.  Ricardo wanted to talk to the police, but Mejia and Gutierrez did not, so they left Ricardo and drove away.

After speaking to Detective Bocardo, Gutierrez asked to use the restroom, though she wished the area to be cleared as to not be seen by anyone who might not like her talking to the police.  Bocardo asked two male Hispanics in the lobby, identified later that evening as John Velez and Raul Lopez to step outside.  After Gutierrez used the restroom, Bocardo brought her home and returned to Area 4.  He observed the same males back in the lobby area.  Bocardo spoke to the men a second time and discovered they were victims of a crime he had been assigned approximately three weeks prior.  Bocardo spoke to the Velez and Lopez, who declined to cooperate with that investigation.[xxvii]  Bocardo utilized Department resources to obtain a photograph of Velez, which he placed in his work portfolio.  Detective Bocardo was unable to locate a photograph of Raul Lopez.[xxviii]

---

[6] Google Maps indicates the route indicated by Ricardo is 0.4 miles by car.

[7] The west end of 21st Place is described by the involved parties in the aggravated battery incident as the "dead end."

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

Detectives next spoke to Apolinar Mejia at his residence, and requested he drive to Area 4 to be interviewed and allow his Mustang to be processed for fingerprints. Detective Bocardo interviewed Mejia, who said he had been at the La Terraza club on Sunday night with Ricardo, Gutierrez, and Rivera, and they left the club around 1:20 to 1:30 AM. As he and Ricardo were walking to his vehicle, he noticed two men looking at them, one of the men was wearing a blue hooded sweatshirt. Mejia and Ricardo continued to the Mustang and were joined "a few minutes later" by Rivera and Gutierrez.[xxix] They all left together in Mejia's Mustang. After approximately five (5) minutes, they drove to the dead-end street, at 21st Place and Marshall Boulevard. Rivera got out of the car and went into the "house" on the corner. While waiting for Rivera to return, Mejia saw the same male he had seen earlier, wearing the blue sweatshirt, walk up to Mejia's car. The male asked what gang they were from, then pointed a gun at the three remaining occupants of the car and stated, "King Killer" and "SD Love."[8] Ricardo talked to the man, who subsequently walked away from the car. Gutierrez asked Mejia to drive away. Mejia said they went eastbound on 21st Place toward California Avenue, south on California Avenue, and *then westbound on Cermak Boulevard. At that time, Ricardo told Mejia she heard two shots.*[xxx] Mejia stated he didn't hear any shots fired.[xxxi] When they reached the corner of Cermak Road and Marshall Boulevard, Ricardo looked north and saw the victim lying on the ground. *Ricardo thought the victim might be Rivera and asked Mejia to stop the car. Mejia said as he stopped the car, the police arrived. Mejia later stated he didn't know how long he drove around, but the police were at the location when they returned.*[xxxii]

*Detective Bocardo stated that during the interview with Mejia, he opened his portfolio and Mejia was able to see a photograph clipped inside. Mejia told Bocardo the man in the photograph was the man who had pointed the gun at them the night of the murder.*[xxxiii] *In the Felony Review Form completed by Assistant States Attorney Megan Goldish she wrote that Mejia had been shown a photo array containing a picture of John Velez. And that John Velez was later brought into Area 4 "a few hours later" as part of an unrelated vehicle stop.*[xxxiv] *Further, Mejia testified he had looked through a number of photographs in "a book" shown to him by detectives.*[xxxv]

Four days later, on March 25, 2001, Detective Bocardo created a photo array containing five (5) photos, including a photo of Velez. The photo array was shown to Micaela Gutierrez at her residence. Gutierrez identified the photo of John Velez as the man who pointed the gun at her the night of March 20, 2001.[xxxvi] The detective had Gutierrez sign and date the photograph.

Later that day, Velez was arrested while driving his 2000 Kia, and was brought to Area 4 by Detectives Bocardo and Dyra. Velez's car was released to a 3rd party, Candace Borg.[xxxvii] Detectives advised Velez of his Miranda rights, which he waived. Velez was questioned about the Hueneca murder, and he stated he had no knowledge of the incident. He could not provide an alibi for that date and time. Velez related information about a shooting incident which occurred three days after the murder in which his girlfriend, Christina Izquierdo, was struck by gunfire. Detectives determined the shooting occurred at St. Mary's Cemetery in the jurisdiction of the Cook County Sheriff's Department. *Velez said he and Izquierdo were visiting his uncle's gravesite and she was struck by gunfire during a drive-by shooting.*[xxxviii]

---

[8] The terms in street gang vernacular, respectively, indicate an adversarial relationship to the Latin Kings gang and allegiance to the Satan's Disciple street gang.

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

Detectives contacted Cook County Sheriff's Detectives J. Sullivan, and J. Davis, who confirmed there was a shooting on that date at that location and agreed to provide Bocardo and Dyra with reports. Davis and Sullivan advised Bocardo and Dyra that while at Christ Hospital, they were attempting to talk to Christina Izquierdo, when John Velez arrived and spoke to Izquierdo. The conversation was in Spanish, which neither detective spoke nor understood. *After Velez left the hospital, Sullivan and Davis asked a nurse who was also present what Velez and Izquierdo said. The nurse replied Velez told Izquierdo she was shot because of something he did on an earlier date.*[xxxix]

Also on March 25th, Detective Bocardo received a fax containing information about the cemetery shooting.[xl] In part, the Cook County Sheriff's report stated, "The victims were then fired upon while in the vehicle. Victim #1 was hit on the left abdomen while still in the vehicle."[xli] Listed on the report were five (5) additional victims, their contact information, and information regarding three (3) suspect vehicles. There was no mention of interviewing Christina Izquierdo at Christ Hospital, nor of John Velez making incriminatory statements.

On March 26, 2001, Detectives Bocardo and Dyra arranged for a physical line-up to contain John Velez. Detective Sam Cirone assisted with the line-up. Witnesses Mejia, Gutierrez, Ricardo, and Rivera agreed to come to Area 4 and view the line-up. At approximately 8:00 PM, the detectives went to Witness Izquierdo's location, spoke to her, and she accompanied them to Area 4 for an interview. Izquierdo was approximately five (5) months pregnant and had been released from the hospital three days prior, with a projectile still in her hip. Izquierdo was separated from the other witnesses until she was interviewed by ASA Goldish. Izquierdo was talked to by Detective Bocardo several times through the evening and night.

Mejia, Gutierrez, Ricardo, and Rivera all viewed the physical line-up.[9] Mejia, Gutierrez, and Ricardo identified Velez as the man who pointed the gun at them in the window of Mejia's Mustang. Gustavo Rivera identified Velez as "the person who was walking next to Anthony Hueneca "as the shots are [sic] fired that kill Anthony Hueneca.""[xlii]

The line-up was interrupted between Micaela Gutierrez and Gustavo Rivera's viewing to inform Velez that an attorney named Sladjana Vuckovic, from First Defense Legal Aid, wished to speak with him. Attorney Vuckovic also requested to speak with Christina Izquierdo, but was denied access.[xliii] Vuckovic also requested to attend the lineup procedure, but was denied access.[xliv] After speaking with Vuckovic, Velez declined to speak any further with detectives. Rivera then viewed the line-up.

After the line-ups were concluded, at approximately 11:00 PM, detectives contacted Assistant State's Attorney Megan Goldish.[xlv] Goldish arrived at Area 4 approximately twenty to thirty minutes later. Goldish had a conversation with Detective Kriston Kato regarding the case[xlvi] and reviewed the police reports, which encompassed approximately twenty to thirty minutes.[xlvii]

---

[9] The witnesses viewed the line up in that order – Mejia, Ricardo, Gutierrez, and then Rivera.

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

The witness interviews with ASA Goldish began at approximately 11:50 PM on March 26th. ASA Goldish interviewed Micaela Gutierrez, Lorena Ricardo, and Apolinar Mejia[10] between 11:50 PM and approximately 1:00 AM on March 26th - 27th. Detective Kato was present for all three of these witness interviews. At approximately 1:00 AM, Goldish began to speak to Rivera.[xlviii] Goldish spoke with Rivera for approximately 30 minutes[xlix] before taking the formal statement at 1:25 AM.[1] Detective Kato was present for the interview with Rivera.

After her interview with Rivera, and before interviewing Christina Izquierdo, Goldish went to speak to John Velez to verify he had "lawyered up."[li] At approximately 3:00 AM, Detective Bocardo brought Christina Izquierdo to be interviewed.[lii] Goldish spoke to Izquierdo for approximately 30 minutes[liii] before starting the handwritten statement.[11] Detective Bocardo was present for the interview of Izquierdo. *Izquierdo related she had gone to St. Mary's Cemetery and was standing at the grave of Gent Velez when she was shot and fell to the ground.[liv] At the hospital, with only the nurse present, Velez stated that her being shot was his fault, and she had been shot because of "what he did." And that he was "all fucked up" and had shot "one of the Kings."[lv]*

After completing these interviews, ASA Goldish recommended the filing of charges against John Velez for the murder of Anthony Huenca.

On March 31, 2001, a .380 caliber semi-automatic pistol was recovered from an anonymous citizen from 2724 W. 24th Street. Officer F. Partida, Star # 16553, completed a Lost & Found Case Report and inventoried the weapon.[lvi] Within the report, Partida detailed his knowledge that a similar weapon was used in the homicide of Anthony Huenca. Partida also mentioned the suspect in that homicide was in custody, the area in which the gun was found is frequented by the suspect, and the suspect had family that lived nearby.

Forensic testing was requested regarding fingerprint examination of the Mustang, and the .380 weapon located by Officer Partida; ballistics testing on the projectile and expended casings found at the crime scene and the .380 handgun, and of a hooded sweatshirt taken from Velez on the date of his booking.

Fingerprint results showed no match to John Velez, the ballistics testing was inconclusive between the crime scene evidence and the .380 handgun, and there was no blood evidence located on the sweatshirt.

---

[10] Goldish believed she interviewed the witnesses in a chronological order of the events of the night of the murder.

[11] According to the statement handwritten by Goldish, for Izquierdo, the statement began at 4:10 AM.

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

## IV.    INVESTIGATIVE ANALYSIS

> *"The investigation of a death is different from most types of scientific work. When certain mistakes are made, they cannot be corrected; thus, further work on the case, however well done, may be of no value in solving the crime or the prosecution of the suspect.  The homicide detective has the responsibility of resolving the most serious criminal act that one human being can commit against another.*
>
> *Therefore, a homicide detective carries the heavy responsibility when call upon to investigate a death, for he/she stands alone in the dead person's shoes to protect the victim's interest against those of everyone else."*
>
> - Los Angeles Police Department Homicide Manual

There is a reason the investigation into the death of a human being is of primary importance.  As a society we want answers, and even more importantly, the public deserves to be protected from those who endanger them.  Victims' families and society at large want and deserve to know that any person willing to illegally take the life of another is prevented from continuing to victimize other people.  To this end, the detectives who investigate these incidents are, and should be, held to a higher standard in the quality of their investigations.  Detectives assigned to homicide investigations should know that time is of the essence in attempting to solve the crime and identify, locate, and arrest the suspect(s).  Delaying a homicide investigation for hours between the initial investigation and the continued investigation and pursuit of the suspect or suspects does not support the mandate police have to provide for the public safety.

> *"The lead investigator typically has a number of responsibilities on a case that other investigators do not have. These include managing the information flow and the case file, briefing supervisors and commanders on the status of cases, meeting with the District Attorney's Office on the investigation, meeting with the medical examiner, and meeting with forensic analysts, as well as a wide array of other case management responsibilities. Significant time is spent with witnesses and family management that is sometimes overlooked by police management."[12]*

Within the Chicago Police Department, the detective position appears to be a generalist investigator, assigned, not by expertise or experience, but because of availability.  Sergeant Denis Walsh, the 3rd Watch Supervisor, stated "the biggest one [factor in assigning a case], I would say, is who is at work, who is there, who didn't have a job, who had been working 20 hours of overtime for the last three days each, who was going to be off the next day."[xlvii]   And that the skills of the investigator were a part of "the decision making process."[xlviii]   However, when assigning a homicide to a detective versus a gang specialist, he said, "I don't know that it really made a difference to me then when I was assigning cases.  I don't recall it making much of a difference to me."[xlix]

---

[12] Homicide Mapping Process, Bureau of Justice Assistance, Carter, Dr. David L., September 2013, page 9

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

Another disadvantage to the generalist approach to detective work is the added workload. As demonstrated in this case, detectives relied upon their memories for statements, facts, etc., until they were able to immortalize them in reports. When a detective must maintain an additional caseload of less serious crimes, this method of documentation can cause memory retention issues through case volume. Issues which can be avoided through proper documentation and note taking.

A homicide detective needs to assume and maintain control of the investigation from the onset. Relinquishing any aspect of the investigation, even that of the initial crime reports, is counterproductive. Contradictions between reports can easily arise and cause preventable problems. Seldom will the investigation of a crime receive as much scrutiny as that of a murder. To learn to successfully investigate a homicide requires involvement, practice, and repetition; and should be accomplished with the assistance and mentoring of an experienced homicide detective, as well as under the guidance of a knowledgeable supervisor. The investigation of a homicide is not, and never should be, a training ground for detectives. Detectives should be well versed and practiced in handling basic investigative procedures before being entrusted with the arduous and complicated tasks required of a homicide investigation.

An issue which touches every aspect of this investigation is the lack of documentation. The need and ability to take notes is a cornerstone of a homicide investigation. There is no homicide investigation text or training which doesn't attach significant importance to proper notetaking. By having a thorough and comprehensive investigative chronology, the detective possesses a record which protects both his own integrity and that of the investigation. While written reports are not themselves evidence, they serve as a record of contemporaneous actions, decisions, and observations made throughout the investigation. They are a reminder to officers, detectives, and witnesses, whose memories can fade or may be influenced by time or interactions with others.

Another weakness observed in reviewing this case is the lack of accountability by detectives regarding the roles they were assigned. On more than one occasion detectives seemed to take minimal responsibility for the tasks they were obligated to fulfill. There was a perception that a "team investigation" would be successful without a "lead detective[13]" to assume the crucial role in organizing the investigation to assure that leads are identified, assigned, followed up, and completed. This case demonstrates that a system of team investigation, without a primary detective or detective team, allowed for clues to go uninvestigated. Even if those leads or clues might have strengthened the case or refocused it to another suspect. While some detectives eschew the idea of following or even including exculpatory evidence and witnesses when investigating a case, the careful investigation of these clues can strengthen or redirect it.

This case is fraught with disorganization. From the lack of direction provided by detectives at the crime scene,[lix] to the cursory sense of responsibility by the assigned detectives who seemed satisfied with the concept that "someone" should or may have handled a particular task.[lxi] The failure of investigators to follow up on potential witnesses or locate additional evidence, and to limit the examination of existing physical evidence and forensic testing occurs throughout this investigation. A large portion of these breakdowns can be attributed to the primary detective's failure to review and organize information,

---

[13] In his Deposition, Detective Bocardo stated he was unsure the term "lead detective" was used in 2001, but the designation was "assigned detective."

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

determine the needed investigative steps, delegate assignments, or perform those steps and assignments themselves as deployment dictates.

In addition, an element of tunnel vision can be found within the investigation. Once John Velez had been identified as a primary suspect, it seemed as if any other prospective direction for the case was abandoned. Detectives' forensic requests were limited in scope, and tended to ignore further investigation or testing requests when results were obtained. Fingerprint analysis and comparison requests were focused solely on Velez, and wider nets to eliminate other witnesses or to uncover alternate suspects, were never pursued. No serious attempt was made to locate the murder weapon. And when a similar caliber weapon was recovered, forensic requests regarding that weapon were limited, again, to Velez's connection. No further investigations were made upon receiving examination results.

There appeared to be little direction or oversight from the detective supervisors. Information and updates were not sought by the supervising sergeants, and were only acknowledged when presented to them, with seemingly no direction or guidance provided. The lack of oversight was further evidenced during the physical line up with John Velez. When counsel representing Velez arrived at Area 4 and at least one live lineup was yet to be completed, the supervisor did not document, nor make sure detectives documented her presence and the reason for her not viewing the lineup. This lack of managerial oversight continued into the review stage in which a supervisor should be examining and critiquing the investigation. A supervisor has a duty to his men and to the Department to ensure the investigation is complete, thorough, and ready to withstand the eventual and inevitable scrutiny of the criminal court process.

