**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN VELEZ, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 CV 8144 |
| | ) | |
| v. | ) | Judge Edmond Chang |
| | ) | |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S ADDITIONAL STATEMENT OF
FACTS PURSUANT TO LOCAL RULE 56.1(c)(2)**

DEFENDANTS, Michael Bocardo, Michael Dyra, John A. Cruz, Sam Cirone, Patrick O'Donovan, Kriston Kato, Bradul A. Ortiz, Michael J. Walsh, Victor M. Perez, Donald Wolverton, Allen Jaglowski, Denis Walsh, and John Farrell (collectively "Individual CPD Defendants"), by their attorneys, BORKAN & SCAHILL, LTD., respond[1] to Plaintiff's Statement of Additional Facts as follows:

1.      Plaintiff is innocent of the Hueneca murder. Ex. 1 (Velez affidavit).

**RESPONSE: Deny. Plaintiff is aware that this is a hotly disputed issue in this case.  *See* Dkt. 99 at ¶¶ 1, 73, 153. Ricardo and Gutierrez identified Plaintiff from a photo array and a lineup as the man who held them up at gunpoint moments before gunshots were fired right in the area where Hueneca was murdered. (Dkt. 309, Individual CPD Defendants' Statement of Material Facts, at ¶¶ 85-88, 102-103).  Mejia also identified Velez as the offender from an upside mugshot of Velez that was in Bocardo's clipboard. (*Id.* at 74). Answering further,**

---

[1] To the extent any of these facts are undisputed and/or admitted by Individual CPD Defendants, it is limited to and applies only for purposes of Defendants' motions for summary judgment. Defendants reserve the right to dispute these facts for all other purposes, including trial.

Mejia and Rivera also identified Plaintiff from a lineup as the person they saw in the area where Hueneca was murdered with a gun. (*Id.* at ¶104). On March 27, 2001, Rivera signed a handwritten statement documenting his observations surrounding Hueneca's murder on March 19, 2001, including his observations of Velez and Hueneca moments before Hueneca was murdered. (*Id.* at 110-111). At the time Plaintiff was charged with the first-degree murder, there was a wealth of additional facts that supported probable cause to arrest and detain Plaintiff for the murder of Hueneca. (*Id.* at ¶ 117).

At Plaintiff's criminal trial, witnesses, Ricardo, Gutierrez and Mejia all identified Plaintiff as the person who pointed a gun at them when they were in Mejia's car on 21st Place moments before they heard gunshots. (*Id.* at ¶ 123). Rivera also made an in-court identification of Plaintiff as the person he had seen walking behind Hueneca before Hueneca was shot. (*Id.* at ¶ 124). Moreover, following the disposition of Plaintiff's criminal case, Plaintiff did not seek a Certificate of Innocence pursuant to 735 Ill. Comp. State. 5/2-702. (*Id.* at ¶¶ 140-141).

2.      The witnesses describe a brief encounter with the man with the gun, who threatened them, inquired of their gang status, shouted gang slogans, and walked away. Dkt 309, ¶¶9-15, 19-21, 26-29, Ex. 2 (Ricardo Dep.) at 278:6-11.

**RESPONSE: Admit.**

3.      Witnesses Mejia's, Ricardo's, and Gutierrez's opportunity to view the man they saw with a gun and reliably identify him later were impeded by many factors, including darkness; obscured ability to view offender by his hood and position outside the car (for at least some of the encounter), presence of a gun, stressful environment, as well as the delay before viewing an identification procedure, and the faults in the presentation of the identification procedures to the

witnesses. Ex. 3 (Steblay Report Part I) at 6, 9-12, 14-18. These factors combine to make the witnesses' identifications less reliable.

**RESPONSE: Defendants object to Plaintiff's reliance on factual theories that he failed to disclose in response to Defendants' contention interrogatories that specifically requested he "describe each and every fact" to support his allegations that the identifications made by Gutierrez or Ricardo were false or that they were manipulated and coerce to falsely identify Velez as the offender. (Def. Ex. 79, Plaintiff's Responses to Defendant Dyra's Second Set of Interrogatories at ¶¶ 10-11). Without waiving the foregoing objection, deny. Plaintiff cites his expert's report, but Defendants contest that report's conclusions, and presented their own expert to refute them. Plaintiff's assertion that "these factors combine to make the witnesses' identification less reliable" is not supported by any citation. The evidence shows that the "factors" cited are not accurate representation of the circumstances, and ignores facts that support the reliability of the identifications. Mejia testified that although it was dark outside, the area was illuminated by streetlamps. (Def. Ex. 7, Deposition of Apolinar Mejia at 19:4-17, 25:18-21). He further testified that the man was wearing a dark colored hooded sweater and that he was able to look at the man's face. (Def. Ex. 3, Trial Testimony of Apolinar Mejia dated Oct. 9, 2020, at R-140:17-24, Def. Ex. 7 at 25:22-26:10). Mejia also testified the offender was Hispanic and that Hispanic people do not look the same to him. (Def. Ex. 7 at 56:20-57:11). Ricardo noticed that the offender was wearing a hood that only covered the top of his head and so she was able to see his face. (Def. Ex. 5, Trial Testimony of Lorena Ricardo dated Oct. 9, 2002, at R-185:1-9, R-195:1-4). When the man pointed the gun at her, she saw the gun and the man's face. (Def. Ex. 12, Deposition of Lorena Ricardo dated Sep. 18, 2020, at 257:23-258:2, 259:16-22). Gutierrez testified the man with the gun**

was about six inches from her and that even though she was crying and praying she able to see the man. (Def. Ex. 4, Trial Testimony of Micaela Gutierrez dated Oct. 8, 2002 at Q-88:15-89:3, 92:24-93:9). Plaintiff's expert, Nancy Steblay, testified it is not her role to say whether the eyewitness's identification in this case are accurate or inaccurate. (Pl's Ex. 9, Deposition of Nancy Steblay at 42:18-43:11, 47:6-20). Steblay further testified that she cannot opine that the identifications made by Mejia, Ricardo and Gutierrez were inaccurate because they were threatened with a gun at the time when they were making their observations of the offender. (Pl's Ex. 9, Deposition of Nancy Steblay at 42:18-43:11, 47:6-20). She also testified she had no factual data that suggested that the positioning of the offender's hood on top of his head impacted the ability of Mejia, Ricardo and Gutierrez to clearly see the offender's face. (*Id*. at 110:9-111:1). Steblay admitted she assumed the view of the offender's face was limited by darkness even though the three eyewitnesses (Mejia, Ricardo and Gutierrez) testified they were able to see the offender's face when he was at the car. (*Id.* at 133:23-134:3, 134:11-15). She also admitted that distance between the offender and the three eyewitnesses was not a factor that affected their ability to observe the offender with the gun because he was close to them. (*Id*. at 131:3-14). Steblay could not say that the time that passed from when the man held the eyewitnesses up at gunpoint to when the eyewitnesses made their identifications affected the accuracy of their identifications. (*Id.* at 166:20-167:7). She also admitted that it was possible for victims of a violent and stressful crime to be able to accurately identify a suspect. (*Id*. at 124:24-125:7). Furthermore, Individual CPD Defendants' eyewitness expert, John Wixted, opined that while Steblay found the crime scene encoding conditions were "poor," eyewitness memory experts have no special expertise in determining what the encoding conditions were the night of the crime and therefore not in a position to pass

judgment on what the witnesses themselves said about those conditions. (Def. Ex. 72, Expert Report of John Wixted at 4). Dr. Wixted further stated that "while it is true that poor estimator variable conditions make it harder for a witness to encode the face of the perpetrator (reducing the correct ID rate compared to more favorable encoding conditions), it is also true that suspect IDs in the poorer estimator variable conditions are typically probative of guilt." (*Id.* at 7).

**Misconduct Related to Mejia**

4.      Mejia identified a photograph of the man who held him at gunpoint. Ex. 4 (Mejia deposition) at 48:20-49:13.

**RESPONSE: Admit. Answering further, when Mejia was shown a mugshot of Velez at his deposition, he testified Velez was the man who had come to his car on the night of the murder. (Def. Ex. 7 at 61:4-62:10).**

5.      The photograph that Mejia identified as the man who held him at gunpoint was never inventoried. Dkt. 309 ¶75.

**RESPONSE: Admit. Mejia identified Velez as the man who held him at gunpoint when he saw an ICAM photograph of Velez in G.S. Bocardo's clipboard and that this photograph was never inventoried; however, deny to the extent that this allegation assumes this particular photograph should have been inventoried. (Pl's Ex. 6, Deposition of Eric Winstrom, at 43:7-11) ("So – so as long as you had the central booking number and a record that – that identification was made from an ICAM photo, you would have a permanent copy of the photograph that you used available to you at any time that you wanted it."). Answering further, G.S. Bocardo did not inventory the mugshot of Velez that Mejia identified because**

it was not part of an official photo array and it was a photograph that could be reproduced. **(Def. Ex. 15, Deposition of Michael Bocardo at 231:5-21).**

6.    The photograph that Mejia identified as the man who held him at gunpoint was never identified in any police report by CB number or other identifying mark. Ex. 5 (Cleared Closed Supplementary Report) at 13.

**RESPONSE: Admit that the photograph Mejia identified as the man who held him at gunpoint was not identified in any police report by CB number but deny that the photograph was not identified in any police report by an "other identifying mark." G.S. Bocardo documented that Mejia inadvertently identified a computer-generated photo of Velez in the Cleared Closed Supplementary Report. (Def. Ex. 19, Cleared Closed Supplementary Report at 13-14).**

7.    Bocardo was supposed to either inventory or document in some way the photograph that he used to obtain the first identification of Mr. Velez. Ex. 6 (Winstrom deposition) at 41:18-43:11. Even Defendants' own police practices expert, Michael Brown, agrees that Bocardo should have inventoried the photograph. Ex. 7 (Brown deposition) at 74:1475:15.

**RESPONSE:  Deny that "Bocardo was supposed to inventory or document the photograph that he used to obtain the first identification of Mr. Velez" because this assertion is not supported by the citation provided.  As long as there was a record that an identification was made from an ICAM photo, which G.S. Bocardo documented in the Cleared Closed Supplementary Report, it was not necessary to inventory the photograph of Velez that Mejia identified because a permanent copy of Velez's photograph was available at any time. (Pl's Ex. 6 at 42:18-43:11). Answering further, admit that Defendants' police practices expert, Michael Brown, testified that per best practices the photograph of Velez that was identified**

**by Mejia should have been identified; however, he acknowledged because Mejia identified Velez from an ICAM photograph, it was easy to reproduce. (Pl's Ex. 7, Deposition of Michael Brown, at 74:22-75:14).**

8.      If Bocardo had a witness identify a photograph from a photo array, he would have the witness sign and date the photograph used to make the identification. Ex. 8 (Bocardo deposition) at 110:23-24. Bocardo did not have Mejia sign and date the photograph used to identify the offender. *Id.* at 230:9-12.

**RESPONSE: Admit that if Bocardo had a witness identify a photograph from a *photo array*, he would have the witness sign and date the photograph used to make the identification, but deny to the extent that this allegation assumes that it was necessary for Bocardo to inventory the computer generated photograph of Velez that Mejia identified because Mejia did not identify Velez's photograph from a photo array, the computer generated photograph of Velez was easy to reproduce and Bocardo documented Mejia's identification of Velez as the offender in the Cleared Closed Supplementary Report. (Def. Ex. 15 at 231:1-21, 226:9-21). Admit that Bocardo did not have Mejia sign and date the computer-generated photograph of Velez that Mejia identified as the offender for the reasons identified above.**

9.      The person depicted in the photograph that Mejia selected was not in the lineup. When Mejia viewed the lineup containing Mr. Velez, he did not recognize the people in the lineup. He had problems choosing the right person from the lineup because the people in the lineup looked so different from the photograph he saw. Exhibit 4 (Mejia deposition) at 51:2454:23.

**RESPONSE:   Deny. The person depicted in the photograph that Mejia selected was in the lineup because Mejia identified a computer-generated photograph of Velez and Velez was in the lineup that Mejia viewed. (Def. Ex. 7 61:4-62:10). When Mejia viewed the lineup**

containing Velez, he recognized and identified Velez as the offender because Velez was the person he saw by his car on March 19, 2001. (*Id*. at 61:4-21). Mejia was not mistaken about the person he saw at his window on March 19, 2001. (*Id*. at 56:20-57:11). Mejia and Velez are Hispanic, and Hispanic people do not look the same to Mejia. (*Id.* at 101:18-102:22).

10.     Mejia did not know who to choose from the line-up and stated out loud "is that him or him (indicating)." Exhibit 4 (Mejia deposition) at 52:13-53:1. In the lineup, Mejia said he could not tell which person in the lineup who was the offender. Exhibit 4 (Mejia deposition) at 52:13-53:12. Mejia asked an officer in the lineup, "where is this guy? Is that him? Or that one over there?" *Id*. at 53:14-21.

**RESPONSE**: **Defendants object to Plaintiff's counsel use of leading questions in eliciting Mejia's deposition testimony. Under Fed. R. Civ. Pro 30(c), the examination and cross examination of witnesses during deposition proceeds "as they would at trial." Because Plaintiff's counsel subpoenaed Mejia's deposition and disclosed him as a witness, Plaintiff's counsel was not permitted to use leading questions during his direct examination of Mejia. Defendants further object to Plaintiff's reliance on factual theories that he failed to disclose in response to Defendants' contention interrogatories that specifically requested he "describe each and every fact" to support his allegations that the identifications made by Mejia was false or that Mejia was manipulated and coerce to falsely identify Velez as the offender. (Def. Ex. 79 at ¶¶ 11-12). Without waiving the foregoing objection, Defendants admit that Mejia answered as such during his deposition in 2020 when counsel for Velez asked the following leading questions: Q. And so you were trying to, do you say, "I don't recognize the man in the lineup that you were"—A. Uh-hum. Q. Is that a yes? A. Yes. Q. And did you say that you couldn't tell if it was – you couldn't tell between two people in the lineup which one the**

person was? A. Uh-hum. Q. Is that a yes? A. Yes. Q. Did the police officer say anything when you said that you didn't recognize the guy, you couldn't tell which person it was? A. Yeah. (Def. Ex. 7 at 53:1-17). Answering further, Plaintiff's eyewitness expert agrees that every time Mejia's revisits his memory of the lineup (that occurred almost nineteen years prior to his deposition), there is room for change or distortion. (Pl's Ex. 9 at 205:13-206:12). When Mejia was asked about the lineup in October 2002 at Velez' criminal trial, which was a lot closer to the time of the lineup than his deposition, he testified that when he viewed the lineup, each lineup participant turned side to side, and he recognized Velez as the person that pointed a gun at him on March 19, 2001. (Def Ex. 3 at R-148:17-149:5). Bocardo did not tell Mejia who to identify from the lineup and Mejia never told Bocardo he could not tell who the offender was because the offender looked different from the photograph. (Def. Ex. 15 at 270:14-21; Def. Ex. 22 at 147:12-24).

