UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN VELEZ, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:18-CV-08144 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CITY OF CHICAGO | ) | |
| ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff John Velez was 17 years old when he was arrested in 2001 for the murder of Anthony Hueneca. Velez was convicted of the murder and spent 16 years in prison, after which he was released after the conviction was vacated. Velez brings this civil rights suit, 42 U.S.C. § 1983, against several Chicago police officers; Cook County Sheriff's Department Detectives James Davis and John Sullivan; Cook County Sheriff Thomas Dart, in his official capacity; former Cook County Assistant State's Attorney Megan Goldish; Cook County; and the City of Chicago (collectively, the Defendants).[1]

Velez alleges that the police officers, Goldish, Davis and Sullivan, individually and in concert with each other, violated his constitutional rights by fabricating evidence against him. According to Velez, the police officers, Davis, and Sullivan also

---

[1]This Court has subject matter jurisdiction over the § 1983 claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367. Separately, the Court formally enters dismissal as to Defendants J. Botwinski and A. Jaglowski, who both passed away, R. 133, 355, and no estate representative was substituted for them (nor are they substantively addressed in the summary judgment briefing).

suppressed exculpatory evidence. Velez also brings deprivation of liberty and mali-cious prosecution claims against the police officers, Davis, and Sullivan. Velez brings claims of conspiracy, failure to intervene, and intentional infliction of emotional dis-tress against the Chicago police officers, Goldish, Davis, and Sullivan. On top of the individual claims, Velez brings a municipal-liability claim against Chicago under *Mo-nell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978), and respondeat superior and indemnification claims against the City, the County, and Sheriff Dart. All of the Defendants—the Chicago Officers, the Sheriff Officers, the Sheriff's Office, Goldish, the County, and the City—have filed motions for summary judgment. R. 303 (Goldish Mot.), R. 305 (the City Mot.), R. 308 (the Chicago Officers' Mot.), R. 311 (the CCSD Detectives, Sheriff Dart, the County Mot.).[2] For the following reasons, the De-fendants' motions are granted in part and denied in part.

## I. Background

In deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zen-ith Radio Corp.*, 475 U.S. 574, 587 (1986).

### A. Night of Hueneca Murder

In the very early hours of March 19, 2001, at around 1:20 or 1:30 a.m., four friends—Apolinar Mejia, Lorena Ricardo, Micaela Gutierrez, and Gustavo Rivera—left a Chicago nightclub located on Marshall Boulevard and Cermak Road. R. 309

---

[2]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

2

(CPDSOF) ¶¶ 4–7; R. 302-3 at R-131:2–132:11; R. 302-4 at Q-97:18–98:6. At the nightclub, Gutierrez and Rivera saw Anthony Hueneca, a member of the Latin Kings gang. CPDSOF ¶ 5, R. 302-4 at Q-96:5–97:17; R. 302-6 at S-10:12–11:18. Upon leaving the nightclub, the four got into Mejia's car and Mejia dropped Rivera off at a building to get rolling papers for marijuana. CPDSOF ¶ 7; R. 302-3 at R-132:6–134:4; R. 302-4 at Q-97:18–99:19; R. 302-6 at S-14:19–15:5. While Mejia, Ricardo, and Gutierrez were waiting in the car for Rivera, a man wearing a dark hoodie approached the car and threatened them with a gun; at one point, the man stated "where's the Kings, where's the Queens at" (a reference to the Latin Kings) and "get ready to die." CPDSOF ¶¶ 9–14; R. 302-4 at Q-102:12–103:16, Q-105:4–22, Q-114:24–115:16. Before walking away, the man said, "king killer, queen killer, SD love." CPDSOF ¶¶ 14, 21; R. 302-4 at Q-112:4–8. Gutierrez testified she believed that "SD love" referred to the Satan's Disciples gang. CPDSOF ¶ 14; R. 302-4 at Q-113:3–13.

It is unclear how much time passed from when the man first approached the car to when he left. *See* CPDSOF ¶ 15; R. 302-4 at Q-138:24–139:13. In any event, when the man left, Mejia drove away, but before Mejia turned onto California Avenue, Gutierrez and Ricardo heard two gunshots. CPDSOF ¶¶ 16, 21; R. 302-4 at Q-115:20–118:9; R. 302-5 at R-192:2–20. Mejia continued to drive, and at some point, Ricardo saw two men (one wearing a dark hoodie) quickly run across the street, headed onto Marshall Avenue. CPDSOF ¶ 22; R. 302-5 at R-193:9–194:13, R-230:8–231:18. When the car reached an intersection, Ricardo saw a body lying on the sidewalk. CPDSOF ¶ 23; R. 302-5 at R-195:5–197:10. There is a dispute about the

distance between where Hueneca was shot and where the friends were held up at gunpoint in the car. It was Bocardo's understanding that Hueneca was shot around 100 feet from where Mejia, Ricardo, and Gutierrez were held up at gunpoint by the man in the dark hoodie. CPDSOF ¶ 65; R. 302-25 at H-25:17–21.

## B. Investigation into Hueneca Murder

At around 1:38 am on March 19, 2001, a caller reported two gunshots and a man lying on the ground in front of 2143 South Marshall Boulevard. CPDSOF ¶ 43; R. 302-50 at CITY000005. Hueneca was found with gunshot wounds to the head and chest, and was transported to the hospital, where he was pronounced dead. CPDSOF ¶¶ 43–44; R. 302-8 at 88:4–89:4; R. 302-50 at CITY000005–006. Later that day, Bocardo and Dyra were assigned to the investigation. CPDSOF ¶ 56; R. 302-17 at 154:10–13; R. 302-14 at T-11:4–18.

### 1. Bocardo and Velez at the Police Station

The day after the murder, Bocardo interviewed Gutierrez in the Area 4 Detective Division. CPDSOF ¶¶ 63–64; R. 302-4 at Q-120:20–121:23. At the end of the interview, Gutierrez asked Bocardo to check the station's common areas. CPDSOF ¶ 66; R. 302-4 at Q-121:24–123:3; R. 302-14 at T-87:1–15. While checking the common areas, Bocardo spotted Velez and Velez's friend, Raul Lopez. CPDSOF ¶¶ 67, 69; R. 302-15 (Bocardo Dep. Tr.) at 202:5–203:5; R. 325-28 (Velez Dep. Tr.) at 406:9–407:19. Velez was at the station because he was looking for a friend who had been taken into custody on an unrelated stop order. CPDSOF ¶ 67; Bocardo Dep. Tr. at 202:5–203:9.

4

Bocardo recognized Velez and Lopez as victims of a February 2001 drive-by shooting that Bocardo was still investigating. CPDSOF ¶ 67; Bocardo Dep. Tr. at 189:13–191:18. Bocardo told Velez and Lopez that he (Bocardo) had been looking for them as the victims, asked them to wait in the lobby, and later spoke with them about the shooting. CPDSOF ¶¶ 70–71; Bocardo Dep. Tr. at 204:10–205:9. During this encounter, Velez told Bocardo that Velez could not see the shooter's face and that he did not want to sign a Refusal to Prosecute form. CPDSOF ¶ 71; Velez Dep. Tr. at 412:19–414:16. After that encounter, Bocardo obtained Velez's mugshot, which Bocardo printed out and put in a clipboard that he carried with him. CPDSOF ¶ 72; R. 302-14 at T-16:10–17:13; Bocardo Dep. Tr. at R. 191:2–6. Bocardo learned Velez was a Satan Disciples member. CPDSOF ¶ 72; Bocardo Dep. Tr. at 244:10–14.

### 2. Mejia Identifies Velez as the Man who Threatened Him

On the same day that Bocardo ran into Velez at the station, Bocardo later interviewed Mejia. CPDSOF ¶ 73; R. 302-3 at R-167:2–8; R. 302-14 at T-17:14–22. There is a dispute, however, about what happened during this interview and whether Mejia identified Velez.

Bocardo has testified that, before this interview, Bocardo had not made any connections between Hueneca's murder and Velez. CPDSOF ¶ 75; R. 302-25 at H-8:5–7, H-30:18–31:1. Bocardo alleges that, after running into Velez, he had attached Velez's mugshot to his clipboard, and during Bocardo's interview with Mejia, Mejia happened to spot Velez's mugshot in the clipboard and identified Velez as the man who held up him and his friends at gunpoint. CPDSOF ¶¶ 74–75; R. 302-14 at T-

5

17:23–18:23; Bocardo Dep. Tr. at 219:18–221:15, 225:22–226:8; R. 302-19, Clear Closed Supplementary Report (CCSR) at 13. Bocardo did not inventory the mugshot of Velez that Mejia allegedly identified. CPDSOF ¶ 75; Bocardo Dep. Tr. at 230:9–231:21. Bocardo did make a note of the alleged clipboard identification in the Clear Closed Supplementary Report (a law enforcement report) created on March 29. CPD-SOF ¶ 76; R. 325-15 at 1; Bocardo Dep. Tr. at 226:9–228:23; CCSR at 13.

But Velez contends that Bocardo fabricated the Mejia clipboard identification to justify putting Velez in the lineup for the Hueneca murder. *See* R. 327 (PSOAF) ¶ 18. Mejia has testified that he did *not* see Velez's photograph on Bocardo's clip-board, but rather identified the man who had held him and his friends at gunpoint by looking through a so-called gang book that contained many photos. PSOAF ¶ 18; R. 325-4 (Mejia Dep. Tr.) at 48:4–49:13, 57:12–58:24, 90:4–91:5, 104:24–108:12. Mejia also testified in his deposition that he lied at Velez's trial when he denied looking through a gang book. PSOAF ¶ 18; Mejia Dep. Tr. at 57:12–58:24, 90:4–91:5, 93:22–94:10, 104:24–108:12. Velez points out that Bocardo's General Progress Report notes about the interview with Mejia do not mention the alleged clipboard identification. PSOAF ¶ 19; *see* R. 337-2. Velez alleges that Mejia identified a photo in a gang book of a person *other* than Velez; this person was not in the lineup that included Velez; and the photo from the alleged gang book was never inventoried. PSOAF ¶¶ 5–6, 9; *see* CPDSOF ¶ 75; Mejia Dep. Tr. at 51:24–54:23.

**Lineup Identification.** On March 26, 2001 (one week after the murder), Mejia, Ricardo, Gutierrez, and Rivera viewed a lineup containing four fillers and

Velez. CPDSOF ¶¶ 97–98; R. 302-6 at S-28:2–7; R. 302-27 at CITY000025; R. 302-48; R. 302-14 at T-33:2–23; R. 302-3 at R-146:18–148:21.[3] Bocardo and Cirone were in the room where the witnesses (one at a time) viewed the lineup, and Dyra was with the lineup participants. CPDSOF ¶ 99; R. 302-18 (Dyra Dep. Tr.) at 153:1–6; Bocardo Dep. Tr. at 270:22–24; R. 302-22 (Cirone Dep. Tr.) at 16:7–9.

There is a dispute about Mejia's lineup identification of Velez. Velez contends that Mejia did not recognize anyone in the lineup as the man who threatened him at gunpoint, and the lineup participants looked different from the photograph from which Mejia earlier identified the offender. PSOAF ¶ 9; Mejia Dep. Tr. at 51:24–54:23. Velez points out that Mejia has testified that he asked Bocardo which person in the lineup was the man that Mejia had earlier identified in the photo to be the offender ("where is this guy? Is that him? Or that one over there?"), to which Bocardo instructed Mejia, "it should be that guy—that guy is that guy." PSOAF ¶¶ 10–13; Mejia Dep. Tr. at 53:14–54:23. Bocardo, however, denies telling Mejia whom to identify from the lineup and denies that Mejia told Bocardo that Mejia could not recognize the offender in the lineup. R. 351 (CPD's Resp. PSOAF) ¶¶ 10–12; Bocardo Dep. Tr. at 270:14–21; *see also* Cirone Dep. Tr. at 147:6–24 (testifying that Mejia made an

---

[3]The Court need not consider whether there is a genuine dispute about the alleged fabrication of Rivera's identification of Velez. For summary judgment purposes, the Court does not consider Rivera's alleged statement to his cousins, William Pelmer and Joseph Rivera, that he falsely implicated Velez because Velez has not obtained a statement from Gus Rivera himself or shown that he is otherwise unavailable under Federal Rule of Evidence 804.

immediate identification of Velez in the lineup and did not hesitate in identifying Velez).

### 3. Gutierrez and Ricardo Identify Velez in Photo Array and Lineup

On March 24, 2001 (five days after the murder), Bocardo and Dyra created a photo array of five mugshots, including Velez's. CPDSOF ¶ 84; CCSR at 13–14. That same day, Ricardo identified Velez from the array as the man who threatened her and her friends with the gun before Hueneca's murder. CPDSOF ¶¶ 85–86; R. 302-14 at T-19:12–21; R. 302-5 at R-198:13–24; R. 302-12 (Ricardo Dep. Tr.) at 104:2–12. The next day, Gutierrez identified Velez from the photo array as the man who threatened her and her friends at gunpoint. CPDSOF ¶ 87; R. 302-4 at Q-123:15–124:15; R. 302-14 at T-20:20–21:1. It is undisputed that Bocardo and Dyra did not say or do anything to suggest that Ricardo or Gutierrez identify Velez from the array. *See* R. 324 (Pl.'s Resp. CPDSOF) ¶¶ 85–87. On March 26, Ricardo and Gutierrez both identified Velez from the lineup. CPDSOF ¶¶ 102–03; Ricardo Dep. Tr. at 110:1–111:3, 293:17–21; R. 302-4 at Q-129:4–130:4, Q-132:11–15.