From the onset of the murder investigation of Anthony Hueneca, fundamental mistakes were made. Many mistakes were those of omission, whether intentional or unintentional. Some of the errors are systemic, originating from accepted Departmental policies and protocols, but many were individual and avoidable.

**ISSUE & OPINION**

Documentation is the cornerstone of a successful homicide investigation. Proper documentation prevents attacks on the integrity of the investigation and on the integrity and competence of the detective.

*"Your report establishes a file for your particular case. Further developments in the investigation become part of that file which is permanent. It may be some time before the assailant is apprehended and brought to trial, and by then, other officers may be handling the case. For this reason it is absolutely necessary that the report be understandable and that all the information contained therein be accurate."*

*Reports are reflection of the department and the writer who submits them. The account of the incident must be accurate and understandable to the reader. The probability of the solution and conviction may well depend upon the thoroughness of the report.*

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

> *The reporting detective and the supervisor who signs the report, will be held accountable."* [lxii]

- Chicago Police Department Violent Crimes Report Format Training

In the case of the Anthony Hueneca murder, documentation issues begin the moment the call was received in Area 4 and the night watch detectives were assigned the investigation of the crime scene. The issues continued throughout the investigation, up to and including the filing of charges with the Assistant States Attorney. Detectives routinely avoided or disregarded the need to take comprehensive and contemporaneous notes. Whether at the scene or during interviews, detectives relied upon their memories rather than immortalizing the information upon which their case was built. At later dates, not only were the detectives unable to recall what occurred with any clarity, but reviews of the completed paperwork provided no assistance. Detectives couldn't determine when or in what order events may have happened, and in some cases, whether they happened at all.

It is true that witnesses can be distracted, and the flow of an interview broken by a detective pausing to take notes.[lxiii] When two detectives are present for an interview, the physical setting of a room can be arranged to allow one detective to interview, while a second detective remains inconspicuously out of sight to take notes to not interrupt the flow of the interview. Interview documentation can be accomplished by methods other than physical notetaking. An audio recording of an interview allows the detective to secure and maintain a rapport with the witness.[14] If done in an inconspicuous manner, this can facilitate a less formal and more relaxed interaction. A recording protects the integrity of the investigator and the interview. Recantations or accusations by witnesses or suspects that a statement, admission, or confession was or was not made, are easily disproven and as a recording will accurately represent the conversation.

Some type of chronological record is essential in the organization of a criminal investigation, and should be required for all investigations. The record of the investigative steps taken in a homicide investigation can mitigate confusion and misunderstandings. The chronological record need not be a detailed report summarizing every statement or follow up. It can be a simple timeline notation of when a follow up was attempted or completed, when a witness was interviewed, when a forensic test was requested or a result was received, or to document unsuccessful attempts to identify, locate, and contact witnesses. Including a date and time of the occurrence in the notes and/or within the reports themselves can prevent later questioning of the chronology and aid in recalling the event(s). Chronological entries can indicate where, within other reports, documents, or investigative file, more detailed information can be found.

Reports created based upon notes, diagrams, and/or photographs, will be reviewed, and sometimes dissected, by fellow detectives, supervisors, prosecutors, defense attorneys, and judges. To that end, they must be accurate regarding details. The homicide investigation and the homicide investigator must be able to withstand intense scrutiny. Detective supervisors have a

---

[14] Illinois is a two-party consent state regarding recording conversations, and was in 2001 when this crime occurred. The recording must be voluntary and both parties must be aware of the recording.

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

duty to review reports and investigations to correct mistakes, point out deficiencies, and address potential areas of 'reasonable doubt' whenever possible. At times that review will and should require asking detailed questions of the primary investigators.

Lastly, it is an unfortunate reality that not all homicides are immediately solved. Cold case detectives rely on the work done by the original investigators. Thus, the original detectives must anticipate extended time periods before a case is solved. The thoroughness of the investigation must allow those investigators to not only familiarize themselves with the clues and leads the detectives followed, but also understand those clues and leads which were investigated but proved unsuccessful.


**BASIS**

In a murder case, documentation starts with the notification of the responding detective. That documentation should include the when, where, and who notified the responding detective, and that same information regarding the crime. The initial investigation into the murder of Anthony Huenca lacked even the basic documentation a seasoned investigator would expect from a patrol officer handling a crime without the assistance of a detective.

On March 19th, Detective Cruz, and the other "assisting detectives" responded to the scene at 2141 S. Marshall Blvd.[lxiv] Detective Cruz remained at the crime scene for 30 minutes and completed one General Progress Report (GPR) which contained no direct information relating to the evidence, or the condition or status of the crime scene.[lxv] The GPR was an abbreviated list of some personnel from the crime scene. Cruz did not initiate a diagram of the scene, he did not make measurements of the evidence, nor did he direct anyone to complete those tasks. There is no indication Detective Cruz collected the results of the witness canvass completed by patrol officers, losing the opportunity to determine if a larger or more detailed canvass should be completed. Cruz stated he left the scene upon the arrival of the photographer and forensic technicians. This precluded him from ensuring proper photographs were taken. As a result, there are photographs of the area near the La Terraza club, but the area in which the only eyewitness was standing is only depicted in the background of the crime scene photographs.[lxvi] Due to the flash of the camera, the area the witness was located is virtually invisible and those photos are of little use in documenting the scene.

Cruz's rapid absence from the scene precluded any possibility for additional photographs to be taken, locating further witnesses to be interviewed, or any other immediate follow up to be initiated. He neglected to detail responding officers to complete a GPR detailing what actions they took and what assignments they fulfilled while at the scene. Direction and oversight on the part of Detective Cruz might have eliminated the issue of Christine Murillo never having been interviewed, which will be discussed later in this report.

The observations Cruz made at the scene were trusted to his memory.[lxvii] As there were no contemporaneous notes, the accuracy of Detective Cruz's memory becomes an issue. Anthony Huenca's body had been transported from the scene before Cruz's arrival.[lxviii] There are no indications in any reports from the initial investigation,[lxix] as to the trajectory of the gunshot

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

wounds Hueneca sustained. The references to gunshot wounds in those reports detail only head and torso wounds. Yet, Detective Cruz described trajectories for both wounds, and misidentified the entry and exit locations for the wound to Anthony Hueneca's torso. Cruz determined the trajectory of the torso wound as left to right.[lxx] This would indicate the wound to Hueneca's torso wound have been fired the opposite side from the head wound. The Autopsy Report of Anthony Hueneca indicated the trajectories of both rounds was right to left.[lxxi] The information was corrected in Detective Dyra's Cleared Closed case report, but no explanation as to how Detective Cruz received that information was provided.

As the two "assigned detectives,"[lxxii] Detectives Dyra and Bocardo were, at minimum, accountable for immortalizing their own actions. In reality, they were responsible for every action and investigative step in this case. This included searching for additional evidence, as well as determining when, where and who interviewed witnesses; what, when and who made forensic requests; and, when provided the results of those tests, whether any further requests were made. Bocardo stated he did not "always take GPRs,"[lxxiii] and the investigative file bears this out, as it contains only six (6) separate GPRs created by Bocardo; two (2) of which are two-page reports containing interview notes,[15] one (1) which closed the original Aggravated Battery case in which Velez and Lopez were listed as victims, one (1) contained the information as to the identity and residence of Micaela Gutierrez,[lxxiv][16] and the final GPR is a rough diagram of the scene completed based upon Lorena Ricardo's description. Detective Dyra completed two (2) GPRs[lxxv], one of which contained information on the woman to whom John Velez's car was released on the night of his arrest. And the other contained a variety of unattributed notes. And while Dyra completed the Case Supplemental reports, when these reports were begun and completed became factors in the issue of contemporaneous recording, memory, and later reporting. Detective Dyra referred to his use of a "running investigation Sup" to which information would be added during the investigation.[lxxvi] This method did not track when the information was obtained versus when it was added to the report. Many of the issues in this case stem from the lack of contemporaneous documentation. The proper adherence to basic investigative protocols and procedures could have minimized those problems.

There is repeated incorrect reporting of building and block numbers in the report. The apartment at the "dead end" of 21st Place, is listed as 2978 W. 21st Place in two locations within the Cleared Closed Supplemental Report.[lxxvii] The correct address for the apartment building in which Rivera met and spoke with Izaguirre and "Phantom" is 2876 W. 21st Place.[17] That report further denotes, "Citizens who frequent the area commonly refer to this location as the 'Dead end.' It is a residential area which [sic] 21st Pl, an east-west street which contains both the 2800 & 2900 Block. The east boundary would be California Ave and west boundary is Marshall Blvd."[lxxviii] The 2900 block of 21st Place lies on the west side of Marshall Blvd. The address used to identify

---

[15] Micaela Gutierrez, who was interviewed on March 20, 2001, and Apolinar Mejia, City 000057-58 and City 000061-62, respectively.

[16] This information was obtained during Bocardo and Dyra's original crime scene visit, as there is a note on the GPR relating detectives contact with Gutierrez's uncle and leaving a business card.

[17] Despite the significance of the apartment, detectives never indicated who was the owner/renter of the apartment at 2876 W. 21st Place.

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

the apartment at the 'dead end,' would place it on the west side of Marshall Blvd., far from the actual location. While these are not egregious mistakes, in considering the total investigation, it certainly is indicative of the perfunctory approach the detectives took in their paperwork. This reflects badly upon the detective supervisors, in that these reports were submitted, reviewed, and received approval.

Detectives Dyra, Bocardo, Cirone, and Kato traveled to the crime scene the evening Bocardo and Dyra were assigned the case.[lxxix] Detective Cirone correctly noted that a detective should visit a crime location, as they would "want to understand the scene."[lxxx] Yet, with the modest information gleaned from the reports left them and no access to the crime scene photographs, none of the four detectives elected to make any contemporaneous notes of their own. The only "sketch" of the scene was Bocardo's aforementioned GPR, "as described by Lorena Ricardo," and was done during her interview later that night at Area 4 rather than at the scene.[lxxxi] As information was accumulated, Detective Bocardo stated he returned to the scene and verified Rivera was able to see the shooting unobstructed,[lxxxii] but he never determined the distance from the shooting to witness locations, nor did he ever document that visitation. Bocardo never verified the witnesses' statements versus any inconsistencies, nor accounted for them. There were no notations on the lighting conditions as they might affect the witnesses accounts, or to ensure the lighting conditions had not changed, or, if so, explain how it was different. There was no attempt to return to the scene with a photographer to retake photos from the witnesses' vantage points. This would have further benefited him in the ability to accurately recall the case for any criminal filing and court. Lastly, it would have aided future detectives who may have to review and understand the case, should it stall and grow "cold."

In interviewing eyewitnesses to a crime, it is a basic tenant of police work to obtain as clear a description of the suspect as possible. Of the witnesses Detectives Bocardo and Dyra interviewed, only Micaela Gutierrez provided a description. She described the person she saw as a male Hispanic, between the ages of 18 and 20 years of age, wearing a dark hoodie and pants.[lxxxiii] In both the handwritten GPR[lxxxiv] and the Cleared Closed Supplemental Report,[lxxxv] Mejia provided an account of the Aggravated Battery, but never gave a physical description of the suspect. The same is true for Gustavo Rivera. Detective Bocardo stated, when asked about obtaining a suspect description from Rivera, "I would've believed I did at that time, it's just not noted on here. This is a summary of the investigation. I don't write – we don't write every single interaction or – it's a summary of what happened."[lxxxvi] There are no interview notes available, and while the Cleared Closed Supplemental Report details Rivera's recounting of the murder, it does not include a suspect description. To the exclusion of ethnicity, hair and eye color, height, weight, or age. The sole clothing information for the suspect indicated he was wearing a 'hoodie."[lxxxvii] Only Lorena Ricardo provided any detailed suspect description, to Detectives Wolverton and Botwinski. Detectives Bocardo and Dyra, who authored the Closed Cleared Supplemental Report, used only the vaguest portions of Ricardo's description in their report, as "male Hispanics in their early 20's dressed in dark hooded sweatshirts and blue jeans. Ricardo describes one subject as chunky and the other was slim built."[lxxxviii] And that suspect description was for the two men she saw running across Cermak Road, as they were the same men she saw earlier outside the La Terraza Club.[lxxxix] And this information came before Ricardo had advised detectives of the Aggravated Battery at the end of 21st Place.

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

Detective Bocardo conducted numerous interviews and the use of an audio recording medium would have greatly assisted in his documentation. Audio recordings can detail when and where the interview took place, who was present, and the content of the interview. Recordings eliminate the potential for misquoting, they provide the most accurate version of what a witness stated, and they add integrity to an investigation. A voluntary, consensual, and inconspicuous recording can allow a detective to develop a rapport with a witness and create a more casual atmosphere in which the detective and witness can talk without the interruption or distraction of physical note taking. Nothing prevented any of the involved detectives from utilizing this technique.[xc] Detective Bocardo believed the capability to audio record an interview was the responsibility of the Chicago Police Department, in that it is their responsibility to provide the equipment. Initiative is an important quality in a homicide investigator. And sometimes initiative requires an investigator to find his or her own means to better handle the investigation. Micro-, and mini-cassette recorders had been widely available since the mid-1980s and were relatively inexpensive, with digital recorders becoming available in the late 1990s. The recording of interviews would have greatly assisted Bocardo in proving the most contested of his interviews, such as the single photo identification by Mejia, and the dispute over whether he interviewed Christina Izquierdo at any length before her statement was taken by ASA Goldish.

On March 20, 2001, Detective Bocardo was clearing the lobby area for Micaela Gutierrez because she felt uneasy that someone might see her talking to the police. When Bocardo entered the lobby area, he observed John Velez and Raul Lopez. Bocardo asked Detective Korzeniewski who they were. He learned they had been in the company of another man who was in custody for murder. "R/GS learned from Korzeniewski the identity of the two subjects and both subjects were victims of a [sic] unrelated shooting that RG/S were assigned to investigate."[xci] It appears from this sentence that Detective Bocardo, upon hearing their names, did not recognize them as victims of a crime he had been assigned to investigate. If this is a mistake in grammar, it demonstrates an instance of imprecise report writing. However, if not, it displays the potential negative consequences of relying on memorized facts when handling a large caseload and is indicative of the larger documentation problem.

The circumstances in which Apolinar Mejia identified John Velez from a single photograph inadvertently seen during an interview with Bocardo, were detailed in a report authored by Detective Dyra.[xcii] Detective Bocardo stated Dyra was not with him when he interviewed Mejia.[xciii] Detective Bocardo recorded the details of the crime for which Mejia was a victim on a GPR, yet he neglected to include the details of that identification. Nor did he have the photograph from which Mejia made the identification signed, dated, and inventoried.[xciv] Det. Bocardo believed that the inclusion of this version of events in a Case Supplemental, authored by his partner, should be considered proper documentation.[xcv]

The first identification of a suspect, beyond a description, is a significant development in a homicide investigation. Detective Bocardo not memorializing the identification and underlying circumstance in his contemporaneous notes of his interview with Mejia is disconcerting. Especially when considering the detectives considered the identification outside normal occurrences in an investigation. When considered against the documentation from the Felony Review, in which ASA Goldish indicated Mejia was shown a photo array from which he picked

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

Velez, [xcvi] and not from a single photo accidently seen by the witness, the issue becomes bigger and more troubling.

According to ASA Goldish, she received information from the dispatcher at Felony Review about a murder at Area 4 and she responded. Goldish stated she would normally return the detective's call, but didn't recall doing so in this case.[xcvii] Although "If it was something like Area 4 I would usually wait until I got there because it was fairly close to 26th Street."[xcviii] She did not recall which detective called for the Felony Review. After she arrived at Area 4, she spoke to Detective Kato before reviewing handwritten GPRs. "I think those were all handwritten ones, the ones I reviewed. The police report was typed up, but I don't – I don't think I ever reviewed any what they call supplemental reports that were typed up."[xcix] ASA Goldish spoke to detectives to obtain an overview of the case and "then I settled myself in one (office) in the back, what they call the sex crimes office."[c] ASA Goldish then began interviewing witnesses.