11.     The officer responded by telling Mejia to take a look. *Id.* at 53:22-54:6. Mejia responded, "yeah, but I don't know." Id. The officer then told him "that guy is the guy." *Id.*

**RESPONSE: Defendants object to Plaintiff's reliance on factual theories that he failed to disclose in response to Defendants' contention interrogatories that specifically requested he "describe each and every fact" to support his allegations that the identifications made by Mejia was false or that Mejia was manipulated and coerce to falsely identify Velez as the offender. (Def. Ex. 79 at ¶¶ 11-12). Without waiving the foregoing objection, Defendants admit that Mejia testified at his deposition in 2020 that the officer responded by telling Mejia to take a look but deny the remaining assertions because they are not supported by the citations provided. There is no evidence that Mejia was recalled exactly what was said by him or the officer during this alleged conversation at the time of the lineup, which occurred**

more than nineteen years before Mejia's deposition in 2020. (Def. Ex. 7 at 53:22-54:6). Bocardo did not tell Mejia who to identify from the lineup and Mejia never told Bocardo he could not tell who the offender was because the offender looked different from the photograph. (Def. Ex. 15 at 270:14-21; Def. Ex. 22 at 147:12-24)

12.     The person Mejia selected from the lineup did not look like the guy who had threatened Mejia and his friends at the car; he looked heavier than the person he had seen at the car a week earlier. *Id*. at 54:24-55:14.

RESPONSE: Admit that the person Mejia identified from the lineup as the offender, Velez, looked heavier to Mejia than when Mejia had seen him at his car a week earlier but deny the remaining assertions. (Def. Ex. 3 at R-153:19-21). Deny that the "person Mejia selected from the lineup did not look like the guy who had threatened Mejia and his friends at the car" because Mejia was not mistaken about Plaintiff being the person he saw at his window on March 19, 2001 (Def. Ex. 7 at 56:20-57:11), or the person in the photograph. (*Id*. at 61:4-21). Mejia believed the person he identified from the lineup, Velez, was the person who pulled the gun on him. (*Id.* at 56:10-12). Mejia and Velez are Hispanic, and Hispanic people do not look the same to Mejia. (*Id.* at 101:18-102:22).

13.     The officer who told Mejia who to pick out the person from the lineup was Defendant Bocardo. *Id*. at 108:10-15.

RESPONSE: Defendants object to Plaintiff's counsel use of leading questions in eliciting Mejia's deposition testimony. Under Fed. R. Civ. Pro 30(c), the examination and cross examination of witnesses during deposition proceeds "as they would at trial." Because Plaintiff's counsel subpoenaed Mejia's deposition and disclosed him as a witness, Plaintiff's counsel was not permitted to use leading questions during his direct examination of Mejia.

**Defendants further object to Plaintiff's reliance on factual theories that he failed to disclose in response to Defendants' contention interrogatories that specifically requested he "describe each and every fact" to support his allegations that the identifications made by Mejia was false or that Mejia was manipulated and coerce to falsely identify Velez as the offender. (Def. Ex. 79 at ¶¶ 11-12). Without waiving the foregoing objection, Defendants admit that Mejia answered as such during his deposition in 2020 when counsel for Velez asked the following leading questions: Q. Was it Mike Bocardo who was showing you the photographs that you made the identification from? A. Yeah. Q. Was he also the officer in the lineup who was with you who told you who to pick out? A. Yes. (Def. Ex. 7 at 108:10-15). Defendants deny this is true. (Def. Ex. 15 at 120:3-11, 270:14-21). Bocardo did not tell Mejia who to identify from the lineup. (Def. Ex. 15 at 270:14-21; Def. Ex. 22 at 147:12-24).**

14.     Mejia believes today that Mr. Velez is the person who approached him at the car (despite acknowledging that his hair looked different and he's a lot heavier). Ex. 4 (Mejia deposition) at 56:13-57:11. Both sides' eyewitness experts agree that a witness's expression of confidence after receiving post-event feedback (such as learning they selected the suspect, or the person has been convicted) can artificially cause the witness to wrongly believe that they are correct in their identification. Ex. 3 (Steblay report Part I) at 26-28, 32-33; Ex. 9 (Steblay deposition) at 127:12-128:18; 420:8-25; Ex. 10 (Wixted deposition) at 21:14-22; 33:16-25.

**RESPONSE**:  **Admit that Mejia believes today that Velez is the person who approached him at the car despite acknowledging that his hair looked different and that Velez looked heavier at the lineup than he did at the car, but deny the remaining assertions as they are not supported by the citations provided. (Def Ex. 7 at 104:19-23, 66:14-66:23, 52:13-57:11). 104:19-23, 66:14-66:23, 52:13-57:11). Mejia testified that despite the differences between**

**Velez's appearance in the photo and Velez's appearance in real life, he identified Velez as the offender. (*Id.* at 52:13-53:24). Defendants' eyewitness expert, Dr. John Wixted and Plaintiff's eyewitness expert recognized post-identification feedback offered by a lineup administrator can inflate a witness's perception of confidence in his or her identification but they cannot say if post-identification feedback results in a reliable or unreliable identification. (Pl's Ex. 3, Steblay report Part I at 28; Pl's Ex. 9 at 42:18-43:11, Pl's Ex. 10, Deposition of John Wixted at 131:14-7-10).**

15.    (Cirone deposition) at 138:4-11; 139:13-19; Ex. 12 (lineup supplemental report) at 4 (documenting that Defendants Bocardo and Cirone were with the viewers of the lineup).

**RESPONSE**: **Admit.**

16.    The person that Mejia selected from the lineup was Mr. Velez. Ex. 12 (lineup supplemental report) at 5.

**RESPONSE**: **Admit.**

17.    According to Bocardo, the basis for first suspecting Mr. Velez as having anything to do with the Hueneca murder was because Mejia happened to view Mr. Velez's photograph upside down on a clipboard he was holding. Ex. 5 (Clear closed supplemental report) at 13; Ex. 13 (Bocardo criminal trial testimony) at T17:23-T18:21; Dkt. 309 ¶¶74-75.

16.    Bocardo and Cirone were present for Mejia's selection of Mr. Velez. Ex. 11

**RESPONSE**: **Admit.**

18.    That clipboard story was a lie. Mejia did not view Velez's photograph on a clipboard; rather, he was shown a number of photographs, and from among those photographs he identified a photograph of the offender. *See* Ex. 4 (Mejia deposition) at 48:4-49:13; 57:12-58:24;

90:4-91:5; 104:24-105:6; 105:12-108:12; 109:1-4. When Mejia testified at trial that he did not look through a book of photographs to find the offender, he was lying. *Id*. at 93:22-94:10

**RESPONSE: Defendants object to Plaintiff's reliance on factual theories that he failed to disclose in response to Defendants' contention interrogatories that specifically requested he "describe each and every fact" to support his allegations that the identifications made by Mejia was false or that Mejia was manipulated and coerce to falsely identify Velez as the offender. (Def. Ex. 79 at ¶¶ 11-12). Without waiving the foregoing objection, deny. Mejia testified at Velez' criminal trial in October 2020 that G.S. Bocardo had a stack of photographs in the side of the clipboard. (Def. Ex. 3 at R-171:5-11, R-172:12-14). Mejia also testified at his deposition in 2020 he saw a picture of Velez sitting on top of the stack of pictures on a clipboard. (Def. Ex. 7 at 94:11-14, 95:8-11; 99:10-100:21). He further testified at his deposition that he recognized the photograph on the clipboard as the offender. (Q. Was there a point in time where you were in a room with an officer and you saw a picture on a clipboard that you recognized as being the person that had the gun next to your car? A. Yes. Q. And when you saw that picture of the person who had the gun next to your car, was that before or after you looked at a book of gang photos? A. Yes. Q. Was it before or after? A. After. Q. Okay. When you saw the picture on top of the clipboard, did you recognize that person as being the person who had pointed the gun into your car? A. Well, actually pictures were covered up and, yeah, but they were not -- I couldn't like see them until he showed them to me. They were not just --he had a little table with him. Q. What do you mean by a little table? A. Like office -- like a desk or something. He had those -- he had, like, those pictures and --yeah. Q. Okay. And did you tell him that the person that you saw in the picture was the person who had pointed a gun at you and your friends in the car? A. Yes. (*Id.* at 99:10-**

**100:21). Mejia also testified that he identified the offender from photos viewed in a gangbook, and stated that *that* identification came from photographs in a book "not on a clipboard." (*Id.* at 104:24-105:6). Admit, Mejia testified at trial that he did not look at a gang book of pictures of gang members but claimed at his deposition in 2020 that he lied when he testified as such at trial. (*Id.* at 93:22-94:10). G.S. Bocardo, the only other person present, also testified that Mejia identified Velez as the offender from a photograph in his clipboard. (Def. Ex. 14 at T16:10-T18:12).**

19.     Bocardo took notes about his interview with Mejia, but his notes do not reflect that Mejia identified Mr. Velez from a photograph on his clipboard. Ex. 8 (Bocardo deposition) at 225:22-230:4; Ex. 14 (Mejia GPR).

**RESPONSE: Admit G.S. Bocardo took notes about his interview with Mejia and that he did not record Mejia identified Plaintiff from the clipboard in his notes but deny the remaining assertion as it assumes that G.S. Bocardo was required to document in his notes that Mejia identified a photograph on his clipboard. G.S. Bocardo documented that Mejia inadvertently identified a computer-generated photo of Velez that was exposed on his clipboard in the Cleared Closed Supplementary Report. (Def. Ex. 19 at 13-14).**

20.     No documentation was made about Mejia's initial identification until the Cleared Closed Supplementary report was drafted, which was after Plaintiff's arrest and Plaintiff was charged with murder. Ex. 5 (Cleared Closed Supplementary Report); Ex. 15 (Supplementary Report Electronic Data) at 1 (showing that the Cleared Closed Supplementary Report was not created until March 29, 2001).

**RESPONSE**: **Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails**

**to set forth an additional material fact requiring denial of Defendants' summary judgment motion. The date when G.S. Bocardo documented Mejia' initial identification in the Cleared Closed Supplementary Report does not create a fact dispute as to the issues germane to Defendants' motion. Defendants further object to the cited document (Pl's. Ex. 15) on the basis that it is inadmissible hearsay. See Fed. R. Evid. 801(c); 802. Without waiving the foregoing objection, Defendants admit no written documentation was made about Mejia's initial identification until the Cleared Closed Supplementary report was drafted but deny the remaining assertion to the extent that it assumes that the Chicago Police Department required the identification to be documented at any time before it was documented in the Cleared Closed Supplementary. In 2001, Chicago Police detectives and/or gang crime specialists, who were investigating a homicide, were expected to create the cleared closed supplementary report at the conclusion of a homicide investigation and to complete the report practicable. (Pl's Ex. 6 at 83:17-84:9). Answering further, Defendants deny the assertion that the Cleared Closed Supplementary was drafted after Plaintiff's arrest or not created until when March 29, 2001, as it is not supported by the material cited.**

21. ASA Goldish was told that Mejia initially identified Velez from a photo array, and Mejia did not tell her anything inconsistent with that. Ex. 16 (Goldish deposition) at 80:1181:7, 82:15-83:3. Further, ASA Goldish does not recall anyone telling her Mejia identified Velez from a photograph on a clipboard. *Id*. at 125:3-18 (); Ex. 17 (felony review folder) at 7 (ASA Goldish's notes document that Mejia identified Mr. Velez from a photo array).

**RESPONSE: Admit.**

## Misconduct Relating to Gus Rivera

22. Joseph Rivera is Gustavo Rivera's cousin. Ex. 18 (J. Rivera deposition) at 22:1-5.

**RESPONSE: Admit that Joseph Rivera testified that he is Gustavo Rivera's cousin.**

23.     Gustavo Rivera confessed to Joseph Rivera that he did not see the Hueneca shooting, and that he only implicated Mr. Velez because the police caught him with narcotics and were pressuring him. Ex. 19 (J. Rivera affidavit); Ex. 18 (J. Rivera deposition) at 98:9-99:1; 100:17-101:1.

**RESPONSE: Defendants object to this statement as it is based on inadmissible hearsay that is not reliable. Plaintiff has not submitted an affidavit from Gustavo Rivera and Gustavo Rivera was not deposed even though he is available because Joseph Rivera spoke to Gustavo Rivera in person two weeks before his deposition in August 2021. (Pl's Ex. 18 at 130:16-22). Accordingly, Joseph Rivera's July 2021 affidavit (which was the first time Joseph Rivera came forward with information about what Gustavo Rivera supposedly told him) and/or his testimony about what Gustavo Rivera supposedly told him is inadmissible hearsay and cannot be used to oppose Defendants' motion for summary judgment. *Eaton v. J.H. Findorff & Son, Inc.*, 1 F.4th 508, 512 n. 3 (7th Cir. 2021) (rejecting evidence as inadmissible hearsay when person with personal knowledge was not deposed and plaintiff did not obtain an affidavit from him); *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016). Likewise, sworn statements that are not based on the declarant's personal knowledge may not be considered on summary judgment. Fed. R. Civ. P. 56(c)(4). Without waiving the foregoing objection, Defendants admit Joseph Rivera claims that Gustavo Rivera told him he did not see the shooting and that he implicated Velez because the police caught him with narcotics and pressured him but deny that any of these statements are true. At the time Gustavo Rivera testified at Velez's criminal trial in October 2002, he was in the custody of the Illinois Department of Corrections serving a five-year sentence for a felony charge of possession of**

a controlled substance.  (Def. Ex. 6, Trial Testimony of Gustavo Rivera dated Oct. 10, 2020 at S-4:14-5:7).  Gustavo Rivera further testified no promises were made to him with regard to his criminal case or sentencing and that he was physically present when Velez shot Hueneca on March 19, 2001.  (*Id.* at S-5:23-6:5, S-17:20-24:24). The prosecution also explicitly stated on the record that Gustavo Rivera was not given a deal for favorable treatment in exchange for his cooperation. (Def. Ex. 78, Report of Proceedings dated October 8, 2002, at R-237:17-R:240:2). Gustavo Rivera has never recanted his identification of Velez as the offender under oath.

24.     Rivera told Joseph Rivera that he falsely identified Velez in exchange for avoiding jail. Ex. 18 (J. Rivera deposition) at 123:19-124:2; Ex. 19 (J. Rivera affidavit.) Rivera's criminal history shows that he was arrested in October of 2000 for drug possession, a charge that was pending in March 2001 when he was interviewed by police during the Hueneca investigation. Rivera's criminal history further shows he was convicted for the drug charge in June 2001 and sentenced to probation, thereby avoiding jail time. Ex. 37 (Gus Rivera Crim Hx).