### 4. Sheriffs' Detectives Investigate Izquierdo Cemetery Shooting

On March 21 (two days after Hueneca's murder), Velez's then-18-year-old girlfriend, Christina Izquierdo—at the time, four months pregnant with Velez's child—was shot at a cemetery in Worth Township and hospitalized. R. 312 (CCSSOF) ¶¶ 17–18, 20; CCSSOF Exh. A at 53:3–9; CCSSOF Exh. C at CITY000097–099; CCSSOF Exh. F at 19:4–20:6. It is disputed why Izquierdo was visiting the cemetery. The Chicago Officers contend that Izquierdo was visiting the grave of Velez's uncle, Gent

8

Velez, who had been killed on March 23, 2000, but Velez contends that Izquierdo went to the cemetery to accompany her friends, who were visiting their friend's grave for his birthday. CPDSOF ¶ 78; CPD's Resp. PSOAF ¶ 33; *Compare* R. 325-27 (Izquierdo Dep. Tr.) at 12:19–14:2, 72:24–73:6, 166:5–167:10 and Velez Dep. Tr. at 123:1–124:1 *with* R. 302-29 (Goldish Dep. Tr.) at 212:23–213:25 and R. 302-32 (Izquierdo Statement) at CITY000102.

Cook County Sheriff Detectives Davis and Sullivan were assigned to investigate the cemetery shooting. CCSSOF ¶ 21; CCSSOF Exh. B at 93:22–24. Davis and Sullivan have both testified that they do not recall investigating the cemetery shooting at all. CCSSOF ¶ 24; CCSSOF Exh. A (Davis Dep. Tr.) at 53:23–54:1; CCSSOF Exh. B (Sullivan Dep. Tr.) at 95:12–19, 96:15–23.

It is also disputed whether Davis and Sullivan interviewed Izquierdo at the hospital at all. The Chicago Officers and the Sherriff Detectives maintain that, on or around March 25, Officers Bocardo and Dyra spoke with Detectives Davis and Sullivan about the cemetery shooting investigation. CCSSOF ¶ 37; CCSR at 14; Bocardo Dep. Tr. at 248:22–250:8; CPDSOF ¶¶ 93–94; Dyra Dep. Tr. at 229:4–8. The Chicago Officers and the Sherriff Detectives contend that Davis and Sullivan told Bocardo and Dyra that they had interviewed Izquierdo at the hospital; Izquierdo had been cooperating with the detectives until Velez entered the room; Velez and Izquierdo then spoke with one another in Spanish; and a nurse later translated the conversation to the detectives, relaying that Velez told Izquierdo that she had been shot because of something that he (Velez) had done on an earlier date. CPDSOF ¶¶ 93–94;

CCSSOF ¶ 38; CCSR at 14; Bocardo Dep. Tr. at 248:22–250:8; Dyra Dep. Tr. at 228:3–22, 229:4–230:3. Bocardo and Dyra documented their conversation with Davis and Sullivan in the CCSR, and Sullivan faxed a preliminary report on the cemetery shooting to Bocardo. CCSSOF ¶¶ 38–39; Sullivan Dep. Tr. at 109:6–18; CCSR at 14. The report did not mention Davis and Sullivan's interview with Izquierdo, nor what the nurse said. PSOAF ¶ 51; *see* R. 337-5.

Velez asserts, though, that Davis and Sullivan did not interview Izquierdo at the hospital and that Velez did not tell Izquierdo that she had gotten shot because of something that he had done. Likewise, Izquierdo has denied that police officers came to speak with her at the hospital and that any police officers were present during her talk with Velez at the hospital. PSOAF ¶ 49; Izquierdo Dep. Tr. at 23:24–24:2, 31:4–12. Both Izquierdo and Velez have denied that Velez made any damning statement in the hospital. Velez testified that he only apologized to Izquierdo in the hospital because he believed that he put her in danger by being in a gang, not because he himself had done something days earlier. PSOAF ¶¶ 44, 46–47; Velez Dep. Tr. at 181:4–14, 192:20–195:14; *see also* Izquierdo Dep. Tr. at 25:6–26:21, 47:2–50:14 ("Q. And just to be clear: [Velez] never said it was his fault because of something that he had done … to the other side, or something like that? … A. No. He never said that.") (alterations omitted).

### 5. Bocardo and Goldish Interview of Izquierdo

**Bocardo Interview.** According to Izquierdo, on March 26 (one week after the murder), Bocardo and Dyra interviewed her at a friend's house about the cemetery

10

shooting. PSOAF ¶ 54; Izquierdo Dep. Tr. 31:1–15. Izquierdo testified that at this interview, Bocardo and Dyra showed her photographs of "random" men and, at some point, told Izquierdo, "Are you going to tell us the truth, or are you going to put on your shoes and walk out with us now?" PSOAF ¶ 55; Izquierdo Dep. Tr. at 31:18–32:18. According to Izquierdo, when she denied knowing what they meant, one of the detectives told her to come with them to the station. PSOAF ¶ 55; Izquierdo Dep. Tr. at 32:8–33:7.

Bocardo then interviewed Izquierdo at Area 4. During this interview, Izquierdo denied any knowledge about Hueneca's murder and denied that Velez told her at the hospital about why she was shot, but admitted Velez was a member of the Satan Disciples and that Latin King members shot her at the cemetery. Pl.'s Resp. CPDSOF ¶ 106; CCSR at 15; Izquierdo Dep. Tr. at 243:6–8.

The parties dispute the underlying circumstances of the interview.[4] Velez alleges that Izquierdo (pregnant and with a days-old gunshot injury) was left in a small room with a metal bench for a long time before Bocardo arrived; Bocardo refused to allow her to use the bathroom, resulting in Izquierdo urinating on herself; Izquierdo was refused phone calls, locked in the room, not offered food, denied pain medication and could not change her bandage despite her bleeding from her wound; and she was

---

[4]The Chicago Officers argue that the circumstances of this interview do not create a fact dispute relevant to their motion because it is undisputed that Izquierdo did not make any incriminating statements about Velez during the Bocardo interview. CPD's Resp. PSOAF ¶ 57. But the facts of the circumstances are relevant because, as Velez contends, Bocardo's interactions with Izquierdo during this interview arguably caused her to ultimately sign the allegedly fabricated handwritten statement implicating Velez.

not allowed to leave. PSOAF ¶¶ 57–59; Izquierdo Dep. Tr. at 38:18–40:7, 42:13–43:11, 51:4–53:23, 62:12–63:9, 85:8–20, 231:19–232:12; R. 325-43 at Q201:4–202:1.

Velez contends that Bocardo told Izquierdo that "[Velez] had killed someone" and told her to say that Velez admitted to her that she had gotten shot because of something he had done. PSOAF ¶ 58; Izquierdo Dep. Tr. at 45:20–46:14. Izquierdo testified that she told Bocardo that Velez did not tell her that. PSOAF ¶ 58; Izquierdo Dep. Tr. at 46:8–14. According to Izquierdo, when she told Bocardo she would not say that Velez confessed to her, Bocardo told her that if she did not make the statement (to the "people outside waiting for [her]"), he would call the Department of Children and Family Services (DCFS) to take her daughter away, but if she did say Velez confessed, she could go home and he would not call DCFS to take away her daughter. PSOAF ¶¶ 61–63; Izquierdo Dep. Tr. at 46:8–14, 55:10–59:15. Izquierdo testified that when Bocardo told her this, she said "okay" because she "didn't want them to take away [her] daughter [and] wanted to go home." Izquierdo Dep. Tr. at 59:1–15.

In contrast, the Chicago Officers maintain that Izquierdo was put in a large office with a comfortable chair; offered food and water; and not kept in the room involuntarily. CPD's Resps. PSOAF ¶¶ 56–57; Goldish Dep. Tr. at 70:5–12, 194:6–13 (testifying that Izquierdo made no complaints about pain), 214:10–22, 217:13–218:17; Bocardo Dep. Tr. at 240:12–241:13 (testifying that Bocardo told Izquierdo that she could use the restroom, told her to let him know if she needed anything to eat or drink, and that she was able to leave if she wanted); R. 302-31 at T-109:7–12. Bocardo

12

denies telling Izquierdo that he would contact DCFS if she did not say Velez confessed. CPD's Resp. PSOAF ¶ 63; Bocardo Dep. Tr. at 256:16–22.

**ASA Goldish.** After interviewing Izquierdo, Bocardo requested a Felony Review Assistant State's Attorney come to Area 4; Goldish arrived that same night. CPDSOF ¶ 107; R. 302-14 at T-38:5–12. Goldish testified that upon arrival, she spoke to Kato about the investigation and read the officers' reports. R. 316 (GSOF) ¶ 6; PSOAF ¶ 107; Goldish Dep. Tr. at 57:1–25, 58: 1–14 (testifying that she does not recall specifically speaking with Kato but that she did speak with him); R. 302-21 (Kato Dep. Tr.) at 156:2–5. It is disputed to what extent Goldish interviewed Izquierdo in front of Bocardo; the Chicago Officers contend that at some point Goldish interviewed Izquierdo alone, but Velez contends that Bocardo was there the entire time. Pl.'s Resp. CPDSOF ¶ 113; Goldish Dep. Tr. at 135:22–24, 188:14–189:23, 217:13–15; Izquierdo Dep. Tr. at 261:7–15.

It is undisputed that at the interview with Goldish, Izquierdo signed a handwritten statement saying that Izquierdo went to the cemetery to visit Gent Velez's grave; after she had been shot, she spoke with Velez at the hospital; Velez told her that she had gotten shot because the Sunday before, he went to 21st and Marshall and "shot one of the Kings" because "the Kings had killed [Gent Velez]." CPDSOF ¶ 114; Izquierdo Statement at CITY000103–104. The statement said that Izquierdo was not threatened or coerced into making it. Izquierdo Statement at CITY000104. Izquierdo denies that these statements came from her and are true. PSOAF ¶ 72; Izquierdo Dep. Tr. at 66:5–67:3, 72:6–73:6 (testifying that she did not know who Gent

13

Velez was), 79:20–81:3 (denying that Velez told her he shot a Latin King member to avenge the death of Gent Velez), 86:1–11.

Velez and Goldish give contrasting accounts of the interview. Velez contends that Goldish delayed interviewing Izquierdo until around 4 a.m., despite knowing that Izquierdo was pregnant and was suffering from recent gunshot wounds. PSOAF ¶¶ 64, 67; Izquierdo Statement at CITY000100; Izquierdo Dep. Tr. at 33:19–34:6, 53:2–4; Goldish Dep. Tr. at 68:4–10, 188:22–189:4, 192:18–23, 196:8–16. Velez alleges that Goldish did not introduce herself as an ASA to Izquierdo, and Izquierdo did not know that Goldish was an ASA, believing her to be a secretary. R. 323, Velez Resp. to GSOF ¶ 45; Izquierdo Dep. Tr. at 66:12–67:3. Velez alleges that when Izquierdo entered the room, Goldish was already writing the statement; Izquierdo testified that when she entered the room to be interviewed, Goldish gave her name and then immediately told Izquierdo, "Okay. I'm going to write this down. And I just need you to sign here, and you can go home." PSOAF ¶ 68; Izquierdo Dep. Tr. at 60:14–61:3, 257:17–22. Izquierdo testified that she stood during the entire interview and told Goldish that her back hurt and that she had urinated on herself because she was refused the restroom, to which Goldish just said "okay" and kept writing the statement. PSOAF ¶¶ 70–71; Izquierdo Dep. Tr. at 254:15–255:1, 262:8–10, 265:1–22, 266:2–10. Izquierdo testified that at the interview, she asked Bocardo if she could "go home after this" and he replied, "Yes, after you sign it [the statement]." Izquierdo Dep. Tr. at 260:13–24, 267:13–15 (she "pretty much had to [sign the statement] so [she] could leave").

14

Goldish contends, however, that Izquierdo was forthcoming and conversational, and never asked to go home during the interview. Goldish Dep. Tr. at 211:7–16, 214:7–216:13, 220:5–18. Goldish contends that she introduced herself to Izquierdo as an ASA, and that Izquierdo told Goldish that "she knew who [Goldish] was." GSOF ¶ 45; Goldish Dep. Tr. at 190:4–13. Goldish has testified that the signed statement came directly from Izquierdo and that Goldish did not start writing it until around half an hour after talking with Izquierdo. R. 347 (Goldish's Resp. PSOAF) ¶¶ 68, 72; Goldish Dep. Tr. at 190:1–191:25, 212:19–22. Goldish and the Chicago Officers contend that Goldish just summarized what Izquierdo had told her into the statement. Goldish's Resps. PSOAF ¶¶ 68, 72; CPDSOF ¶ 113; Bocardo Dep. Tr. at 242:20–243:4; Goldish Dep. Tr. at 198:25–201:3, 212:19–22; R. 302-35 at Q-180:17–20; R. 302-31 at T-112:24–113:15, T-138:21–23. Goldish testified that Izquierdo never complained to her about mistreatment by the police, nor of being in discomfort or pain, and was sitting in a large, reclining chair at the interview, not standing. GSOF ¶¶ 47–48; Goldish's Resps. PSOAF ¶¶ 70–72, 75; Goldish Dep. Tr. at 191:19–25, 194:6–13, 214:7–216:13, 217:13–218:21; R. 302-31 at T-109:7–12, T-140:13–24.