This indicates the Cleared Closed Case Supplemental, which outlined the single photograph identification was not completed, and so wasn't reviewed at the time of the Felony Review. For ASA Goldish to have included the information about Mejia looking through a photo array in her Felony Review, she would have had to have gotten it during her call back, which she did not remember making,[ci] to either Detective Bocardo or Dyra, or during the "overview" briefing she received from Detective Kato. And that is in direct contradiction to Detective Kato who, during his deposition, stated "I can recall that, prior to the arrest of Velez, Gang Crimes Specialist Bocardo stated that one of the witnesses identified a picture of Velez. Other – other than that, that's the only thing I could say, honestly, that I remember of the case. That – other than that I don't recall it."[cii] If Detective Kato remembered that peculiarity in the case so far after the fact, why, presumably with that knowledge fresher in his mind, would he have provided erroneous information to ASA Goldish within days of the single photo identification? Again, the improper documentation, raises a huge issue regarding the integrity of the investigation.

Finally, Mejia later stated he was shown multiple photographs in a book before being shown individual photographs by a detective.[ciii] Sgt. Walsh's acknowledgement of the existence of photo books containing pictures of certain types of offenders lends credibility to Mejia's statement.[civ] Detective Bocardo created a challenge to his own integrity, and that of the case, when the issue could have been eliminated by utilizing any method to immediately memorialize the single photo identification with Mejia.

The documentation that is available, such as the Closed Cleared Supplemental Report, lacks comprehensiveness and accuracy, and appears carelessly written. An example of this appears in the evidence section of that report. Detective Dyra requested, with regard to the crime scene ballistic evidence, "2 Wolf .380 auto cartridge cases submitted to crime lab for …" without any further instruction or indication. Regarding the weapon recovered by Officer Partida, the Davis P-380 handgun, magazine, and cartridges, Dyra wrote "A request to the Illinois State Police crime lab was made on the weapon, magazine, and cartridges."[cv] Detective Dyra did not indicate what testing was being requested.

Adding to the misperception of Detective Bocardo's belief that the later Supplemental Report documentation was the equivalent of contemporaneous notes, is a review of the Criminal Case

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

Records Information System printout for RD# G155779[cvi], the Homicide Investigation of Anthony Hueneca. The printout indicates three Case Supplemental Reports created by Detective Dyra.

The earliest creation date for Detective Dyra's reports is for the "CLEARED CLOSED" report seen on line three. The date on that report is March 29, 2001. This is the report which contained the circumstances of the single photograph identification. Detective Bocardo's handwritten notes of his interview with Apolinar Mejia, were dated March 20, 2001. The report which outlined the circumstance of the single photo identification of John Velez was begun nine days later.[18] This disputes the impression that the information regarding the identification was included in the "running investigation sup" contemporaneously, or even soon afterward.

According to the Cleared Closed sixteen-page Case Supplemental, Bocardo interviewed Christina Izquierdo while at Area 4.[cvii] Bocardo's GPR for that interview,[cviii] contained basic identifying information and no narrative interview information. This in contrast to the two-page interview notes he obtained from Micaela Gutierrez, and Apolinar Mejia.[cix] Bocardo was not able to recall when during the night he interviewed Izquierdo.[cx] A simple notation of the time of the interview and the location it was conducted could have prevented the appearance of impropriety. A thorough set of interview notes, such as were completed for Gutierrez and Mejia, would have ended the issue.

On March 26, 2001, Detectives Bocardo and Dyra, along with Detective Sam Cirone, arranged the live line up including John Velez. During that line up, witnesses Mejia, Ricardo, and Gutierrez identified Velez as "the person who pointed a gun at them." And Rivera identified Velez as "the person who was walking next to Anthony Hueneca as the shots were fired that kill [sic] Anthony Hueneca."[cxi] A required handwritten Line Up Supplementary Report[cxii] was generated. However, nowhere in any report is there documentation as to an admonition provided to inform the witnesses that the participants within lineup may have no connection to the crime. Without that admonition, witnesses can determine they must pick someone out, or detectives can unduly influence witnesses toward a particular participant in the lineup. Another check on the veracity of a lineup is the presence of an attorney representing the suspect. While they are not always available, their participation in the lineup can be beneficial to deflect later accusations of improprieties and misconduct on the part of the detectives.

Attorney Sladjana Vuckovic was present and represented Velez on the night of his arrest, as was evidenced by detectives allowing her to meet with Velez. She could have witnessed, at least, Gustavo Rivera's viewing of the lineup. According to Vuckovic, she requested of Detective Dyra and Sergeant Vail that she be allowed to attend the lineup, but was denied the opportunity.[cxiii] Even if the denial was within the policy of the CPD Lineup Procedures, guidelines, the supervisor present should have detailed the denial. The absence of that information is another omission, both undocumented and unexplained.

---

[18] The remaining two reports, also authored by Detective Dyra, were both created on April 2, 2001, four days after the first supplemental, and within one hour of each other.

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

### ISSUE & OPINION

The largest deficiency lies in investigative procedure and follow up.  Follow up investigations were not completed, detectives failed to reconcile discrepancies between witness statements, and allowed for inaccuracies within the officially reported information.  There was also a lack of diligence to identify, locate, and arrest the suspect.

> *"Please remember that often the initial observations made by the investigator at the scene are the foundation upon which the entire investigation is built.  Supervisors and other investigators will depend upon those observations to continue the investigation, interview witnesses, and eventually interview the suspected offender."[cxiv]*

> *"The detective Division is part of the Bureau of Investigative Services.  The Bureau as a whole and the Investigative Division is responsible for conducting <u>thorough</u> investigations, arresting offenders, preparing cases for court, providing information and liaison with department personnel in CRIMINAL matters.  Cooperation is also given to outside law enforcement agencies with similar responsibilities.[cxv]*

- Chicago Police Department Detective Division Organization Training

In conducting a homicide investigation, it is a necessity to corroborate as much information as possible.  Homicide cases based upon single witness identification can be insufficient to obtain a filing, much less a conviction.  When an eyewitness account is the strongest evidence, a detective must assure the statement, and more so if there is more than one, addresses and explains any contradictory information.  Witness statements, taken individually, can be affected by time, perspective, and outside influence.  But the corroborating statements of other witnesses and/or physical evidence can mitigate that issue.

Physical evidence can be interpreted in different ways and must be viewed in context with other evidence and information.  A detective must maintain an open mind and follow the facts.  Leads require continued examination to allow for changes in the direction of the investigation.  A maxim in homicide investigation is "your theory has to fit the facts; you can't make the facts fit your theory."

The duty to follow up on leads and information includes unfruitful lines of inquiry.  A detective must record the attempts, the results, and the reasons the information was not helpful or relevant.  Comparing all information is necessary to seek the truth and to identify and arrest the correct suspect. The case must be in a constant state of re-evaluation and detectives must determine if the information that develops is complimentary of or contradictory to the information they already have.  They must be prepared to act upon that knowledge.  Both Detective Bocardo and Dyra acknowledged the concept and necessity of including exculpatory information in their investigative reports.[cxvi]

A simultaneous consideration for a thorough homicide investigation is the anticipation of the areas in which the case may be attacked in court.  Unanswered questions and unfollowed leads

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

can lead to reasonable doubt.  A homicide detective must consider alternative theories and interpretations of evidence, and address weaknesses in the investigation, all of which may raise reasonable doubt in the minds of one or more jurors.  The homicide detective must constantly analyze and reexamine the case to address those potential defenses and reasonably and factually negate them.

This case has numerous lines of inquiry which were not pursued.  These could have, and more importantly, should have been addressed.  And more perplexing, the results of these leads, if followed, might have benefited the investigators.  The largest of these neglected leads involved potential witnesses.  While no one could predict which witnesses may have contributed inculpatory or exculpatory information, without the due diligence to locate and interview them, the obligation to find the truth is missed.  At least eight possible witnesses were never located.  And two additional witnesses were never recontacted.  And, apparently, no efforts were initiated to do so.

Testing of the forensic evidence collected during the investigation was requested, including ballistics, fingerprints, and trace analysis of Velez's sweatshirt.  However, the fingerprint comparisons requested were limited in scope, as were the ballistics requests.  Further, when results were returned, there was no effort made to evaluate and consider whether further requests could have been submitted.  Trace (Gunshot Residue) and blood evidence testing was requested on the sweatshirt worn by Velez on the night of his arrest.  After receiving these results, again, no further evaluation was performed to strengthen or mitigate the results.  This lack of further investigation indicated tunnel vision toward Velez.

Lastly, the sense of urgency that should mark a homicide investigation, is missing in all aspects of this case.  Detectives did not locate and interview witnesses before they could speak with others and potentially influence, or be influenced by them.  Time lost by delaying follow up can equal evidence being lost or destroyed.  A homicide detective must ensure leads are immediately followed up and proper investigative steps are recorded.  A gap of approximately seven hours between the end of watch of the scene detective and the assignment of the case is confounding.  This gap is lengthened if consideration is given to the overnight detectives stopping the investigation to "finish" reports to go "End of Watch" on time.  Once the case had been assigned and detectives identified a potential suspect on March 20, 2001, confusingly no one worked the case until four days later, on March 24, 2001.[cxvii]


**BASIS**

From the start, there was no sense of urgency in the investigation of the murder of Anthony Hueneca.  Large time gaps work against detectives in the investigation of a homicide.  Detectives appeared to succumb to tunnel vision upon becoming aware of John Velez and did not deviate from him as a suspect.  This is demonstrated by a failure to follow through with physical evidence when it did not produce "positive" results which pointed at their suspect.

After the first responding uniformed patrol officers arrived at the scene, the investigation did not appear to draw the interest of detectives.  Investigative procedures were given seemingly minimal

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

effort. Some of the scene responsibilities were accomplished, but there is little in the reports that indicate whether this was happenstance or the result of any coordinated investigative effort.

The duties of the homicide detective begin when the notification is received and before they respond to the crime location. The date and time of the call, who notified the detective, the location of the scene, including whether the scene is indoors or outdoors, should all be noted. The detective should consider any factors which might require special attention, such as, the size of the scene, the number of witnesses present, language skills which might be required, weather conditions that might affect the scene and investigation, and/or the potential need for a search warrant to enter and conduct the investigation.

Once they arrive at the crime location, detectives need to record their observations. This step assures that any mis- or "outdated" information is corrected. Detectives need to speak to the first responders to confirm the intelligence they received upon notification.

The detective must have a good working relationship with the patrol officers who will, inevitably, arrive at the scene first. Detectives should take the initiative to ensure patrol officers and supervisors are trained or knowledgeable in the steps which should be taken, and how to accomplish them, prior to the detective's arrival. Once these steps are routine, through training and practical use, crime scene investigations will move swifter and allow better coordination. Detectives can speak with responding officers to determine what actions have been completed, which are ongoing, and what needs to be addressed. Responding officers and detectives should not be restricted by an official rank structure to avoid taking the initiative which may provide information identifying witnesses, evidence, and potentially a suspect. The scene detectives should also assure that each responding patrol officer complete a GPR detailing the actions they took, including witnesses they interviewed with contact information, any items of evidence they may have located or touched, etc.

Among the homicide detectives' duties is ensuring the scene is secure and is of the appropriate size to protect the evidence. The detective must assure that a log of personnel at the scene has begun; already identified eyewitnesses have been, at least, preliminarily interviewed; a canvass for additional witnesses has begun, and any evidence located has been identified and marked. Further, if the victim has been transported, which in some cases occurs before the victim is pronounced dead, the assigned detective should confirm an officer has accompanied the victim to the hospital to collect information as to the injuries the victim sustained and time of death pronounced, personnel who worked on the victim and pronounced the death, to recover clothing and other evidence which might be needed; and to relay this information to the detective at the scene. The detective in charge of the crime scene then has the responsibility to immediately document their observations of all the pertinent information from the scene. Is the scene an interior or exterior scene; and the lighting conditions, whether it is day light, nighttime, or artificial lighting.

The detective handling a homicide crime scene should ensure that, not only a canvass for witnesses has occurred, but upon receiving information of a possible route of escape for a suspect, that officers are deployed to search that route for discarded weapons or other evidence, such as clothing. The information provided by Lorena Ricardo on the night of the murder,

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

informed detectives that a potential suspect had fled south on Marshall Boulevard across Cermak Road. There is no indication this was completed.

The scene detective is also responsible for documenting the location and condition of the scene itself and any evidence located. The detective has the responsibility to direct the photographer. Photos of the crime scene should be taken under the "Four Corners" theory. Overall photographs from all four compass points should be taken of the crime scene, with consideration for more photos from eight compass points (i.e., north, northeast, east, southeast, south, southwest, west, and northwest). Overall photographs should be taken after all the evidence has been located and marked. Followed by a series of closer photographs of each individual piece of evidence should be taken. When witness information is relayed to the detective, photos from the location of the witness should be taken to establish the veracity and truthfulness of the witness. And in conjunction to photographs, a diagram of the scene should always be created. The diagram can show the approximate depth of field between objects, even a drawing which is not to scale. Photographs depict objects and spatial relationships in a two-dimensional aspect, whereas the addition of a diagram can better convey the relationship between objects, evidence, buildings, and locations of witnesses at the time of crime. The photographs of this crime scene were minimal and provided little perspective to a detective to determine what had occurred, or if witness statements were accurate.

The homicide detective must have a basic knowledge of forensics and have a strong working relationship with the crime scene technicians. This partnership involves working with and being present to direct aspects of the collection based upon the detectives evolving understanding of the case. He or she must also remain at the scene to advise and take advice from the criminalists in the best manner to collect evidence, and to prioritize collection based upon which evidence is determined to be the most valuable. Before the evidence is collected, each item should be photographed in place and measured from two fixed points (street curb lines, telephone, or power poles, building walls, etc.). This procedure would enable the scene to be "recreated" for court or for another detective potentially years later.

The detective handling the scene needs to remain and receive information from other detectives or patrol officers. He or she is the repository for and organizer of all the information obtained. In turn, they must direct the investigation forward when the information warrants movement.

Lastly, the scene detective is responsible for breaking down the crime scene. Based upon his or her time at the scene and the information received, the detective needs to assure that all the needed evidence has been collected, photographs depict the scene in its entirety, and that documentation has been satisfactorily completed. Once the scene is "released" the potential for recovering evidence is greatly reduced.

In the review of this investigation, it became apparent these responsibilities were given little consideration. Detective Cruz did not take physical notes regarding any of his involvement in the investigation. The singular GPR authored by Cruz[cxviii] is a list of the responding officers. Cruz relied upon his memory to recall his observations of the crime scene, as well as information related to him by the responding patrol officers.[cxix] Cruz did not assume investigative responsibility for the scene because he felt he had no authority to do so.[cxx] After the crime scene

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

technicians arrived, Cruz briefed them with the limited information he had and left. Cruz, by his own estimation, remained "perhaps" 30 minutes at the location acting as the scene detective.[cxxi]

Cruz was an experienced police officer and detective and possessed knowledge of the duties of the scene detective.[cxxii] Cruz knew his responsibility to remain at the scene while it was being processed by forensic specialists, and yet, in deposition, he stated, "If I waited for the crime scene guy, I would give them what I had …"[cxxiii] He also admitted he had no knowledge of what other detectives assigned to assist in the investigation were doing.[cxxiv] One of the primary duties of the detective in charge of the crime scene is to collect all information regarding the crime. Collating and disseminating this information to criminalists for evaluation is a primary task. That job cannot be properly completed when the detective at the scene is present for so short a period. Under the procedure within the Chicago Police Department of delayed assignment of cases,[19] he apparently didn't feel an obligation to the investigation, when that knowledge should have made him more obligated to do the best possible job.

These deficiencies at the original crime scene, should have been recognized by any detective, and most unquestionably by the detectives assigned the primary responsibility for the case. Detectives Bocardo and Dyra should have discovered, throughout their investigation, these omissions and acted to correct or attempt to mitigate them.