RESPONSE: Defendants object to this statement as it is based on inadmissible hearsay that is not reliable. Plaintiff has not submitted an affidavit from Gustavo Rivera and Gustavo Rivera was not deposed even though he is available because Joseph Rivera spoke to Gustavo Rivera in person two weeks before his deposition in August 2021. (Pl's Ex. 18 at 130:16-22). Accordingly, Joseph Rivera's July 2021 affidavit (which was the first time Joseph Rivera came forward with information about what Gustavo Rivera supposedly told him) and/or his testimony about what Gustavo Rivera supposedly told him is inadmissible hearsay and cannot be used to oppose Defendants' motion for summary judgment. *Eaton v. J.H. Findorff & Son, Inc.*, 1 F.4th 508, 512 n. 3 (7th Cir. 2021) (rejecting evidence as inadmissible hearsay

**when person with personal knowledge was not deposed and plaintiff did not obtain an affidavit from him);** *Cairel v. Alderden*, **821 F.3d 823, 830 (7th Cir. 2016). Likewise, sworn statements that are not based on the declarant's personal knowledge may not be considered on summary judgment. Fed. R. Civ. P. 56(c)(4). Answering further, Gustavo Rivera's criminal history report constitutes several layers of inadmissible hearsay and Plaintiff has not produced any witness who made these allegations or any witness who prepared or maintained this record. Without waiving the foregoing objection, deny. Rivera testified at Velez's criminal trial in October 2002 that in March 2000, he pled guilty to possession of a controlled substance and received probation and in June 2001, he pled guilty to another possession of controlled substance and received probation. (Def. Ex. 6 at S-5:8-17). He further testified no promises were made to him with regard to his criminal case or sentencing and that he was physically present when Velez shot Hueneca on March 19, 2001. (*Id.* at S-5:23-6:5, S-17:20-24:24). The prosecution also explicitly stated on the record that Gustavo Rivera was not given a deal for favorable treatment in exchange for his cooperation. (Def. Ex. 78 at R-237:17-R:240:2).**

25.     Joseph Rivera witnessed the Hueneca shooting. Ex. 18 (J. Rivera deposition) at 74:15-82:25. He observed Gus Rivera go into the house on 21st Place, and then saw Hueneca approached by someone who hugged him, and then shot him. *Id*. In Joseph Rivera's description, Hueneca was not being followed by this person, and did not stop and turn around to walk South immediately before he was shot. *Id*.

**RESPONSE**:   **Deny. Joseph Rivera testified at his deposition in August 2021 that he witnessed the Hueneca shooting, observed Gustavo Rivera go into a building on 21st Place, saw Hueneca approached by someone who appeared to hug him, not follow him, and then**

shoot him but deny that his testimony is true because Joseph Rivera was in the custody of the Illinois Department of Corrections at the time of the murder on March 19, 2001 and was released on parole on February 2002. (Def. Ex. 66, Joseph Rivera's selected IDOC records). While Joseph Rivera testified that he was released from IDOC in February 2001, this is contradicted by his IDOC records, which are admissible for purposes of summary judgment because they have been authenticated by a records custodian at IDOC. (Pl's Ex. 18, Deposition of Joseph Rivera, at 33:4-9; Def. Ex. 66; Def. Ex. 71, Affidavit of Records Custodian Certifying Records Pursuant to Fed R. Evid. 803(6) and 902(11)). This Court should not accept Joseph Rivera's version of events because his version of the events is utterly discredited by the record, which demonstrates the following: 1) Joseph Rivera was in the custody of IDOC for an armed robbery conviction from October 1, 1999 to February 20, 2002. (Def. Ex. 66 at 1); 2) Joseph Rivera received counseling at IDOC on various dates from March 1, 2001 through June 21, 2001, despite his testimony that he was released from IDOC custody in February 2001 (Pl's Ex. 18 at 33:4-9; Def. Ex. 66 at 3); 3) he was found to have violated IDOC rules on May 13, 2001 and June 20, 2001 and he admitted he was guilty of these violations (Def Ex. 66 at 4-5); 4) he completed an IDOC individual development plan, which he signed, on December 14, 2001. (Def. Ex. 66 at 13-14); 5) the Prisoner Review Board determined on September 5, 2001, that when Joseph Rivera was released from IDOC custody he would be placed on mandatory supervised release and be required to participate in a drug program (Def Ex. 66 at 21); 6) the IDOC tested him from substance abuse violations on April 11, 2001, at a time when he claims he was no longer in custody (Def Ex. 66 at 22); 7) his friend, Melissa Chavez, and his stepsister visited him numerous times when he was in IDOC custody from March 11, 2001 through November 23, 2001. (Def Ex. 66 at 24); 8) his projected

mandatory supervised release date was February 20, 2002 (Def. Ex. 66 at 15-20); 9) he was released from IDOC custody and placed on mandatory supervised release on February 20, 2002. (Def. Ex. 66 at 6, 8-9); 10) he acknowledged receiving forms from IDOC when he released from custody on February 20, 2002 (Def Ex. 66 at 10-11); and 11) his IDOC reporting instructions indicated that on his release date, February 20, 2002, his release plan was to stay with his mother, Michelle Rivera, at her home in Chicago (Def. Ex. 66 at 12). Furthermore, Joseph Rivera's brother, William Pelmer, testified at his deposition that Joseph Rivera was "locked up" at the time of the March 19, 2001 murder and that he wasn't released until 2002. (Pl's Ex. 20, Deposition of William Pelmer, at 12:1-6, 107:12-108:10). Answering further, Joseph Rivera's July 2021 affidavit and his testimony are unreliable because the first time he came forward with a story about what happened on the night of the Hueneca murder was when Plaintiff's attorney approached him. (Pl's Ex. 18 at 86:11-24). He further claims that he was shot at by the same person who shot Hueneca on the night of the Hueneca murder but he admits he never went to the police despite allegedly knowing who shot at him and he refused to identify the person who allegedly shoot Hueneca because he abides by his street's gang code of silence. (Pl's Ex. 18 at 83:7-85:8, 91:8-91:13). He also failed to disclose the identity of the person who could corroborate that he was in the area of the Hueneca murder. (*Id.* at 43:8-45:5). He also refused to answer many questions at his deposition about his gang affiliation. (*Id.* at 17:13-17:20, 18:11-18:18, 18:24-19:10). He also disavowed information in the affidavit he signed about his conversation with Gus Rivera, claimed not to know the real name of Hueneca or the date of the shooting, but this information was included in his affidavit anyway. (*Id.* at 116:4-9, 117:6-22).

26.    William Pelmer is another cousin of Gus Rivera's. Ex. 20 (Pelmer deposition) at 13:9-11.

**RESPONSE**: **Admit.**

27.    Gus Rivera likewise admitted to Pelmer that he never witnessed the Hueneca shooting, and that Rivera's testimony about the shooting is a complete fabrication. Ex. 20 (Pelmer deposition) at 22:8-27:1; Ex. 21 (Pelmer Affidavit). Gus Rivera told Pelmer that he falsely implicated Mr. Velez because he was being pressured by the police and because Mr. Velez was an opposition gang member. Ex. 20 (Pelmer deposition) at 31:2-32:25.

**RESPONSE: Defendants object to this statement as it is based on inadmissible hearsay that is not reliable. Plaintiff has not submitted an affidavit from Gustavo Rivera and Gustavo Rivera was not deposed even though he is available as Pelmer testified the last time he spoke to Gustavo Rivera was in 2017 or 2018. (Pl's Ex. 20 at 100:18-22). Accordingly, William Pelmer's July 2014 affidavit and/or testimony about what Gustavo Rivera supposedly told him is inadmissible hearsay and cannot be used to oppose Defendants' motion for summary judgment. *Eaton v. J.H. Findorff & Son, Inc.*, 1 F.4th 508, 512 n. 3 (7th Cir. 2021) (rejecting evidence as inadmissible hearsay when person with personal knowledge was not deposed and plaintiff did not obtain an affidavit from him); *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016). Likewise, sworn statements that are not based on the declarant's personal knowledge may not be considered on summary judgment. Fed. R. Civ. P. 56(c)(4). Pelmer was not present on 21st Place at the time of the murder on March 19, 2001 and therefore does not have the requisite personal knowledge to testify who was or who as not present at the scene of the murder. (Pl's Ex. 20 at 56:16-57:7). Without waiving the foregoing objection, admit Pelmer testified as such for the first time at his deposition in July 2021 but deny that it is**

true. According to Pelmer's July 2014 affidavit, the conversation he had with Gus Rivera where Gus Rivera supposedly admitted to him that he did not witness the Hueneca shooting occurred sometime in 2002 when he and Gus Rivera were together in the bullpen at the courthouse and that Gus Rivera was going to testify or had testified against Velez. (Pl's Ex. 21, Affidavit of William Pelmer).  However, this statement is not true and is unreliable because Pelmer had previously made an inconsistent statement to Velez' criminal defense attorney that this supposed conversation with Gustavo Rivera occurred in 2003.  Specifically, in November 2013, before Pelmer signed his July 2014 affidavit, Pelmer told Velez's criminal defense attorney, Jennifer Blagg, that the conversation he supposedly had with Gus Rivera occurred in the bullpen sometime in 2003 when Gus Rivera was in court to testify at Velez' criminal trial. (Pl's Ex. 20 at 14:12-19:7, 20:1-8; Def. Ex. 73, Letter from William Pelmer to Jennifer Blagg dated November 7, 2013, at 2).  Pelmer's statement could not be true because Gus Rivera testified at Velez' criminal trial on October 10, 2002 and Velez' criminal trial was completed in 2002. (Def. Ex. 6 at S-1).  Pelmer's July 2014 affidavit changed the date of the conversation with Gus Rivera to "some time in late 2000," but Pelmer admitted at his deposition that he didn't write the affidavit and that it had been typed up by Velez' attorney, Jennifer Blagg. (Pl's Ex. 20 at 119:5-11).  Moreover, although Gus Rivera and William Pelmer had pending criminal matters in 2002, they were never in court at the same time either before or after Velez' October 2002 criminal trial; thus, they would never have been together in the bullpen at the courthouse. (Pl's Ex. 37, Criminal History Report of Gustavo Rivera; Def. Ex. 74, Certified Statement of Conviction for William Pelmer for case No. 02 CR 0378601; Def. Ex. 75, Certified Statement of Conviction of Gustavo Rivera for case No. 02 CR 2146301; Def Ex 76, Certified Statement of Conviction of Juan Gonzalez aka Gustavo

22

Rivera for case No. 00 CR 2952601; Def. Ex. 77 at Certified Statement of Conviction for John

Velez for case No. 01 CR 09862-01).  Answering further, Gustavo Rivera testified at Velez's

criminal trial in October 2002 that no promises were made to him with regard to his criminal

case or sentencing and that he was physically present when Velez shot Hueneca on March

19, 2001.  (Def. Ex. 6 at S-5:23-6:5, S-17:20-24:24).  The prosecution also explicitly stated on

the record that Gustavo Rivera was not given a deal for favorable treatment in exchange for

his cooperation.  (Def. Ex. 78 at R-237:17-R:240:2).

28.     Bocardo, Kato and Dyra interviewed Rivera. Ex. 22 (Dyra deposition) at 167:3-12

("Q: And if there's no other indication somewhere in the file that someone other than you and

Detective Bocardo interviewed these two witnesses, Juan Izaguirre and Gus Rivera, then that means

it was you and Detective Bocardo who interviewed Juan Izaguirre and Gustavo Rivera, correct? A:

Most likely, yes."); Ex. 5 (Cleared Closed Report) at 9-10; Ex. 8 (Bocardo deposition) at 163:10-

64:4 (recounting what Gus Rivera told "us"); Ex. 23 (Gus Rivera trial testimony) at S57:8-S60:23

(According to Rivera, he told Bocardo and Kato that the guy with the Grand Am was from 23rd

and Whipple, provided nicknames for those two men, and that he drove off with the two men in the

Grand Am the night of the murder); Ex. 24 (Kato Deposition) at 23:24-24:20; Ex. 25 (Rivera

statement) (listing Kato as witnessing the handwritten statement). There is no evidence that anyone

other than Bocardo, Kato, and Dyra interviewed Rivera.

RESPONSE: Deny that "Bocardo, Kato and Dyra interviewed Rivera" because this assertion

is not supported by the citation provided.  Admit that G.S. Bocardo and G.S. Dyra

interviewed Rivera on the date of the murder, March 19, 2001.  Answering further, admit

Detective Kato spoke to Rivera before he provided his handwritten statement to ASA Megan

Goldish on March 27, 2001 and witnessed Rivera giving his handwritten statement but deny

**Detective Kato interviewed Gustavo Rivera. (Def. Ex. 21, Deposition of Kriston Kato dated March 16, 2021 at 24:8-25:1, 173:15-17) (Q. So when you interviewed Gus Rivera, did he tell you that he didn't actually see the shooting? A. I didn't interview Gus. And when I said, I usually speak to the person that's gonna be interviewed by the ASA, I spoke to them prior to going in to talk to the State's attorney) (*Id.* at 167:19-168:2). Admit Rivera testified at Velez's criminal trial that he told Bocardo and Kato the guy in the red Grand Am was a King from 23rd and Whipple, the nicknames of the two men in the red Grand Am and that the people in the Grand Am drop him off at Gutierrez' house. Admit that there is no evidence that anyone other than G.S. Bocardo and G.S Dyra interviewed Gustavo Rivera and that Det. Kato spoke to him before he was about to give his statement.**

29.     There are no contemporaneous notes of an interview with Rivera. Ex. 8 (Bocardo Dep.) at 172:6-24. According to police, Rivera was unable to describe the offender in any way, and there is no documentation of any description provided by Rivera, the only alleged witness to the murder. *Id*. at 175:4-182:10; Ex. 22 (Dyra Dep.) at 176:4-178:2.

**RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion. Whether Defendants did or did not take contemporaneous notes of an interview of Rivera does not create a fact dispute as to the issues germane to Defendants' motion. Without waiving the foregoing objection, Defendants admit that there are no contemporaneous notes of an interview with Rivera but deny the assertion to the extent that it assumes it was necessary for the police to takes of their interview of Rivera. (Def. Ex. 15 at 172:19-173:2; Def. Ex. 18, Deposition of Michael Dyra dated Nov 16, 2020 at 121:17-122:8, Answering**

further, a summary of Rivera's interview was documented in the Cleared Closed Supplementary Report. Deny that "[a]ccording to police, Rivera was unable to describe the offender in any way, and there is no documentation of any description provided by Rivera, the only alleged witness to the murder" as it is not supported by the citation provided. Rather, Rivera told the police that the man with the gun was wearing a hoodie and that he would be able to identify him if he saw again, which was documented in the Cleared Closed Supplementary Report. (Def. Ex. 19 at 9-10). It was apparent to Bocardo that Rivera was talking about the same man with a gun that Lorena, Ricardo and Mejia had told them about. (Def. Ex. 15 at 177:9-179:3, 181:1-20). Plaintiff's expert agrees that even if the description provided by Rivera was a general description of the gunman this does not mean that he was not able to correctly identify the gunman. (Pl's Ex. 9 at 157:1-7).

30.     There is no explanation for why Defendants did not obtain a description of the shooter from Rivera. Id.; Ex. 8 (Bocardo Dep.) at 175:4-182:10.

**RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion. Whether there is an explanation for why Defendants did not obtain a description of the shooter from Rivera does not create a fact dispute as to the issues germane to Defendants' motion. Without waiving the foregoing objection, deny the assertion as it is not supported by the citation provided. G.S. Bocardo testified that he could not recall if he asked Gustavo Rivera to provide a description but believes he did get a description from him. (Def. Ex. 15 at 178:9-179:3 179:7-17). G.S Dyra testified that may have gotten a description of the offender from Rivera. (Def. Ex. 18 at 177:5-9). Furthermore, Rivera told the police that the**

**man with the gun was wearing a hoodie and that he would be able to identify him if he saw**

**again, which was documented in the Cleared Closed Supplementary Report. (Def. Ex. 19 at**

**9-10).**

31.     Rivera told police he was unable to identify the victim, his friend, until after the

murder was over. *Id*. at 169:8-170:6; Ex. 25 (Rivera statement) at 6.

**RESPONSE**: **Admit that Rivera told ASA Megan Goldish that he learned after the murder**

**that it was his friend, Bam-Bam, who had been killed but deny the remaining assertions as**

**it is not supported by the citation provided. (Def. Ex. 29, Deposition of Megan Goldish dated**

**Aug. 30, 2021, at 159:18-23).**

32.     Bocardo took notes of his interview with Gutierrez and obtained her description

of the offender. Ex. 8 (Bocardo Dep.) at 198:15-199:12; Ex. 26 (Gutierrez GPR).

**RESPONSE: Admit**.

### Misconduct Relating to Cristina Izquierdo

33.     On March 21, 2001, around 4:30 p.m., Mr. Velez's girlfriend, Cristina Izquierdo

("Izquierdo"), who was 18 years old and pregnant with his child, "tagged along" with her friend

Angelica Valdez to St Mary's Cemetery. Ex. 34 (Izquierdo Statement). Valdez was visiting a

friend's grave for his birthday. Ex. 27 (Izquierdo Dep.) at 12:19-13:3; 13:16:14:2. Valdez drove

her car to the cemetery; Alexis Robles and three males also went in the car. *Id*. at 14:3-4; 13:810.

Mr. Velez did not go with the group. *Id*. at 13:11-13.

**RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for**

**summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails**

**to set forth an additional material fact requiring denial of Defendants' summary judgment**

**motion. The reason why Angelica Valdez went to the cemetery does not create a fact dispute**

as to the issues germane to Defendants' motion. Without waiving the foregoing objection, Defendants admit on March 21, 2001, Mr. Velez's girlfriend, Cristina Izquierdo ("Izquierdo"), who was 18 years old and pregnant with his child, went to St. Mary's Cemetery with her friend Angelica Valdez, Alexis Robles and three other guys but deny the remaining assertion as it not supported by the citation provided. Rather, Izquierdo's statement indicates she went to the cemetery on the morning of March 21, 2001. (Def. Ex. 32, Statement of Cristina Izquierdo at 3). Answering further, Velez testified at his deposition that he went to the same cemetery in the morning on March 21, 2001 and that the shooting had already occurred by the time he got there. (Def. Ex. 20, Deposition of John Velez dated at July 6, 2021 at 178:19-179:5, 181:18-22). Admit that Izquierdo testified at her deposition in August 2021 that Valdez was visiting a friend's grave for his birthday but deny this is true. On or around March 27, 2001, Izquierdo told Goldish she was the cemetery to visit Gent Velez's grave. (Def Ex. 29 at 212:23-213:3, 213:20-25; Def. Ex. 32 at 3). Answering further, according to Angelica Valdez, they went to the cemetery to visit a friend on the date of the anniversary of his death, not his birthday. (Def. Ex. 67, Affidavit of Angelica Lopez dated January 3, 2008 at 1). Admit Izquierdo testified that Valdez drove her car to the cemetery, and that Alexis Robles and three other males also went in the car and that Velez did not go to the cemetery with the group.

33.     When the group got to the cemetery, they went to the friend's grave site and put balloons and flowers on the grave. *Id*. at 14:8-23. As soon as they put the balloons down and said a couple of words, they ran back to Valdez's car because a group of 20 gangbangers started coming towards them. *Id*. at 15:17-16:3.

**RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion. What they did or did not do when they got to the cemetery does not create a fact dispute as to the issues germane to Defendants' motion as it is undisputed that Izquierdo was shot at the cemetery. Without waiving the foregoing objection, Defendants admit Izquierdo testified at her deposition in August 2021 that when the group got to the cemetery, they went to the friend's grave site and put balloons and flowers on the grave, and as soon as they put the balloons down and said a couple of words, they ran back to Valdez's car because of a group of 20 gangbangers started coming towards them but deny this is true. Izquierdo told Goldish she went to the cemetery to visit Gent Velez's grave. (Def Ex. 29 at 212:23-213:3, 213:20-25; Def. Ex. 32 at 3). Answering further, according to Alexis Robles she didn't go with the group to their friend's grave because she stood back to visit her father's grave who was buried at the same cemetery. (Def. Ex. 68, Affidavit of Alexis Robles dated January 25, 2008, at 1). Furthermore, according to Izquierdo's handwritten statement, she and her friends were standing at the grave site when at least five or six shots rang out and she was hit near her back left hip, and the bullet travel to her right hip. (Def Ex. 34 at 4).**

34. Izquierdo, Valdez, Lopez, and the three guys made it into Valdez's car. Valdez was in the driver's seat, Izquierdo was in the middle front seat, and Lopez was in the passenger's seat. *Id*. at 16:16-21. A truck started hitting the car from the side and Izquierdo saw two of the men that had been running towards the group point guns at the car. Izquierdo heard five or six gunshots. *Id*. at 17:4-18:1. She was struck in her left lower back and the bullet traveled to her right hip. *Id*. at 18:10-24.

**RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion. Izquierdo's exact location when she was shot does not create a fact dispute as to the issues germane to Defendants' motion as it is undisputed that Izquierdo was shot at the cemetery. Without waiving their foregoing objection, Defendants deny that "Izquierdo, Valdez, Lopez, and the three guys made it into Valdez's car. Valdez was in the driver's seat, Izquierdo was in the middle front seat, and Lopez was in the passenger's seat" because this assertion is not supported by the citation provided. Admit that Izquierdo testified at her deposition in August 2021 that she, Angelica Valdez and Alexis Robles and the three guys made it into Valdez's car and that Valdez was in the driver's seat, Izquierdo was in the middle seat and Alexis Robles was in the passenger seat. Admit Izquierdo testified at her deposition in August 2021 that "[a] truck started hitting the car from the side and Izquierdo saw two of the men that had been running towards the group point guns at the car. Izquierdo heard five or six gunshots" but deny that is true. Izquierdo told ASA Megan Goldish that she was shot when she was at or near the gravesite. (Def. Ex. 29 at 203:25-204:19). Admit Izquierdo was struck in her left lower back and the bullet traveled to her right hip.**

35. When the group saw that the shooters had left, they all jumped out of the car. *Id*. at 19:10-19.

**RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion. What occurred after the shooters left the cemetery does not create a fact dispute as**

to the issues germane to Defendants' motion as it is undisputed that Izquierdo was shot at the cemetery. **Without waiving their foregoing objection, Defendants admit Izquierdo testified at her deposition in August 2021 that "when the group saw that the shooters had left, they all jumped out of the car" but deny that this is true. According to Alexis Robles, after the shooters left the cemetery, everyone got out of the car except Izquierdo. (Def. Ex. 68 at 2).**

37.    Izquierdo was inside a car when she was shot. She was not standing at a gravesite, nor did she fall to the ground when she got shot. Mr. Velez was not present when she was shot. *Id*. at 29:8-19.

**RESPONSE**: **Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion. Izquierdo's exact location when she was shot does not create a fact dispute as to the issues germane to Defendants' motion as it is undisputed that Izquierdo was shot at the cemetery. Without waiving their foregoing objection, Defendants admit Izquierdo testified at her deposition in August 2021 she was inside a car when she was shot but deny that this is true. Izquierdo told ASA Megan Goldish that she was shot when she was at or near the gravesite. (Def. Ex. 29 at 203:25-204:19; Def. Ex. 32 at 3). Admit that Izquierdo testified that Velez was not present when she was shot.**

38.    Izquierdo woke up to a paramedic trying to take her pulse. *Id*. at 19:10-19. She heard Mr. Velez yelling, "Is she okay?" and "I want to go with her." *Id*. at 20:11-23. Izquierdo was put in an ambulance; the paramedics did not let Mr. Velez into it. *Id*; Ex. 28 (Velez Dep.) at 182:16-183:6 (officers wouldn't let Velez near Izquierdo; he was told to let the paramedics do their job).

**RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion. Velez' conversation with the paramedics after Izquierdo was shot does not create a fact dispute as to the issues germane to Defendants' motion. Without waiving their foregoing objection, admit.**

39.     Izquierdo was transported to Christ Hospital. Ex. 27 (Izquierdo Dep.) at 20:2-6. When the ambulance doors opened, she saw Mr. Velez standing there. *Id*. at 20:24-21:3; Ex. 28 (Velez Dep.) at 187:10-20.

**RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion. When Izquierdo saw Velez after she was shot does not create a fact dispute as to the issues germane to Defendants' motion. Without waiving their foregoing objection, Defendants admit Izquierdo was transported to Christ Hospital but deny the remaining assertion to the extent it assumes Izquierdo saw Velez after she had been transported to Christ Hospital. Rather, according to Izquierdo's statement she noticed Velez was at the cemetery after she had been shot and while she was still at the cemetery. (Def. Ex. 32 at 4).**

40.     After Izquierdo was stabilized in a triage room, she was transferred to another room and Mr. Velez entered. Ex. 27 (Izquierdo Dep.) at 21:4-22:2.

**RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment**

**motion. Whether Izquierdo was in a room or the trauma room at Christ Hospital when she spoke to Velez does not create a fact dispute as to the issues germane to Defendants' motion as it is undisputed that they spoke to each other at the hospital. Without waiving their foregoing objection, Defendants admit Izquierdo testified at her deposition in August 2020 that she believes she was in a triage room and then moved to another room but deny this is true. Izquierdo told Goldish she was in the trauma room when she spoke to Velez at the hospital. (Def. Ex. 32 at 4). Answering further, ASA Goldish testified that she does not know if she called it the trauma room (Def. Ex. 29 at 198:25-200:7).**

41.     Both Izquierdo and Velez were upset, crying, and worried about their baby. *Id.* at 22:3-20, 23:10-15.

**RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion. Whether Izquierdo and Velez were upset, crying and worried about their baby does not create a fact dispute as to the issues germane to Defendants' motion as it is undisputed that they spoke to each other at the hospital. Without waiving their foregoing objection, Defendants admit Izquierdo testified at her deposition in August 2021 that she and Velez were upset and crying and that she was worried about their baby but deny the remaining assertion because is it not supported by the citations provided.**

42.     Izquierdo and Velez had a conversation in Spanish. Izquierdo recalls that she told Velez in Spanish that "It's going to be okay" and not to worry. Velez responded in Spanish that "he was going to go back there and to the same thing they did" to Izquierdo. *Id.* at 24:3-19.

**RESPONSE: Admit Izquierdo testified as such at her deposition in August 2021 but deny to the extent that this assumes this was the entirety of the conversation between them. Izquierdo told ASA Goldish that Velez told her that this happened to her because of something he did and that last week he had gone over with a few of the guys and shot someone who was a member of the Latin Kings street gang. (Def. Ex. 29 at 198:25-200:10; Def. Ex. 32 at 4-5). When Velez said to Izquierdo "he was going to go back there and do the same thing they did" to Izquierdo she understood this to mean that Velez was going to shoot the people that had shot her. (Def. Ex. 28 at 201:24-202:9).**

43.     At some point during the conversation, Velez said in Spanish to Izquierdo that her being shot was his fault. *Id*. 49:14-22. Izquierdo believed that Velez blamed himself for her getting shot because if she and Plaintiff were not in a relationship, she would not have at the cemetery with Plaintiff's friends with gang members trying to attack her. *Id*. at 48:15-49:22.

**RESPONSE: Admit Izquierdo testified as such at her deposition in August 2021 but deny to the extent that this assumes this was the entirety of the conversation between them. Izquierdo told ASA Goldish that Velez told her she was shot because of something he did and that last week he had gone over with a few of the guys and shot someone who was a member of the Latin Kings street gang. (Def. Ex. 29 at 198:25-200:10; Def. Ex. 32 at 4-5).**

44.     Velez recalls crying and apologizing to Izquierdo because he felt like her being with him put her at risk. He felt responsible for Izquierdo getting shot because of his affiliation with the Satan Disciples. He believed if Izquierdo wasn't in a relationship with him, she would not have been in the car or had a reason to go to the cemetery. Ex. 28 (Velez Dep.) at 192:23194:4.

**RESPONSE: Admit that Velez testified as such at his deposition in July 2021 but deny to the extent that this assumes this was the entirety of the conversation between them. Izquierdo**

**told ASA Goldish that Velez told her that she was shot because of something he did and that last week he had gone over with a few of the guys and shot someone who was a member of the Latin Kings street gang. (Def. Ex. 29 at 198:25-200:10; Def. Ex. 32 at 4-5).**

45. A nurse came in the room while Izquierdo and Velez were talking. No police officers were present. Ex. 27 (Izquierdo Dep.) at 23:19-24:2.

**RESPONSE: Admit.**

46. During Izquierdo and Velez's conversation, Velez never said anything about Izquierdo being shot because he had shot someone the weekend before; never talked about going to Marshall and 21st street the weekend before; never said it was all his fault because of what he did; never said that last Sunday he'd gone over to 21st and Marshall and that he was "all fucked up"; never said he was "all fucked up" and he shot one of the Kings; never told Izquierdo that the other guy had also pulled out a gun but that he had shot the guy first; and never said that he shot the guy because the Kings had killed Snaky. Ex. 27 (Izquierdo Dep.) at 25:6-26:21, 50:6-14 ("Q. And just to be clear: [Velez] never said it was his fault because of something that he had done to the other side, or something like that? A. No. He never said that."). Izquierdo could not have become uncooperative upon Velez's arrival, because no police officers were present when Velez was present. *Id.* at 23:19-24:2.

**RESPONSE: Deny. Izquierdo told ASA Goldish that Velez told her that she was shot because of something he did and that last week he had gone over with a few of the guys and shot someone who was a member of the Latin Kings street gang. (Def. Ex. 29 at 198:25-200:10; Def. Ex. 32 at 4-5). Answering further, Izquierdo does not remember if she spoke to any police officers when she was in the smaller room at the hospital. (Def. Ex. 32 at 197:23-198:1).**

34

47.     Velez has never told Izquierdo that she got shot by the Latin Kings or that she got shot because he shot and killed a Latin King a week prior. Ex. 28 (Velez Dep.) at 181:4-14.