After the interview, Goldish recommended to her supervisor that murder charges be brought against Velez. Her supervisor approved, and Velez was later charged with first-degree murder. CPDSOF ¶ 115; Goldish Dep. Tr. at 225:11–226:14, 234:5–25; R. 302-62 at T-270; R. 302-54.

15

### 6. The Velez Statement

On March 25, 2001, Bocardo, Dyra, Kato, and Cirone arrested Velez for Huenca's murder. CPDSOF ¶ 89; R. 302-14 at T-21:5–18; Bocardo Dep. Tr. at 158:20–159:3. Bocardo and Dyra wrote the supplementary CCSR, which contains a statement from Velez (Velez Statement). CPD's Resp. PSOAF ¶ 78; Dyra Dep. Tr. at 252:20–254:11; CCSR at 14. The Velez Statement says that Velez did not recall his whereabouts on the night of the murder; he and Izquierdo went to the cemetery to visit Gent Velez's grave; and he believes that the Latin Kings shot and killed Gent Velez and also shot Izquierdo. CCSR at 14.

Velez disputes the statement's accuracy (and that it came from him), including denying that he said that Izquierdo went to the cemetery to visit Gent Velez's grave; that Gent Velez was a Satan Disciples member; Latin Kings killed Gent Velez; and he could not recall his whereabouts the night of the murder. PSOAF ¶ 79; Velez Dep. Tr. at 123:1–18, 127:2–128:18, 134:14–135:7, 159:10–17, 318:1–22; Izquierdo Dep. Tr. at 13:8–14:14, 27:2–4. According to Velez, when asked where he was the night of the murder, he said he wanted a lawyer; Velez contends that he refused to answer questions and told the officers he did not know what they were talking about. PSOAF ¶¶ 79, 81; Velez Dep. Tr. at 316:15–319:13. Velez recalls that an older gentlemen (positioned in front of Kato) brought in photos of Gent Velez and told Velez, "This is why you did it." PSOAF ¶ 83; Velez Dep. Tr. at 313:10–316:16. The Chicago Officers assert, however, that the statement came directly from Velez and Velez brought up

the shooting of Izquierdo on his own. CPD's Resps. PSOAF ¶¶ 79–81, 83; Bocardo Dep. Tr. at 243:14–244:9.

## C. Sentence and Vacatur

At the state court trial, the State argued that Velez murdered Hueneca in a gang-retaliation shooting to avenge the murder of his uncle, Gent Velez. CPDSOF ¶ 120; R. 302-33 at Q-7:1–20. Mejia, Ricardo, and Gutierrez identified Velez at trial as the man who threatened them before the shooting. CPDSOF ¶ 123; R. 302-3 at R-134:16–20, R-149:15–150:5; R. 302-4 at Q-103:20–104:5, Q-124:5–20; R. 302-5 at R-198:19–199:2, R-201:2–15. Bocardo testified at trial that Mejia identified the photo of Velez on his clipboard. CPDSOF ¶ 126; R. 302-14 at T-16:10–18:16, T-91:6–93:20. Also, at trial, Izquierdo recanted her written statement and testified that Goldish had not prepared it in her presence. CPDSOF ¶ 128; R. 302-35 at Q-182:24–184:13, Q-198:20–24, Q-233:15–234:15. During closing arguments, the State told the jury to re-call Velez's confession in the hospital and to consider Izquierdo's statement as an admission that Velez murdered Hueneca. CPDSOF ¶ 130; R. 302-40 at T-209:4–9, T-175:24–176:6 ("What did [Velez] tell Cristina when he was at the hospital with her just two days after this? That this was all his fault because he killed the King on Marshall and 21st Street, and he did it because Latin Kings killed his uncle, Gent Velez, Snaky, the year before.").

On October 15, 2002, a jury found Velez guilty of first-degree murder. CPDSOF ¶ 132; R. 302-62 at T-270:12–22. In mid-December 2002, Velez was sentenced to 55

years in prison for the murder, and an additional 25 years because the jury found Velez had used a firearm to kill Hueneca. CPDSOF ¶ 132; R. 302-46 at W-36:4–14.

Velez later pursued post-conviction relief. Around 15 years later, on December 11, 2017, at post-conviction proceedings, an ASA informed the court that the State found "there were some constitutional violations that occurred at the trial" and agreed to post-conviction relief. CPDSOF ¶ 139; R. 302-37 at 2–3. The State told the court it would not be retrying Velez and made an oral motion to dismiss the case. CPDSOF ¶ 139; R. 302-37 at 2–3. That same day, an order was entered vacating Velez's conviction and sentences. CPDSOF ¶ 139; R. 302-38.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And again, in evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are

entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. The Chicago Officers

For the reasons explained below, the Chicago Officers' motion is granted in part, denied in part.

### 1. Individual Officers' Participation in the Investigation

Velez concedes that summary judgment should be granted to Chicago Police Officers Patrick O'Donovan, Bradul Ortiz, Michael Walsh, Victor Perez, D. Wolverton, A. Jaglowski, Sergeant Denis Walsh, and Lieutenant John Farrell. *See* R. 331 (Pl.'s Resp. Defs.' Mot. Summ. J.) at 2 n.1. With that concession in place, the Court grants summary judgment on all claims against those defendants, and the claims against them are dismissed with prejudice.

The claims against Bocardo, Dyra, Cruz, Cirone, and Kato remain at issue. It is undisputed that Bocardo had sufficient involvement in the alleged claims to be personally liable if the claims otherwise survive, but Dyra, Cruz, Cirone, and Kato argue that they lack the requisite personal involvement in the underlying events. R. 352 (CPD Reply) at 13, 16, 34; *see Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) ("Individual liability under § 1983 requires personal involvement in the

19

alleged constitutional deprivation … A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.") (cleaned up).[5]

**Dyra.** Giving the benefit of reasonable inferences to Velez, a jury could reasonably find that Dyra had sufficient personal involvement in the alleged fabrication of the Velez Statement and the Velez hospital statement. It is undisputed that Dyra and Bocardo wrote the CCSR containing Velez's hospital statement and the Velez Statement. CPD's Resp. PSOAF ¶ 78; Dyra Dep. Tr. at 252:20–254:11; CCSR at 14. The Chicago Officers contend that Cook County Detectives Davis and Sullivan told Dyra and Bocardo about Velez's admission to Izquierdo in the hospital, an admission that Velez claims was fabricated by Bocardo and Dyra, or Davis or Sullivan, or both sets of officers. CPDSOF ¶¶ 93–94; CCSSOF ¶ 38; CCSR at 14; Bocardo Dep. Tr. at 248:22–250:8; Dyra Dep. Tr. at 228:3–22, 229:4–230:3. In any event, with regard to personal involvement, it is undisputed that Bocardo and Dyra were the ones who documented the allegedly fabricated hospital confession and the Velez Statement in the CCSR. CCSSOF ¶¶ 38–39; CCSR at 14.

Beyond the allegedly fabricated hospital statement, it is true that Velez does not point to direct evidence that Dyra was involved in the Mejia identifications. The alleged clipboard identification occurred with, at most, Bocardo; and Dyra was not in the room with Mejia when Bocardo allegedly told him to pick Velez from the lineup.

---

[5]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

*See* CPDSOF ¶ 99; Dyra Dep. Tr. at 153:1–6. Having said that, a jury could reasonably infer that Dyra acted with the other officers to fabricate the case against Velez, because otherwise the jury would have to find that each set of officers fabricated evidence with the other set somehow not knowing. Frame-ups like that would be extremely risky, because the pieces of fabricated evidence could contradict or undermine each other if the officers did not work together. Given Dyra's alleged direct involvement with the Velez Statement and Velez's alleged hospital statement, he had sufficient personal involvement—as an alleged conspirator—in the identifications too.

**Cirone.** A reasonable jury could find that Cirone had sufficient personal involvement with the Mejia lineup identification to support the failure to intervene claim. Velez contends that Cirone was present, right there, when Bocardo allegedly told Mejia to pick out Velez from the lineup. PSOAF ¶¶ 10–13, 15; Mejia Dep. Tr. at 53:14–54:23; Cirone Dep. Tr. at 16:7–9, 147:6–24. The record allows a jury to reasonably find that Cirone failed to intervene in the alleged fabrication of the Mejia lineup identification. At the same time, however, the record does not allow a reasonable jury to find that Cirone fabricated the identification *himself*. Velez also fails to specify how Cirone was involved in the allegedly fabricated Mejia clipboard identification, the Velez Statement, and the Izquierdo Statement. For these reasons, the § 1983 direct claims against Cirone are dismissed, and only the failure to intervene claim as to the Mejia lineup identification survives.

**Kato.** Velez does not specify how Kato was involved in the allegedly fabricated Mejia clipboard identification, Velez Statement, or Izquierdo Statement. But there is a genuine fact dispute over whether Kato was present during Velez's interview where another officer told Velez that he killed Hueneca because Gent Velez was killed. PSOAF ¶ 83; *Compare* Velez Dep. Tr. at 313:10–316:14 *with* Dyra Dep. Tr. at 223:12–18, Kato Dep. Tr. at 22:22–23:4, 101:15–24. For this reason, like with Cirone, the § 1983 direct claims against Kato are dismissed except for the failure to intervene claim as to the Velez Statement.

**Cruz.** Velez focuses on Cruz's handling of the crime scene. *See* Pl.'s Resps. CPDSOF ¶¶ 47–49 (stating that Cruz did not initiate a diagram of the scene, make measurements of evidence, collect results of the witness canvas, and that Cruz's "rapid absence from the scene precluded any possibility for additional photographs to be taken, locating further witnesses to be interviewed, or any other immediate follow up"). But the events giving rise to the § 1983 claims (that is, the events that caused the conviction and sentence) are premised on alleged fabrication of witness interviews and statements, as well as withholding evidence—but not on how the crime scene was handled or mishandled. It is undisputed that after Cruz worked the crime scene, other detectives followed up on the case. Pl.'s Resp. CPDSOF ¶ 49. Because there is insufficient evidence in the record from which a reasonable jury could find Cruz had sufficient personal involvement, all claims against Cruz are dismissed with prejudice. *See Colbert*, 851 F.3d at 657.

22

## 2. Fabrication of Evidence

Velez alleges that the Chicago Officers violated his due process rights by fabricating evidence against him (Count 1). R. 91 (Compl.) ¶¶ 109–14. The allegedly fabricated evidence includes the Velez Statement; the Velez hospital statement; the Mejia clipboard identification; Mejia's lineup identification; and the Izquierdo Statement. Pl.'s Resp. Defs.' Mot. Summ. J. at 13–14. As detailed below, summary judgment is denied on the fabrication claim as to Bocardo and Dyra because there is a genuine issue for trial on whether they fabricated the Izquierdo Statement, the Velez Statement, and Mejia's identifications (both clipboard and lineup). (It is worth mentioning that there is apparently no dispute that Ricardo and Gutierrez identified Velez.).

"Law enforcement officers may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 344 (7th Cir. 2019) (cleaned up). "Using false evidence to convict violates a defendant's right to a fair trial guaranteed by the Fourteenth Amendment's Due Process Clause." *Id.* Accordingly, the Seventh Circuit has "consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012). To establish a fabrication claim, a plaintiff must show that a defendant "created evidence that they knew to be false." *Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) (cleaned up). "Knowledge and intent must often be proven by circumstantial

evidence." *Stinson v. Gauger*, 868 F.3d 516, 527 (7th Cir. 2017) (cleaned up). At summary judgment, a plaintiff "need not have a smoking gun or an admission to prove knowledge"; a plaintiff need only offer "sufficient evidence from which a reasonable jury could find that the Individual Defendants knew the evidence they were eliciting was false." *Gray v. City of Chicago*, 2022 WL 910601, at *10 (N.D. Ill. Mar. 29, 2022).