The night of the murder, Detectives Wolverton, Botwinski, and Jaglowski interviewed three witnesses, Edward Perez, Jacqulina Gonzalez, and Lorena Ricardo. Additionally, Detective Cruz's report listed three (3) witnesses as "to be identified" in the "To Do" list.[cxxv] Ricardo had information which, if fully developed in the initial investigation, would have led to both Apolinar Mejia and Micaela Gutierrez. But a more extensive interview of Ricardo was left until the afternoon of March 19, 2001, and the follow up interviews of the latter two witnesses until March 20, 2001.[cxxvi]

Unbelievably, a witness identified as Christine Murillo was listed on five formal reports,[cxxvii] yet was never interviewed by detectives. Murillo's name, address, and age were listed on the original General Offense Report and on every subsequent Case Supplemental report. No detective from the night of the crime apparently attempted to locate and interview this witness. Incredibly, Detectives Bocardo and Dyra, the "main"[cxxviii] detectives, never acted upon a potential independent eyewitness, identified on the night of the murder, whose information was on virtually every Supplemental report they themselves authored. Neither Officer Perez, the author of the General Offense Report, nor his partner Officer Walsh remembered Christine Murillo.[cxxix] A GPR apparently authored by Officer Deenihan, Star # 20739, contained a similar suspect description and direction of travel as the witnesses quoted on the General Offense Report, however the street indicated is slightly different. No follow up to inquire of Officer Deenihan was apparently ever attempted to obtain any further information he might possess.

---

[19] In the Violent Crimes Detective Training Lesson Plan for Detective Division Organization, under Methods of Investigations & Assignments, there is an instructor's note relating to the assignment of cases. "Handouts" are limited to "1 to 3 jobs a day, 2 days to one week after the occurrence." City 064816

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

Two witnesses from the initial crime response, Edward Perez, and Jacqulina Gonzalez, were never reinterviewed regarding their accounts. Both were interviewed and related information that, after being told about or hearing shots respectively, they saw someone running southbound on Marshall from the direction of the murder.[cxxx] Edward Perez provided one of the more detailed suspect descriptions in this case. In conjunction with Lorena Ricardo's statements of the direction she saw the suspect run, Perez and Gonzalez could provide additional corroborative evidence. But detectives never recontacted either party to attempt to obtain more information.

Another uncontacted witness, "Phantom," was in the apartment on 21st Place when Rivera stopped in to buy rolling papers. Izaguirre told detectives he was at the apartment on the "Dead end" street[20] waiting for the victim "who was going to give him a ride home."[cxxxi] This information was corroborated by Jacqulina Gonzalez who told Detectives Wolverton and Botwinski she had spoken to Anthony and relayed information to him that Izaguirre needed a ride home.[cxxxii] The logical implication would be that the apartment was "Phantom's" residence. Rivera said he spoke with "Phantom" and Izaguirre for approximately five minutes before leaving to find the other witnesses gone.[cxxxiii] "Phantom" was still in the apartment after the murder when Rivera returned.[cxxxiv] And, presumably, "Phantom" was still in the apartment after Rivera left with the men in the red Grand AM. The opportunity to identify and interview "Phantom" was missed. Detective Bocardo stated he had returned to the building on 21st Place during his investigation to verify where Rivera was at the time of the shooting and Rivera's line of sight.[cxxxv] But he never indicated he attempted to contact the resident of the apartment, presumably "Phantom," and interview a potential witness.

Within minutes of the police arrival, patrol officers conducted a canvas of the area for potential witnesses. Neighborhood canvasses are a necessary protocol at any homicide scene. The canvas notes[cxxxvi] were provided and located within the CPD Investigative File. One location noted an apartment indicating no answer, one residence was not canvassed due to a locked gate,[cxxxvii] and other notations had sparse narratives for the people contacted. Detectives never attempted to recanvass the neighborhood locate the people who may not have answered their doors that evening, or reinterview witnesses for any further information.

Additionally, there are four (4) 9-1-1 emergency calls generated for this crime.[cxxxviii] Though the callers wished to remain anonymous, efforts could have been made to trace the originating numbers and re-interview the callers at a later, safer time to discern if any further information was available. Initially reluctant witnesses can sometimes supply additional and better information once a rapport with detectives is established.

Discrepancies in and between the primary witnesses' interviews were never addressed. Though some may seem minor in scope, they should raise concerns in the detectives about the veracity of those witnesses. Also, they are fodder for defense attorneys to question their credibility. And when the witnesses are asked to testify, those differences can unnerve and confuse a witness and be fatal to a prosecution.

---

[20] One of the times the address was incorrectly reported as being 2978 W. 21st Place.

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

Lorena Ricardo, one of only two witnesses[21] interviewed for the General Offense Report, reported seeing three to four male Hispanics running southbound on Marshall Blvd, then eastbound on 23rd Street.[cxxxix] There was no indication as to exactly where Ricardo was when this observation was made, nor was there mention of her hearing any shots fired. Later that same evening, Ricardo was interviewed by Detectives Wolverton and Botwinski. The handwritten notes by Wolverton and Botwinski noted Ricardo seeing two male Hispanics running southbound from Marshall Blvd, and crossing Cermak Road.[cxl] However, there was still no mention of her hearing shots fired,[cxli] and there was no indication as to where Ricardo was on Cermak Road, when she saw the men running. The Case Supplemental Report authored by Detective Cruz indicated that Ricardo was also interviewed by Detective Jaglowski.[cxlii] In that portion of the narrative Ricardo reported she was in Apolinar Mejia's car driving westbound on Cermak Road approaching Marshall Blvd when she heard three (3) shots. She looked forward and saw two male Hispanics running southbound on the east side of Marshall Blvd.[cxliii]

According to the Cleared Closed Supplemental Report, Ricardo stated that after she, Mejia, and Gutierrez left the dead end, they were at the intersection of 21st Place and California Street when she heard two (2) shots fired. They then went south on California Avenue, and turned westbound on Cermak Road. While on Cermak Road, she saw the two male Hispanics running south on Marshall Blvd. There is no indication, aside from being on Cermak Road, as to exactly where they were when she saw the two men, and the distance between the car and the men. Ricardo indicated one of the two men she saw running was the same man who pointed a gun at her minutes before.

Nowhere in the reports or the paperwork are these discrepancies addressed; the number of shots Ricardo heard fired (none mentioned, then three, then two); where she was when the shots were fired (westbound on Cermak Road, or at the intersection of 21st Place and California); or the number of men she saw running away from (three to four, then two). Detective Bocardo didn't recall asking Ricardo about those issues, stating, "I'm sure at that time, like I said, I may have asked her."[cxliv] However, if he received any substantive explanation, he never recorded or related it to anyone.

When compared to the statement of Gustavo Rivera, Ricardo's accounts become more problematic. Rivera saw two men, the victim and the suspect, when the shooting occurred. The question arises that if the suspect Rivera saw with the victim is one of the two men Ricardo saw running south on Marshall Blvd, who is the second man and where was he during the shooting? Was that person a second suspect or was he a potential witness to the murder? Detectives Bocardo and Dyra never addressed this inconsistency within their investigation.

On the first night of the investigation, March 19, 2001, Gustavo Rivera related information on a red Grand Am vehicle stopped next to him at the time of the shooting. The car was occupied by two people he "knew from the neighborhood."[cxlv] Rivera ducked down behind the car when he saw "two flashes" from the area of the victim and suspect. The two people inside the car also ducked down. This information provided detectives the potential for two additional eyewitnesses, arguably in the same position to see the crime as Rivera. Detective Bocardo stated he acted on

---

[21] The other witness listed is the never interviewed Christine Murillo.

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

the information Rivera provided him by driving around the area the red car frequented, but he had no luck in finding it.[cxlvi] Det. Bocardo didn't note the dates, times, nor number of attempts he made in locating the vehicle. Bocardo didn't engage any other resources to attempt to locate the car when he couldn't. He could have requested the patrol car assigned in that area, or detectives working other watches, to check during alternate hours to attempt to locate the red Grand Am. None of these investigative methods were noted or reported to have been attempted.

Gustavo Rivera, in his trial testimony, related he had provided further information to Detectives Kato and Bocardo regarding the two men inside the red Grand Am. Rivera gave the nicknames of the two men, and information that one of the men in the car the gang was affiliated with the Whipple Kings street gang.[cxlvii] Rivera testified that, after looking out Izaguirre's apartment window and seeing the suspect was no longer around, he went back outside, entered the Grand Am, and left with the two men before the police arrived.[cxlviii] Bocardo acknowledged Rivera provided information as to the area the car frequented, which lends credibility to Rivera's statement that he provided more information. So, it is puzzling as to why no follow up was documented or done with that more detailed information.

As the primary detectives on this case, Bocardo and Dyra should have noted the connection between the area in which the Whipple Kings claim as their territory[22] and the address of Christine Murillo, the uncontacted witness, in the 2200 block of South Whipple. This potential link should have been noted and investigated.

Detective Jaglowski stated at deposition his ability to access a database for gang members containing names, tattoos, nicknames, and gang affiliations.[cxlix] Jaglowski stated it was also his practice to talk to gang specialists to find information regarding gangs. Detectives Bocardo and Dyra were gang specialists by rank at the time of this investigation. This database was available to Detectives Bocardo and Dyra, and with the information they were provided by Rivera, should have developed leads to identify the occupants of the Grand Am.

Detectives Bocardo and Dyra did not seek to clarify an inconsistency in Rivera's statement. Rivera stated he was standing on the passenger side of the red Grand Am when the shots were fired, and he was able to identify the suspect. In the handwritten statement by ASA Goldish, Rivera stated he was ten (10) feet away from Hueneca when the suspect was next to Hueneca.[cl] Hueneca turned and began walking south on Marshall Blvd when the shots were fired. The statement reports Rivera's view was unobstructed and well lit. However, the crime scene photographs indicate there was at least two residential "lots" width between Rivera and where Hueneca fell.[cli] The disparity is distance between Rivera's statement and the photographic evidence is significant. Using Google Maps, it can be determined the approximate distance between where Rivera stated he was standing and approximately, based upon crime scene photos, where Hueneca went to the ground was around 150 feet. A difference of approximately 140 feet, that distance is roughly half a football field. And, as previously mentioned, Detective Bocardo stated he returned to the scene to verify Rivera's information, but he never documented or reported that fact to anyone before his involvement in this civil matter.[clii] Detective Bocardo never relayed to ASA Goldish the disparity of Rivera's estimation versus his own personal

---

[22] Gustavo Rivera testified he told detectives the Whipple Kings were from the area around 23rd Street and Whipple.

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

knowledge of the crime location. Crime scene photos show the overhead streetlight south of the murder location appeared to be out, and an overhead streetlight, possibly on the south side of 21st Place, near the dead end, was working. It would have been in the best interest of the case to verify or refute if an identification was possible at that distance, under the lighting conditions existing that night.

The statements from the four primary witnesses also contain additional discrepancies. When relating their stories, the witnesses have varying time estimates. Those estimates, while it is often not concerning in an investigation, in this case should have raised questions for the detectives.

Lorena Ricardo was interviewed on the first night by Detectives Wolverton and Botwinski. The notes from that interview[cliii] indicate she was in Mejia's car driving on Cermak Road when she saw two men run south on Marshall. She stated she recognized them from 20 minutes before when she left the club. No notations or inquiries were made as to what Ricardo, and the others in the car, were doing during those twenty minutes, or where they were. The narrative of "driving around the neighborhood" is continued in the Crime Scene Supplemental Report[cliv] with no information as to purpose or duration. In Detective Dyra's Cleared Closed Supplemental Report narrative[clv], Ricardo indicated that after leaving the club "they started driving around for a while" before they went to the "dead end." Neither of Ricardo's time frame differences were explored or defined. When Micaela Gutierrez was interviewed, she stated after leaving the club, the four occupants of the Mustang drove around for ten to fifteen minutes before driving to the "dead end." Apolinar Mejia stated that after leaving the club, he and the others drove around for about five minutes before traveling to the "dead end." Gustavo Rivera, in his statement to police, stated after leaving the club they "drove around the neighborhood for a short time" and then went to Izaguirre's apartment at the "dead end." Detectives should have determined the definitions of "a short time,"[23] "a while,"[24] to reconcile them with "five minutes,"[25] and "ten to fifteen minutes."[26] In interviewing, vague or "lost" time often indicates a period the interviewee wishes to avoid discussing. The disparities should have been recognized, challenged, and resolved.

Mejia, Gutierrez, and Ricardo all indicated that after leaving the dead end of 21st Place, and as they reached California Avenue, approximately 0.2 miles away,[27] they heard shots being fired. Gustavo Rivera stated, after coming out of Izaguirre's apartment, his friends were gone. While he was waiting outside, he observed the victim and suspect walking north on Marshall Boulevard. As the suspect came close to the victim, the victim turned and walked southbound. The suspect followed alongside. At that time, a red Grand Am pulled up and stopped. Rivera, standing next to the Grand Am, saw the flashes and ducked down. He then ran back into the apartment building.[clvi]

For all these narratives to coincide, at a minimum, Mejia and the other occupants of the Mustang would have had to pass the Grand Am going opposite directions on 21st Street. If the Mustang

---

[23] Gustavo Rivera
[24] Lorena Ricardo
[25] Apolinar Mejia
[26] Micaela Gutierrez
[27] This is a Google maps estimation of distance.

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

were at the east end of 21st Place and the Grand Am was at the dead end of 21st Place when the shots were fired, the two vehicles would have to pass each other. Yet detectives never inquired of the Mustang occupants whether they saw the Grand Am. And the Grand Am occupants were never located, or possibly looked for, to ask those same questions. As a detective, matching these two minimal events, regardless of any inaccurate time estimation on the part of the witnesses, would have tended to corroborate the witnesses' stories. But again, the detectives did not notice or address this aspect of the event chronology.

In reaction to an anonymous 911 call at 0138 hours, Officer Perez responded to the location. He indicated in his General Offense Case Report, they arrived on the scene at 0141 hours.[clvii] When the additional time it would have taken to call 911 and make the initial report, and dispatch the patrol unit, is considered with the patrol unit's three-minute response time, the actual time involved would be, conservatively, close to three minutes and thirty seconds, and possibly longer.

In Detective Cruz's Supplemental Report, Ricardo indicated after seeing the victim lying on Marshall Boulevard from inside the car, Mejia drove north on Marshall Blvd., and he stopped near the victim.[clviii] In Detective Dyra's Cleared Closed Supplemental, Ricardo is reported as stating that after seeing the victim lying on the sidewalk of Marshall Blvd., Mejia continued west, and Ricardo had to convince him to turn around.[clix] The conflict between the two scenarios is clear. Also, there is no indication in either narrative as to the police being at the scene.

Micaela Gutierrez stated they left the dead end and heard shots while at the intersection of 21st Place and California Ave. They drove south on California and then west on Cermak Road. When they saw the victim on Marshall Blvd., she said Ricardo wanted to stop, but Mejia drove away and then came back to the location.[clx] There is no indication as to how far away they drove, or how long it was before they returned. However, when they returned, the police were arriving. This would tend to indicate Mejia drove around the neighborhood for over three minutes before returning.

Mejia originally stated that after leaving the "dead end," they drove on 21st Street to California Avenue, then south to Cermak Road, and back around to Marshall Boulevard. Mejia stated that when Ricardo looked north and saw the victim, he stopped the car on Marshall Boulevard. And "as they stopped the police arrived."[clxi] This account of their actions is impossible based upon the police response time.

These time inconsistencies may seem minor, but when compared to the realities of the police response, they become troubling. The witnesses' descriptions of their actions do not mesh with the realistic time frame. Only later when Mejia admitted in deposition that after leaving 21st Place, they "drove around," they were all "smoking weed,"[clxii] and the police were already on scene when they arrived at Cermak Road and Marshall Blvd.,[clxiii] did the narrative make sense. However, at the time of the investigation, they should have raised flags between the investigators. Detectives Bocardo and Dyra failed to address these conflicts at the time of their investigation.

After interviewing Lorena Ricardo on March 19, 2001, she led Detectives Dyra and Bocardo to the residence of Apolinar Mejia. But instead of attempting to contact Mejia, detectives "decided to come [the] back the next day."[clxiv] Detectives showed little diligence by delaying, at least an

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

attempt, to locate a witness. Detective Bocardo has indicated that interviewing a witness as soon after an incident occurs is the best practice during an investigation,[clxv] yet he didn't follow this practice.