**RESPONSE: Deny. Izquierdo told ASA Goldish that Velez told her that she was shot because of something he did and that last week he had gone over with a few of the guys and shot someone who was a member of the Latin Kings street gang. (Def. Ex. 29 at 198:25-200:10; Def. Ex. 32 at 4-5).**

48.     After the cemetery shooting, Defendants Cook County Sheriff's Department Detectives Davis and Sullivan were assigned to investigate. They went to Christ Hospital to interview Izquierdo. Ex. 29 (Davis Dep.) at 55:9-13; Ex. 30 (Sullivan Dep.) at 93:22-24, 104:12-105:12, 228:9-17. Defendants Davis and Sullivan have no recollection of interviewing Izquierdo. Ex. 29 (Davis Dep.) at 58:17-21; 107:16-23. Ex. 30 (Sullivan Dep.) at 117:20-118:1; 120:16-23.

**RESPONSE: Admit.**

49.     Izquierdo does not recall any police officers talking to her at the hospital. *Id*. at 31:4-12. She does not recall ever speaking to Defendants Davis or Sullivan at the hospital. *Id*. at 198:19-199:1.

**RESPONSE: Admit that at the time of her deposition in August 2021, Izquierdo did not recall speaking to any police officer but deny the remaining assertion as it is supported by the citations provided. Izquierdo testified she does not recall speaking to Cook County Sheriff's Police Detective Davis or Sullivan at the hospital. (Def Ex. 28 at 198:19-199:1) (Q. Do you remember speaking to Cook County Sheriff's Police Detective Davis at the hospital? A. No. Q. Do you remember speaking to Cook County Sheriff's Police Detective Sullivan? A. No).**

50. On March 25, 2001, Defendants Davis and Sullivan went to Area 4 and met with Defendants Bocardo and Dyra. Ex. 5 (Cleared Closed Supp Report) at 14. Defendants Davis and Sullivan claimed that while they were at the hospital interviewing Izquierdo on March 21, 2001, Izquierdo was cooperating until Velez arrived in the room. *Id*. They claimed that they overhead a conversation in Spanish between Izquierdo and Velez in which a nurse was also present. *Id*. They claimed after Velez left, they asked the nurse what Velez had said in Spanish, and the nurse told them that Izquierdo asked Velez why she had been shot and he responded that it was because of what he had done on an earlier date. *Id*. Defendants Bocardo and Dyra documented Davis and Sullivan's fabricated statements in their Cleared Closed Supplementary Report. *Id*.

**RESPONSE: Admit but deny "Defendants Bocardo and Dyra documented Cook County Sheriff's Detectives Davis and Sullivan's fabricated statements in their Cleared Closed Supplementary Report" as this assertion is not supported by the citation provided. Answering further, admit that G.S. Bocardo and Dyra documented Cook County Sheriff's Detectives Davis and Sullivan's statements in their Cleared Closed Supplementary Report but deny that their statements were fabricated. (Def. Ex. 15 at 253:3-10; Def. Ex. 19 at 14).**

51. The same day, Defendant Sullivan faxed a preliminary report regarding the shooting at the cemetery to Defendant Bocardo. *See* Ex. 31 (CCSD Preliminary Report). There is no mention in the report of Davis and Sullivan interviewing Izquierdo at the hospital, Velez allegedly making incriminatory statements, or the name or contact information for the nurse who allegedly witnessed Velez confess to murder. *Id.*

**RESPONSE: Admit that "[t]he same day, Defendant Sullivan faxed a preliminary report regarding the shooting at the cemetery to Defendant Bocardo" but deny the remaining assertions as they are not supported by the citation provided and deny the implication that**

the preliminary report that was faxed to G.S. Bocardo was complete or that information about Cook County Sheriff's Detectives Davis' and Sullivan's interview of Izquierdo at the hospital was not included in any other report prepared by them. Cook County Sheriff's Detective Davis would have drafted his notes of his interview with Izquierdo and the nurse on General Progress Notes. (Def. Ex. 23, Deposition of John Davis dated August 10, 2021 at 109:17-110:9). Cook County Sheriff's Detective Sullivan testified that he does not recall if he completed any GPRS that he overheard a conversation between Velez and Izquierdo but he has no reason to believe that he would not have. (Def. Ex. 24, Deposition of John Sullivan dated June 23, 2021 at 135:16-136:3). No one was ever prosecuted for the cemetery shooting and the Cook County Sheriff's Department case file regarding the investigation into the March 21, 2001, cemetery shooting was destroyed pursuant to the retention schedule in the Records Protection Act. (Def. Ex. 23 at 117:11-15; Def. Ex. 24 at 99:9-10:17-19).

52. If the nurse had truly witnessed a confession, Sullivan and Davis would have documented the nurse's name and contact information. Ex. 29 (Davis Dep.) at 72:3-13 (if a third party witness told Davis she witnessed a confession to a crime, he would note the name of the third party); Ex. 30 (Sullivan Dep.) at 133:25-134:9 (if Sullivan had been told by a nurse that Izquierdo asked Velez she was shot, and Velez stated that she was shot because of what he did on an earlier date, Sullivan would have tried verify that information in his investigation); *id.* at 135:6-15 (if a nurse had relayed the conversation between Izquierdo and Velez to Sullivan, he would have documented the name of the nurse).

RESPONSE: **Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment**

motion.  Whether a nurse witnessed Velez's confession to Izquierdo does not create a fact dispute as to the issues germane to Defendants' motion as it is undisputed that Cook County Sheriff's Detectives Davis and Sullivan relayed this information to G.S. Bocardo and G.S Dyra.  Without waiving their foregoing objection, deny that "[if]f the nurse had truly witnessed a confession, Sullivan and Davis would have documented the nurse's name and contact information" as this is not supported by the citation provided.  Detective Davis testified if a third-party witness told him she had "overheard a confession" and he was "documenting that confession" he would note the name of the third-party witness.  (Def. Ex. 23 at 72:3-13).  Defendants admit the remaining assertions to the extent they cite Cook County Sheriff's Detective Sullivan's deposition testimony; however, they deny the implication that a nurse never witnessed or heard Velez' confession to Izquierdo because the portions of the record cited does not establish this fact. Answering further, Detective Sullivan further testified that he had no reason to believe that he would not have documented the name of the nurse.  (Def Ex. 24 at 135:6-15).  No one was ever prosecuted for the cemetery shooting and the Cook County Sheriff's Department case file regarding the investigation into the March 21, 2001, cemetery shooting was destroyed pursuant to the retention schedule in the Records Protection Act. (Def. Ex. 23 at 117:11-15; Def. Ex. 24 at 99:9-10:17-19).

53.    Plaintiff's expert opines and Defendants Bocardo, Dyra, and Kato all agree that a detective who learned the name of a nurse who witnessed a confession would have documented the nurse's name. Ex. 32 (Bub Report) at 33 (opining that documenting the name of the nurse "should have been a priority" because "it would have provided detectives with an independent reliable witness to present in court."); Ex. 8 (Bocardo Dep.) at 252:16-253:2 (the nurse's name should have been discovered as part of the homicide investigation); Ex. 22 (Dyra Dep.) at 231:4-

12 (Dyra would have identified the nurse to find out if she could corroborate that his suspect confessed); Ex. 24 (Kato Dep.) at 66:12-67:4 (if a suspect made an incriminating statement to a third person, he would document the identity of the third person).

**RESPONSE**: **Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion. Whether a nurse witnessed Velez's confession to Izquierdo does not create a fact dispute as to the issues germane to Defendants' motion as it is undisputed that Cook County Sheriff's Detectives Davis and Sullivan relayed this information to G.S. Bocardo and G.S Dyra. Without waiving their foregoing objection, admit the remaining assertions to the extent they cite the testimony of Plaintiff's expert, G.S. Bocardo, G.S Dyra and Detective Kato but deny the implication that a nurse never witnessed or heard Velez' confession to Izquierdo because the portions of the record cited do not establish this fact. Answering further, Detective Sullivan further testified that he had no reason to believe that he would not have documented the name of the nurse. (Def Ex. 24 at 135:6-15). No one was ever prosecuted for the cemetery shooting and the Cook County Sheriff's Department case file regarding the investigation into the March 21, 2001, cemetery shooting was destroyed pursuant to the retention schedule in the Records Protection Act. (Def. Ex. 23 at 117:11-15; Def. Ex. 24 at 99:9-10:17-19).**

54.    Three days after Izquierdo was discharged from the hospital, Bocardo and Dyra interviewed Izquierdo at her friend Angelica Valdez's residence regarding the cemetery shooting. Ex 27 (Izquierdo Dep.) at 31:1-15; Ex. 8 (Bocardo Dep.) at 238:12-18; Ex. 5 (Cleared Closed Supp Report) at 15-16 ("R/GS [Bocardo and Dyra] then left Area Four and attempted to locate Christina

Izquierdo. Izquierdo was located at 3409 W. Pershing and after being informed of the investigation, she agreed to accompany R/GS to Area Four to be interviewed.'").

**RESPONSE: Admit G.S. Bocardo and G.S. Dyra spoke to Izquierdo at her friend Angelica Valdez's residence on March 26, 2001, three days after she was discharged from the hospital, but deny the remaining assertion because it is not supported by the citation provided. G.S. Bocardo and G.S Dyra asked Izquierdo if she was willing to come to the Detective Area and talk to them but they did not interview her at Valdez's home. (Def. Ex. 15 at 238:15-18, 240:12-241:1) (Q. And you questioned her there at her home where she was comfortable; right? A. We spoke with her there and asked her if she would come into the area with us.). (Def. Ex. 19 at 15).**

55. Defendants Bocardo and Dyra showed Izquierdo photographs of "random" men, but she was unable to identify any of the men. Ex. 27 (Izquierdo Dep) at 31:18-32:7. The detectives separated Izquierdo from Valdez and one of them whispered to Izquierdo, "Are you going to tell us the truth, or are you going to put on your shoes and walk out with us now?"

Izquierdo was confused by what the detectives were talking about because she thought they were there to talk to her about the cemetery shooting. When she told them, "I don't know what you're talking about," one of them responded, "Put on your fucking shoes. You're coming with us." Id. at 32:8-33:7.

**RESPONSE: Admit G.S. Bocardo and G.S. Dyra spoke to Izquierdo at her friend Angelica Valdez's residence on March 26, 2001, three days after she was discharged from the hospital, but deny the remaining assertions because they are not supported by the citation provided. G.S. Bocardo and G.S Dyra asked Izquierdo if she was willing to come to the Detective Area and talk to them but they did not interview her at Valdez's home or show her photographs**

40

of random men. (Def. Ex. 15 at 238:15-18, 240:12-241:1) (Q. And you questioned her there at her home where she was comfortable; right? A. We spoke with her there and asked her if she would come into the area with us.). (Def. Ex. 19 at 15). If G.S. Bocardo and G.S. Dyra had shown photographs to Izquierdo they would have documented this in a report. (Def Ex. 15 at 107:10-13) (Q. If a witness used a photo array but did not make an identification, would you have to document that fact? A. Yes, Sir.). Answering further, Plaintiff's cousin, Alexis Robles even testified that Izquierdo voluntarily agreed to go with the detectives. (Def. Ex. 69 at 156:20-22).

56. Izquierdo was in pain from the open gunshot wound; the bullet was still in her body. The patch covering the wound was covered with blood. Id. at 33:19-34:6, 53:2-4. When she arrived at Area, she was placed in a cell that had a metal bench with no other furniture, and a window with "the gate on it." Id. at 37:3-22. She was brought to Area 4 around 6 or 7 p.m. Ex. 43 (Izquierdo trial testimony) at Q179:21-180:8

RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion. Izquierdo's condition at the time of her interview does not create a fact dispute as to the issues germane to Defendants' motion. Without waiving their foregoing objection, admit Izquierdo testified at her deposition in August 2021 that she was in pain from the open gunshot wound, that the bullet was still in her body and the patch covering the wound was covered with blood but deny the remaining assertions as they are not true. When Izquierdo arrived at Area 4, she was put in an oversized office or room that had a window and a comfortable chair. (Def. Ex. 15 at 240:12-241:13). ASA Goldish believes Izquierdo was in one

of the bigger interview rooms that had a window. (Def. ex. 29 at 70:5-12). Izquierdo testified at Velez's criminal trial that she was put in a room and not a cell. (Def. Ex. 35, Trial Testimony of Cristina Izquierdo dated March 27, 2001 at Q-196:7-11). Answering further, Izquierdo never complained about being in pain to ASA Goldish. (Def. Ex. 29 at 194:6-13). ASA Goldish saw Izquierdo walk into the room, sit down next to her and she did not observe "any signs of pain, no wincing, no moaning, no moving around saying ouch or anything like that." (*Id.*). ASA Goldish asked Izquierdo if there were any issues or complications with her pregnancy because she had been shot. Izquierdo said "no" and told her she was going to have the bullet removed after she had the baby. (Def. Ex. 29 at 195:20-196:7). Admit Izquierdo testified at Velez's criminal trial that she was brought to Area 4 around 6 or 7 p.m.

57. Izquierdo was left in the room "for a long time." She was tired, hungry, upset, scared, and had to use the bathroom. Ex. 27 (Izquierdo deposition) at 38:2-8. After some unknown period of time, Defendant Bocardo came to the door and asked her "about what David said." Id. at 39:10-11. Izquierdo answered that she didn't understand what Bocardo was talking about and asked to use the bathroom. Bocardo refused her request and Izquierdo urinated on herself. Id. at 38:18-40:7, 42:13-43:11.

**RESPONSE**: **Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion. The conversation between Izquierdo and G.S. Bocardo does not create a fact dispute as to the issues germane to Defendants' motion because it is undisputed that Izquierdo did not make any incriminating statements about Velez' involvement in the Hueneca murder to G.S. Bocardo or G.S Dyra. (Dkt. 324 at ¶ 106). Without waiving their foregoing objection,**

admit Izquierdo testified as such at her deposition in August 2021 but deny that it is true. When G.S. Bocardo put Izquierdo in the oversized office/room, he asked her if she needed anything to eat or drink and he did not keep her in the room against her will. (Def. Ex. 15 at 241:2-13). Izquierdo denied having a conversation with Velez at the hospital about the reason the Latin Kings shot her during her conversation with G.S. Bocardo, which was documented in the Cleared Closed Supplementary. (Def. Ex. 15 at 243:3-19; Def. Ex. 19 at 15). Answering further, ASA Goldish asked Izquierdo at least two times how she had been treated by the police. (Def Ex. 29 at 217:16-218:17).

58. When Bocardo returned to the cell, he told Izquierdo that "David had killed someone," and she should say that Velez told her in the hospital that it was his fault that they shot her. *Id*. at 45:20- 46:7. Izquierdo told Bocardo that Velez had never said that. *Id*. at 46:8-14. Velez blamed himself for her shooting, but she believed he meant his gang affiliation and because she was pregnant with his child was the reason, not for any particular action Velez had taken. *Id*. at 47:9-49:22. Bocardo didn't believe her and told her, "You have to think about your daughter." Id. at 50:23-51:3.

RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion. The conversation between Izquierdo and G.S. Bocardo does not create a fact dispute as to the issues germane to Defendants' motion because it is undisputed that Izquierdo did not make any incriminating statements about Velez' involvement in the Hueneca homicide to G.S. Bocardo or G.S Dyra. (Dkt. 324 at ¶ 106). Without waiving their foregoing objection, admit Izquierdo testified as such at her deposition in August 2021 but deny that it is true.

**When G.S. Bocardo spoke to Izquierdo at Area 4, she told him she didn't know anything about the Hueneca murder or Velez's involvement in the murder, which was documented in the Cleared Closed Supplementary Report. (Def. Ex. 15 at 243:3-19; Def. Ex. 19 at 15).**

59.     Izquierdo told Bocardo she was pregnant, had been shot a few days before, was hungry, and her head hurt. She did not eat anything, nor was she offered any food. *Id*. at 63:5-9. Izquierdo was refused phone calls, not allowed to leave, and denied pain medication for her wound. *Id*. at 51:4-53:2, 62:12-63:4. She was locked in the interrogation room. Ex. 43 (Izquierdo trial testimony) at Q201:19-202:1). She was in a lot of pain and could not sleep on the bench because it was metal, and she was wet with urine. Ex. 27 (Izquierdo deposition) at 53:5-20. Izquierdo showed Bocardo where she had been shot and the gauze for her wound covered with blood; Bocardo got Izquierdo's blood on his hand. *Id*. at 84:4-85:11.

**RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion. The conversation between Izquierdo and G.S. Bocardo does not create a fact dispute as to the issues germane to Defendants' motion because it is undisputed that Izquierdo did not make any incriminating statements about Velez' involvement in the Hueneca homicide to G.S. Bocardo or G.S Dyra. (Dkt. 324 at ¶ 106). Without waiving their foregoing objection, admit Izquierdo testified as such but deny that it is true. When G.S. Bocardo put Izquierdo in the oversized office/room, he asked her if she needed anything to eat or drink and he did not keep her in the room against her will. (Def. Ex. 15 at 241:2-13). The room Izquierdo was put in was called room F and the door to room F was not locked while Izquierdo was in room F. (*Id.* at 258:23-259:5). Answering further, ASA Goldish asked Izquierdo at least two times**

**how she had been treated by the police and she told her that she had been treated well. (Def. Ex. 29 at 217:16-218:17; Def. Ex. 31, Trial Testimony of Megan Goldish dated October 15, 2002 at T-109:7-12; Def. Ex. 32 at 5). Izquierdo never expressed any discomfort to ASA Goldish. (Def. Ex. 31 at T-109:7-12). Izquierdo told ASA Goldish that she had been given food to eat, and tea and water to drink and when ASA Goldish met with Izquierdo at Area 4 she was eating the entire time they were talking. (Def. Ex. 29 at 214:10-22; Def. Ex. 32 at 5). Izquierdo never told ASA Goldish that she was in pain. (Def. Ex. 29 at 192:11-17).**

60.     At some point while Izquierdo was at the police station, attorney Sladjana Vuckovic came and asked to see Izquierdo. Ex. 33 (Vuckovic Dep.) at 40:12-21; 50:23-51:2. Vuckovic was told that Izquierdo had declined her representation. *Id*. at 55:10-15. This was a lie; Izquierdo was not told a lawyer was present to see her. Ex. 27 (Izquierdo Dep.) at 51:16-19. If Izquierdo had known a lawyer wanted to see her, she would have spoken with them. Id. at 51:2052:4.

**RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion. Whether or not Izquierdo declined representation of counsel does not create a fact dispute as to the issues germane to Defendants' motion because it is undisputed that Izquierdo did not make any incriminating statements about Velez' involvement in the Hueneca homicide to G.S. Bocardo or G.S Dyra and there is no evidence that any of the Individual CPD Defendants told Vuckovic that Izquierdo declined representation. (Dkt. 324 at ¶ 106). Without waiving their foregoing objection, admit attorney Vuckovic indicated she represented Velez and Izquierdo when she came to Area 4 and that she was told Izquierdo declined her representation. (Def. Ex. 19 at 15). Answering further, admit that Izquierdo**

testified at her deposition in August 2021 that she was not told a lawyer was present to see her but deny that this is true and deny "this was a lie." Izquierdo was asked if she wanted Vuckovic to represent her and Izquierdo declined. (*Id.*). Furthermore, when Velez was in custody he was asked if he wanted to be represented by Vuckovic, he said yes, and he met with her at Area 4. (Def. Ex. 19 at 15; Def. Ex. 20 at 319:25-320:14). Admit that Izquierdo also testified at her deposition in August 2021 that if she had known a lawyer wanted to see her, she would have spoken to the lawyer but deny the implication that she was not told a lawyer wanted to see her. (Def. Ex. 19 at 15).

61. When Bocardo came back to the cell, he told Izquierdo if she didn't say that Velez had confessed murder to her, Bocardo would contact DCFS and have them wait until she gave birth and take away her baby. Bocardo stated if Izquierdo said that Velez had confessed murder to her, she would be able to go home, he would not call DCFS, and she would be with her daughter. Ex. 27 (Izquierdo Dep.) at 55:10-56:3, 57:13-59:7.

RESPONSE: Admit to the extent to this paragraph cites Izquierdo's deposition testimony but deny that it is true. G.S. Bocardo never told Izquierdo that if she didn't cooperate and say that Velez had confessed murder to her, that he would contact DCFS and have them wait until she gave birth and take away her baby. (Def. Ex. 15 at 256:16-22) (Q. Did you tell Kristina that if she didn't cooperate you would take her baby away from her? A. No sir. Q. That would be totally, totally wrong to do – to suggest in any way that Ms. Izquierdo's baby might be taken away from her; right? A. Yes). Answering further, ASA Goldish asked Izquierdo at least two times how she had been treated by the police and Izquierdo told her that she had been treated well. (Def Ex. 29 at 217:16-218:17; Def. Ex. 31 at T-109:7-12; Def. Ex. 32 at 5). Izquierdo also told ASA Goldish that she had not been threatened or coerced

into making her handwritten and was not promised anything in exchange for her statement. **(Def. Ex. 32 at 50). (Def. Ex. 35 at Q-190:11-14) (Q. And you were not promised anything in exchange for this statement, is that right Christina? A. That's right.). Izquierdo told Alexis Robles she was sorry for giving a statement against Velez and that she had done so to get back at him because she was jealous that he was with another girl. (Def. Ex. 69 at 159:18-160:15).**

62. Bocardo told Izquierdo "not to be stupid," "not to be dumb," and that he would take her baby away if she didn't sign a statement. He told Izquierdo that she didn't have anywhere to go and her kids could end up in the system. *Id*. at 248:1-8.

**RESPONSE: Admit to the extent to this paragraph cites Izquierdo's deposition testimony but deny that it is true. G.S. Bocardo never told Izquierdo that if she didn't cooperate and say that Velez had confessed murder to her, that he would contact DCFS and have them wait until she gave birth and take away her baby. (Def. Ex. 15 at 256:16-22) (Q. Did you tell Kristina that if she didn't cooperate you would take her baby away from her? A. No sir. Q. That would be totally, totally wrong to do – to suggest in any way that Ms. Izquierdo's baby might be taken away from her; right? A. Yes). Answering further, ASA Goldish asked Izquierdo at least two times how she had been treated by the police and she told her that she had been treated well. (Def Ex. 29 at 217:16-218:17; Def. Ex. 31 at T-109:7-12; Def. Ex. 32 at 5). Izquierdo also told ASA Goldish that she had not been threatened or coerced into making her handwritten and was not promised anything in exchange for her statement. (Def. Ex. 32 at 5). (Def. Ex. 35 at Q-190:11-14) (Q. And you were not promised anything in exchange for this statement, is that right Christina? A. That's right.). Izquierdo told Alexis Robles she was sorry for giving a statement against Velez and that she had done so to get**

back at him because she was jealous that he was with another girl. **(Def. Ex. 69 at 159:18-160:15).**

63.     Izquierdo said "okay" to Bocardo because she wanted to go home and didn't want her daughter to be taken away. *Id*. at 59:10-15.

**RESPONSE: Admit to the extent to this paragraph cites Izquierdo's deposition testimony but deny that it is true. G.S. Bocardo never told Izquierdo that if she didn't cooperate and say that Velez had confessed murder to her, that he would contact DCFS and have them wait until she gave birth and take away her baby. (Def. Ex. 15 at 256:16-22) (Q. Did you tell Kristina that if she didn't cooperate you would take her baby away from her? A. No sir. Q. That would be totally, totally wrong to do – to suggest in any way that Ms. Izquierdo's baby might be taken away from her; right? A. Yes). Answering further, ASA Goldish asked Izquierdo at least two times how she had been treated by the police and she told her that she had been treated well.  (Def Ex. 29 at 217:16-218:17; Def. Ex. 31 at T-109:7-12; Def. Ex. 32 at 5).  Izquierdo also told ASA Goldish that she had not been threatened or coerced into making her handwritten and was not promised anything in exchange for her statement. (Def. Ex. 32 at 5; Def. Ex. 35 at Q-190:11-14) (Q. And you were not promised anything in exchange for this statement, is that Christina? A. That's right.). Izquierdo told Alexis Robles she was sorry for giving a statement against Velez and that she had done so to get back at him because she was jealous that he was with another girl. (Def. Ex. 69 at 159:18-160:15).**

64.     Around 4:00 a.m., Bocardo then escorted Izquierdo to another room, where Defendant Goldish was. Ex. 16 (Goldish Dep.) at 192:18-20 (Goldish believed she spoke to Izquierdo at "3:30-ish or so in the morning"); Ex. 34 (Izquierdo Statement) ("on March 27, 2001 at 4:10 a.m....).

48

**RESPONSE: Admit ASA Goldish met Izquierdo around 4:00 a.m. and that ASA Goldish testified at her deposition that she believed she spoke to Izquierdo at "3:30-ish or so in the morning" but deny the remaining assertion because it is not supported by the citation provided.**

65.     Back in 2001, Defendant Goldish had the option to take court reported statements from witnesses. Ex. 16 (Goldish Dep.) at 47:12-48:6. She didn't know if there were any rules prohibiting her from using a court reporter, video recording, or audio recording for a witness statement. *Id*. at 48:7-19.

**RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion. Without waiving their foregoing objection, admit.**

66.     Goldish determined the order she spoke to witnesses. Ex. 16 (Goldish Dep.) at 69:2-8, 108:15-109:24. Nothing prevented Goldish from speaking to one witness before the other. *Id*. at 65:14-16. There would have been no issue for Goldish to interview Izquierdo "out of order." *Id*. at 68:11-69:1. Her preference was to interview Izquierdo last. *Id*. at 134:19-135:3; 184:10-17.

**RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion. Without waiving their foregoing objection, admit to the extent this paragraph cites ASA Goldish's deposition testimony but deny the implication that she interviewed Izquierdo last for some nefarious reason. Rather, ASA Goldish proceeded to interview the witnesses chronologically based on who was present before the shooting, after the shooting and then**

interview witnesses who may or may not have had information about the shooting. **(Def. Ex. 29 at 64:3-65:5).**

67.     Before Goldish spoke with Izquierdo, Goldish knew Izquierdo was pregnant and had been shot less than five days before. Ex. 16 (Goldish Dep.) at 68:4-10; 188:22-189:4. She had interviewed witnesses outside of the detective area before and nothing prohibited her from interviewing Izquierdo at her home instead of at Area 4. Ex. 16 (Goldish Dep.) at 109:14-110:13.

**RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion.  Without waiving their foregoing objection, admit to the extent this paragraph cites ASA Goldish's deposition testimony but deny the implication that because Izquierdo was in pain, ASA Goldish should have interviewed Izquierdo at her home rather than Area Four. Izquierdo never complained about being in pain to ASA Goldish. (Def. Ex. 29 at 194:6-13). ASA Goldish saw Izquierdo walk into the room, sit down next to her and she did not observe "any signs of pain, no wincing, no moaning, no moving around saying ouch or anything like that." (Id.). ASA Goldish asked Izquierdo if there were any issues or complications with her pregnancy because she had been shot. Izquierdo said no and told her she was going to have the bullet removed after she had the baby. (Def. Ex. 29 at 195:20-196:7). Answering further, Velez's cousin, Alexis Robles even testified that Izquierdo voluntarily agreed to go with the detectives.  (Def. Ex. 69 at 156:20-22).**

68.     When Izquierdo entered the room, Defendant Goldish was handwriting a statement. Ex. 27 (Izquierdo Dep.) at 257:17-22. Goldish told Izquierdo, "I just need you to sign here, and

you can go home." *Id*. at 60:14-61:3; 319:13-19. Bocardo was present for this exchange. Ex. 43 (Izquierdo trial testimony) at 232:10-21.

**RESPONSE: Deny. ASA Goldish spoke to Izquierdo and then wrote the statement while Izquierdo was talking to her and in the presence of Izquierdo. After ASA Goldish wrote the first page, she had Izquierdo read it to her. (Def. Ex. 31 at T-113:4-15, T-138:21-23). ASA Goldish did not write statement without first getting the information from Izquierdo. (Def. Ex. 29 at 198:25-201:3). ASA Goldish did not leave the room, write up a statement and then bring it Izquierdo to sign. (*Id*.). All the details that are contained in Izquierdo's statement came from Izquierdo and not from ASA Goldish or the detectives. (Def. Ex. 15 at 242:20-243:4; Def Ex. 29 at 212:19-22)**

69.     While Izquierdo was in the room with Goldish, Goldish learned that Izquierdo still had the bullet she had been shot with five days prior lodged in her hip. Ex. 16 (Goldish Dep.) at 196:8-16.

**RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion. Without waiving their foregoing objection, admit.**

70.     Izquierdo stood for an hour as Goldish wrote the statement. Izquierdo did not want to sit down because she was wet with urine and wanted to leave badly. *Id*. at 254:15-24, 262:8-10. Bocardo was in the room the entire time. *Id*. at 261:7-15.

**RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment**

51

**motion. Without waiving their foregoing objection, admit to the extent this paragraph cites Izquierdo's deposition testimony but deny it is true. Izquierdo sat down next to ASA Goldish in a recliner type chair while ASA Goldish was talking to her and writing the statement. (Def. Ex. 29 at 215:21-216:11; Def. Ex. 31 at T-140:13-24). Izquierdo sat next to ASA Goldish for about two hours. (Def Ex. 29 at 194:6-13).**

71. Izquierdo told Goldish she had peed on herself. Goldish simply said "ok" and kept writing. *Id.* at 265:1-22. Izquierdo also told Goldish her back was hurting. *Id.* at 266:2-10.

**RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion. Without waiving their foregoing objection, admit Izquierdo testified as such but deny that it is true. ASA Goldish asked Izquierdo at least two times how she had been treated by the police and she told her that she had been treated well. (Def Ex. 29 at 217:16-218:17; Def. Ex. 31 at T-109:7-12; Def. Ex. 32 at 5). Izquierdo never expressed any discomfort to ASA Goldish. (Def. Ex. 31 at T-109:7-12). Izquierdo told ASA Goldish that she had been given food to eat, and tea and water to drink and when ASA Goldish met with Izquierdo at Area 4 she was eating the entire time they were talking. (Def. Ex. 29 at 214:10-22; Def. Ex. 32 at 5).**

72. Goldish fabricated the statement she had Izquierdo eventually sign. Goldish claims that the following statements came from Izquierdo, Ex. 16 (Goldish Dep.) at 198:25200:10; 201:24-203:24; 210:19-22, but Izquierdo denies that any of these statements came from her or are true:

- That Goldish had advised Izquierdo that she was a prosecutor, an attorney and not her attorney. (Ex. 27 - Izquierdo deposition) at 66:5-19, 67:1-3. Izquierdo did not know

who Goldish was and thought she was a police officer. Ex. 43 (Izquierdo trial testimony) at 230:13-16

- That Izquierdo had been given food to eat, and tea and water to drink at the station. Ex. 27 (Izquierdo deposition) at 64:5-65:2;
- That Izquierdo had completed up to the 11th grade. *Id*. at 67:12-16. Izquierdo had only completed a week of school in her freshman year. *Id*. at 67:17-20;
- That Izquierdo lived with her friend Angelica Valdez and Valdez's parents. *Id*. at 68:14-20;
- That Izquierdo's due date was August 26, 2001. *Id*. at 69:19-23. Her due date was August 21st. *Id*;
- That Izquierdo went with Velez on March 18, 2001 to his aunt Frances Velez's house to eat. *Id*. at 70:50-19;
- That Izquierdo went to a cemetery in the morning of March 21, 2001 to put flowers on the grave of Gent Velez who was shot to death on March 22, 2000. *Id*. at 72:6-19. Izquierdo went to the cemetery in the afternoon and had no idea who Gent Velez was or that he had been shot. *Id*. at 72:24-73:6. In fact, Izquierdo said she was "tagging along" with Valdez, who was going to the cemetery to "visit" a friend on his birthday. *Id*. at 13:5-14:2; 166:5-167:10;
- That Izquierdo was standing at the gravesite when shots rang out. *Id*. at 73:2274:2;
- That Izquierdo believed the Latin Kings shot Genet Velez. *Id*. at 74:19-23;
- That Izquierdo believed she was shot by Latin Kings. *Id*. at 75:2-6. Izquierdo didn't know who shot her. *Id*. at 75:7-12;
- That after Izquierdo was hit by a bullet, she collapsed to the floor. *Id*. at 77:1218;
- That Velez was at the cemetery when Izquierdo had been shot. *Id*. at 78:6-14
- That Velez told Izquierdo that he was sorry she had been shot and it was all his fault because of what he did. *Id*. at 79:20-24;
- That Velez told Izquierdo that "last Sunday he had gone over to 21st and Marshall and that he was all fucked up." *Id*. at 80:1-5;
- That Izquierdo thought that when Velez said he was "all fucked up" that she thought it meant he was drunk or high on drugs. *Id*. at 80:6-11;
- That Velez said that "he was all fucked up and he shot one of the kings." *Id*. at 80:16-19
- That Velez said that "the other guy had also pulled out a gun but that David had shot the guy first." *Id*. at 80:20-23;
- That Velez said that "he shot the guy because the Kings had killed Snaky." *Id*. at 81:1-3;
- That Izquierdo knew that Gent Velez was known to everybody as Snaky. *Id*. at 81:4-10;
- That Velez told Izquierdo that "last Sunday, when he shot the king, he was with a couple of the boys" and Izquierdo thought that meant that Velez was with a couple of other Satan Disciples. *Id*. at 81:11-23;
- That Izquierdo was not threatened or coerced into making the statement, nor has she been promised anything in exchange for this statement." *Id*. at 86:1-5. The only reason Izquierdo signed the statement was so she could go home. *Id*;

- That Izquierdo was "making this statement voluntarily and it is the truth." *Id*. at 86:6-11. Izquierdo stated this was not the truth and the statement was not voluntary. *Id*.
- That Izquierdo "signed the bottom of each page to indicate that it is correct." *Id*. at 87:13-19. Izquierdo just signed it so she could leave, she was not saying it was correct. *Id*.

**RESPONSE: Admit Goldish testified that the above statements came from Izquierdo. Admit that Izquierdo claims that the statements did not come from her or are false but deny that this is true. Deny that Goldish fabricated the statement she had Izquierdo eventually sign. ASA Goldish spoke to Izquierdo and then wrote the statement while Izquierdo was talking to her and in the presence of Izquierdo. (Def. Ex. 31 at T-113:4-15, T-138:21-23). All the details that are contained in Izquierdo' s statement came from Izquierdo and not from ASA Goldish or the detectives. (Def. Ex. 15 at 242:20-243:4; Def Ex. 29 at 212:19-22). Answering further:**

- **ASA Goldish introduced herself to Izquierdo, explained to her that she was an assistant state's attorney, a prosecutor, not her attorney, nor the attorney for Velez and Izquierdo acknowledged she understood that ASA Goldish was not her attorney. (Def. Ex. 31 at T-108:7-14, Ex. 29 at 190:4-13). It was ASA Goldish's practice to introduce herself to witnesses. (Def Ex. 29 at 133:11-13).**
- **Izquierdo told ASA Goldish that she had been given food to eat, and tea and water to drink and when ASA Goldish met with Izquierdo at Area 4 she was eating the entire time they were talking. (Def. Ex. 29 at 214:10-22; Def. Ex. 32 at 5).**
- **Izquierdo told ASA Goldish that she gone up to 11th grade. (Def Ex. 29 at 191:6-12). Izquierdo never told ASA Goldish that she had only completed the ninth grade in school. (*Id*. at 221:507).**
- **Izquierdo told ASA Goldish and G.S. Bocardo she lived with her friend Angelica Valdez and Valdez's parents. (Def. Ex. 35 at Q-208:20-209:6). Izquierdo's friend and Velez's cousin, Alexis Robles, also had the understanding that Izquierdo lived with Angelica Valdez. (Def. Ex. 68 at 1).**
- **Izquierdo told G.S. Bocardo that her due date was August 26, 2001. (Def. Ex. 35 at Q-218:4-19). Izquierdo's child was born on August 27, 2001. (Def Ex. 28 at 312:22-24).**
- **Izquierdo told ASA Goldish she went to the cemetery in the morning of March 21, 2001 to put flowers on the grave of Gent Velez who had been shot to death on March 22, 2200. (Def. Ex. 29 at 198:25-200:7, 202:17-20). Izquierdo never told ASA Goldish they were not at the cemetery to visit Gent Velez's grave. (*Id*. at 212:23-213:14). Velez testified at his deposition that he went to the same cemetery**

in the morning on March 21, 2001 and that the shooting had already occurred by the time he got there. (Def. Ex. 20 at July 6, 2021 at 178:19-179:5, 181:18-22). According to Alexis Robles, they went to the cemetery in the morning. (Def. Ex. 69, Deposition of Alexis Robles dated July 19, 2001 at 146:5-11).

- Izquierdo told ASA Goldish she was standing at the gravesite when shots rang out. (Def. Ex. 29 at 203:16-20).

- Izquierdo told ASA Goldish she believed the Latin Kings shot Gent Velez. (Def. Ex. 15 at 242:20-243:4; Def Ex. 29 at 212:19-22).

- Izquierdo told ASA Goldish she believed she was shot by Latin Kings. (Def. Ex. 15 at 242:20-243:4; Def Ex. 29 at 212:19-22). The group of people who ran towards Izquierdo and her friends when she was at the cemetery threw up the crown, which meant they belonged to the Latin Kings, and they announced themselves as members of the Latin Kings street gang when they were shooting (Def. Ex. 28 at 179:2-20; Def. Ex. 69 at 147:4-14). The preliminary report that Cook County Sheriff's Detective Sullivan faxed to G.S. Bocardo states the victims of the cemetery shooting "observed the subjects wearing black and gold clothing, which symbolizes Latin Kings." (Pl's Ex. 31 at 3).

- Izquierdo told ASA Goldish after she had been hit by a bullet, she collapsed to the floor. (Def. Ex. 29 at 198:25-200:7, 204:5-19).

- Izquierdo told ASA Goldish that after she had been hit with the bullet, she noticed Velez was at the cemetery. (Def. Ex. 32 at 4). There is nothing in Izquierdo's statement indicating that Velez was at the cemetery when she was shot. (*Id*.). When Izquierdo was at the cemetery, she heard Velez. (Def. Ex. 28 at 20:11-13). Velez was able to speak to Izquierdo at the cemetery. (Def. Ex. 20 at 183:13-20). He asked her if she was okay, and Izquierdo was crying. (*Id*.).

- Izquierdo told ASA Goldish that Velez told her he was sorry that he had been shot and that he was going to do something about it. (Def. Ex. 35 at Q-178:18-21, Def Ex. 20 at 192:23-193:15). Velez told Izquierdo in Spanish that it was his fault that she had been shot. (Def. Ex. 28 at 98:7-11, 202:21-203:13). Izquierdo told ASA Goldish that Velez told her it was his fault because of what he did. (Def. Ex. 29 at 198:25-200:7).

- Izquierdo told ASA Goldish that Velez told her that last week he had gone over to 21st and Marshall and that he was all "fucked up." (*Id.*).

- Izquierdo told ASA Goldish that when Velez said he was "all fucked up" that she thought it meant he was drunk or high on drugs. (*Id.*).

- Izquierdo told ASA Goldish that Velez told her when he was "all fucked up" that he shot one of the kings. (*Id.*).

- Izquierdo told ASA Goldish that Velez told her that the guy he ended up shooting had a gun too but that he shot him first. (*Id.*).

- Izquierdo told ASA Goldish that Velez told her he shot the guy because the Kings had killed Snaky. (Def. Ex. 15 at 242:20-243:4; Def. Ex. 32 at 5; Def Ex. 29 at 212:19-22).

- Izquierdo told ASA Goldish that Gent Velez was known to everybody as Snaky. (Def. Ex. 15 at 242:20-243:4; Def. Ex. 32 at 5; Def Ex. 29 at 212:19-22). Gent Velez's nickname was Snaky. (Def. Ex. 20 at 126:13-16, 128:2-6). Izquierdo knew that Gent Velez was Velez's uncle. (Def Ex. 35 at Q-184:19-23).

- **Izquierdo told ASA Goldish that Velez told her when he shot the King, he was with other guys, and that she understood this to mean that he was with other Satan Disciples. (Def. Ex. 29 at 198:25-200:7).**
- **ASA Goldish asked Izquierdo at least two times how she had been treated by the police and Izquierdo told her that she had been treated well. (Def Ex. 29 at 217:16-218:17; Def. Ex. 31 at T-109:7-12; Def. Ex. 32 at 5). Izquierdo also told ASA Goldish that she had not been threatened or coerced into making her handwritten, was making the statement voluntarily, and was not promised anything in exchange for her statement. (Def. Ex. 29 at 198:25-200:7; Def. Ex. 32 at 5; Def. Ex. 35 at Q-190:11-14) (Q. And you were not promised anything in exchange for this statement, is that Christina? A. That's right.).**
- **Izquierdo signed each page of the handwritten statement after she reviewed it. (Def Ex. 35 at Q-180:17-20, 181:4-14). ASA Goldish did not tell Izquierdo that she could go home if she signed the handwritten statement. (Def. Ex. 29 at 219:11-13).**

73. Goldish acknowledges it would have been wrong to write up a statement then come into the room and have Izquierdo sign it. It would have been improper because Goldish would have been characterizing the statement as if Izquierdo had provided the information when it had in fact come from Goldish. Ex. 16 (Goldish Dep.) at 200:15-201:3.

**RESPONSE: Admit to the extent this paragraph cites ASA Goldish's deposition testimony but deny the implication that ASA Goldish wrote Izquierdo's statement before she met with her or that she wrote it anywhere but in Izquierdo's presence. ASA Goldish spoke to Izquierdo and then wrote the statement while Izquierdo was talking to her and in the presence of Izquierdo. After ASA Goldish wrote the first page, she had Izquierdo read it to her. (Def. Ex. 31 at T-113:4-15, T-138:21-23). ASA Goldish did not write statement without first getting the information from Izquierdo. (Def. Ex. 29 at 198:25-201:3). ASA Goldish did not leave the room, write up a statement and then bring it Izquierdo to sign. (*Id*.). All the details that are contained in Izquierdo's statement came from Izquierdo and not from ASA Goldish or the detectives. (Def. Ex. 15 at 242:20-243:4; Def Ex. 29 at 212:19-22).**

74.    Goldish also knew it would be wrong to tell a witness that their baby would be taken away if they didn't cooperate with a criminal investigation. Ex. 16 (Goldish Dep.) at 218:22-219:10.

**RESPONSE:  Admit to the extent this paragraph cites ASA Goldish's deposition testimony but deny the implication that ASA Goldish or any Individual CPD Defendant Officer told Izquierdo that her baby would be taken away if she did not incriminate Velez. G.S. Bocardo never told Izquierdo that if she didn't cooperate and say that Velez had confessed murder to her, that he would contact DCFS and have them wait until she gave birth and take away her baby. (Def. Ex. 15 at 256:16-22) (Q. Did you tell Kristina that if she didn't cooperate you would take her baby away from her? A. No sir. Q. That would be totally, totally wrong to do – to suggest in any way that Ms. Izquierdo's baby might be taken away from her; right? A. Yes). Answering further, ASA Goldish asked Izquierdo at least two times how she had been treated by the police and she told her that she had been treated well.  (Def Ex. 29 at 217:16-218:17; Def. Ex. 31 at T-109:7-12; Def. Ex. 32 at 5). Izquierdo also told ASA Goldish that she had not been threatened or coerced into making her handwritten and was not promised anything in exchange for her statement. (Def. Ex. 32 at 5; Def. Ex. 35 at Q-190:11-14) (Q. And you were not promised anything in exchange for this statement, is that Christina? A. That's right.).**

75.    In stark contrast to Izquierdo's account of her interview with Goldish, Goldish claims that Izquierdo was "pleasant," "forthcoming," and "not reticent at all." Ex. 16 (Goldish Dep.) at 214:7-216:13. Goldish claims Izquierdo was eating the entire time the two were talking, laughing about getting crumbs on the statement as Goldish wrote it, and sitting in a comfortable chair for the ninety minutes the two were speaking. Id. Izquierdo never asked to go home or

expressed any displeasure with having to be at the police station until 5:00 a.m. *Id*. at 215:7-9; 220:5-12.

**RESPONSE: Admit that ASA Goldish testified as such but deny the implication that Izquierdo was not or did not behave in a manner consistent with ASA Goldish's description.**

### Mr. Velez's Arrest and Interrogation

76.     When Mr. Velez was arrested, he had a crutch in his car with him. Ex. 28 (Velez deposition) at 496:1-12.

**RESPONSE: Admit Velez testified as such at his deposition but deny the implication that Velez was not able to run on the night of Hueneca's murder.  Gustavo Rivera testified at Velez's criminal trial on October 10, 2002 that he saw Velez run away after he heard the gunshots that killed Hueneca.  (Def. Ex. 6 at S-24:16-24, S-25:15-21, S-56:3-9).**

77.     Mr. Velez had been shot in his left knee and did not receive physical therapy for his injury. Ex. 28 (Velez deposition) at 385:13-386:11.