At this stage, in evaluating the fabrication claim, the Court will consider the alleged fabricated evidence in the aggregate. *See Goudy v. Cummings*, 922 F.3d 834, 843–44 (7th Cir. 2019); *Washington v. Boudreau*, 2022 WL 4599708, at *20 (N.D. Ill. Sept. 30, 2022) (noting addressing the bases of fabrication claim individually was unnecessary because courts look at plaintiff's § 1983 "allegations as a whole, not the disaggregated bases") (cleaned up). In *Goudy*, the Seventh Circuit explained it would be premature at the summary judgment stage to dismiss due process claims against a defendant who was only personally responsible for the suppression of some material, but not others. 922 F.3d at 843. This is because the plaintiff brought "a single claim based on one overarching constitutional harm: that he was deprived of a fair trial in violation of his due process rights" and alleged that individual defendants contributed to that constitutional injury in different ways. *Id.* ("Section 1983 liability must be understood against the background of the ordinary principles of tort law, where joint and several liability is the norm."). The Seventh Circuit concluded that, generally speaking, it was for a jury to decide whether the defendant's alleged wrongs (for which he was personally responsible) was enough to undermine confidence in the verdict. *Id.*

24

Like the plaintiff in *Goudy*, Velez brings a single fabrication claim based on an overarching injury (the conviction and sentence), and alleges that Bocardo and Dyra contributed to that harm in different ways. So the Court considers the fabrication allegations as a whole (though even an individualized assessment of each basis of the fabrication claim shows why summary judgement cannot be granted here).

Velez has presented enough to go to trial on the fabrication claim against Bocardo and Dyra. This is a close call, because (as noted earlier) there is no record evidence to believe that Bocardo and Dyra said or did anything to suggest that Ricardo or Gutierrez identify Velez from the photo array. Pl.'s Resps. CPDSOF ¶¶ 85–87. Still, viewing the alleged fabrication in the aggregate, a jury could reasonably find that the Velez Statement, the Mejia identifications, and the Izquierdo Statement were fabricated and caused the conviction.

- **Velez Statement.** Giving reasonable inferences to Velez, a jury could reasonably find that Bocardo and Dyra fabricated Velez's Statement based on Velez's own testimony that the statement was inaccurate and did not come from him; he refused to answer questions in his interview; he asked for a lawyer in lieu of answering questions; and an older officer (in front of Kato) insisted to Velez that Velez killed Hueneca to avenge his uncle's murder. PSOAF ¶¶ 79, 81, 83; *Compare* CCSR at 14 *with* Velez Dep. Tr. at 123:1–18, 127:2–128:18, 134:14–135:7, 313:10–319:13; Izquierdo Dep. Tr. at 13:8–14:14, 27:2–4. Velez's assertions clash with the Chicago Officers', who allege that the statement came directly from Velez, Velez brought up the shooting

25

of Izquierdo on his own, and he did not refuse to answer questions. *See* CPD's Resps. PSOAF ¶¶ 79–81, 83; Bocardo Dep. Tr. at 243:14–244:9; CCSR at 14.

- **Mejia clipboard identification.** There is a genuine dispute about Mejia's clipboard identification, which is another reason why summary judgment on the fabrication claim cannot be granted. Velez contends that the entire clipboard identification is a lie created to justify putting him in the lineup for the Hueneca investigation. Velez points out that, most importantly, Mejia has testified that he did *not* view Velez's photograph on Bocardo's clipboard, but instead identified the man who had held him and his friends at gunpoint in a gang book with many photos. PSOAF ¶¶ 18–19; Mejia Dep. Tr. at 48:4–49:13, 57:12–58:24, 90:4–91:5, 104:24–108:12. Velez emphasizes that Mejia has testified that he lied at Velez's trial when he denied looking through a gang book. PSOAF ¶ 18; Mejia Dep. Tr. at 57:12–58:24, 90:4–91:5, 93:22–94:10, 104:24–108:12; R. 337-2 (GPR notes on Mejia interview lacking alleged clipboard identification). In contrast, the Chicago Officers assert that the clipboard identification really happened. CPDSOF ¶¶ 74–75; Bocardo Dep. Tr. at 219:18–221:15, 225:22–226:8; CCSR at 13.

- **Mejia lineup identification.** Giving reasonable inferences to Velez, a reasonable jury could find that Mejia initially identified a photograph of someone other than Velez, but Bocardo still told Mejia to select Velez from the lineup when Mejia said that he did not recognize anyone in the lineup. *See*

PSOAF ¶¶ 9–13, 18; Mejia Dep. Tr. at 51:24–54:23. Velez's allegations on the lineup identification clash with the Chicago Officers', who deny that Bocardo told Mejia to identify Velez from the lineup or that Mejia told Bocardo that he did not recognize the offender in the lineup. CPD's Resps. PSOAF ¶¶ 10–12; Bocardo Dep. Tr. at 270:14–21; Cirone Dep. Tr. at 147:6–24 (testifying that Mejia made an immediate identification of Velez in the lineup).

- **Izquierdo Statement.** Drawing all reasonable inferences in Velez's favor, a reasonable jury could find that Bocardo fabricated Izquierdo's statement. Velez contends that Bocardo threatened to take away Izquierdo's child (via DCFS) if she did not say that Velez confessed to her, and that Bocardo told Izquierdo during the interview (with Goldish) that she could go home after she signed the statement. *See* PSOAF ¶¶ 61–63; Izquierdo Dep. Tr. at 46:8–14, 55:10–59:15, 260:13–24, 267:13–15 (testifying that she "pretty much had to [sign the statement] so [she] could leave"). Bocardo denies these allegations. CPD's Resp. PSOAF ¶ 63; Bocardo Dep. Tr. at 242:20–243:4, 256:16–22. Given Izquierdo's testimony, Velez presents sufficient evidence on Bocardo's role in allegedly fabricating the Izquierdo Statement.

As the listing of disputes shows, Velez and the Chicago Officers present divergent accounts on the allegedly fabricated evidence, creating fact questions properly reserved for a jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge."); *Hackett v. City of South Bend*, 956 F.3d 504, 507 (7th Cir. 2020) ("In fact-intensive cases, credibility traps abound, and courts must be alert to avoid them."). There is a genuine fact dispute on whether Bocardo and Dyra had knowledge of the alleged fabrication. Velez alleges, among other things, that Bocardo made up the clipboard identification; Bocardo told Mejia to select Velez from the lineup despite Mejia allegedly identifying someone other than Velez before to Bocardo; and that the Velez Statement did not come from Velez, but rather Bocardo and Dyra. The evidence presented is sufficient for the knowledge requirement at this stage. *Stinson*, 868 F.3d at 527 (circumstantial evidence sufficient to prove knowledge and intent).

The Chicago Officers argue that Velez is just repackaging a claim for an unduly suggestive identification or coercion into a fabrication claim. But "there is a difference between fabricated evidence, which is necessarily untrue, and evidence obtained through coercion, which may be true." *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1156 (N.D. Ill. 2022); *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (explaining that coerced testimony may still be helpful to jury so long as coercive methods are disclosed but "the same cannot be said for fabricated evidence, [which] will *never* help a jury perform its essential truth-seeking function.") (cleaned up) (emphasis in original). The events alleged here are properly considered as part of a fabrication claim. For example, Velez and Izquierdo both assert that their statements did not come from them, but rather were fabricated by the Chicago Officers. And Velez does not argue the Mejia clipboard identification was coercion—Velez's argument

28

is that the identification never happened at all. So Velez's allegations do not involve solely coercion, but instead allege the manufacturing of false confessions, inculpatory statements, and identifications. *See Phillips v. City of Chicago*, 2018 WL 1309881, at *26 (N.D. Ill. Mar. 13, 2018) (denying summary judgment on fabrication claim where evidence—plaintiffs testifying that police gave them pre-written stories, urged them to adopt the stories, and coached them to memorize the stories' details—"suggest[ed] a calculated effort to weave a complex narrative out of whole cloth").

The Chicago Officers unpersuasively argue that certain pieces of potential evidence—the CCSR; testimony about the discussion between Bocardo, Dyra, Davis, and Sullivan; and police reports documenting the Mejia identifications—were not used against Velez at the state court trial. It is true that the Seventh Circuit has "consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." *Whitlock*, 682 F.3d at 580. But here, although the CCSR, the discussion amongst Bocardo, Dyra, Davis, and Sullivan, and the police reports about the Mejia identifications may not have been admitted into evidence, the alleged fabrications (the Mejia identifications themselves, Izquierdo Statement,[6] hospital statement) were used at trial against Velez. *Taylor v. City of Chicago*, 2021 WL 4401528, at *7 (N.D. Ill. Sept. 27, 2021) (holding that a police report was used against

---

[6]The Court rejects the Chicago Officers' argument that the Izquierdo Statement is not actionable due to it being inadmissible. The Statement was admitted at Velez's trial and was admissible as impeachment evidence.

defendant at trial where the contents of the fabricated report were used at trial). Indeed, Velez's alleged hospital statement (contained in the CCSR) and Mejia's lineup and clipboard identifications were explicitly testified about at the trial. *See, e.g.,* R. 302-14 at T-16:10–18:21, T-34:18–35:1, T-91:11–94:7 (Bocardo testifying at trial about Mejia's clipboard and lineup identifications); R. 302-3 at R-144:19–146:16, R-153:1–154:1, R-171:2–172:14 (Mejia trial testimony on clipboard and lineup identifications); R. 302-35 at 177:3–179:17, 181:1–184:12, 195:3–8 (Izquierdo testifying about hospital confession and statement); R. 302-40 at T-175:24–176:6, T-209:4–9 (prosecution citing alleged hospital confession as motive evidence and an admission of murder in closing argument).

Lastly, the Chicago Officers argue that the Izquierdo Statement was not material given the other evidence of guilt, citing the Mejia, Ricardo, Rivera, and Gutierrez's identifications. But a reasonable jury could find the statement was material because it provided important motive evidence and arguably could be considered a damning admission by Velez. Giving reasonable inferences to Velez, a reasonable jury could especially find that the Mejia identifications were material, and indeed the trial evidence was arguably closely balanced. *See* R. 302-40 at T-175:24–176:6, T-209:4–9; R. 325-35 at T254:9–15 (jury stating that they reached "a state of impasse" due to "fundamental disagreements"); *Myvett v. Chicago Police Detective Edward Heerdt*, 232 F. Supp. 3d 1005, 1022 (N.D. Ill. 2017).

In sum, a reasonable jury could find that Bocardo and Dyra deliberately manufactured the alleged fabricated evidence (including fabricating the grounds to

pursue Velez as a suspect), and that the fabrication proximately caused Velez's conviction and imprisonment. Summary judgment is denied on the fabrication claim as to Bocardo and Dyra.

### 3. *Brady*

Moving on, as detailed below, summary judgment is denied on the *Brady* claim (Count 2) against Bocardo based on the alleged suppression of Mejia's identifications—the photo that Mejia picked as the offender, that Mejia did not recognize anyone in the lineup as the offender, and Mejia's identification of someone else as the offender. But (as explained below) the Court rejects that the Ricardo, Gutierrez, and Rivera identifications, or the alleged notes or reports of the Rivera interview, support the *Brady* claim.

"Under *Brady*, the government violates its duty to produce exculpatory evidence when (1) the evidence at issue favors the defendant because it is either exculpatory or impeaching; (2) the government suppresses the evidence willfully or inadvertently; and (3) the suppression of the evidence results in prejudice." *United States v. Serfling*, 504 F.3d 672, 678 (7th Cir. 2007). Evidence is not suppressed if the defendant "knew of the evidence and could have obtained it through the exercise of reasonable diligence." *United States v. Walker*, 746 F.3d 300, 306 (7th Cir. 2014). Reasonable diligence, however, does not require defense counsel to seek evidence they "had no reason to believe existed." *Boss v. Pierce*, 263 F.3d 734, 743 (7th Cir. 2001).

*Brady* claims turn on the "cumulative effect of all such evidence suppressed by the government," not each piece of suppressed evidence in isolation. *Kyles v. Whitley*,

514 U.S. 419, 421 (1995); *Anderson*, 932 F.3d at 505 (7th Cir. 2019) ("Courts must assess the cumulative effect of all the suppressed evidence in the context of the entire record.") (cleaned up). Also, in considering prejudice, "the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434 (cleaned up).

In *Avery v. City of Milwaukee*, the Seventh Circuit approved the viability of a *Brady* claim based on coercive interrogations or fabricated evidence, reasoning that the accused could "impeach the coerced testimony by pointing to the tactics the officers used to extract it [giving] the jury a fair opportunity to find the truth." 847 F.3d 433, 439 (7th Cir. 2017) (cleaned up). The Seventh Circuit acknowledged that the criminal defendant (the later civil-rights plaintiff) knew that the informants' statements were false but did not know about the pressure tactics and inducements the detectives used to obtain them, and thus was denied impeachment evidence. *Id.* 435–36, 439, 443; *see also Anderson*, 932 F.3d at 506–07.

Here, Velez has presented sufficient evidence for the *Brady* claim to survive summary judgment as against Bocardo, who was involved in the alleged Mejia identifications. Velez argues that Mejia initially identified someone else's photograph as the person who threatened him and his friends with the gun, and that Bocardo did not disclose that identification, nor the photo Mejia picked, nor that Mejia did not recognize anyone in the lineup as the offender. PSOAF ¶¶ 4–9. This allegedly withheld evidence is impeachment evidence that, if disclosed, could have been used by

Velez at trial to not only attack Mejia's identifications but also the Chicago Officers' grounds for suspecting Velez in the first place. *See Fields v. Wharrie*, 672 F.3d 505, 517 (7th Cir. 2012) ("The constitutional violation occurs when the means by which the testimony was acquired are not disclosed at trial—or when other information that impeach the testimony's reliability are not shared with the defense."); *Avery*, 847 F.3d at 439 (*Brady* obligation covers disclosing facts about coercive tactics to obtain testimony to ensure the accused can impeach the coerced testimony). Drawing reasonable inferences in favor of Velez, a reasonable jury could find prejudice based on the failure to disclose Mejia's identification of someone else, Mejia's lack of recognition at the lineup, and the photo of someone else initially selected by Mejia.