A further example of the absence of diligence was the delay between the photo identification of Velez on March 20, 2001, and any other follow up, until March 24, 2001. Detectives stated their reliance on the team concept of investigating crimes, yet didn't utilize that concept to continue the investigation in their absence. No mention was made, nor documented, of any effort to have other detectives follow up in the intervening four days Detectives Bocardo and Dyra were unavailable. Detectives believed they had an armed aggravated assault and murder suspect identified, but showed little interest in corroborating that identification through other witnesses and arresting the suspect as soon as possible. Arguably, this delay in locating and taking a violent and armed gang member off the streets placed the public in danger. Detectives should be cognizant that by delaying their investigation they also created a potential officer safety issue. Detectives never indicated they warned or advised detectives or patrol through an Investigative Alert. When a suspect has committed a crime and is later encountered police, the danger posed to other officers would be great, as the suspect has knowledge of what they have done, and the police do not.

A foundation of the case against John Velez was his admission/confession to Christina Izquierdo while she was in Christ Hospital on the night of March 21st, 2001. Izquierdo's shooting was the impetus for Velez to confess that his actions were the catalyst for the attack on her. Izquierdo's testimony was the foundation for Velez's admission, but it was not important enough to merit an effort to corroborate it.

Detectives Bocardo and Dyra first became aware of Christina Izquierdo after interviewing John Velez on March 25th regarding his potential involvement in the Anthony Hueneca murder. After waiving his Miranda rights, Velez denied knowledge of the murder, and then related information about a completely unrelated shooting incident involving Izquierdo on March 21st.[clxvi] As a result of that information, detectives contacted the Cook County Sheriffs and spoke with Detectives Sullivan and Davis. Detectives Davis and Sullivan communicated to Bocardo and Dyra information in which a nurse overheard an admission by Velez while he and Izquierdo were talking in Spanish. Detectives Sullivan and Davis were at the hospital attempting to interview Izquierdo when the incident occurred. Velez purportedly told Izquierdo she was shot because of "what he did on an earlier date."[clxvii] Sullivan and Davis advised Bocardo and Dyra they did not speak Spanish, but they had received the information from the nurse.

Chicago PD detectives requested a copy of reports relating to the shooting. Detective Sullivan faxed a three-page information sheet regarding the incident.[clxviii] The report details the circumstances of the "Aggravated Battery," in which Izquierdo and the other victims were at the cemetery and were chased back into their car. Three suspect vehicles boxed in the victim's car striking it, and then fired shots into the victim's car. Izquierdo was struck by gunfire and transported by ambulance to Christ Hospital for treatment.

The Cook County Detective fax included contact information for the five (5) additional victims, one (1) additional witness, and descriptions of the three (3) suspect vehicles. The report did not

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

contain information regarding any admission or confession by or contact with John Velez. Neither did the Cook County detectives include contact information for the nurse.[clxix]

Inexplicably, Detectives Bocardo and Dyra, having spoken to Sullivan and Davis and received the admission information, never recontacted the Cook County Detectives regarding the absence of that material which was essential in the murder case. There is no record of the Chicago detectives attempting to reconcile what they were told verbally with the written information they were provided.

According to Detectives Bocardo and Dyra, the reason for Izquierdo's visit to St. Mary's Cemetery was reported to be the visitation to the grave of Gent Velez[clxx], an uncle of John Velez, and a member of the "Ambrose" street gang[28], known as "Shakey," near the anniversary of Gent Velez's murder. Izquierdo stated she did not tell the original detectives[29] she was visiting the grave of Gent Velez, nor did she know who Gent was. In fact, there was no information in the crime overview which was faxed to Bocardo to indicate who the group of six were visiting that day.[clxxi] Izquierdo said she was "tagging along" with her friend Angie[30], who was going to the cemetery to "visit" a friend on his birthday.[clxxii] She denied Velez had admitted to shooting anyone. And she stated Velez did comment that day regarding the shooting, but he claimed fault was because he was in a gang, not because he had shot anyone earlier in the week. Velez did threaten future retaliation. Izquierdo stated no detectives were in the room when she spoke with John Velez, but the nurse was present.[clxxiii] This information increases the need to locate and interview the nurse. Detectives needed to find out if the nurse speaks Spanish, what she heard Velez say that evening, and if the Cook County detectives were in fact present when the conversation occurred. Yet, neither CPD detective attempted to locate and interview an important witness to their case. Furthermore, there were no interviews with other five victims to corroborate information as to why they were at the cemetery or who they were visiting, either by the Cook County detectives nor anyone from the Chicago Police Department.

The purported motive for John Velez to kill Anthony Hueneca was as an "anniversary killing" in retaliation for Velez's Uncle Gent. However, the actual information disputes that assertion. The graveside visit to Gent Velez was closer in time to the anniversary of Gent's death than the "anniversary killing" motive date ascribed to John Velez. Gent Velez was killed between March 22-23, 2000.[clxxiv] The murder of Anthony Hueneca was March 19th, 2001, four days earlier than the anniversary date.

This inconsistency regarding the actual anniversary of Gent Velez's murder continued. The date of March 19th, 2000 was written in the Felony Review paperwork as the approximately date of Gent Velez's death.[clxxv] Presumably this was information provided by CPD detectives, most likely Detective Kato. But the handwritten statement for Christina Izquierdo indicated that, "Gent Velez was Mr. Velez's uncle who was shot to death on March 22, 2000."[clxxvi]   ASA

---

[28] The Cleared Closed Case Supplemental Report indicated John Velez identified his uncle as a "Satan Disciple" gang member.

[29] Cook County Detectives Sullivan and Davis

[30] According to Det. Bocardo's handwritten GPR, City 000063, this would most likely be Angelica Valdez. Valdez was listed on the Cook County Sheriffs Fax information as the second victim in the cemetery shooting.

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

Goldish was the author of both handwritten reports and should have been aware of these contradictory entries and inquired of the detectives as to which date was correct and resolved the discrepancy.

In the early morning hours of March 27th, ASA Goldish interviewed Christina Izquierdo about the circumstances of her shooting and her relationship with John Velez. ASA Goldish hand wrote the statement with Izquierdo and Detective Bocardo in the room.[clxxvii] All the parties present signed the statement to verify its authenticity and "voluntariness." This was the only interview between ASA Goldish and a witness in this case in which Detective Bocardo, the assigned detective, was present. According to the handwritten statement, Izquierdo said she was standing at the gravesite when she was shot[clxxviii] and she "fell to the floor."[clxxix] Izquierdo's statement continued to say the Velez admitted to being "fucked up," he shot a Latin King gang member, he shot the guy because a Latin King gang member had killed "Shakey," and he was with "a couple of the boys." Izquierdo told the State's Attorney that only the nurse was present and Izquierdo didn't know if the nurse spoke Spanish.[clxxx]

The factual inconsistencies included in the versions of the admission/confession information necessitated clarification. There was the "overheard" Velez admission while Cook County Detectives were in the room interviewing Izquierdo, the nurse was present, and in which Velez claimed Izquierdo was shot because of something he did on an earlier date.[clxxxi] A second version, from the ASA interview of Izquierdo, included a confession "while only a nurse was also present." In this story Velez said, "last Sunday he had gone over to 21st and Marshall and that he was all 'fucked up.'" And "he was all 'fucked up' and he shot one of the Latin Kings … the other guy had also pulled out a gun but that [he] Mr. Velez had shot the guy first" and "he shot the guy because the Kings had killed 'Shakey' … last Sunday when he shot the King, he was with a couple of the boys."[clxxxii] And the last account, included in the Cleared Closed Supplemental Report, Izquierdo stated she did not have a conversation at Christ Hospital about the reason she was the victim of a shooting.[clxxxiii] The inaccuracies found in all these instances cast more doubt on the official versions, immortalized in both the law enforcement and prosecutorial paperwork, than on the account related by Christina Izquierdo.

Detective Bocardo, more so than Dyra, had been involved in all interactions with Christina Izquierdo. Izquierdo's statements were pivotal in providing motive and admissions or confessions for the crime. Yet Detective Bocardo, who should have been aware that major discrepancies in a witness's story can undermine a witness's credibility, allowed Izquierdo to give factually inaccurate statements throughout her interview with ASA Goldish without challenge. And after the statement was read back, Bocardo signed the statement indicating agreement with the contents. Further, Bocardo did nothing to bring to Goldish's attention about the supposed presence, then absence, of Cook County detectives in the emergency room while at Christ Hospital. There were three separate versions of the hospital "story" (the verbal recitation between Sullivan and Davis and Bocardo and Dyra, the Supplemental Case Report version, and the ASA handwritten version), each detailing different people present, and different versions of what Velez was purported to have said. Bocardo did not bring any of that information to the attention of ASA Goldish.

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

In gang related cases, it can be expected that gang members, their girlfriends, or wives will not cooperate with a law enforcement investigation. Detectives should always maintain skepticism when conducting these interviews, and seek to corroborate or refute all information to the degree possible. The simplest solution to confirm what Velez was reported to have said in the hospital would be to interview the nurse who overheard the confession/admission and document her statement. This follow-up would further allow detectives to determine the veracity of Izquierdo as a witness. Most importantly, it would have provided detectives with an independent reliable witness to present in court, eliminating the need for Izquierdo to testify.

Neither of the Cook County Detectives, Sullivan nor Davis, remembers hearing or taking a statement in the hospital,[clxxxiv] and both stated if they were made aware of one, even though it may have been secondhand, they would have documented it and conducted a further inquiry.[clxxxv] This information is in direct contradiction to the Closed Cleared Supplemental Report, and as such, it is the responsibility of the assigned detectives to resolve.

Detective Bocardo did not recall what steps he took to locate the nurse.[clxxxvi] He stated he didn't go to the hospital[clxxxvii] and believed calling the hospital to attempt to ascertain the name of the nurse "would have been a waste of time."[clxxxviii] Nor, as the assigned detective, does Bocardo know if "another member of the team" contacted her or if someone else tried, but he does acknowledge "an effort should have been made."[clxxxix] Detective Dyra didn't talk to the nurse, and didn't know if he requested to talk to her. He admitted he would've liked to know who she was, but couldn't produce any documentation to show he had made any attempts to identify her.[cxc] The importance of interviewing a witness this significant should have been a priority of the primary investigators and not delegated to another detective or left to chance.

The problems from the absence of an interview of the nurse and Izquierdo's recantation at trial were both easily predictable and avoidable. Neither detective noticed, nor apparently cared about those problems.

Detectives Bocardo and Dyra never attempted to locate the outstanding murder weapon. Both before and after the .380 caliber pistol recovered by Officer Partida, on March 31st. Detectives Bocardo, Dyra, or Cruz never organized an 'article' search of the suspects direction of flight. Detectives should have searched the path from the crime to where the suspect was last seen (and beyond) to attempt to locate the weapon in case it had been discarded as the suspect ran. Once John Velez was identified as a suspect in the murder, based upon the information developed from Mejia, Gutierrez, Ricardo, and Rivera, the detectives would have had enough probable cause to seek and obtain a search warrant for Velez's residence and vehicle. Nether was done. Further, and more inexplicable, when Velez was arrested while driving, there was no attempt recorded or suggested that his car was searched for a murder weapon. The car was released at the scene to a woman named Candice Borg.[cxci] There were seventeen (17) photographs taken of Apolinar Mejia's Mustang,[cxcii] and nine (9) photographs taken of Anthony Hueneca's Cadillac,[cxciii] yet no photographs or forensic processing was completed of the suspect's vehicle. Detectives, believing this murder was gang related, should have sought independent information and evidence establishing Velez's gang affiliation through writings, photos, clothing, or other items to present in court. These types of items are often found in suspect's vehicles and residences. There was

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

ample time for Detectives Dyra and Bocardo to have written, sought, and served a search warrant for both.

On March 20, 2001, Detectives asked Apolinar Mejia for and received permission to have the Ford Mustang fingerprinted. Mejia's car was processed in the garage for Area 4. As a result of that forensic examination, partial latent prints were recovered from the front passenger window and door.[cxciv] On April 2, 2001, detectives Bocardo and Dyra requested the latent prints lifted from the vehicle be compared to John Velez, "to see if they match."[cxcv] Bocardo and Dyra included a set of elimination prints from Apolinar Mejia,[cxcvi] but elimination was not specifically requested. The inclusion of elimination prints for Mejia was proper follow up. However, in addition to Velez reportedly leaning into the vehicle that evening, Lorena Ricardo, Micaela Gutierrez, and Gustavo Rivera also had occasion to touch the passenger side door of the Mustang. All three witnesses entered and exited the vehicle, making it extremely likely they left their fingerprints were on the passenger door. The lack of elimination prints taken from the witnesses for comparison is either poor detective work, or blindered efforts with regards to Velez.

The Illinois State Police Department of Forensic Services forwarded a report, dated May 28, 2001, to detectives which stated the prints lifted from the Mustang "did not reveal an identification" when compared to John Velez.[cxcvii] Conscientious follow up would suggest a detective request additional elimination fingerprints for Rivera, Gutierrez, or Ricardo. Yet, detectives never requested those elimination prints, nor could they determine if the fingerprints lifted from Mejia's car were entered into the Automated Fingerprint Identification Systems (AFIS) to attempt to identify them.[cxcviii] This additional request would have served two purposes, 1) to potentially identify another suspect, or 2) to identify the latent lifts which would require a reasonable explanation as to how the prints came to be on the vehicle. The first reason implies the detectives did not want to "move on" from John Velez, the second is a product of perfunctory investigative work. Detective Dyra requested the fingerprint lifts be expedited in comparison to Velez, but he stated, "if there was any evidence that he was not the person or if there was another person that I needed to talk to, I would have talked to them, I guess."[cxcix] Yet, when those fingerprints did not match John Velez nor Apolinar Mejia, he did not follow up on those results or confirm an AFIS submission was made.

Detectives Dyra and Bocardo requested, on April 5, 2001, the .380 caliber weapon, magazine, and live rounds, located on March 31st, be examined for fingerprints, and be compared ballistically to the projectiles and expended cartridges recovered during the murder investigation. But, while the request is a sound investigative procedure, the same singular focus on Velez seemed to be present. Detectives only requested the latent prints to "be compared to the offenders fingerprints Juan [sic] Velez ..."[cc]

The results of the ballistics testing showed the expended cartridges and projectile from the Hueneca murder could neither be identified or eliminated from being fired from the same weapon. According to the Illinois State Police crime lab, the cartridges and projectile from the

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

murder were unsuitable for entry in the "unsolved case file."[31]  Neither could they be determined to have been fired or eliminated as being fired from, the .380 caliber weapon recovered on March 31, 2001, by Officer Partida.  The test fired cartridge and projectile from the "Partida" weapon were suitable for inclusion in the "unsolved case file."  Detectives should have requested all the ballistic evidence be submitted to the National Integrated Ballistic Information Network (NIBIN) for comparison and possible leads.  At minimum, the results would confirm the Illinois State crime lab findings, and the ballistic leads would be exhausted.  A "cold hit" on the ballistic evidence obtained through NIBIN, may have led detectives to another weapon in custody and potentially another suspect connected to it, or connected the weapon to another crime, both of which could have provided more investigative avenues to pursue.

There is no indication that a specific "type and caliber" examination was requested or completed on the murder projectile.  This examination can narrow the range of weapons able to leave the markings on the projectile, i.e., right- or left-hand twist, number of striations (lands and grooves), which can tend to eliminate or include various weapons in an investigation.  This information is valuable to the original and any subsequent investigators in lessening the range of weapons to look at in a case.

Gunshot Residue (GSR) and blood examinations were requested on the sweatshirt worn by John Velez at the time of his arrest.[cci]  The ballistics crime lab report[32] indicated the wrist cuffs showed "… that the sweatshirt came in contact with a PGSR related item, or was in the vicinity of a discharged firearm."[ccii]  The right sleeve of the sweatshirt "contains particles characteristic of background samples," and the left sleeve "contains unique and consistent PGSR particles."   As the test results indicated a stronger concentration on the left sleeve of the sweatshirt, information as to which hand the suspect held the weapon, would have been significant.  It is reasonable to assume that the hand in which the suspect held the weapon would have the stronger GSR content.  There were no notations made in any reports as to in which hand the suspect held the gun.[33]  Detectives Bocardo and Dyra should have made every attempt to indicate whether John Velez was right or left-handed.