**RESPONSE: Admit Velez testified as such at his deposition but deny the implication that Velez was not able to run on the night of Hueneca's murder. Gustavo Rivera testified at Velez's criminal trial on October 10, 2002 that he saw Velez run away after he heard the gunshots that killed Hueneca.  (Def. Ex. 6 at S-24:16-24, S-25:15-21, S-56:3-9).**

78.     Bocardo and Dyra wrote the cleared closed supplementary report. Ex. 22 (Dyra Dep.) at 252:20-254:11 (Dyra typed the report); Ex. 5 (Cleared Closed Supplementary Report) at 16 (listing Bocardo and Dyra as the authors).

**RESPONSE: Admit.**

79.     That cleared closed supplementary report falsely states that Plaintiff said 1) that he had been at the cemetery with Izquierdo when she was shot; 2) that he and Izquierdo had been at

the cemetery to visit his Uncle Gent Velez's grave; 3) that his Uncle Gent Velez was a Satan Disciple; 4) that Latin Kings had killed Gent Velez; and 5) that Mr. Velez did not know where he was the night of the murder and could not account for his whereabouts. *See* Ex. 5 (Cleared Closed supplementary report) at 14; Ex. 28 (Velez deposition) at 127:2-128:18 (Gent Velez was an Ambrose, not a Satan Disciple); *id*. 134:14-135:7 (Gent Velez was not a Satan Disciple); *id*. at 318:1-22 (Plaintiff said he wanted a lawyer instead of answering when asked where he was the night of the murder); *id*. at 159:10-17 (Mr. Velez does not know any family member who was killed by the Latin Kings); *id*. at 169:11-20 (Mr. Velez was not with Izquierdo at the cemetery, she had already been shot when he arrived); Ex. 27 (Izquierdo deposition) at 13:8-19, 78:6-10 (Plaintiff was not with Izquierdo at the cemetery when she was shot); *id*. at 13:20-14:14, 27:2:4, Izquierdo was not at the cemetery to visit Gent Velez's grave.

**RESPONSE: Deny that the Cleared Closed Supplementary Report is false. (Def. Ex. 15 at 243:18-244:4) (Q. Tell me what you remember. A. There wasn't much said. He basically denied having any knowledge of a homicide, and he spoke about this girlfriend being shot at the cemetery, kept away from the subject of the homicide. I mean, I don't remember his exact words, but basically tells us about his girlfriend being shot and told us that he knew nothing. Wasn't nothing about the homicide, and he basically couldn't account for his whereabouts on that day."). Deny that the Cleared Closed Supplementary Report states Velez was at the cemetery with Izquierdo when she was shot as this is not supported by the citation provided. (Def. Ex. 19 at 5). Admit statements 2 through 4 to the extent they cite the Cleared Closed Supplementary Report but deny the implication that Velez did not make such statements to the Defendant Officers. (Def. Ex. 15 at 243:18-244:9). Answering further, Velez never told any police officer that he was supposedly at his aunt's home doing laundry**

with his cousin Alexis Robles on March 18, 2001 to the early morning hours on March 19, 2001. (Def. Ex. 20 at 319:14-22). The Latin Kings killed Velez's uncle Ismael Robles (Alexis Robles' father) and his uncle, Mario Velez. (Def. Ex. 69 at 195:10-15, Def. Ex. 70, Deposition of Alexis Robles dated July 16, 2020 at 60:24-61:2).

80.     All of these facts were testified to by Defendant Bocardo at Plaintiff's criminal trial. Ex. 13 (Bocardo trial testimony) at T31:2-T33:15, T95:10-24.

**RESPONSE: Defendants admit that G.S. Bocardo testified to the following facts at Velez's criminal trial: 1) that Velez told him that his girlfriend, Christina Izquierdo, was shot by a Latin King while visiting a cemetery that week; 2) that Velez said they were at the cemetery because his uncle, Snaky, was shot a year ago and they were visiting the gravesite to pay their respects; 3) that Velez said his uncle was a Satan Disciple; 4) that Velez said the Latin Kings were responsible for his uncle's death and 5) that Velez did not his whereabouts on the night of murder or know anything about Hueneca's shooting death. Deny that G.S. Bocardo testified that Velez told him he was at the cemetery with Izquierdo when she was shot because this is not supported by the citation provided and further deny the implication that the Cleared Closed Supplementary Report was introduced or used as evidence at Velez's criminal trial.**

81.     When Plaintiff was at the station following his arrest, he asked for an attorney and refused to answer questions. Ex. 28 (Velez deposition) at 316:15-20, 317:17-318:22.

**RESPONSE: Deny that  Velez refused to answer questions because Velez told G.S. Bocardo the following facts: 1) that his girlfriend, Christina Izquierdo, was shot by a Latin King while visiting a cemetery that week; 2) that they were at the cemetery because his uncle, Snaky, was shot a year ago and they were visiting the gravesite to pay their respects; 3) that his uncle**

was a Satan Disciple; 4) that the Latin Kings were responsible for his uncle's death and 5) that he did not his whereabouts on the night of murder or know anything about Hueneca's shooting death. **(Def. Ex. 15 at 243:14-244:9). Answering further, it wasn't until Velez was asked if he wanted to be represented by Vuckovic that he invoked his right to counsel when he said yes, and he met with her at Area 4. (Def. Ex. 19 at 15; Def. Ex. 20 at 319:25-320:14).**

82.     When Bocardo took Mr. Velez to the bathroom, he forced Mr. Velez's head down to the toilet while simultaneously pulling his handcuffed wrists as high up Plaintiff's back as they could go. Ex. 28 (Velez deposition) at 311:13-21.

**RESPONSE: Admit Velez testified as such at his deposition in 2021 but deny that it is true. (Def. Ex. 15 at 243:14-244:9).**

83.     While Mr. Velez was being interrogated, "the older gentleman" brought in photos of his deceased uncle, Gent Velez, and telling him "'This is why you did it. This is why you did it. Right?'" Ex. 28 (Velez deposition) at 313:10-21, 315:11-12. Kato was also present while the older detective told Plaintiff that he killed Hueneca because Gent Velez was killed. *Id*. at 314:10-316:14. Mr. Velez did not know what they were talking about, did not ask, and did not comment. *Id*. at 316:15-20, 317:17-24.

**RESPONSE: Deny. Admit Velez testified as such during his deposition in 2021 but deny that it is true. Velez told G.S. Bocardo the following facts: 1) that his girlfriend, Christina Izquierdo, was shot by a Latin King while visiting a cemetery that week; 2) that they were at the cemetery because his uncle, Snaky, was shot a year ago and they were visiting the gravesite to pay their respects; 3) that his uncle was a Satan Disciple; 4) that the Latin Kings were responsible for his uncle's death and 5) that he did not his whereabouts on the night of murder or know anything about Hueneca's shooting death. (Def. Ex. 15 at 243:14-244:9; Def.**

61

**Ex. 18 at 224:7-18). Det. Kato did not interact with John Velez and was not present when Velez was questioned as Area 4. (Def Ex. 18 at 223:12-18; Def. Ex. 21 at 22:22-23:4, 101:101-24).**

84.     Defendant Dyra graduated high school in 1972. Ex. 22 (Dyra Dep.) at 17:24-18:2.

**RESPONSE: Admit.**

### Mr. Velez's Trial Was Closely Balanced

85.     During closing arguments, the prosecutor argued: "What did he tell Cristina when he was at the hospital with her just two days after this? That this was all his fault because he killed the King on Marshall and 21st Street, and he did it because Latin Kings killed his uncle, Gent Velez, Snaky, the year before." Ex. 35 (criminal transcript dated Oct. 15, 2002, 2 p.m. session) at T176:1-6. The prosecutor also argued during closing arguments: "That is evidence that you may consider, a signed, handwritten statement by Christine Izquierdo in it stating that the defendant admitted to the murder and admitted why. It's pretty compelling stuff." Id. at T209:6-9.

**RESPONSE: Admit**

86.     During deliberations, Mr. Velez's criminal jury reported that they were at impasse, had "fundamental disagreements that could not be changed by time," and could not reach agreement on the charges. Ex. 35 (criminal trial transcript dated Oct. 15, 2002, 2 p.m. session) at T254:9-15.

**RESPONSE: Defendants object to this statement as immaterial to Defendants' motion for summary judgment and inconsistent with the purposes of Local Rule 56.2(b)(3)(C) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motion. Without waiving their foregoing objection, admit to the extent to this paragraph**

cites Velez's criminal trial transcript but deny the implication that anything substantive can be gleaned from the criminal jury's "fundamental disagreements."

87.     Mejia never spoke to a female prosecutor at the police station. Ex. 4 (Mejia deposition) at 59:21-23.

**RESPONSE: Admit to the extent to this paragraph cites Mejia's September 2020 deposition testimony but deny that it is true. ASA Goldish spoke to Mejia at the police station and confirmed that he identified the man with the gun from the lineup. (Def. Ex. 29 at 119:16-19; 129:6-12; Def. Ex. 31 at T-122:9-14, T-124:10-16)**

88.     Ricardo has no memory of speaking to a female prosecutor at the police station. Ex. 2 (Ricardo deposition) at 111:8-22.

**RESPONSE: Admit to the extent to this paragraph cites Ricardo's September 2020 deposition testimony but deny the implication that Ricardo was not interviewed by ASA Goldish. ASA Goldish spoke to Ricardo at the police station before she spoke to Mejia. (Def. Ex. 29 at 108:9-14, 110:20-113:15; Def. Ex. 31 at T-123:13-16).**

### Dismissing the Charges Against Plaintiff

89.     Assistant State's Attorney Linda Walls investigated all of Plaintiff's post-conviction claims, including his claim of actual innocence. Ex. 36 (Walls deposition) at 55:2-6; 56:14-16.

**RESPONSE: Admit ASA Linda Walls testified as such, but deny that she investigated his claim of actual innocence because she did not interview affiants Edgar Valdez, Cristina Izquierdo, Edgar Valdez, Alexis Robles, Angelica Valdez even though Velez had attached affidavits from these individuals to his post-conviction petition. (Def. Ex. 65 at 59:1-13, 118:12-22). Answering further, she did not even interview Velez. (*Id*. at 58:11-15).**

90.     Assistant State's Attorney Linda Walls reviewed Plaintiff's post-conviction petition; the appellate record, including all transcripts in the case; the police reports; and interviewed the affiants of any affidavits in the record. Ex. 36 (Walls deposition) at 52:17-23; 53:2-15; 56:17-57:7.

**RESPONSE: Admit that ASA Walls testified as such but deny that she interviewed all the affiants of all the affidavits in the record. She did not interview affiants Edgar Valdez, Cristina Izquierdo, Edgar Valdez, Alexis Robles, Angelica Valdez even though Velez had attached affidavits from these individuals to his post-conviction petition. (Def. Ex. 66 at 59:1-13, 118:12-22). Answering further, ASA Walls reviewed the transcript of the state's closing statement to see if the state used Izquierdo's statement as substantive evidence. (*Id.* at 84:22-85:6, 87:21-88:4). Based on ASA Walls' investigation, she determined Izquierdo's statement had been admitted as substantive evidence. (*Id.* at 94:10-15).**

91.     Assistant State's Attorney Linda Walls interviewed Pelmer in regard to Plaintiff's claim of actual innocence. Ex. 36 (Walls deposition) at 116:22-117:10; 121:1-14.

**RESPONSE: Admit. Answering further, when the state decided to dismiss the charges against Velez it did so without talking to or interviewing Gustavo Rivera. (Def. Ex. 65 at 132:16-133:15). The state was not able to locate Gustavo Rivera. (*Id.*).**

92.     Plaintiff's post-conviction petition alleged that 1) Olga Lopez and Alexis Robles were with Izquierdo at the cemetery and could verify that Izquierdo was at the cemetery to visit Emanual Martinez's grave, not Gent Velez's grave (Dkt. 302-36 at 15); 2) photographs of Emanuel Martinez's gravestone verified that his birthday was the same day that Izquierdo was at the cemetery (*id.*); 3) Lopez's medical records demonstrated that she was injured in a car crash at the cemetery, corroborating Izquierdo's testimony that she was shot inside a car and contradicting her false statement that she was shot at a gravesite (*id.* at 16; Ex. 34 (Izquierdo statement) at 4); 4) Gent

Velez's grave had no headstone until 2011, contradicting the notion that Izquierdo and her friends were there to visit Gent Velez's grave (Dkt. 302-36 at 16); 5) Gent Velez's grave is on the opposite side of the cemetery from Martinez's grave (*id*. at 16); 6) evidence demonstrating that Gent Velez was a member of the Almighty Ambrose gang, not the Satan Disciples, as alleged in the statement attributed to Plaintiff in Dyra and Bocardo's supplementary report (id. at 17, 31-32; Ex. 5 (Clear Closed supp report) at 14; 7) Gus Rivera admitted to his cousin, Pelmer, that he did not witness the Hueneca murder, but only implicated Mr. Velez because the police offered to help him with his drug charges (Dkt. 302-36 at 26-27); 8) Gent Velez's murder was unsolved, and thus not attributable to the Latin Kings, contrary to the statement attributed to Plaintiff in Dyra and Bocardo's supplementary report (Ex. 5 (Clear Closed supp report) at 14); 9) the area where the murder was committed was not well-lit, as the closest working streetlight was 90 feet away (Dkt. 302-36 at 39); 10) Gus Rivera was at least 135 feet away from the murder when it occurred (id. at 39-40); 11) Alexis Robles provided testimony that Mr. Velez was with her at the time of the murder, establishing an alibi for him (id. at 40-41); 12) Evidence that Mr. Velez had been shot in the knee in September 2000 and his lack of care thereafter, and thus he could not run as of March 2001, contrary to descriptions by several witnesses who saw the perpetrator running from the scene (id. at 43-44); 13) Evidence that Defendant Bocardo was accused multiple times of gross misconduct, lending credence to the accusations against Bocardo in this case (*d*. at 49-51).

**RESPONSE: Admit Plaintiff's post-conviction petition includes the above allegations but deny that it is true. (Dkt. 309 at ¶117). At the time Plaintiff was charged with the first-degree murder, there was a wealth of additional facts that supported probable cause to arrest and detain Plaintiff for the murder of Hueneca. (*Id.*)**

Respectfully submitted,

BORKAN & SCAHILL, LTD.


By:/s/Misha Itchhaporia

Steven B. Borkan
Timothy P. Scahill
Misha Itchhaporia
Special Assistants Corporation Counsel
BORKAN & SCAHILL, LTD.
Two First National Plaza
20 South Clark Street
Suite 1700
Chicago, Illinois 60603
(312) 580-1030
*Attorneys for Defendant Chicago Police Officers*