Also, a reasonable jury could infer that Velez could not have obtained the withheld information about Mejia's identifications through reasonable diligence. Generally speaking, reasonable diligence does not require defense counsel to uncover fabricated witness identifications. *See Boss*, 263 F.3d at 740; *Jimenez v. City of Chicago*, 830 F.Supp.2d 432, 444–45 (N.D. Ill. 2011) ("Defendants' argument seems to assume the existence of a *Perry Mason*-like world in which prosecution witnesses readily give up impeaching information when interviewed or questioned by defense counsel …. Witnesses coerced or persuaded to testify in a particular way often tend to identify with, and to ally themselves with, their persuaders.").

It is worth noting that there is no genuine fact issue on whether the Chicago Officers withheld notes on the clipboard identification, because Velez fails to present sufficient evidence that these notes ever existed. Also, the Court need not address the

disclosure (or lack thereof) of the circumstances of the Izquierdo interview or Gent Velez's arrest autopsy report. Velez does not respond to the Chicago Officers' arguments on this point in his Response. *See* Pl.'s Resp. Defs.' Mot. SJ at 33 (defining *Brady* claim as based on Mejia identifying someone else, Bocardo pressuring Mejia to pick Velez, and the Rivera coercion). Those events cannot be part of the *Brady* claim at trial.

### 4. Intentional Infliction of Emotional Distress

Velez's claim for intentional infliction of emotional distress (Count 7) also survives summary judgment. For this claim, Velez must show "(1) that the conduct was extreme and outrageous, (2) that the actor intended that his conduct inflict severe emotional distress or knew that there was a high probability that his conduct would inflict such distress, and, (3) that the conduct in fact caused severe emotional distress." *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015) (citing *Schiller v. Mitchell*, 828 N.E.2d 323, 333 (Ill. App. Ct. 2005)). "For conduct to be extreme and outrageous, it must go beyond all bounds of decency and be considered intolerable in a civilized community." *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010) (cleaned up). "Courts analyze whether conduct is extreme and outrageous based on an objective standard taking into consideration the totality of the circumstances" and do not "look at each of the acts separately." *Parker v. Side by Side, Inc.*, 50 F. Supp. 3d 988, 1023 (N.D. Ill. 2014) (citing *Duffy v. Orlan Brook Condo. Owners' Ass'n*, 981 N.E.2d 1069, 1079 (Ill. App. Ct. 2012)); *Holder v. Ivanjack*, 39 F. Supp. 2d 965, 970 (N.D. Ill. 1999).

Courts also examine the "degree of power or authority the defendant holds over the plaintiff." *Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016).

Drawing inferences in Velez's favor, a reasonable jury could conclude that the remaining Chicago Officers' alleged acts were "extreme and outrageous." *See Washington*, 2022 WL 4599708, at *25 (explaining that other courts in this District have explained that "an average member in the community would consider it outrageous for police officers to falsely frame, arrest and imprison an innocent citizen") (cleaned up). Contrast the allegations here with those in *Cairel* where the court rejected an emotional-distress claim because the officers there did not use anything other than "ordinary interrogation tactics." 821 F.3d at 833. Here, Velez alleges (and the evidence supports at the summary judgment stage) that the Chicago Officers fabricated Velez's statement; fabricated an initial identification and told a witness to pick Velez in a lineup, despite that witness identifying someone else before; and coerced a witness to sign a fabricated statement. This alleged conduct goes beyond an "ordinary interrogation tactic." *Id.*; *see also Carroccia v. Anderson*, 249 F. Supp. 2d 1016, 1028 (N.D. Ill. 2003) ("If, as alleged, defendants fabricated false or misleading evidence of [plaintiff's] guilt or concealed exculpatory evidence from prosecutors, that behavior is sufficiently outrageous to support a claim for emotional distress.") (cleaned up); *Washington*, 2022 WL 4599708, at *25. If a jury is persuaded by Velez's evidence on the fabrication and *Brady* claims, then a jury may similarly find the Chicago Officers liable for emotional distress.

### 5. Deprivation of Liberty and Malicious Prosecution

Summary judgment is granted against Velez's claims for deprivation of liberty without probable cause and malicious prosecution (Counts 3 and 8) because there is not a genuine fact dispute that the Chicago Officers had probable cause to seize Velez. Probable cause precludes these claims.

"Probable cause is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014) (cleaned up). Probable cause exists "whenever an officer or a court has enough information to warrant a prudent person to believe criminal conduct has occurred." *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010). The probable cause standard is an objective one based on the facts known to the officers at the time of the seizure or arrest. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *Fox*, 600 F.3d at 834. "False statements and fabricated evidence cannot serve as the basis for probable cause." *Tucker v. Lally*, 2020 WL 60205, at *4 (N.D. Ill. Jan. 6, 2020).

Velez fails to present sufficient evidence from which a reasonable jury could find a lack of probable cause. Before Velez was arrested, at least two witnesses—Gutierrez and Ricardo—identified Velez in a photo array as the man who had threatened them with a gun shortly before Hueneca's murder. CPDSOF ¶¶ 84–87; R. 302-14 at T-19:12–21, T-20:20–21:1; R. 302-5 at R-198:13–24; Ricardo Dep. Tr. at 104:2–12, 105:8–106:8; R. 302-4 at Q-123:15–124:15, 126:21–127:3. Again, there is no genuine dispute that Ricardo or Gutierrez's identifications were fabricated or coerced—they were not. *See* Pl.'s Resps. to CPDSOF ¶¶ 84–87 (admitting Bocardo and Dyra "did not say or do anything to suggest Ricardo identify the photograph of Velez";

admitting there is no evidence that Bocardo or any other officer pressured or suggested to Gutierrez to identify Velez's photograph). "Probable cause can be based on a single identification from a credible eyewitness." *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015); *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000) ("[W]e have consistently held that an identification or a report from a single, credible victim or eyewitness can provide the basis for probable cause.").

And though it is true that the identifications occurred after the allegedly fabricated clipboard identification, the Chicago Officers still had probable cause based on the Gutierrez and Ricardo identifications predating Velez's arrest. *See Vaughn v. Chapman*, 662 F. App'x 464, 467 (7th Cir. 2016) ("Although Vaughn alleges that this evidence was the fruit of an illegal search of the car, this would not undermine its relevance to the question of probable cause."); *Nugent v. Hayes*, 88 F. Supp. 2d 862, 869 (N.D. Ill. 2000) ("Even excluding all of the evidence Mr. Nugent claims is tainted or concocted and including all of the evidence that Mr. Nugent believes is exculpatory, the remaining evidence and testimony establishes probable cause …."); *Cairel*, 821 F.3d at 834. Summary judgment is granted on Velez's deprivation of liberty claim against the Chicago Officers.

Because probable cause existed when the criminal complaint was filed, Velez's malicious prosecution claim also cannot survive summary judgment.[7] *See Martinez v. City of Chicago*, 900 F.3d 838, 849 (7th Cir. 2018) ("To state a claim for malicious

---

[7]The court need not address the CPD Officers' indicative of innocence point, given the dismissal on probable cause grounds.

prosecution under Illinois law, a plaintiff must allege that: (1) he was subjected to judicial proceedings; (2) for which there was no probable cause ....") (cleaned up); *Cairel*, 821 F.3d at 834. This claim too is dismissed.

### 6. Failure to Intervene

The Court grants summary judgment on the failure-to-intervene claim (Count 5) against Bocardo and Dyra, but but denies summary judgment on the failure-to-intervene claim against Cirone and Kato. To prevail on a failure-to-intervene claim, a plaintiff must show "that the Defendants (1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017); *see also Sanchez v. City of Chicago*, 700 F.3d 919, 928 (7th Cir. 2012) (explaining failure to intervene theory of liability is to hold Officer A liable for the wrongdoing of Officer B when Officer A has knowledge of the wrongdoing and ability to stop it).

A reasonable jury cannot find that Bocardo or Dyra failed to intervene because one cannot fail to intervene in one's *own* conduct. *See Thompson v. Vill. of Monee*, 2013 WL 3337801, at *13 (N.D. Ill. July 1, 2013) (dismissing failure-to-intervene claim with prejudice because officer-defendant "cannot possibly intervene to stop his own conduct"); *Rosario v. City of Chicago*, 2012 WL 1319806, at *9 n.2 (N.D. Ill. Apr. 17, 2012) (granting summary judgment on failure-to-intervene claim "because [officer] cannot be said to have failed to intervene in what [plaintiff] contends was his own conduct"). Velez argues Bocardo himself fabricated the Mejia clipboard story, Mejia's lineup identification, coerced Izquierdo (with Goldish) into signing a false

statement, and fabricated the Velez statement. A jury cannot reasonably infer Bocardo failed to intervene because the allegations concern Bocardo's own conduct. Same for Dyra. Velez alleges Dyra fabricated the contents of the CCSR, including the contents of the conversation with Davis and Sullivan about the hospital confession. Because Velez alleges Dyra himself fabricated and he fails to allege how Dyra had an opportunity to intervene in the other alleged fabrications, the failure-to-intervene claim against Dyra fails.

But a reasonable jury could find that Cirone and Kato failed to intervene. Velez alleges, with enough factual support, that Cirone was present when Bocardo allegedly told Mejia to pick Velez from the lineup after Mejia said he did not recognize anyone. CPDSOF ¶ 99; Bocardo Dep. Tr. at 270:22–24; Cirone Dep. Tr. at 16:7–9. And the record evidence supports a finding that Kato was present during Velez's interview when another officer told Velez that he killed Hueneca because Gent Velez was killed. PSOAF ¶ 83; Velez Dep. Tr. at 313:10–316:16. Drawing reasonable inferences in favor of Velez, a reasonable jury could find that Cirone and Kato knew that other officers were fabricating evidence (for example, Mejia allegedly told Bocardo that he did not recognize anyone in the lineup, and Velez alleges that Velez refused to answer questions). PSOAF ¶¶ 9, 79, 81; Mejia Dep. Tr. at 51:24–54:23; Velez Dep. Tr. at 316:15–319:13; *see Brown*, 633 F. Supp. 3d at 1168 (failure to intervene survives summary judgment where sufficient evidence detective knew one or more of his colleagues "were determined to extract [plaintiff's] confession without regards to protecting his constitutional rights and had an opportunity to warn them to stop"). The fact question

of identifying when Kato and Cirone could have intervened is reserved for the jury in the circumstances of this case. *Brown*, 633 F. Supp. 3d at 1168 (detective defendants worked together to interrogate witnesses and thus plaintiff does not "need to pinpoint a particular moment when each Detective Defendant could have stepped in" because that is a question for the factfinder).

### 7. Qualified Immunity

The Chicago Officers argue they are entitled to qualified immunity on the federal claims. The Court need not address qualified immunity for the liberty-deprivation claim, because that claim has been dismissed. Otherwise, the Chicago Officers are not entitled to qualified immunity on the federal claims.

"Two central questions must be addressed in the course of determining whether qualified immunity is available: whether the plaintiff has alleged a deprivation of a constitutional right at all, and whether the right at issue was clearly established at the time and under the circumstances presented." *Whitlock*, 682 F.3d at 580 (cleaned up). "There was and is no disputing that [fabricating evidence and withholding material exculpatory evidence] violates clearly established constitutional rights." *Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008); *see also Brown*, 633 F. Supp. 3d at 1154 (no qualified immunity on fabrication, coercive interrogation, or conspiracy claims because "it is beyond reasonable dispute that fabricating evidence and conspiring to frame a suspect violates an individual's constitutional rights").

Velez's due process rights were clearly established in 2001. *Newsome v. McCabe*, 256 F.3d 747, 752–53 (7th Cir. 2001) (holding that it was "clearly established

in 1979 and 1980 that police could not withhold from prosecutors exculpatory information about fingerprints and the conduct of a lineup"), *abrogated on other grounds by Manuel v. City of Joliet*, 580 U.S. 357 (2017); *Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014) ("[I]t was established law by 1985 (indeed long before), ... that a government lawyer's fabricating evidence against a criminal defendant was a violation of due process."); *Yang v. Hardin*, 37 F.3d 282, 285–86 (7th Cir. 1994) (officer who is present has duty to intervene to prevent other officers from infringing on the constitutional rights). And on the facts of this case, officers would know that fabricating witness statements, the accused's statements, and identifications would all violate the right to due process. Because Velez has enough evidence of constitutional-rights violations, (fabricating evidence and withholding exculpatory evidence), and those rights were clearly established in 2001, qualified immunity does not apply to the Chicago Officers here.