GSR information can be useful during an interrogation to elicit an admission or confession from a suspect.  After Velez was arrested on March 25th, he was advised of his Miranda Rights and spoke with detectives.  During that interrogation, detectives never attempted to discern where else Velez could have encountered a firearm, nor inquired who or what other method might have resulted in the transfer of residue.

Another issue involved with GSR testing, and present here, is the time frame between the crime and the recovery and GSR testing.  The detective must prove the item or person (in this case, the sweatshirt) had not been contaminated by GSR between the crime and recovery.  Reasonable doubt can be inferred by suggesting the hoodie had been loaned to someone or Velez had contact

---

[31] It is not known if the "unsolved case file" is merely a storage facility or, as NIBIN is, a searchable database which requires a request for specific comparison, or has an automated search function to match any other ballistics which are entered into the system.

[32] The Illinois State Police Division of Forensic Services Report was dated July 12, 2001.

[33] This omission extended to the handwritten statement taken by ASA Goldish during the Felony Filing Review.

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

with a contaminated item from being in a police station, and that was the cause of the test result. The larger the time frame, the less inculpatory a positive test result becomes. A weakly positive test is not damning evidence, as with the result indicated on the Illinois Crime lab report. In this case, there were six (6) days between the crime and Velez's arrest. On March 20, 2001, Velez was in Area 4 Station after having been stopped while in the company of another murder suspect.[cciii] So, there is little evidentiary value in the circumstances involved in this case.

After the ballistics trace evidence portion of the testing was completed, the sweatshirt was forwarded to the Forensic Biology section for the serology portion of the request.[cciv]

On July 27, 2001, Detectives Bocardo and Dyra received a report from the Illinois State Police Division of Forensic Services regarding the serological testing on the sweatshirt. This report indicated no trace blood evidence was found.

Detectives should have attempted to reconcile the results of the forensic testing to explain them, or to consider a new path in their investigation. The GSR testing showed a higher concentration on the left sleeve, indicating the suspect held the weapon in his left hand. In considering the photographs of Anthony Hueneca's head wound, detectives should have noted a pattern of stippling around the wound. They should have consulted with forensic specialists at the coroner's office and within the Illinois Police State Crime Lab to determine the potential for "blowback" spatter from the wound and its expected presence on the hoodie. The presence of GSR, but not of trace blood evidence indicates several scenarios to consider. In addition to the scenarios indicated prior, i.e., it might have been worn by a third party between the murder and Velez's arrest, or Velez obtained GSR trace from the police car or somewhere in the station; there are the possibilities the sweatshirt itself might not have been the one worn, or it may have been cleaned prior to Velez's contact with the police. If the last scenario were the case, it would follow that the GSR would likely have washed off if the cleaning were sufficient to remove trace blood evidence. Thus, the GSR found on the sweatshirt may have been from circumstances separate from the murder.

In all the forensic testing, it appeared as if the detectives interest waned if the examination results did not connect John Velez to the crime. Further testing or investigation was neglected when the results did not compliment their theory of the crime.

The test results, the inconclusive ballistic examination, the absence of blood on the sweatshirt, and minute amounts of GSR, furthered the argument for writing and serving a search warrant of Velez's residence or searching his car at the time of his arrest. However, that investigative avenue was never pursued.

While Detectives Bocardo and Dyra did make some proper procedural requests during their investigation, it can be strongly argued those requests were narrowly focused on proving the guilt of John Velez. And when the examination results were arguably exculpatory for John Velez, the continued procedural follow ups were not completed.

**Exhibit 14**

JOHN VELEZ v CITY OF CHICAGO, et al.

**ISSUE & OPINION**

Throughout this case the overall responsibility for the investigation appeared to be actively avoided. Investigative steps were not attempted, and tasks and assignments were not completed nor delegated. In the case of the crime scene, it was blamed upon a lack of supervisory presence. Neglected steps in the investigative process were attributed to the assumption that other investigators, rather than the assigned detectives, should or might have completed tasks. Overall, personal responsibility was sidestepped.

A homicide detective should be notified immediately of the incident and should respond, regardless of time or day. And upon arrival, that detective must take primary responsibility for the investigation. Every aspect of the investigation must be under their control. From completion of the original crime report through the final report or reports required in submitting the case for prosecution, and throughout trial. The primary investigating officer, regardless of terminology, is the repository for information and the decision maker for all moves in furtherance of the investigation.

A lead investigator's responsibility extends beyond filing the case. A homicide detective must remain available and accessible during trial preparation and trial. That detective's intimate knowledge of the case and its intricacies are an essential resource to the prosecutor. The responsibility to investigate issues which arise from information acquired after filing remains his or her duty.

Further, a homicide detective should cultivate the trust and cooperation of the witnesses to their case. Testifying at grand jury hearings, preliminary hearings, and/or trials, in addition to enduring trial delays and the hardships of missing work for repeated appearances, can test the resolve of citizens not used to the justice system. The relationship between investigator and witnesses can be essential in guaranteeing witnesses appear in court and feel safe in doing so, particularly in gang related crimes.

Lastly, supervisory responsibility was cursory at best, and absent at worst. Throughout the investigation Detectives Bocardo and Dyra stated they "updated" their supervisors and sought feedback and guidance, yet there are no indications that guidance, feedback, or direction was provided. Mistakes were continuously made and not corrected, up to and through the completion of the investigative reports. Administrative review is an essential part of the investigatory process. And there was no indication that any review was performed beyond a perfunctory signing of the reports after they were submitted.

**BASIS**

When a radio call is received by any metropolitan police department, uniformed patrol officers are usually the first to respond and arrive at a scene. As a rule, the senior officer at the scene, either by rank or by seniority ofttimes becomes the ad hoc supervisor until a ranking officer arrives or the call is sufficiently handled. In the case of a homicide, where detectives respond to the scene, once tactical considerations are resolved and the scene is secured, the investigation

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

begins, and the senior or ranking detective should and must take charge of the scene. Without a single investigator, or partnership of two detectives, to take charge of the crime scene, information cannot be effectively collected, organized, disseminated, and acted upon to ensure crime scene protocols and proper investigative practices and procedures are completed.

Detectives Cruz, Bocardo, Dyra, Jaglowski, and Cirone, all attended the detective school/training required and presented by the Chicago Police Department.[ccv] That training included instruction on the Organization of the Detective Division and the Department's expectations of all detectives. One of several expectation standards, under Section 3, Entitled "Methods of Investigations & Assignments," Paragraphs C & D read, "C) *The investigations assigned to you will be your responsibility.[34]* Reports, interviews, the locating of witnesses and collection of evidence and recovery of property will remain with the assigned detective." and " D) In some cases, other detectives will be assigned to also conduct part of the investigation, or an arrest will be made by another unit and another detective will be sent to investigate and "process" the case. However, the final responsibility for submission of the report lies with the detective that was first assigned the case."[ccvi]

The deflection of responsibility was present on the first night of the investigation, and persisted on multiple occasions to excuse oversights and errors in the investigative process. As the assigned investigators, Detectives Bocardo and Dyra held the ultimate responsibility of completing follow up investigations and interviews, or at minimum, assuring those follow ups were accomplished. That responsibility also extended backwards to the original crime scene. They should have reviewed the reports continuously against information they learned as they conducted their investigation. They had the duty to always evaluate the investigation, and make determinations as to the completeness and thoroughness of each step. This practice would allow them to identify discrepancies and contradictions.

Both Detective Bocardo and Dyra avoided that accountability. Detective Bocardo stated, "We were assigned the investigation. I didn't say I was in charge of it. We were assigned it."[ccvii]

One example of Detective Dyra avoiding accountability is failing to verify the date of Gent Velez's murder, the relevant facts to establish Anthony Hueneca's murder as an anniversary killing, and the circumstances which ultimately led to the "admission/confession" of John Velez. Dyra believed the Gent Velez case "would" have been looked at and stated, "Someone would that was involved in the investigation, yes."[ccviii] Yet, no one involved in this case remembered viewing the case file or documenting it.

Detective Bocardo, with respect to the nurse who was purported to overhear the Spanish confession/admission of John Velez in Christ Hospital, stated, "I believe the Sheriffs attempted to find out who they were, but I couldn't tell you today what the outcome of that was."[ccix] And "I don't remember if I did or another member of the team did. I couldn't tell you today – I don't remember … Somebody may have tried, I couldn't tell you if it was – they were successful. Apparently not, it's not documented."[ccx]

---

[34] Emphasis added

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

In July of 2002, when asked by defense attorney Abrams in a Motion to Quash Hearing if he or a patrol officer made the arrest, Bocardo stated, "I participated in the arrest."[ccxi]  In almost every circumstance, Bocardo was reticent to assume the responsibility for even a basic step in the investigation.

Detective Kato, with respect to having the information for potential eyewitnesses, said he would want the contact information for the two men "from the neighborhood" inside the red Grand AM. He later indicated because "it was not my (his) investigation" he would not have wanted the information to identify two potential eyewitnesses to a murder, before admitting that if it were his investigation, he would want information to help himself. [ccxii]  This attitude displays how a lack of responsibility can negatively affect an investigation.

According to Detective Jaglowski, "There were people assigned for the paper, but there was no real lead detective."[ccxiii]  Detective Jaglowski opined the obligation to assure all appropriate investigative leads were investigated belonged to "the one that was largely responsible …" and expressed that the assignment of a case defined who was "largely responsible."  But then stated, "We – we operated as a team, so it was just some – one of us would take – one of us would be largely responsible.  Nobody was assigned to be largely responsible. We were all assigned to do a good job."  "Nobody ever volunteered to be largely responsible. We all just did our job."[ccxiv]

At the conclusion of the live Line Up procedure at Area 4 on the night of March 26th, Goldish was called by either Detective Bocardo or Dyra[35].[ccxv]  Goldish was briefed and given police reports upon her arrival at Area 4 by Detective Kato,[ccxvi] who had already distanced himself from responsibility for the case.  Kato was present during the interviews of Micaela Gutierrez, Lorena Ricardo, Apolinar Mejia, and Gustavo Rivera.[ccxvii]  ASA Goldish remembered having contact with Detective Dyra when she went to speak to John Velez regarding the invocation of his rights.[ccxviii]  The only contact she recalled having with Detective Bocardo was his presence in the room when Goldish interviewed Christina Izquierdo.[ccxix]

In this case, where Detectives Bocardo and Dyra were the "assigned detectives," after the completion of the lineup, there was no more important task then to brief the ASA and ensure she had all the facts at hand, and provide information throughout the night should she have questions.  Neither Bocardo nor Dyra briefed Goldish,[ccxx] Detective Bocardo participated in one interview, and Detective Dyra accompanied ASA Goldish to inquire of John Velez if he invoked his rights.  Detective Kato was given the responsibility to brief Goldish and was present for three of the four witness interviews.  Detectives Cirone and Kato should have been tasked to handle any smaller assignments in the evening, while Bocardo and Dyra assumed the primary detective role they were assigned.   After spending approximately seven (7) hours at Area 4 handling the Felony Review, Goldish didn't know who the assigned detective was.[ccxxi]

Acting as the lead homicide detective, the partnership with the prosecuting attorney should be clear and well established.  The prosecuting ASA will come to and rely upon the detective for information and follow up during trial preparation.  That partnership also must contain trust.

---

[35] The narrative of the report stated, "R/GS contact ASA Goldish who then comes to Area Four." As Detective Dyra authored the report, it should be presumed he called Goldish, however no one recalls who made the call.

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

When the prosecuting attorney has contradictory information and a detective allows that information to remain unclarified, such as the factual inconsistencies regarding the shooting of Christina Izquierdo, the varied accounts of the admission/confession, and the circumstances of the first identification of a suspect, the case is set up for failure. If the Felony Review attorney cannot effectively identify the primary investigating officer(s), the potential for prosecutorial breakdown increases.

During an investigation, a detective must develop a rapport or positive relationship with their witnesses. The unfamiliarity of the judicial system can be overwhelming, confusing, and frightening to most citizens. The detective, in building rapport, can ensure a witness is available and able to arrive at court. Something that an investigator working for the States Attorney's office may not be able to replicate in the limited time they will have with the case, and especially without the familiarity the primary detective possesses. Working with witnesses in a gang related case can add a myriad of problems, not the least of which is fear of retaliation for talking to police, or testifying in court. Detectives often must cajole, convince, or flatter witnesses to court. Sitting in hallways, anterooms, and during breaks is an expected duty for a homicide detective.

When dealing with Ricardo, Gutierrez, Mejia, and Rivera, Detectives Bocardo and Dyra appeared responsive and receptive to some of the witnesses needs. They transported Gutierrez to and from Area 4 for her interview, and safeguarded her while she used the restroom at the station. Rivera and Ricardo were both driven to the Area 4 station for interviews and returned later by detectives. Apolinar Mejia was left to be contacted "the next day" rather than be disturbed late on the night of March 19, 2001.

A distressing departure from this attitude is the treatment of Christina Izquierdo. Detectives were fully aware of her physical circumstances at the time of the investigation. She was approximately four to five months pregnant, had suffered a gunshot wound five days prior, and was released from the hospital three days prior to her being transported to Area 4. If Detective Bocardo's statement that Izquierdo was cooperative and willing to travel to the station was accurate, allowing her to wait for between seven and eight[36] hours after arriving at the station to be interviewed is callous.

In her deposition, Izquierdo related a different version of her treatment by detectives. Izquierdo stated she was interviewed at her friend Angie's residence regarding her being the victim of a shooting. She was shown photographs of "random" men, but when she was unable to identify any of the men, detectives told her she was going to accompany them to Area 4. Izquierdo said she was in pain from the gunshot wound and had a gauze bandage on her hip. When she arrived at Area 4, she was put into a room she described as having a metal bench with no other furniture, and a window with "the gate on it."[ccxxii] After being in the room for an unknown period of time, a detective came to the door and asked her "about what David said." She refused to confirm that information, but asked about using a bathroom. The request was refused and Izquierdo stated that while she was in the room, she urinated on herself.[ccxxiii] The next time the detective entered the

---

[36] This time frame is in minor dispute. Izquierdo was brought to Area 4 at approximately 8:00 PM on March 26, 2001. The interview of Izquierdo by ASA Goldish began somewhere between 3:00-3:30 AM on March 27, 2001.

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

room, he told Izquierdo what she should say regarding Velez's statement at the hospital. Izquierdo stated Velez blamed himself for her shooting, but she believed he meant his gang affiliation and because she was pregnant with his child was the reason, not for any particular action Velez had taken.[ccxxiv]  [37] [ccxxv]  Izquierdo stated she was refused phone calls, was not allowed to leave, and was denied pain medication for her wound.[37] [ccxxv]  The detective told her if she didn't say what he wanted, he would contact DCFS and have them wait until she gave birth then take away her baby.  The detective stated if Izquierdo said what he wanted, she would be able to go home.[ccxxvi]  Izquierdo gave the statement to ASA Goldish because she was afraid her baby would be taken away and she wanted to go home.[ccxxvii]  If Christina Izquierdo's version of how and why she was taken to Area 4 and her treatment there is true, it is appalling.

Regardless of ASA Goldish's desire to interview them in a chronological order, Detective Bocardo could have intervened on behalf of Izquierdo with ASA Goldish to interview her before the other witnesses.  And it bears repeating, if Bocardo and Dyra had sought out and interviewed the nurse at Christ Hospital, interviewing Izquierdo would have reduced the need to rely solely upon Izquierdo's statement.

There must be accountability on the part of the detective supervisors.  Supervisors in a homicide unit should have proficiency in handling homicide cases.  Sgt. Walsh worked the Violent Crimes Unit as a detective for over six years, from March of 1992 through the summer of 1998.[ccxxviii]  He possessed the requisite knowledge to effectively analyze, evaluate and critique a homicide investigation.  He acknowledged experience with homicide investigation because during his time working the Violent Crimes Unit, "that was the killing fields back then."[ccxxix]  His input and guidance should have been sought, and he should have been able to provide direction to address the previously mentioned errors and missteps.