### 8. Conspiracy

The Chicago Officers seek summary judgment on Velez's federal and state conspiracy claims (Counts 4 and 10), arguing that there is no evidence of a conspiracy or agreement to violate Velez's rights in this case. "Because conspiracies are carried out in secret, direct proof of agreement is rare." *Kraemer v. Grant Cnty.*, 892 F.2d 686, 689 (7th Cir. 1990) (cleaned up); *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999). So, a plaintiff need not provide direct evidence of the agreement between the conspirators; circumstantial evidence may suffice. *Williams v. City of Chicago*, 2011 WL 133011, at *1 (N.D. Ill. Jan. 14, 2011) (plaintiff did not

41

have direct evidence of an express or implied agreement but presented enough circumstantial evidence to survive summary judgment); *McClure*, 720 N.E.2d at 258 (explaining that conspiracy usually must be established from circumstantial evidence and inferences drawn from evidence). Due to the difficulty of establishing a conspiracy with direct evidence, "the question [of] whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives." *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979), *rev'd in part on other grounds*, 446 U.S. 754 (1980)); *see also United States ex rel. McGee v. IBM Corp.*, 2017 WL 4467458, at *15 (N.D. Ill. Oct. 6, 2017).

Velez has presented sufficient circumstantial evidence of an agreement for the conspiracy claim to survive summary judgment. Similar to the plaintiff in *Williams*, Velez provides evidence that "defendant officers' similar stories diverge significantly from his own." 2011 WL 133011, at *1 (cleaned up). Viewing the evidence in the light most favorable to Velez, a jury could reasonably conclude that Bocardo suppressed the fact that Mejia had identified someone other than Velez; Bocardo fabricated the grounds (the clipboard identification) to suspect Velez in the first place; Bocardo told Mejia to pick Velez at the lineup in front of Cirone; Bocardo and Dyra spoke with County Detectives Davis and Sullivan, which led to the fabricated hospital confession, disputed by both Velez and Izquierdo; Bocardo and Goldish fabricated the Izquierdo Statement and pressured Izquierdo to sign it; and Bocardo and Dyra fabricated the

Velez Statement to support the fabricated confession. "The existence of a mutual understanding can be inferred from evidence of joint conduct that is unlikely to have occurred absent the existence of a conspiratorial agreement." *Id.* at *1 (cleaned up). If the jury finds Velez's version of events credible, then the evidence presented (along with the stark contrast between Velez, Izquierdo, and Mejia's accounts versus the Defendants' version) is enough to, at least circumstantially, support a finding that Defendants had a conspiratorial agreement. A jury could reasonably conclude the Chicago Officers reached an agreement with Davis, Sullivan, and Goldish to violate Velez's constitutional rights. Summary judgment on Velez's conspiracy claims against the remaining Chicago Officers is denied.

## B. ASA Goldish

### 1. Fabrication of Evidence

Moving on to the claims against former prosecutor Goldish, Velez bases the fabrication claim (Count 1) against her primarily on Izquierdo's statement. Goldish argues that there is no evidence showing that she "did anything other than review reports, interview witnesses, memorialize witness statements, and recommend charges with the approval of a supervisor." Goldish Mot. Summ. J. at 10. But a reasonable jury could conclude that Goldish fabricated the statement, and so the fabrication claim against Goldish survives summary judgment.

"A fabrication-of-evidence due process violation occurs when the criminal defendant is harmed by 'the police or prosecutor who manufactures evidence that he knows to be false.'" *Chatman v. City of Chicago*, 2015 WL 1090965, at *6 (N.D. Ill.

43

Mar. 10, 2015) (quoting *Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014)). Through Izquierdo's testimony, Velez has presented evidence that Goldish began writing the statement before meeting with Izquierdo, and that upon Izquierdo entering the room with Goldish, Goldish just gave her name and immediately told Izquierdo, "Okay. I'm going to write this down. And I just need you to sign here, and you can go home." PSOAF ¶ 68; Izquierdo Dep. Tr. at 60:14–61:3, 257:17–22. Izquierdo denies that the contents of the Izquierdo Statement came from her and denies that the contents are accurate. PSOAF ¶ 72; Izquierdo Dep. Tr. at 66:5–67:3, 72:6–73:6, 79:20–81:3. Velez also points to the coercive conditions in which Izquierdo signed the statement, as well as Izquierdo's testimony that she was told she could go home *after* she signed the statement. PSOAF ¶¶ 70–71; Izquierdo Dep. Tr. at 254:15– 255:1, 260:13–24, 262:8–10, 265:1–22, 266:2–10, 267:13–15 (testifying that she "pretty much had to [sign the statement] so [she] could leave").

To be sure, Velez's version of events is directly contradicted by Goldish's. Goldish contends that the Izquierdo Statement is based on responses from Izquierdo; Goldish did not start writing the statement until after talking with Izquierdo; Izquierdo never asked to go home or complained about pain or mistreatment by the police; and Izquierdo was forthcoming. GSOF ¶¶ 47–48; Goldish's Resps. PSOAF ¶¶ 68, 70–72, 75; Goldish Dep. Tr. at 190:1–191:25, 194:6–13, 211:7–16, 212:19–22, 214:7–216:13, 220:5–18; R. 302-31 at T-109:7–12, T-140:13–24. But, as described above, Velez presents sufficient evidence of a genuine fact dispute on fabrication. A reasonable jury could find that Goldish wrote the Izquierdo Statement containing

44

false statements that did not come from Izquierdo, and then Goldish (along with Bo-cardo) pressured Izquierdo to sign a false statement.

Goldish argues that Velez fails to show that Goldish caused Izquierdo to adopt statements that Goldish *knew* to be false. R. 346, Goldish Reply at 8 (citing *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014)). In *Petty*, the Seventh Circuit explained that "a prosecutor fabricating evidence that she knows to be false is different than getting a reluctant witness to say what may be true." 754 F.3d at 422 (cleaned up). But here, Izquierdo's testimony asserts that Goldish did not merely get a reluctant witness to say what may be true or simply memorialize an interview, but instead drafted the statement herself with details not told to her by Izquierdo and pressured Izquierdo to sign the statement containing those details that Izquierdo denies. Although Izquierdo has testified that Velez told her that he blamed himself for her getting shot, that self-blame is completely different from Velez telling Izquierdo that he blamed himself because she was shot due to him "[shooting] one of the Kings" because "the Kings had killed [Gent Velez]." CPDSOF ¶ 114; Izquierdo Statement at CITY000103–004. Velez has presented sufficient evidence from which a reasonable jury could find that Goldish knew the Izquierdo Statement was false, and thus the fabrication claim against Goldish may proceed. *See Gray*, 2022 WL 910601, at *10 (plaintiff "need not have a smoking gun or an admission to prove knowledge.").

### 2. Absolute Immunity and Qualified Immunity

Neither absolute nor qualified immunity protect Goldish here. Goldish argues that absolute immunity applies because she did nothing more than "review reports,

interview witnesses, memorialize witness statements, and recommend charges with the approval of a supervisor." Goldish Mot. Summ. J. at 6, 10. Goldish contends that this conduct is "intimately associated with the judicial phase of the criminal process," so absolute immunity applies. Goldish Mot. Summ. J. at 6; *Smith v. Power*, 346 F.3d 740, 742 (7th Cir. 2003) (explaining that prosecutors are absolutely immune from § 1983 suits for monetary damages for conduct intimately associated with the judicial phase). Absolute immunity, however, does not shield a prosecutor whose acts are *investigative* and who fabricate evidence during the "preliminary investigation of an unsolved crime." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 275–76 (1993).

Velez presents sufficient evidence to show that Goldish's acts were investigative, and thus not covered by absolute immunity. Goldish did not just analyze evidence and memorialize the statement in her prosecutorial function, but instead allegedly fabricated the Izquierdo Statement and participated in coercing Izquierdo to sign the statement. *See supra* § III(B)(1). This type of conduct "distinguishes [Goldish] from a prosecutor who 'simply evaluated the evidence assembled.'" *Orange v. Burge*, 2008 WL 4443280, at *10 (N.D. Ill. Sept. 29, 2008) (quoting *Spiegel v. Rabinovitz*, 121 F.3d 251, 254 (7th Cir.1997)). A reasonable jury could infer from the evidence that Goldish acted in an investigative capacity by, among other things, "participating in the creation of new evidence." *Serrano v. Guevara*, 2020 WL 3000284, at *23 (N.D. Ill. June 4, 2020); *see also Orange*, 2008 WL 4443280, at *10 (denying absolute immunity because prosecutor "actively assisted in gathering the evidence that would later form the basis of the charges against [plaintiff]"). In sum, absolute

46

immunity does not apply because a reasonable jury could infer that Goldish fabricated the statement and coerced Izquierdo, acts not covered by absolute immunity. *See*, *e.g.*, *Lewis v. Mills*, 677 F.3d 324, 331 (7th Cir. 2012) ("[A] showing that a prosecutor investigated and fabricated evidence against a target would automatically defeat absolute prosecutorial immunity."); *Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1051 (N.D. Ill. 2016) (denying absolute immunity because "there are facts from which a jury could infer that the ASAs participated in coercive interrogations, that they fabricated the confessions, and that they reduced the confessions to writing so the codefendants could sign them").

Turning to qualified immunity, Goldish does not address in detail the qualified immunity claim. In any event, for the same reasons explained in § III.A.7, qualified immunity does not apply to Goldish. *See Brown*, 633 F. Supp. 3d at 1154 ("When a prosecutor acts as an investigator rather than as a legal advocate, he is entitled to qualified immunity to the same extent as police officers carrying out those same duties."). Velez presents sufficient evidence from which a reasonable jury could infer Goldish fabricated evidence. Because fabrication of evidence violates "clearly established constitutional rights," qualified immunity does not apply to Goldish. In *Brown*, the court reasoned that because it was "beyond reasonable dispute that fabricating evidence and conspiring to frame a suspect violates an individual's constitutional rights," an ASA was not entitled to qualified immunity on plaintiff's claims for fabrication, coercive interrogation, or conspiracy. *Id.*; *see also Dominguez v. Hendley*, 545 F.3d at 589; *Whitlock*, 682 F.3d at 580–82, 586.

### 3. Failure to Intervene

Next, Velez's failure-to-intervene claim against Goldish must be dismissed. It is true that Velez presents evidence from which a reasonable jury could infer that Goldish fabricated the Izquierdo statement, coerced Izquierdo to sign the fabricated statement, and conspired with Bocardo to fabricate the statement. But an intervention claim does not apply because Goldish cannot fail to intervene in her own conduct. *See Thompson*, 2013 WL 3337801, at * 13 (dismissing failure-to-intervene claim because officer-defendant "cannot possibly intervene to stop his own conduct"); *see also Rosario*, 2012 WL 1319806, at *9 n.2. This particular theory against Goldish will not be sent to the jury.

### 4. Intentional Infliction of Emotional Distress

The Court denies summary judgment on Velez's emotional-distress claim (Count 7) as to Goldish. Goldish argues that there is "nothing in the record that suggests Goldish's conduct was extreme and outrageous" and that she was acting within her "core functions as a prosecutor." Goldish Mot. Summ. J. at 14. To repeat, however, Velez presents sufficient evidence from which a reasonable jury could infer that Goldish fabricated the Izquierdo Statement and coerced Izquierdo to sign it. *See supra* § III(B)(1); PSOAF ¶¶ 68, 72; Izquierdo Dep. Tr. at 60:14–61:3, 66:5– 67:3, 72:6–73:6, 79:20–81:3, 254:15–255:1, 260:13–262:10, 257:17–22, 265:1–22, 266:2–10, 267:13–15. As previously explained, *see supra* § III(B)(2), the fabrication goes well beyond Goldish's core functions as a prosecutor to participating in the creation of evidence, and allegedly fabricated evidence at that. A reasonable jury could find that Goldish's

alleged acts, including fabrication, were "extreme and outrageous" to sustain an emotional distress claim. *See Rosario v. City of Chicago*, 2012 WL 1319806, at *11 (N.D. Ill. Apr. 17, 2012) ("Allegations that a state official fabricated false or misleading evidence of guilt ... would be sufficiently 'outrageous' to support an IIED claim.") (cleaned up); *see also Carroccia*, 249 F. Supp. 2d at 1028.

### 5. Conspiracy

Marching on, Goldish argues that the federal conspiracy claim (Count 4) fails because Velez fails to show an underlying constitutional violation and fails to show that the Defendants agreed to inflict the constitutional harm. Goldish Mot. Summ. J. at 12. As previously explained, *see supra* § III(B)(1), Velez presents sufficient evidence of a due-process violation (fabrication of evidence) by Goldish to survive summary judgment. So there is an underlying violation on which to premise the conspiracy claim.

On the conspiratorial agreement, at this summary judgment stage, Velez presents sufficient circumstantial evidence of an agreement between the Chicago Officers and Goldish to violate Velez's due-process rights. A plaintiff asserting a conspiracy claim need not provide direct evidence; circumstantial evidence may suffice. *Williams*, 2011 WL 133011, at *1; *Hampton*, 600 F.2d at 621. Drawing all reasonable inferences in favor of Velez and viewing the evidence in the light most favorable to him, a reasonable jury could infer an agreement based on evidence that Goldish spoke with Kato upon arriving at Area 4 before interviewing Izquierdo; Bocardo was in the room when Goldish interviewed Izquierdo; the allegedly fabricated Izquierdo

Statement has a narrative consistent with the one in the CCSR with the Velez hospital statement; and Bocardo and Goldish coerced Izquierdo into signing the statement. *See* GSOF ¶ 6; PSOAF ¶¶ 68, 107; Pl.'s Resp. CPDSOF ¶ 113; Goldish Dep. Tr. at 57:1–25, 58: 1–14; Kato Dep. Tr. at 156:2–5; Izquierdo Dep. Tr. at 60:14–61:3, 257:17–22, 260:13–24, 261:7–15, 267:13–15.