According to both assigned detectives, their supervisors were updated verbally on the status of ongoing cases.  Detective Dyra notified his supervisor verbally of case updates.[ccxxx]  Detective Bocardo would speak to his supervisors and update them, looking for feedback or sometimes suggestions.[ccxxxi]  This is an acceptable and encouraged practice in a homicide unit.  Open, continuous, and honest review by supervisors and other detectives can provide beneficial feedback and ideas for the investigation that may move an otherwise stagnant investigation forward.

But there is nothing to suggest the content of the updates reported by Detectives Bocardo and Dyra.  There is no indication whether the briefings were detailed or if they included the omissions, inaccuracies, or discrepancies noted in this report.  And, if any suggestions were made by supervisors or peers, whether they were followed, noted, or considered.  Sgt. Walsh stated he had "absolutely nothing to do with this [investigation] except for assigning the case."[ccxxxii]  Walsh stated, "if you [he] were *aware*[38]" of a follow up which needed to be conducted, or if a witness needed to be interviewed, or if forensic testing needed to be done, "you would ask them to do it."[ccxxxiii]  "But typically, you didn't need to do it."  "Like I say, it didn't happen very often."[ccxxxiv]  Whatever updates Sgt. Walsh received; he was not aware of any problems.  If he

---

[37] The pain medication was not brought with her from home when she was brought to Area 4.
[38] Emphasis added

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

did see actions that needed to be taken or concerns that needed to be addressed, and relayed and discussed them with the detectives, then the onus returns to Detective Bocardo and Dyra to explain why they were not handled. Walsh's background should have made him aware of those investigatory deficits. If he didn't notice them, or worse, ignored them, his supervision was deficient.

The detective supervisors also failed to provide proper review to an important aspect of the investigation. Supervisors should make their subordinates understand that a review of case folders and investigations is standard and not an indication of lack of confidence in their abilities.

When attorney Sladjana Vuckovic arrived at Area 4, she met and spoke with Detective Dyra and Sergeant Vail regarding her representing John Velez.[ccxxxv] She was allowed to meet with Velez, the result was Velez's invocation of his Miranda rights. She also requested she be allowed to attend Rivera's viewing of the lineup, but she was denied.[ccxxxvi] General Order 88-18 is clear as to the opportunity to be afforded to a defense attorney present during while a live lineup is being conducted. If there were articulable circumstance for Vuckovic not to witness the lineup, documentation should have created to memorialize the decision that Vuckovic would "impede … the impartial objectives of the lineup." [ccxxxvii] Any supervisor would have the duty to document how, "either tacitly or overtly," the attorney would have impeded the lineup. If the omission was accidental, it is careless. If the omission was by choice, it becomes indefensible. A supervisor should be the model for his or her subordinates. They should provide the example of the work product they expect from their investigators. Documentation is, as Sergeant Walsh stated, a "solid practice."[ccxxxviii] So the lack of immortalizing as important a decision as denying a defense attorney access to a lineup, as recommended by a CPD General Order, is perplexing.

The issue regarding live lineups does not appear to be an isolated problem, but a systemic problem of supervision. A review of 200 homicide files by Loevy & Loevy LLC shows that in only eleven of 622 live lineups did a supervisor oversee the process (1.77% of live lineups). And in only twenty-four (24) of the 622 live lineups was it documented that a defense attorney was present (3.86% of live lineups).

More disturbing is the small number of combined 955 photo array presentations and live lineups in which there is any documentation regarding a photo array admonition being provided to witnesses. In only a single investigation (0.1 % of the showings) was there any indication as to an admonition being given, case RD# B544256. While not a requirement at the time of the investigation, the practice of providing an admonition prior to viewing either photo lineups or in-person lineups, provides integrity to the investigation. The admonition requirement, since adopted by CPD, solidifies the reliability of the process.

**Exhibit 14**

JOHN VELEZ v CITY OF CHICAGO, et al.

## V.    SUMMARY OF OPINIONS

The following comprehensive opinions and conclusions are based upon the analysis and deductions as outlined and articulated in the previous sections of this report.

A reality of law enforcement is police officers are not regarded as infallible entities. Society and the public question almost everything they do and say, and sometimes reinterpret those actions based upon their own experiences and biases, rather than through the experience of a trained police officer. Therefore, the proper, timely, and accurate recording of all the information obtained in ANY investigation is imperative, but of the utmost importance in investigating a murder.

The victim of murder, by definition, can no longer speak for themselves. To seek the truth and obtain justice for the families of the victims, and equally, to protect the public, homicide detectives must hold themselves to a higher standard.

Errors within the investigation could have been mitigated or eliminated by proper documentation. It was a primary duty of investigators, but was seldom accomplished. There was also no apparent consideration that this case might need to be re-examined later, disregarding the idea the case might remain unsolved and require future detectives to reinvestigate.

Each of the following passages contain the essence of the written contemporaneous corroboration required in a homicide investigation. Two of the three textbooks are recommended reference material in the Detective Training material.[ccxxxix] The concepts, if not the actual texts, should be familiar to the detectives, and utilized in the investigation of every case. Sgt. Walsh believed that taking immediate or contemporaneous notes during interviews was a "solid practice."[ccxl] But those basic principles for documentation were seldom followed. The severe lack of proper notetaking and report writing is obvious throughout this investigation.

> Note keeping
>
>         Practically speaking, no one, no matter how many homicides he or she has investigated, can know for sure at the beginning just what witness, suspect, feature, or piece of physical or trace evidence will be important. Therefore, notetaking is of the utmost importance in homicide investigations. The investigator's notebook will eventually accumulate vast amounts of information, which may later be instrumental in proving or disproving a specific point or fact in question.
>         Because note keeping is essential to any good homicide investigation, it is imperative that investigative notes be comprehensive, accurate, and reflective of a proper chronological time frame. In fact, on each separate notation, the investigator should record the time and date of the event. These notes must be preserved for later review and/or admission into evidence.[39]

---

[39]Practical Homicide Investigation, Third Edition. (1996), Geberth, Vernon J., page 808

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Repository for Details
    Experienced investigators employ a notebook to record the relevant details of a case.
Adequate notes are considered a prerequisite to the future recording, evaluation, and presentation
of the information developed in the course of an investigation.  The intervention of time affects the
quantity and accuracy of the data remembered by the investigator.[40]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    Of all the many duties and responsibilities of the officer conducting the crime scene
search, perhaps the most important is note taking.  Note taking is important for several reasons.  It
forces investigators to commit their observations to writing.  It enables them to keep a detailed
record of everything they see and do.  It is not infrequent to find some seemingly insignificant
item in an investigator's notes become a key in an investigation at some later time.
    Notes should be taken in chronological order.  They should detail, step by step, each and
every action the officer makes.  Notes should be complete and thorough.[41]

A homicide scene is the most intensely investigated in law enforcement. There is no crime which
receives the attention of the public as the taking of a human life. And as such, the homicide crime
scene needs to be handled correctly from the onset.  There is no "go back," no "do over," no
"reset" at a scene.  It is incumbent that the homicide detective is meticulous, accurate, and
methodical in their handling of that scene. A homicide detective needs to document his or her
actions and observations, from the moment they are notified of the incident, through the
prosecution or the unfortunate inability to solve the case.  They are also responsible for assuring
the processing of the scene by forensic technicians, is done correctly, with respect for each
"competing" discipline.

Many of the deficiencies outlined in this report appear to be repetitive, but in the case of a
criminal investigation, every action can affect various investigative steps simultaneously.
Missteps can cause a ripple effect and undermine the case.  Conversely, utilizing proper
procedures and protocols can also affect each step.  Successful prosecutions are built upon
evidence; whether circumstantial, forensic, or eyewitness.  Even investigations which grow
"cold" from exhausted or absence of actionable leads, will benefit from a solid and
comprehensive investigation when they are eventually reopened.

Building a successful case requires the detective to examine each lead and, to the best of his or
her ability, explore every realistic avenue which might aid in their endeavor.  These efforts can
sometimes seem needless, and be painstaking, dull, and ultimately unproductive.  But they are
necessary.  Documenting every step, every interview (no matter how productive), every forensic
request and result is tedious, time consuming, and often boring work.  But it is necessary.

There was no urgency or determination to solve the crime, nor to identify, locate, and take a
potentially armed suspect off the streets.  Detectives seemed interested in handling their duties
only within the parameters of their scheduled shifts.  Whether a personal attitude or an
administrative policy, this is unacceptable.  When a suspect was identified, no actions were taken

[40] *Fundamentals of Criminal Investigation,* 5th Edition, O'Hara, G. L., & O'Hara, G. L. (1988), page 28
[41] Techniques of Crime Scene Investigation, 5th Edition (1992) Fisher, Barry & A. J., page 68

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

to corroborate the identification. Detectives Bocardo and Dyra made no effort to assure the case was driven forward in their absence, nor made any effort to notify patrol officers or other detectives of potential safety issues. They left a potentially armed, dangerous gang member on the street. If the concept of "team investigations" was accepted and adhered to, other members of the team should have been directed to pick up and advance the case.

Detectives failed to properly handle the investigation from the moment the crime was reported, through the limited and superficial follow up, and eventually to the case filing with the Assistant State's Attorney's Office. Every example documented in this report contributed to the collapse of the case against John Velez. Witnesses were never located and interviewed, nor were discrepancies addressed. Efforts to obtain evidence were never attempted or completed, and forensic testing was selectively requested. Tunnel vision toward John Velez, and to the exclusion of any other potential suspect was obvious.

The disputed identification by Apolinar Mejia caused a crisis of credibility for Detective Bocardo. His version of events was called into question both by the contemporaneous Felony Review paperwork and Mejia's later deposition. John Velez's supposed statements at Christ Hospital were no less a problem. The statement began as an admission when verbally related by Cook County Detectives. When the Cook County Detectives faxed the crime information, the admission information was omitted. The statement next developed into a near confession, though disputed both before, during, and after trial by Christina Izquierdo. But for all the discrepancies noted, the information was never confirmed by follow up with Detectives Sullivan and Davis, or with the independent third-party nurse, who remained unidentified because of lack of effort. Either of these interviews were simple to complete, and were never done.

The detectives ignored or disregarded procedurally appropriate follow ups, and allowed inaccuracies in the case to go unaddressed.

The homicide detective needs to establish control of the scene, of the investigation, and of the case. In contrast, the detectives involved in the Hueneca murder investigation, at various times, eschewed that control and deflected their responsibilities under various justifications.

From the Violent Crimes Detective Training, Detective Division Organization Presentation:

> "Conclusion:
> Whenever you are assigned a case, wether [sic] it is a processing, a major investigation, or a handout, that investigation remains your responsibility. You are responsible for the successful prosecution and at times you may be called upon to testify in court ten or fifteen years later about the case, the defendant or your report. Everything you do as a detective is considered important, and it reflects upon the detective, the division, and the department. When preparing any report remember that you have to live with (the) report for the rest of your career."[ccxli]

Detective Cruz said, "It would – they would look – yeah, they might look for direction, somebody else on the scene, other officers on the scene may look to me for direction. They – and at the time, like I said, if something needed to be – if something needed to be protected or information

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

to be gleaned that I would not be able to do at the time, I might ask them to do something.  They wouldn't have to do what I asked them to do.  I didn't have the authority."[ccxlii]  Thus the crime scene was left to almost investigate itself, in the apparent hope someone would document and collate the information to solve the crime and prosecute a suspect.

Detective Bocardo equivocated, "We were assigned the investigation.  I didn't say I was in charge of it.  We were assigned it. … We were the assigned detectives.  We had other detectives assisting us with it.  If you want me to equate being in charge, being the assigned detective, then I'll say, okay, we were in charge, as you want to label it.  But we were the assigned detectives being assisted by numerous other detectives in the area.  Supervisors.  I would put more a supervisor in charge of the investigation overlooking the assigned detectives."[ccxliii]  Whenever he was given the opportunity to accept responsibility, Bocardo continued to avoid it.  Detective Bocardo put the obligation of the investigation on Sgt. Walsh, who does bear some responsibility to oversee the investigation based upon his position and experience.  However, in the end, Detectives Bocardo and Dyra ultimately share the obligation and duty.

Detective Sam Cirone recognized who bore responsibility for the case when he referred to Bocardo and Dyra as the "main detectives."[ccxliv]  Though Cirone's involvement was cursory and limited, his experience along with that of Detective Kato could have benefitted Bocardo and Dyra, but they provided little in the way of advice or assistance.

Detective Jaglowski testified in his deposition, "We knew what we had to do and we did it."[ccxlv]  The review of this case does not support that statement.

Detectives Bocardo and Dyra should have accepted the mantle of responsibility and taken control of their case.  The indifference to proper procedure, policy, and practice was detrimental to the investigation.  The investigation by committee system allowed leads to remain unworked.  The "somebody will do it" concept resulted in "nobody did it."  That lax investigative technique and cursory adherence to proper protocols, procedures, practices, and policies spread throughout the case, and it, in turn, resulted in a substandard investigation.

A supervisor's confidence in their detectives' abilities is laudatory, but Sergeant Walsh's conviction is misplaced.  A detective who is assured in the quality of his or her work product, as well as an inexperienced detective seeking to learn the proper investigative procedures, should welcome examination, suggestions, and corrections.  The maxim of "fresh eyes" applies to any aspect of an investigation.  Whether simply in the form of proofreading a report for spelling and grammatical errors, or in the greater need to ensure mistakes of omission, oversight, indifference, or neglect are corrected.   Corrections may take the form of suggestions or orders.  But they should be made and addressed.  Often the hardest "sale" of a detective's case is to a prosecuting attorney's office, as prosecutors are judged, rated, and promoted based upon conviction rates.  A supervisor should be willing to pose difficult questions to test a case before it reaches the filing stage.

A supervisor has unique, overlapping, and sometimes contradictory, responsibilities.  They are answerable to the public, the Department, the investigation, and to their detectives.  When supervisors neglect to respond to crime scenes, or fail to provide advice and guidance based upon

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

their expertise and experience, or challenge discrepancies and investigative errors, or to fulfill their own duties, they fail the system. The absence of "awareness" and direct supervision, as demonstrated in this investigation, provides an atmosphere in which detectives can ignore their responsibilities, avoid proper procedures, and cut corners. Overall, it allows for malfeasance with little fear of reprisal or discipline. All of which will ultimately lead to the detriment of the case and damage their own reputations and that of the Department. It also erodes the public trust and severely hampers the ability of other law enforcement to properly perform their duties.

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

VI.        ADDENDA

Any outside media which is used to support the conclusions and opinions detailed within the report should be listed here.

In addition to those items listed in Section II, the portions of the following reports, articles, and/or publications were reviewed in the formulation of the above opinions.

> Geberth; V. J. (2021). Practical Homicide Investigation: Tactics, Procedures, and Forensic Techniques, Third Edition by Vernon J. Geberth (1996–06-11). CRC Press; 3rd edition (1996–06-11).

> Techniques of Crime Scene Investigation (5th ed) by Barry A. J. Fisher (1992–09-17). (2021). CRC Press; 5th edition (1992–09-17).

> Fundamentals of Criminal Investigation (5th Ed.) O'Hara, G. L., & O'Hara, G. L. C.C. Thomas. (1988)

> Homicide Mapping Process, Bureau of Justice Assistance, Carter, Dr. David L., September 2013

> Review of the Chicago Police Department's Homicide Investigation Process, Police Executive Research Forum. Bureau of Justice Assistance. Executive Summary, (2019)

> Los Angeles Police Department Homicide Manual, Investigative Analysis Section, January 1, 2009,

The conclusions and opinions drawn within this report are based on my examination of all the information available at the time of the review.  Those same conclusions and opinions rely upon my knowledge, experience, and expertise.  I reserve the right to amend this report upon receipt and review of any additional relevant material related to this matter.

COMPLETED:

ROBERT BUB

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

CITATIONS/ENDNOTES

[i] CPD Case Supplemental Report, Statement of Edward Perez, page 7, City 000019, and handwritten CPD General Progress Report, City 000048

[ii] CPD Case Supplemental Report, Statement of Jacqulina Gonzalez, page 8, City 000020

[iii] Ibid.

[iv] CPD Case Supplemental Report, Statement of Edward Perez, page 8, City 000020

[v] CPD Case Supplemental Report, City 000020, and GPR, City 000048

[vi] CPD Case Supplemental Report, Authored by Det. John Cruz, Statement of Lorena Ricardo, page 7, City 000019

[vii] Ibid.