Velez's allegations on the Goldish and Bocardo interviews of Izquierdo conflict with Goldish and the Chicago Officers' accounts. Goldish and the Chicago Officers contend that Goldish just summarized what Izquierdo had told her into the statement and the statement came directly from Izquierdo. Goldish's Resps. to PSOAF ¶¶ 68, 72; CPDSOF ¶ 113; Bocardo Dep. Tr. at 242:20–243:4; Goldish Dep. Tr. at 198:25–201:3, 212:19–22; R. 302-35 at Q-180:17–20; R. 302-31 at T-112:24–113:15, T-138:21–23. If the jury finds Velez's version of events credible, then the evidence presented (along with the stark contrast between Velez and Izquierdo's accounts versus the Defendants' version) is enough to, at least circumstantially, support a jury finding that Goldish entered into a conspiratorial agreement with the Chicago Officers.

The state law conspiracy claim likewise survives summary judgment. An Illinois state law conspiracy claim can also be established from circumstantial evidence and inferences drawn from that evidence. *See McClure*, 720 N.E.2d at 258. As explained above, Velez presents sufficient evidence of an agreement between Goldish and the Chicago Officers for a state law conspiracy claim to survive summary judgment.

### C. Sheriff Detectives, Sheriff Dart, and the County

Velez concedes dismissal of the *Brady*, emotional distress, and malicious pros-
ecution claims against the Sherrif Detectives, and concedes that Davis and Sullivan
did not coerce any witness. Pl.'s Resp. Defs.' Mot. Summ. J. 2, 23 nn.1, 4. Of the re-
maining claims, the Court denies in part and grants in part the motion for the reasons
below.[8]

### 1. Fabrication of Evidence

The fabrication claim (Count 1) against Davis and Sullivan is a closer call than
the case against the Chicago Officers, but a reasonable jury could find that Davis and
Sullivan fabricated the Velez hospital statement. Velez alleges that the following
statements attributed to Davis and Sullivan were fabricated, specifically, that Davis
and Sullivan interviewed Izquierdo; that Davis and Sullivan saw Izquierdo and Velez
speaking Spanish in front of a nurse; and that the nurse told Davis and Sullivan that
Velez told Izquierdo that she was shot because of something Velez had done days
earlier.

Velez presents sufficient evidence at this stage that, in reality, Davis and Sul-
livan did not visit Izquierdo at the hospital and did not witness any conversation
between Izquierdo and Velez, let alone one where Velez confessed to Izquierdo.

---

[8]The Sheriff Detectives, Sheriff Dart, and the County argue that Paragraphs 15, 16,
19, 25, 30, 33, 36 of the CCSDSOF (the Statement of Facts) should be deemed admitted. The
Court declines to deem those paragraphs admitted. The responses contain supplements to
cited facts and are proper. Also, the responses did not impede this Court from assessing
whether there is a genuine dispute and making a summary judgment determination.

Izquierdo has denied that police officers came to speak with her at the hospital and that any police officers were present during her conversation with Velez at the hospital. PSOAF ¶ 49; Izquierdo Dep. Tr. at 23:24–24:2, 31:4–12. And both Izquierdo and Velez have denied that Velez told her that she had gotten shot because he had done something days earlier. PSOAF ¶¶ 44, 46–47; Velez Dep. Tr. at 193:1–195:8 (testifying he only apologized to Izquierdo due to his gang affiliation and that he never explained to Izquierdo why he was sorry); Izquierdo Dep. Tr. at 25:6–26:21, 181:4–14, 192:20–195:14, 47:2–50:14 ("Q. And just to be clear: [Velez] never said it was his fault because of something that he had done … to the other side, or something like that? A. No. He never said that.") (cleaned up). Velez points out the Sheriff Detectives' report for the cemetery shooting does not mention Davis and Sullivan interviewing Izquierdo, nor Velez's allegedly inculpatory statements to Izquierdo at the hospital. R. 337-5.

Although it is true that Davis and Sullivan played no further role in the Hueneca investigation beyond speaking with the Chicago Officers about their alleged interview of Izquierdo, Velez has presented sufficient evidence that Davis and Sullivan were the source of the allegedly fabricated hospital confession, which was later cited at trial and in closing argument. *See* R. 302-40 at T-175:24–176:6, T-209:4–9 (prosecution citing alleged hospital statement as motive evidence and an admission of murder in closing argument). A reasonable jury also could conclude the hospital confession (1) provided critical motive evidence based upon which Bocardo would

later interview Izquierdo and (2) made it into the Izquierdo Statement, which was used at trial to secure Velez's conviction.

Velez raises sufficient evidence on the fabrication claim against the Sheriff Detectives to survive summary judgment. Both Velez and Izquierdo have disputed that Davis and Sullivan were present for their conversation and deny that Velez told Izquierdo she had gotten shot because of something he had done days earlier. PSOAF ¶¶ 44, 46–47, 49; Izquierdo Dep. Tr. at 23:24–24:2, 25:6–26:21, 31:4–12, 47:2–50:14; Velez Dep. Tr. at 181:4–14, 192:20–195:14. These accounts directly contradict the statements attributed to Davis and Sullivan. CPDSOF ¶¶ 93–94; CCSSOF ¶ 38; CCSR at 14; Bocardo Dep. Tr. at 248:22–250:8; Dyra Dep. Tr. at 228:3–22, 229:4–230:3. Also, Velez argues that the hospital statement was either fabricated by the Chicago Officers or the Sheriff Detectives—or both. Pl.'s Resp. Defs.' Mot. Summ. J. at 21. It is the jury's role to decide which set of Defendants (if any) are responsible—or if both are responsible as part of a conspiracy. The dispute on the fabrication claim boils down to witness credibility: Velez and Izquierdo's versions of events versus the CPD and CCSD Officers'. These "questions of witness credibility are reserved for the jury." *Mohr v. Chicago Sch. Reform Bd. of Trustees of Bd. of Educ. of City of Chicago*, 155 F. Supp. 2d 923, 926 (N.D. Ill. 2001) (cleaned up).

Lastly, the Sheriff Detectives argue that Velez and Izquierdo have both testified consistently with some portions of the account, specifically that Velez and Izquierdo spoke at the hospital in front of a nurse during which Velez apologized for her getting shot. This argument is unavailing, however, because testifying that Velez

53

apologized generally is far different from an account that Velez's apology contained an incriminating admission that Izquierdo was shot due to him shooting someone.

## 2. Deprivation of Liberty and Failure to Intervene

Next, the Court dismisses the claim for deprivation of liberty against the Sheriff Detectives due to the existence of probable cause, which bars this claim. *See supra* III(A)(5). Summary judgment is also granted on the failure-to-intervene claim against the Sheriff Detectives. Velez has enough evidence to convince a reasonable jury that Davis and Sullivan fabricated the hospital admission. But, as with Bocardo and Dyra, Davis and Sullivan cannot intervene in their own conduct. Thus, the failure-to-intervene claim against them is dismissed. *See Thompson*, 2013 WL 3337801, at *13 (dismissing failure-to-intervene claim with prejudice because officer-defendant "cannot possibly intervene to stop his own conduct"); *see also Rosario*, 2012 WL 1319806, at *9 n.2. A jury cannot reasonably infer Davis and Sullivan failed to intervene in their own conduct.

## 3. Qualified Immunity

Qualified immunity does not apply to the Sheriff Detectives.[9] As previously explained, *see* § III.A.7, qualified immunity generally does not shield officers who

---

[9]The Sheriff Detectives also argue that they are entitled to qualified immunity based on alleged unsettled law on whether officers from a single municipality can be liable for conspiring with one another. The Court concludes that, at the summary judgment stage, the fabrication and conspiracy claims against the individual detectives survive. But it might be appropriate, when this case approaches trial, for the defense to request a jury instruction on intra-corporate conspiracy (not using that legalese, of course). The Court need not decide this issue now.

fabricate material evidence. *See Dominguez*, 545 F.3d at 589 ("There was and is no disputing that [fabricating evidence and withholding material exculpatory evidence] violates clearly established constitutional rights."); *see also Brown*, 633 F. Supp. 3d at 1154 (no qualified immunity because "it is beyond reasonable dispute that fabricating evidence and conspiring to frame a suspect violates an individual's constitutional rights"). And Velez's due process rights were clearly established in 2001. *See, e.g.*, *Fields*, 740 F.3d at 1114.

### 4. Conspiracy

Velez's federal and state conspiracy claims against the Sheriff Detectives (Counts 4 and 10) survive summary judgment. The Sheriff Detectives argue that Velez's conspiracy allegations are speculative, and that Velez supposedly presents no evidence of a conspiracy. It is true that a viable conspiracy claim cannot be based on mere conjecture. But here, Velez has presented sufficient circumstantial evidence of a conspiratorial agreement to survive summary judgment on this claim. *See Kraemer*, 892 F.2d at 689 (noting that direct proof of conspiratorial agreement is rare); *McClure*, 720 N.E.2d at 258 (conspiracy usually must be established from circumstantial evidence); *Williams*, 2011 WL 133011, at *1.

Velez has presented sufficient evidence from which a reasonable jury could infer that (1) Bocardo and Dyra spoke with Davis and Sullivan and a product of that conversation was the allegedly fabricated Velez hospital admission; (2) Bocardo and Goldish fabricated the Izquierdo Statement that contains the hospital statement; and (3) Bocardo and Dyra fabricated the Velez Statement, which says that Latin King

members shot and killed Gent Velez and shot Izquierdo. Again, based on Izquierdo's own testimony, Velez presents evidence that Davis and Sullivan did not interview Izquierdo at the hospital and that Velez never told Izquierdo at the hospital that she had gotten shot because of something he had done. *See* PSOAF ¶¶ 44, 46–47, 49; Izquierdo Dep. Tr. at 23:24–24:2, 31:4–12, 47:2–50:14; Velez Dep. Tr. at 181:4–14, 192:20–195:14. Yet Bocardo and Dyra's conversation with Davis and Sullivan (reflected in the CCSR) says that Davis and Sullivan did interview Izquierdo in the hospital, Velez and Izquierdo had a conversation in Spanish in front of Davis and Sullivan, and a nurse later translated the conversation to the detectives, including relaying that Velez told Izquierdo she was shot because of something he had done on an earlier date. CPDSOF ¶¶ 93–94; CCSSOF ¶ 38; CCSR at 14; Bocardo Dep. Tr. at 248:22–250:8; Dyra Dep. Tr. at 228:3–22, 229:4–230:3.

Based on the record evidence and viewing the evidence in a light most favorable to Velez, a reasonable jury could infer that Davis and Sullivan reached an agreement with the Chicago Officers to fabricate the hospital admission. The circumstantial evidence presented is enough to support a reasonable jury finding that Davis and Sullivan had a conspiratorial agreement with the Chicago Officers. Summary judgment on the federal conspiracy claim is denied.

The state law conspiracy claim also survives summary judgment. The state law conspiracy claim can also be established from circumstantial evidence and inferences drawn from that evidence. *See McClure*, 720 N.E.2d at 258. As explained above,

Velez presents sufficient evidence of an agreement between Davis and Sullivan and the Chicago Officers for the state law conspiracy claim to survive summary judgment.

### 5. Respondeat Superior and Indemnification

Cook County argues that the respondeat superior claim (Count 9) against it must be dismissed because the County is not responsible for the actions of the Cook County Sheriff's officers. R. 313 (CCSD Mot. Summ. J. Mem.) at 15 (citing *Moy v. County of Cook*, 640 N.E. 2d 926 (Ill. 1994)). The County's argument is well-supported by the case law, so the respondeat superior claim against the County is dismissed. *See Moy*, 640 N.E.2d at 930, 931 (affirming dismissal of vicarious liability claims against County because the County Sheriff "is not in an employment relationship with the County of Cook ... [t]herefore, the county may not be held vicariously liable for the sheriff's alleged negligent conduct"); *see also O'Connor v. County of Cook*, 787 N.E.2d 185, 190 (Ill. App. 2003) (holding Cook County did not "bear any vicarious liability for the acts and omissions of the Sheriff and his staff"); *Mohammed v. West-Care Found., Inc.*, 2018 WL 2388407, at *4 (N.D. Ill. May 25, 2018) ("It is well established that there is no vicarious liability against a county for the actions of elected officials and their deputies in their individual capacities") (cleaned up). "This is also true for supervisors who are named in an attempt to shift liability from employee-tortfeasors in § 1983 actions and so Sheriff Dart also may not be liable under a theory of respondeat superior." *Mohammed*, 2018 WL 2388407, at *4 (N.D. Ill. May 25, 2018). Accordingly, the respondeat superior claim is dismissed against Cook County and the Sheriff's Office on the federal law claims. For the state law claims against

the remaining Chicago Officers, respondeat superior liability still remains in the case as to Chicago, but whether that should be presented to the jury or bifurcated will be decided at the pretrial-conference stage.