[viii] CPD General Offense Case Report, City 000005 & 00006

[ix] CPD General Progress Reports, City 000048 - 50

[x] CPD Case Supplemental Report, City 000019, and Deposition Transcript of Det. Jaglowski, pages 33 and 39

[xi] Deposition Transcript of Det. Michael Bocardo, page 143

[xii] CPD Case Supplemental Report, City 000034

[xiii] Deposition Transcript of Detective Sam Cirone, page 156

[xiv] Trial Transcript of Gustavo Rivera, Plaintiff 000984-985

[xv] CPD Case Supplemental Report, Statement of Gustavo Rivera, page 9, City 00035

[xvi] Ibid., City 000036

[xvii] Trial Transcript of Gustavo Rivera, Plaintiff 000995 & 001025

[xviii] Ibid., Plaintiff 1026

[xix] Trial Testimony of Gustavo Rivera, Plaintiff 001026-001029

[xx] CPD Closed Cleared Supplemental Report, City 000035

[xxi] CPD Case Supplemental Report, Statement of Lorena Ricardo, page 10, City 000036

[xxii] Ibid.

[xxiii] Ibid.

[xxiv] CPD Case Supplemental Report, City 000037

[xxv] CPD Case Supplemental Report, City 00037-38

[xxvi] Trial Testimony of Micaela Gutierrez, Plaintiff 583

[xxvii] CPD GPR, City 000060

[xxviii] Deposition Transcript of Det. Michael Bocardo, page 191

[xxix] CPD Case Supplementary Report, City 000039

[xxx] Ibid.

[xxxi] Deposition Transcript of Apolinar Mejia, page 40

[xxxii] Ibid., page 38

[xxxiii] CPD Case Supplementary Report, City 000039

[xxxiv] Deposition Transcript of ASA Megan Goldish, page 122 – 129, referencing CCSAO 120

[xxxv] Deposition Transcript of Apolinar Mejia, pages 90 - 94

[xxxvi] Ibid., page 000040

[xxxvii] CPD GPR Report, City 000044

[xxxviii] CPD Case Supplementary Report, CITY 000040

[xxxix] Ibid.

[xl] CPD Investigative File – Hueneca Homicide, CITY 000096-000099

[xli] Ibid., City 000099

[xlii] CPD Supplemental Report, City 000026

[xliii] Deposition Transcript of Sladjana Vuckovic, pages 54 & 68

[xliv] Ibid., page 70

[xlv] Deposition Transcript of ASA Megan Goldish, pages 57-58

[xlvi] Ibid. page 58

[xlvii] Ibid. page 63

[xlviii] Deposition Transcript of ASA Megan Goldish, page135.

[xlix] Ibid. page 146

[l] CPD Investigative File – Hueneca Homicide, Statement of Gustavo Rivera, CITY 000107

[li] Deposition Transcript of ASA Megan Goldish, page 184

[lii] Ibid. page 189

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

---

[liii] Ibid. page 190
[liv] CPD Investigative File – Huenca Homicide, Statement of Christina Izquierdo, CITY 000103-104
[lv] Ibid., CITY 000103
[lvi] CPD Lost & Found Case Report, City 000092
[lvii] Deposition Transcript of Sgt. Denis Walsh, page 74
[lviii] Ibid.
[lix] Ibid., page 85
[lx] Deposition Transcript of Det. John Cruz, page 49
[lxi] Deposition Transcript of Det. Michael Bocardo, page 252; Deposition Transcript of Det. Michael Dyra, page 227
[lxii] CPD Investigative Report Format material, City 062365
[lxiii] Deposition Transcript of Det. Michael Dyra, pages 121-122
[lxiv] CPD Case Supplemental Report, City 000019
[lxv] CPD Investigative File – Huenca Homicide, City 000051
[lxvi] CPD Crime Scene Photographs, City 000178, 000201-203, and 000218
[lxvii] Deposition Transcript of Det. John Cruz, page 78
[lxviii] Deposition Transcript of Det. John Cruz, page 42
[lxix] CPD General Offense Report, City 000006, CPD GPR, City 000046, and CPD GPR, City 000047
[lxx] CPD Case Supplemental Report, City 000015
[lxxi] Cook County Medical Examiner Report of Postmortem Examination for Anthony Huenca, City 000118-119
[lxxii] Deposition Transcript of Det. Michael Bocardo, page 143, and Deposition Transcript of Det. Sam Cirone, page 161
[lxxiii] Ibid., page 173
[lxxiv] CPD General Progress Report, City 000056
[lxxv] CPD General Progress Reports, City 000044 and 000059
[lxxvi] Deposition Transcript of Det. Michael Dyra, pages 123-125
[lxxvii] CPD Cleared Closed Supplemental Report, City 000035 & 000037
[lxxviii] Ibid., page 000035
[lxxix] Deposition Transcript of Det. Sam Cirone, page 157
[lxxx] Ibid. page 160
[lxxxi] CPD General Progress Report, City 000055
[lxxxii] Deposition Transcript of Det. Michael Bocardo, page 183
[lxxxiii] CPD General Progress Report, City 000058
[lxxxiv] CPD General Progress Report, City 000061-61
[lxxxv] CPD Supplemental Report, City 000039
[lxxxvi] Deposition Transcript of Det. Michael Bocardo, page 179
[lxxxvii] Ibid., 000035-000036
[lxxxviii] CPD Cleared Closed Supplemental Report, City 000036
[lxxxix] CPD General Progress Report, City 000050
[xc] Deposition Transcript of Det. Michael Bocardo, pages 127-129
[xci] CPD Cleared Closed Supplemental Case Report, City 000038
[xcii] CPD Supplemental Report, City 000039
[xciii] Deposition Transcript of Det. Michael Bocardo, pages 215-216
[xciv] Ibid., page 230
[xcv] Ibid., pages 228-229
[xcvi] Assistant State's Attorney Felony Review Folder, CCSAO 000120, and Deposition Transcript of ASA Megan Goldish, page 123
[xcvii] Deposition Transcript of ASA Megan Goldish, page 56
[xcviii] Ibid., page 35
[xcix] Ibid., page 26
[c] Ibid., page 58
[ci] Ibid., page 56
[cii] Deposition Transcript of Kriston Kato, pages 23-24
[ciii] Deposition Transcript of Apolinar Mejia, pages 89-90, 95, 99-100, and 105-106
[civ] Deposition Transcript of Sgt. Denis Walsh, page 115
[cv] CPD Supplemental Report, City 000032
[cvi] Criminal History Records Information System, City 043046-046050

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

cvii CPD Supplemental Report, City 000041
cviii CPD Investigative File – Hueneca Homicide, City 000063
cix CPD General Progress Reports, City 000057-58 and 000061-62
cx Deposition Transcripts of Det. Michael Bocardo, page 292
cxi CPD Supplemental Report, City 000026
cxii CPD General Progress Report – Line Up, City 000043
cxiii Deposition Transcript of Attorney Sladjana Vuckovic, page 70
cxiv Chicago Police Department Bureau of Investigative Services, Detective Division Training Program, Death and Homicide Investigations manual (Revision 1996), page 2, City 061037
cxv Violent Crimes Detective Training, Detective Division Organization Presentation, referencing CPD General Order 86-5 Add3B, City 064814
cxvi Deposition Transcript of Det. Michael Bocardo, page 81, and Deposition Transcript of Det. Michael Dyra, pages 69-70
cxvii CPD Supplemental Report, City 000037-000039
cxviii Ibid.
cxix Deposition Transcript of Det. John Cruz, pages 78
cxx Deposition Transcript of Det. John Cruz, page 50
cxxi Ibid., page 77
cxxii Ibid., pages 46-47
cxxiii Ibid., page 46
cxxiv Ibid., 47
cxxv CPD Case Supplemental Report, City 000019
cxxvi Ibid., City 000037
cxxvii CPD General Offense Report, City 000005; CPD Supplemental Report City 000013; CPD Supplemental Report, City 000022; CPD Supplemental Report, City 000027; and CPD Supplemental Report, City 000130
cxxviii Deposition Transcript of Det. Sam Cirone, page 161
cxxix Deposition Transcript of Victor Perez, pages 36 & 85; Deposition Transcript of Officer Michael Walsh, page 65
cxxx CPD Case Supplemental Report, City 000020
cxxxi Ibid., City 000035
cxxxii CPD GPR, City 000049
cxxxiii Trial Testimony of Gustavo Rivera, Plaintiffs 000984-000985
cxxxiv Ibid., Plaintiff 000995
cxxxv Deposition Transcript of Det. Michael Bocardo, page 183
cxxxvi CPD Investigative File – Hueneca Homicide, pages 000053-000054
cxxxvii Ibid., City 000017
cxxxviii CPD Investigative File – Hueneca Homicide, pages 000071-000075
cxxxix General Offense Report, City 000005
cxl General Progress Report, City 000050
cxli Ibid.
cxlii Case Supplemental Report, City 000019
cxliii Ibid.
cxliv Deposition Transcript of Det. Michael Bocardo, pages 196-197
cxlv CPD Supplemental Report, City 000036
cxlvi Deposition Transcript of Det. Michael Bocardo, page 174
cxlvii Trial Testimony of Gustavo Rivera, Plaintiffs 1028-1029
cxlviii Ibid., Plaintiff 001026
cxlix Deposition Transcript of Det. Allen Jaglowski, page 91
cl Gustavo Rivera statement to ASA Goldish, City 000111
cli Crime Scene photographs, City 000177-000179
clii Deposition Transcript of Det. Michael Bocardo, page 184
cliii CPD GPR, City 000050
cliv CPD Case Supplemental Report, City 000019
clv CPD Cleared Closed Case Supplemental Report, City 000036
clvi Ibid., City 000036
clvii CPD General Offense Case Report, City 000005
clviii CPD Case Supplemental Report, City 000019

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

clix CPD Closed Cleared Supplemental Case Report, City 000037
clx CPD Cleared Closed Supplemental Case Report, City 000038
clxi Ibid., City 000039
clxii Deposition Transcript of Apolinar Mejia, page 38-39
clxiii Ibid., page 38
clxiv CPD Supplemental Report, City 000037, and Trial Testimony of Det. Michael Bocardo, Plaintiff 001056-001057
clxv Deposition Transcript of Det. Michael Bocardo, Pages 85-86
clxvi CPD Supplemental Case Report, City 000040
clxvii Ibid.
clxviii Cook County Sheriffs Facsimile Report, RE: Agg Battery, City 000096-000099, and Deposition Transcript of Det. John Sullivan, page 109
clxix Ibid.
clxx CPD Supplementary Report, City 000041, and statement of Christina Izquierdo, City 000102
clxxi Cook County Fax Transmittal, City 000096-000099
clxxii Deposition Transcript of Christina Izquierdo, page 13-14
clxxiii Ibid., pages 198-205
clxxiv CPD General Offense Report, CCSAO 0306
clxxv ASA Goldish Felony Filing Review, CCSAO 000119
clxxvi CPD Investigative File – Hueneca Homicide, statement of Christina Izquierdo, City 000102
clxxvii Deposition Transcript of ASA Megan Goldish, page 200
clxxviii CPD Investigative File – Hueneca Homicide, statement of Christina Izquierdo, page 000102
clxxix Ibid., page 000103
clxxx Ibid., page 000104
clxxxi CPD Supplemental Report, City 000040, and Deposition Transcript of Det. Michael Bocardo, pages 249-250
clxxxii CPD Investigative File – Hueneca Homicide, statement of Christina Izquierdo, City 000103-000104
clxxxiii CPD Cleared Closed Supplemental Case Report, City 000041
clxxxiv Deposition Transcript of Det. James Davis, pages 57-58 and Deposition Transcript of Det. John Sullivan, page 118
clxxxv Deposition Transcript of Det. James Davis, pages 69-73, and Deposition Transcript of Det. John Sullivan, page 134-135
clxxxvi Deposition Transcript of Det. Michael Bocardo, page 251
clxxxvii Ibid., page 251
clxxxviii Ibid., page 251
clxxxix Ibid., page 253
cxc Deposition Transcript of Det. Michel Dyra, page231
cxci CPD GPR, City 000044, and City 000065
cxcii CPD Photographs, City 000140-000157
cxciii CPD Photographs, City 000188-000195
cxciv CPD Case Supplemental Report, City 000038-39
cxcv Illinois State Police Forensic Evidence Submission Form, City 000091
cxcvi Illinois State Police Department of Forensic Services Evidence Report, City 000137
cxcvii Ibid.
cxcviii Deposition Transcript of Det. Michael Dyra, pages 267-270
cxcix Deposition Transcript of Det. Michael Dyra, page 268
cc Illinois State Police Forensic Evidence Submission Form, City 000093
cci CPD Cleared Closed Supplemental Case Report, City 000032
ccii Illinois State Police Department of Forensic Services Evidence Report, City 0000126
cciii CPD Cleared Closed Supplemental Case Report, City 000038
cciv Illinois State Police Department of Forensic Services Evidence Report, City 0000127
ccv Deposition Transcript of Det. John Cruz, pages 21-22, Deposition Transcript of Det. Michael Bocardo, pages 59-60, Deposition Transcript of Det. Michael Dyra, pages 29-30, Deposition Transcript of Det. Allen Jaglowski, pages 23-24, and Deposition Transcript of Det. Sam Cirone, page 31
ccvi Violent Crimes Detective Training, Detective Division Organization Presentation, City 064816
ccvii Deposition Transcript of Det. Michael Bocardo, page 139
ccviii Deposition Transcript of Det. Michael Dyra, page 227

**Exhibit 14**

**JOHN VELEZ v CITY OF CHICAGO, et al.**

---

ccix Deposition Transcript of Det. Michael Bocardo, page 250
ccx Ibid., page 252
ccxi May 3, 2001, Trial Testimony of Det. Michael Bocardo, Plaintiff 000205
ccxii Deposition Transcript of Det. Kriston Kato, page 189-192
ccxiii Deposition Transcript of Det. Allen Jaglowski, page 30
ccxiv Ibid., pages 42-44
ccxv CPD Case Supplemental Report, City 000042
ccxvi Deposition Transcript of ASA Megan Goldish, page 58
ccxvii Ibid. page 90
ccxviii Ibid. page 86
ccxix Ibid., pages 85 & 188
ccxx Deposition Transcript of Det. Michael Bocardo, pages 265-266
ccxxi Ibid., pages 185-186
ccxxii Deposition Transcript of Christina Izquierdo, pages 31-37
ccxxiii Ibid., pages 39-40
ccxxiv Ibid., pages 48-50
ccxxv Ibid., pages 50-54
ccxxvi Ibid., pages 55-56
ccxxvii Ibid., page 59
ccxxviii Deposition Transcript of Sgt. Denis Walsh, page 28 and 31-32
ccxxix Ibid., page 35
ccxxx Deposition Transcript of Det. Michael Dyra, pages 77-78
ccxxxi Deposition Transcript of Det. Michael Bocardo, pages 141-142
ccxxxii Deposition Transcript of Sgt. Denis Walsh, page 63
ccxxxiii Ibid., pages 75-77
ccxxxiv Ibid., page 77
ccxxxv Deposition Transcript of Sladjana Vuckovic, page 51
ccxxxvi Ibid., pages 70-71
ccxxxvii Chicago Police Department General Order 88-18, II. Conduct of the lineup, Section B.
ccxxxviii Deposition Transcript of Sgt. Denis Wash, pages 85-88
ccxxxix Chicago Police Department Bureau of Investigative Services, Detective Division Training Program, Death and Homicide Investigations manual (Revision 1996), City 061031, and Violent Crimes Detective Training, Detective Division Organization Presentation, City 064813
ccxl Deposition Transcript of Sgt. Denis Wash, pages 85-88
ccxli Violent Crimes Detective Training, Detective Division Organization Presentation, City 064817
ccxlii Deposition Transcript of Det. John Cruz, pages 51-52
ccxliii Deposition Transcript of Det. Michael Bocardo, pages 139-140
ccxliv Deposition Transcript of Det. Sam Cirone, page 161
ccxlv Deposition Transcript of Det. Allen Jaglowski, page 44

**Exhibit 14**