Summary judgment is not granted on the indemnification claim (Count 11) against Cook County and Sheriff Dart. The County and Sheriff Dart argue for dismissal of the claim because Velez cannot prove Davis and Sullivan are liable for any misconduct. Because Velez has presented sufficient evidence on the fabrication claim against Davis and Sullivan, this argument fails. The indemnification claim may proceed. *See Carver v. Sheriff of LaSalle Cnty.*, 787 N.E.2d 127, 141 (Ill. 2003) (holding that because "the office of the sheriff is funded by the county, the county is therefore required to pay a judgment entered against a sheriff's office in an official capacity"); *Carver v. Sheriff of LaSalle Cnty.*, 324 F.3d 947–48 (7th Cir. 2003) (per curiam); *Wilson v. Cook County*, 2020 WL 5642945, at *3 n.3 (N.D. Ill. 2020); *Harris v. Cnty. of Cook*, 2022 WL 425716, at *12 (N.D. Ill. Feb. 11, 2022) (noting "the County remains a proper defendant because state law requires the County to pay judgments entered against the Sheriff in his official capacity").

### D. City of Chicago

Velez seeks to hold Chicago liable under *Monell* for his constitutional injuries under the theory that the City was deliberately indifferent to a widespread pattern and practice of (1) fabricating evidence and coercing and pressuring witness to provide statements officers knew to be false; (2) failing to investigate and discipline CPD officers for misconduct; (3) condoning a code of silence; (4) withholding material,

exculpatory evidence that a witness had been coerced, pressured, or induced to provide false statements; and (5) failing to supervise CPD officers to prevent misconduct.

A municipality or local government cannot be liable under § 1983 unless the underlying constitutional deprivation is caused by a municipal policy, custom, or practice. *See Monell*, 436 U.S. 658; *see also Flores v. City of S. Bend*, 997 F.3d 725, 731 (7th Cir. 2021). Three types of action by a municipality support municipal liability under § 1983: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (cleaned up). If Velez relies on a widespread policy or custom, then "he must prove three elements: (1) a widespread policy or custom, (2) deliberate indifference, and (3) causation." *Brown*, 633 F. Supp. 3d at 1175.

Velez's evidence on the *Monell* claim includes prior complaints filed against certain Chicago police officers; a low rate of sustained complaints against police officers; and expert reports.[10] Velez's expert, Anthony Finnell, is a former supervising investigator for Chicago's Independent Police Review Authority, homicide

---

[10]Because this case involves fabrication claims (not suggestive identification), Dr. Nancy Steblay's expert report is not probative for summary judgment purposes. The Court does not rely on Dr. Steblay's report for summary judgment analysis and thus need not address the City's challenge to Dr. Steblay's opinion.

investigator, and training officer. *See* R. 329-8. He cites a 2017 DOJ Report and discusses events from the 1970s, 1980s, and early 1990s. *See* R. 329-7 (Finnell Rep.) at 23, 26, 36. But these events are too remote in time from the underlying misconduct alleged here—mostly in 2001—to be relevant in establishing a pertinent practice or custom. *See Brown*, 633 F. Supp. 3d at 1148, 1150 (noting that reports concerning events substantially before or after the events at issue were "immaterial" to *Monell* claim analysis); *Milan v. Schulz*, 2022 WL 1804157, at *5 (N.D. Ill. June 2, 2022) (explaining that the 2017 DOJ Report focused on police officer shootings and use of force was not relevant to *Monell* claim in case involving claims of fabrication and withholding of evidence).

Also, Velez fails to present evidence sufficient for a reasonable jury to find a widespread practice of fabrication. Finnel points to prior complaints against Bocardo, Dyra, and Kato, but it is unclear what conduct all of the complaints targeted. R. 328 (PSOAF to the City) ¶ 54; Finnell Rep. at 49–54; R. 329-21; R. 338-1 (Dyra CR Histories); R. 338-2 (Kato CR Histories). Finnel lists examples of the complaints, but of those examples, only a few involved fabrication, and of those few, three are against Kato and concern incidents from 1992 to 1994, and one is against Bocardo and Dyra in 2002. *See* Finnell Rep. at 50–53. *See Thomas v. City of Markham*, 2017 WL 4340182, at *4 (N.D. Ill. Sept. 29, 2017) ("Allegations of general past misconduct or allegations of dissimilar incidents are not sufficient to allege a pervasive practice and a defendant's deliberate indifference to its consequences.") (cleaned up).

What's more, the civil lawsuits cited by Velez do not support a widespread practice of fabrication, because many of the cases settled or had judgment entered in favor of the *defense*, and the few in favor of plaintiffs did not involve fabrication. *See* Finnell Rep. at 54–56; *Miller v. City of Harvey*, 2015 WL 5144476, at *4 (N.D. Ill. Aug. 31, 2015) (explaining proffered evidence of settled cases insufficient to survive summary judgment on *Monell* claim); *Thomas*, 2017 WL 4340182, at *4–5 (reasoning most of lawsuits against defendant-officer were too remote in time from plaintiff's lawsuit and involved different claims "not sufficiently similar to infer either a widespread practice of using excessive force [or deliberate indifference]").

Lastly, Velez relies on the low sustained rates of complaint registers (CRs), that is, disciplinary charges, from 1996 to 2001 for his *Monell* claim. PSOAF ¶ 32. In that five-year span, there were 18 total allegations of fabricated statements (17 external, 1 internal) of which the one internal allegation was sustained post-investigation and the 17 external ones were not. *Id.*; Finnell Rep. at 8, 25. There were also three allegations (all external) of fabricated statement or fabricated evidence, of which none were sustained. Although "there is no clear consensus as to how frequently [conduct] must occur to impose *Monell* liability," a plaintiff still must demonstrate "that there is a policy at issue rather than a random event." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). Here, Velez fails to present sufficient evidence from which a reasonable jury could conclude fabrication goes beyond "individual misconduct by police officers (that is covered elsewhere under § 1983) [to] a *widespread practice* that permeates a critical mass of an institutional

61

body." *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015) (emphasis in orig.); *see also Bryant v. Whalen*, 759 F. Supp. 410, 412 (N.D. Ill. 1991) ("Statistics of unsustained complaints of excessive force, without any evidence that those complaints had merit, will simply not suffice to establish municipal liability under § 1983").

Velez, however, *does* present sufficient evidence of *Monell* liability based on a failure to investigate and a failure to discipline specific officers. Velez presents evidence that despite incurring 42 CRs, Kato had never been disciplined by CPD, and cites Kato's testimony that he does not recall a supervisor *even speaking* with him about complaints against him for coercion. Finnell Rep. at 49; PSOAF to the City ¶¶ 54–56; Kato Dep. Tr. at 213:16–215:3, 254:1–15, 255:10–18; Kato CR Histories. The Plaintiff's expert, Anthony Finnell, opines on the integrity of CPD misconduct investigations from 1996 to 2001, and finds that out of 2,679 allegations, only 111 were sustained after initial investigation and only 62 were sustained after external review (of which 12 led to discipline). *See* PSOAF to the City ¶ 38; Finnell Rep. at 7, 24–25, 58. Finnell also finds low rates of sustained complaints that are made by the public versus internally, procedural deficiencies of investigations, and lengthy delays of investigations. *See* Finnel Rep. at 31, 40–46. Viewing the evidence in a light most favorable to Velez, Velez presents sufficient evidence to survive summary judgment on his *Monell* claim against the City based on a failure to investigate and to discipline theory. *See, e.g.*, *Washington*, 2022 WL 4599708, at *16–17 (concluding Plaintiff presented sufficient evidence for *Monell* claim based on expert opinion on deficiencies of investigations and discipline); *Marcinczyk v. Plewa*, 2012 WL 1429448, at *3–4 (N.D.

62

Ill. Apr. 25, 2012) (concluding plaintiff presented sufficient evidence for *Monell* claim, including evidence indicating that "minuscule percentage of civil rights complaints are found to be meritorious after investigations and that officers who have complaints lodged successfully against them are subject to only minimal discipline").

A reasonable jury could find a widespread failure to investigate and to discipline caused the Chicago Officers to believe that their alleged "misconduct would not be discovered and that, even if discovered, [they] would not face any effective disciplinary action resulting from such misconduct." *Marcinczyk*, 2012 WL 1429448, at *4; *see LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 991 (N.D. Ill. 2017) ("As long as the causal link is not too tenuous, the question [of] whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury.") (cleaned up).

Having said that, Velez does not present sufficient evidence on the code-of-silence theory of his *Monell* claim. To support a widespread practice of condoning a code of silence, Velez cites 2015 statements from then-City of Chicago Mayor Rahm Emanuel, a 2016 statement by the president of the policers officers' union in Chicago, the 2017 DOJ Report, the 1990 Goldston Report, and a 1991 statement from the Christopher Commission. This evidence substantially pre-dates or post-dates the alleged misconduct against Velez in 2001, so the evidence is not relevant. *See Bedford v. Dewitt*, 2023 WL 2561757, at *23 (N.D. Ill. Mar. 17, 2023) (reasoning that the plaintiff fails to meet burden to "establish that such a widespread practice existed at the time relevant to these events"). Velez also cites the absence of internal allegations of

63

lineup and photo array misconduct as supporting a code of silence. This, though, in addition to conclusory statements in the report about a code of silence existing and citations to statements made long before or after the alleged misconduct, is insufficient to sustain the code-of-silence theory to survive summary judgment.

Velez's *Monell* claim also fails at this stage to the extent it relies on a widespread failure to supervise or failure to train. Velez fails to marshal sufficient evidence connecting an alleged widespread failure to train or to supervise with the constitutional violations against him. To support the theory, Velez cites a policy stating that detectives should function with autonomy; deposition testimony that detectives conduct their own lineups; an expert report finding inadequate supervision of lineups; and the alleged little direction from supervisors on Velez's lineup. Still, Velez fails to present sufficient evidence from which a reasonable jury could conclude a *widespread* practice of failing to train or to supervise, or that this alleged failure directly caused his constitutional violations. *See Milan*, 2022 WL 1804157, at *3, 6 (explaining that plaintiff failed to provide facts linking failure to train to his injuries, which is required to "permit an inference that the municipal entity has chosen an impermissible way of operating") (cleaned up); *Barnes v. City of Centralia*, 943 F.3d 826, 832 (7th Cir. 2019) (affirming summary judgment where plaintiff failed to provide evidence that the city failed to properly train its police "much less evidence that a failure to train or supervise was the moving force" behind her constitutional injury).

The *Monell* claim also fails to the extent that it relies on a *Brady* theory. Velez has not presented sufficient evidence from which a reasonable jury could infer a

64

widespread practice of withholding *Brady* evidence. The Finnell Report addresses *Brady* violations only in passing and does not analyze *Brady* withholdings in its analysis of allegations against Chicago police officers. Moreover, Velez does not substantively respond to the City's motion on this theory.

In sum, the *Monell* claim survives summary judgment only to the extent that it is based on a widespread practice of a failure to investigate and to discipline for fabrication of evidence. (The City does not contest the respondeat superior and indemnification claims in its motion, so those claims survive against the City.)

## IV. Conclusion

The Defendants' motions are granted in part and denied in part. For the Chicago Officers, summary judgment is granted on (a) all claims against Officers Patrick O'Donovan, Bradul Ortiz, Michael Walsh, John A. Cruz, Victor Perez, D. Wolverton (#20014), A. Jaglowski (#20196), Sergeant Denis Walsh, and Lieutenant John Farrell; (b) all claims against Sam Cirone and Kriston Kato, except for the failure to intervene; (c) the failure-to-intervene claim against Officers Michael Bocardo and Michael Dyra; (d) the deprivation of liberty claim; and (e) the malicious prosecution claim. With regard to Bocardo and Dyra, summary judgment is denied on the claims for fabrication, emotional distress, and conspiracy, and as to Bocardo, on the *Brady* claim as well.

With regard to former prosecutor Goldish, summary judgment is denied on the claims for fabrication, emotional distress, and conspiracy; and granted on the failure-to-intervene claim. For Sheriff Detectives Davis and Sullivan, summary judgment is

granted on the claims for failure to intervene and deprivation of liberty (and, as conceded by Velez, on the claims for emotional distress, malicious prosecution, and *Brady*); and denied on the claims for fabrication and conspiracy. For the County and the Sheriff's Office, summary judgment is granted on respondeat superior and denied on the indemnification claim. Finally, with regard to the City, summary judgment is denied on the *Monell* claim based on the failure to investigate and to discipline for fabrication of evidence, but on all other premises, summary judgment is granted.

With this decision in place, the parties shall engage in settlement negotiations, starting with a reasonable demand from Velez by October 18, 2023, and a response from the defense by November 6, 2023. The defense shall file email the demand and response to the Court's Proposed Order email account on November 6, 2023. The parties shall file a status report on November 10, 2023. The status hearing of October 6, 2023, is reset to November 17, 2023, at 8:30 a.m.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 30, 2023